## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF VIRGINIA
### Roanoke Division

BAE SYSTEMS ORDNANCE SYSTEMS, INC.,

*Plaintiff*,

v.

FLUOR FEDERAL SOLUTIONS, LLC,

*Defendant*.

*Serve:*

Fluor Federal Solutions, LLC
c/o Corporation Service Company
100 Shockoe Slip Fl 2,
Richmond, VA, 23219 - 4100

Case No. ___7:20cv00587___

## COMPLAINT

BAE Systems Ordnance Systems, Inc. ("BAE OSI"), by counsel, files this Complaint against Defendant, Fluor Federal Solutions, LLC ("Fluor").  In support of this Complaint, BAE OSI states as follows:

## OVERVIEW OF ACTION

1.   This action arises out of Fluor's breaches of its firm fixed price Design/Build Subcontract ("Subcontract") with BAE OSI to design, construct, and partially commission a new nitrocellulose manufacturing facility ("the NC facility") at the Radford Army Ammunition Plant ("RFAAP") in Radford, Virginia (the "Project").

1

2.   BAE OSI selected Fluor as a bidder for the Subcontract because it is one of the world's largest publicly-traded engineering, procurement and construction firms, and claimed to have the required subject-matter experience to perform design-build work on process plants similar to the NC facility.

3.   In addition, at the time BAE OSI selected Fluor for bidding, Fluor was constructing a cutter warehouse and mat foundations at RFAAP under a separate subcontract with BAE OSI.

4.   BAE OSI, therefore, had a reasonable belief that Fluor had the experience and subject-matter expertise it represented itself as having in designing and constructing process plants and was comfortable eventually awarding the Subcontract to Fluor because of its claimed and represented experience, expertise and its on-going work for BAE OSI at RFAAP.  BAE OSI also was aware that Fluor had substantial experience as a prime contractor performing on various construction projects with the US Army.

5.   BAE OSI's comfort with Fluor turned out to be misplaced.

6.   Under the Subcontract, Fluor was required to complete its work on the Project by July 30, 2018, subject to time extensions for reasons specified in the Subcontract, if any.  No justifiable ground for time extensions occurred during the Project.

7.   Fluor, however, without legal or contractual excuse, failed to complete its work by the July 30, 2018 contract deadline.  In fact, as of the date of this Complaint, Fluor still has not completed its work.  Fluor currently forecasts finishing its work in December 2020 – an unexcused delay of nearly two-and-a-half years.

8.   Fluor's unexcused delay was caused by a combination of factors solely within its control, including: (a) initially underbidding the Project, which prevented Fluor from devoting the necessary resources to timely complete its work; (b) failing to staff the Project with an experienced

2

program management team, and design and engineering team, which caused years of delay to the critical design process; (c) engaging in a "slow-walk" strategy intended to coerce BAE OSI to pay Fluor substantial additional sums in excess of the Subcontract's mutually agreed, firm fixed price; (d) refusing to add additional resources and shifts as contractually required to recover schedule; and (e) abysmally mismanaging its own workforces and those of its lower-tier subcontractors.

9.   As a result of Fluor's nearly two-and-a-half-year unexcused delay, BAE OSI has incurred millions of dollars in costs and expenses, including project management costs that would have been avoided had Fluor performed its contractual duties to meet the July 30, 2018 contract completion deadline.

10. Without the additional resources that BAE OSI devoted to the Project, the Project would have been delayed beyond the currently forecasted completion date, and BAE OSI would likely have faced a contractual termination for default by its United States Army customer.

11. In addition to the additional project management and other costs, BAE OSI was required to provide the Army at least $9 million in concessions to avoid a devastating termination for default resulting from Fluor's unexcused delay.

## **PARTIES**

12.  BAE OSI is a Delaware corporation with its principal place of business located at 4509 West Stone Drive, Kingsport, Tennessee 37660.  BAE OSI is an award-winning global leader in the development of next-generation explosives and propellants.  In addition to its energetic material manufacturing expertise, BAE OSI manages two ammunition plants for the Army, RFAAP in Radford, Virginia and the Holston Army Ammunition Plant in Kingsport, Tennessee.  BAE OSI's services include modernization program management, energetics research and development, and inventory management.

13. Fluor is a limited liability company organized under the laws of the State of South Carolina with its principal place of business located at 100 Fluor Daniel Drive, Greenville, South Carolina 29607. Fluor's single member is Fluor Enterprises, Inc. Fluor Enterprises, Inc. is a corporation formed under the laws of the State of California with its principal place of business in Irving, Texas. On its corporate parent's website, fluor.com, Fluor touts that it specializes in "delivering engineering, procurement, and construction services for clients around the world." Among other things, Fluor's website states that it "Designs, Builds, and Maintains the World's Toughest Projects" and "is a global, publicly-traded engineering, procurement, construction (EPC) and maintenance company. Fluor works with clients in diverse industries around the world to design, construct and maintain their capital projects." Fluor's Government website features work on the RFAAP project, stating that it "is providing engineering, procurement and construction (EPC) services responsible for the design/build of several new structures on the existing site [including the] Multi-phase new Nitrocellulose Manufacturing Facility." Fluor continues that it "coordinated concurrent design and construction activities by employing a mix of self-perform and subcontracts" as part of its "Firm Fix Price, Design/Build Contract" to "design/build . . . several new structures on the existing" RFAAP site.[1]

## JURISDICTION, VENUE AND GOVERNING LAW

14. This Court has subject matter jurisdiction over this dispute under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000.00 exclusive of interest, costs and attorneys' fees, and complete diversity of citizenship exits between BAE OSI and Fluor.

15. Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because: (a) a substantial part of the events giving rise to the claims occurred in this district; (b) a substantial amount of the work

---

[1] https://www.fluor.com/projects/bae-radford-army-ammunition-plant (accessed Sept. 30, 2020)

performed under the Subcontract was performed in this judicial district; and (c) Fluor breached the Subcontract in this judicial district.  In addition, Article 19(b) of the General Provisions of the Subcontract requires all actions arising out of the Subcontract to be filed in a court of competent jurisdiction in Virginia, the state where the Project was performed.

16. Under Section 16(a) of Section 1B of the General Provisions of the Subcontract, the Subcontract is to be interpreted under the laws of the Commonwealth of Virginia as the state in which the Contract is performed.

17. The parties waived their rights to a jury trial pursuant to Section 19(c) of the General Provisions of the Subcontract.

## FLUOR'S BIDDING STRATEGY FOR FIXED PRICE DESIGN/BUILD WORK

18.  To be awarded a design-build construction contract, based on a firm fixed price, the successful contractor obviously must submit the winning bid.  But winning the bid is not the only factor that must be considered in the bid's preparation.  The successful contractor must also prepare a bid, based on its sound judgment and experience that accurately projects the actual costs that will be incurred in designing and constructing the project.  Otherwise, the winning bid will not provide sufficient funds to permit completion of the project for the bid price, a situation that can incentivize a desperate contractor to devise meritless "change" claims to fund the shortfall or face massive losses.

19. As Fluor is well-aware, fixed-price design/build contracts, such as the contract awarded to Fluor for this Project, are intended to minimize risk for the owner or operator of the project (such as BAE OSI) and to shift that risk to the contractor.  This is appropriate because contractors like Fluor are expected to leverage their superior knowledge, experience and expertise in designing, managing and building large, complex projects such as the NC facility to prepare a competitive

bid, taking into account all the resources and staffing required to timely complete the project.  In fact, in Fluor's proposal for this Project, Fluor highlighted its processes and procedures derived from its years of experience for assessing "the best case, worst case and most likely case durations of the major critical path activities so that schedule risk can be monitored and mitigated and _**on-time schedule performance assured**_."[2]  (Emphasis added).

20. Indeed, in its Annual Form 10-K for 2015, the year that BAE OSI awarded Fluor the Subcontract for the Project, Fluor's parent company acknowledged the risks of underbidding a fixed-price contract, and recognized that costs overruns that flow therefrom are risks that must be borne by the bidder:

> Fixed-price contracts include both lump-sum contracts and negotiated fixed-price contracts . . .  This type of contracting *presents certain inherent risks including the possibility of ambiguities in the specifications received, or economic and other changes that may occur during the contract period.*….  If we perform well under these types of contracts, we can benefit from cost savings; however, *if the project does not proceed as originally planned, we generally cannot recover cost overruns except in certain limited situations.*
>
> …
>
> Generally our business is performed under contracts that include cost and schedule estimates in relation to our services. *Inaccuracies in these estimates may lead to cost overruns that may not be paid by our clients thereby resulting in reduced profits or losses*.
>
> …
>
> [I]n many of our fixed-price contracts, we guarantee to a client that we will complete a project by a scheduled date….  If we subsequently fail to complete the project as scheduled… *we may be held responsible under the guarantee or warranty provisions of our contract for cost impacts to the client resulting from any delay* ….

2015 Form 10-K at 10, 15, 20 (Feb. 18, 2016) (emphasis added).

---

[2] Contrary to Fluor's promises, for much of the Project, Fluor refused to provide proper resources and staffing, failed to provide an accurate schedule, and did not take appropriate or sufficient actions to ensure "on-time schedule performance."

21. In 2018, after it became obvious that Fluor was struggling to perform on a number of firm-fixed price projects, the former Chairman and CEO of Fluor Corporation (Defendant's parent company), described Fluor's recent negative experience underbidding firm-fixed price projects as follows:

> The customers start at [a] figure, negotiate it downward and there's *always some contractor that is willing to say okay to the lower number using some excuse to justify the win*, ***Fluor included***. We have had 12 gas-fired power projects since 2003. 10 of the 12 have underperformed our as-sold expectation with three suffering losses. Competition, both public and private, have had similar experiences with ***no current projects performing as expected***.

Fluor's Q1 2018 Earnings Call (May 3, 2018) (emphasis added).

22. On February 18, 2020, Fluor Corporation disclosed in an earnings call that the Securities and Exchange Commission ("SEC") had initiated an investigation into its fixed-price work, including Defendant's fixed-price work at RFAAP with BAE OSI.  *See* Fluor's Q4 2019 Earnings Call (Feb. 18, 2020).  On February 19, 2020, *Engineering News-Record* reported:

> Fixed-price projects *continue to be a source of trouble for Fluor Corp*….  In a response to the SEC and for its own review, Executive Chairman Alan Boeckmann told investors Feb. 18 that 'the company is looking at its prior revenue recognition, charges and related control environment' on one project at the U.S. Radford Army Ammunition Plant in Radford, Va….[3]

23. On March 20, 2020, GS Analytics published an article discussing Fluor's current market reputation for underbidding and concluded that "*[t]his clearly is a case of aggressive estimates/financial projections gone wrong across the board rather than execution issues on a*

---

[3]https://www.enr.com/articles/48714-sec-starts-investigation-of-fluors-fixed-price-work#:~:text=The%20U.S.%20Securities%20and%20Exchange,the%20second%20quarter%20of%202019 (accessed Sept. 30, 2020) (emphasis added)

*couple of projects*."[4]  "It seems like Fluor's fixed-price contracts really have a bad reputation in the market." *Id.*

24. It is now obvious that Fluor applied this strategy when trying to win the contract to perform the Project.  It is equally clear that this aggressive bidding strategy had an impact on Fluor's ability to timely deliver this Project.  It was slow to staff the Project with the design expertise required and repeatedly refused to take actions necessary to mitigate its significantly delayed schedule, like adding shifts and resources, because doing so would have increased the losses stemming from Fluor's apparent underestimation of the costs required to perform the Project on time.

25. On April 30, 2020, Fluor Corporation announced that it received a subpoena from the U.S. Department of Justice ("DOJ") "seeking documents and information related to second quarter 2019 charges; certain of the projects associated with those charges; and certain project accounting, financial reporting and governance matters."  Fluor Corp. 8-K (May 8, 2020).  These second quarter 2019 charges by Fluor included Fluor's charges on the RFAAP.[5]  *See* Fluor Corp. 2019 10-K at 44 (Sept. 25, 2020) (stating Fluor belatedly recognized pre-tax charges against revenue of $37 million in 2017, $56 million in 2018 and $83 million in 2019 – a total write down of $176 million at RFAAP, *e.g.*, "Segment loss in 2019 . . . totaling $83 million resulting from forecast revisions for late engineering changes and cost growth related to the Radford Project.  Segment loss in 2018 and 2017 included charges totaling $56 million and $37 million, respectively, on the Radford project.")

---

[4]https://seekingalpha.com/article/4328769-fluor-why-turnaround-is-difficult-despite-experienced-new-management-team (accessed Sept. 25, 2020) (emphasis added).

[5]https://seekingalpha.com/article/4328769-fluor-why-turnaround-is-difficult-despite-experienced-new-management-team (accessed Sept. 25, 2020).

26. After being targeted for investigation by the SEC and DOJ, and conducting its own internal investigation, on September 8, 2020, Fluor Corporation admitted to errors and/or impropriety with respect to the RFAAP, stating:

> [T]he Company has identified material errors in accounting for its Radford Nitrocellulose project (the "Project"). These errors cause the Company's financial statements for the periods described above to be materially incorrect. The errors arose from a failure to timely recognize changes in forecasted project costs *and from errors in estimating the amount of variable consideration for the Project.* As a result, the Company incorrectly recognized revenue and projected losses during the periods described above.

Fluor Corp. 8-K (Sept. 8, 2020) (emphasis added).

27. On September 25, 2020, Fluor Corporation again admitted culpability for not properly recognizing costs on the RFAAP project stating:  "In periods prior to 2019, FFS [(Fluor Federal Solutions, *i.e.*, Defendant] also *did not maintain effective controls over project cost forecasting*, primarily driven by a *failure to maintain a sufficient complement of project level personnel with appropriate levels of accounting and controls knowledge* for the Radford project."  Fluor Corp. 2019 10-K at 52 (Sept. 25, 2020) (emphasis added).

28. Fluor Corporation has also been the subject of numerous shareholder suits, which rely on confidential statements from former employees, alleging:  "[Fluor Corporation] systematically understated costs and underbid and approved fixed-priced estimates in order to win Fluor new business [that] personally enriched [Fluor Corporation executives] due to the structure of their incentive compensation packages tied to new contract awards."[6]

---

[6] *See, e.g.*, *Chun, et al. v. Fluor Corp. et al.*, Case No. 3:18-cv-01338-X, ECF No. 90, at 6 (N.D. Tex. Apr. 2, 2020); *Lee v. Hernandez et al.*, Case No. 3:20-cv-01558, ECF No. 1, at ¶ 14 (N.D. Tex. June 12, 2020) ("[C]ertain Officers [of Fluor Corporation] … collectively pocket[ed] tens of millions dollars in bonus compensation directly linked to Fluor's underbids and damaging contract awards."); *Bottoni v. Hernandez et al.*, Case 3:20-cv-01442-X , ECF No. 1, at ¶ 14 (N.D. Tex. June 5, 2020) (same).

29. With respect to the RFAAP, a Subcontracts Administrator ("Administrator") for Fluor from May 2011 to October 2017, stated:

> [W]hen bidding on these projects, Fluor sought to reduce the estimated costs in its bids to win work given the hyper-competitive market…. *[I]f Fluor could not win a project with its current bid, supervisors asked [the Administrator] to submit a "best and final" bid to drive down the price of the bid.* [The Administrator's] team would attempt to trim as many of the costs as possible off the bid. In addition, [the Administrator] stated that Fluor [Bruce A.] Stanski[, Fluor's CFO from August 4, 2017 until May 31, 2019,] would lead "red tape" conference calls to conduct a comprehensive review of Government bids in the range of $50-$75 million and higher, where details of a project would be discussed to "*cut out all the fat.*" [The Administrator] experienced issues with obtaining quotes from subcontractors due to the fast turnaround time required to submit Government project bids, oftentimes limited to just 45 days. It was difficult for [the Administrator] to find qualified subcontractors to provide adequate and timely bids to be incorporated into Fluor's bid. As a result, [the Administrator] believed there were instances where Fluor entered misallocated labor hours into its initial bid, and *then if Fluor won the bid or was in the final running, Fluor would attempt to revise the bid through a change order to more accurately reflect the number of subcontractor hours required.*

*Chun, et al. v. Fluor Corp. et al.*, Case No. 3:18-cv-01338-X, ECF No. 90, at ¶ 81 (N.D. Tex. Apr. 2, 2020) (citing Confidential Witness No. 6) (emphasis added).

30. Instead of "cutting the fat" from its bid on this Project, Fluor cut into the bone by not properly including staff or subcontractor resources to be able to effectively and timely complete its Work. This was most evident in Fluor's failure to timely stand-up a design team to analyze, prepare, and complete the process design, which was a key driver of Fluor's two-and-a-half years of unexcused delay.

31. Also consistent with Fluor's strategy, as explained by its Administrator, Fluor attempted to effectively "revise [its] bid" on the Project by submitting over one hundred million dollars of baseless change orders, which BAE OSI denied under the terms of the Subcontract. Based on information and belief, it was Fluor's belated recognition that it could not make good on its strategy

to revise its bid by change orders that resulted in the significant write-downs on the Project that Fluor acknowledged in its 2019 10-K.

32. These admissions and write-downs by Fluor and its parent company demonstrate that Fluor is fully aware that it is entirely responsible for its inability to perform the contractual obligations it owed to BAE OSI, which has caused BAE OSI to suffer the damages set forth herein.

## PROJECT BACKGROUND

33. The legacy facility at RFAAP produces nitrocellulose ("NC") used for rocket and gun propellants.[7]  It was built in the 1940s to support military ammunition requirements during World War II.  Today, RFAAP is vital to national security as a key manufacturer for NC for the military.

34. The U.S. Army Joint Munitions Command ("Army" or "Owner") contracted with BAE OSI to operate and maintain RFAAP under a Basic Ordering Agreement ("BOA") dated May 17, 2011.  Pursuant to the BOA, the Army issues orders for a full range of operations, maintenance services, and program/project management services.  These orders are referred to as Task Orders.

35. Under BOA Task Order 002 (the "Prime Contract"), issued by the Army on January 23, 2012, BAE OSI is tasked with replacing the current legacy NC manufacturing train at RFAAP with a new modern facility (*i.e.*, the Project). The original scheduled completion date under the Prime Contract was July 30, 2015.

36. The Project consisted of the following:

    a.  A Nitration Building ("NB") to house a control room, the nitration system and the pre-stabilization system;

---

[7] NC is an elementary component required for almost all military ammunition and is, therefore, essential to our national security.

b.  A Stabilization Building ("SB") to house the deflaking/refining system, post-boiling system, blending system, and water recovery system;

c.  A Dewater/Packout building to house dewatering centrifuge and packout systems, docks for the load-out of finished product and an area for the storage of finished products;

d.  An Administration Building with an analytical laboratory to support NC operations;

e.  An Acid Tank Farm ("ATF") located in close proximity to the NB with tanks for nitric acid, sulfuric acid, oleum, mixed acid, spent acid, and recovered acid; and

f.  A Cutter Warehouse for storage and processing of cellulose (building to be built under a separate contract, with installation of process equipment and related mechanical, piping and electrical systems part of the Project).

37. BAE OSI originally subcontracted with Lauren Engineers & Constructors ("Lauren") to design and build the Project.  BAE OSI and Lauren entered into a design contract in February 2012, and a construction contract in March 2013.

38. By 2015, it was clear that Lauren was not capable of competently performing its work and completing the Project in a timely manner.

39. Accordingly, on January 28, 2015, BAE OSI terminated its construction subcontract with Lauren.  Later, on March 10, 2015, BAE OSI also terminated its design subcontract with Lauren. Only a limited amount of construction work had been performed as of the termination of the construction subcontract with Lauren, and the design was in progress and remained to be completed.

## PROCUREMENT OF FLUOR AS REPLACEMENT CONTRACTOR

40. Following BAE OSI's termination of the Lauren subcontracts, BAE OSI initiated a competitive design/build procurement for a replacement subcontractor for the Project. The procurement process began in April 2015.

41. BAE OSI invited Fluor, AECOM, HiTT, Jacobs, and Burns & McDonnell to participate in the procurement. All of the interested bidders are large, well-known and experienced engineering and construction companies with substantial experience with design-build contracting and work on process plants like the NC facility. BAE OSI advised the interested bidders that it anticipated a firm fixed price solicitation and subcontract award to a single contractor.

42. In April 2015, BAE OSI provided Fluor and the other aforementioned interested bidders access to a secure electronic data room in which they could access all of the in-progress Lauren design and other documents, in the event the bidders deemed it appropriate to review such information.

43. On June 4, 2015, after BAE OSI obtained possession of the native SmartPlant computer aided design and drafting ("CADD") files from Lauren, BAE OSI sent them to Fluor and the other bidders, for their use in the event they deemed it appropriate to review such information. SmartPlant is an engineering program that creates virtual three-dimensional (3-D) models of designs that are, or will be, under construction.

44. The in-progress Lauren design files and other media when provided to Fluor and the other potential bidders by BAE OSI were physically and conspicuously marked "As Is" in the legend.

45. Accordingly, by early June 2015, BAE OSI had provided Fluor (as well as the other interested bidders), for their independent evaluation and assessment as they deemed appropriate, all of the Lauren "As Is" native design files, drawings, and specifications in BAE OSI's possession,

which largely were a work-in-progress at the time Lauren was terminated.  These files included: media files with the SmartPlant model, CADD drawings, 22 Process Flow Diagrams ("PFDs"), 212 Piping and Instrumentation Diagrams ("P&ID") and information from process equipment vendors.

46. After all the bidders had been given full access to the Lauren design files and other related documents for a month to review as they saw fit, on July 2, 2015, BAE OSI issued its Request for Proposal ("RFP") to Fluor and the other interested bidders.  The RFP included a Statement of Work ("SOW") describing the eventual design/build awardee's work requirements.  The SOW was eventually incorporated into the Subcontract.  A true and correct copy of the Subcontract is attached hereto as **Exhibit A**.[8]

47. The SOW expressly and unambiguously stated that the Lauren design materials were provided for reference only and that the eventual subcontractor would be required to conduct *its own analysis*, *prepare its own drawings* and, critically, be ***solely responsible for the design***. Specifically, the SOW stated:

> a. "This project will design, procure and construct the new NC facility . . . The ***preliminary design*** of . . . the new facility has been developed and is included in this SOW.  This ***Conceptual Design*** was developed by Lauren Engineers & Constructors (LEC) based on the Technical Design Package (TDP) prepared by the U.S. Army."  Ex. A at SOW § 2.1.  (Emphasis added).

---

[8] The Subcontract contains information that is restricted by U.S. export control, operationally sensitive, or may be Fluor confidential and proprietary information.  Portions of "Subcontract Exhibit E – Technical Bid Package" include information that is restricted by U.S. export controls regulations and, as such, cannot be publically disclosed.  For that reason, and given the voluminous nature of the Technical Bid Package, with the exception of a redacted version of the SOW, it will not be included with Exhibit A.  Similarly, "Subcontract Exhibit I – Supplier Proposal (Nov. 25, 2015)" appears to contain Fluor confidential and proprietary pricing information and is not included with Exhibit A for that reason.  BAE OSI suggests that a protective order be established to address materials, such as the Technical Bid Package and confidential and proprietary information, that cannot be publically disclosed.  After such protective order is put in place, an un-redacted version of the entire Subcontract will be provided.

b. "The drawings, specifications, and technical documents provided in APPENDIX G [to the SOW] are amended in the Statement of Work ("SOW") by BAE [S]ystems to show additional requirements and/or corrections. *These drawings are provided for reference only. The Subcontractor shall prepare their own drawings to be used for design review submittals, construction and as Record Drawings*." *Id*. at SOW § 2.2. (Emphasis added).

c. "It is incumbent upon the *Subcontractor to review the documents submitted and to perform their own analysis*, including Hazard and Operability Studies and Life Safety Code Analysis. *The Subcontractor shall be solely responsible for the design* and all safety reviews and safety submittals with all required state and federal agencies." *Id*. at SOW § 2.5. (Emphasis added).

d. *Subcontractor will be responsible to validate and complete all PFD's and P&ID's*. PFDs and P&IDs are currently red lined to reflect all preliminary PHA [Process Hazard Analysis] action items and any other design changes that have occurred up to the time of this solicitation." *Id*. at SOW § 2.7. (Emphasis added).

48. Fluor submitted its proposal in response to BAE OSI's RFP on September 25, 2015, which it later revised on November 16, 2015 (collectively, "the Proposal").

49. At no point in the Proposal did Fluor question or take exception to the SOW requirement that it be solely responsible for the design or the time (and resources) required for Fluor to perform its own, independent analysis and validation.

50. On the contrary, Fluor unqualifiedly embraced the challenges of this firm-fixed price design/build project and repeatedly assured BAE OSI that it had the experience and depth of resources to bring the Project to a successful and *timely* completion. A few representative examples of Fluor's statements in its Proposal are:

a. "Fluor Corporation (Fluor) is one of the world's largest publicly traded engineering, procurement, construction, maintenance and PM companies, with revenues of $21.5 billion in 2014. We offer a deep pool of resources to the NC Facility project, including knowledgeable and experienced engineers, proven best practices, and industry-leading knowledge sharing

and reachback capabilities.  ***We specialize in building the world's toughest and most challenging projects***."

   b.  "Our construction experts have developed an optimized, construction sequencing approach to the NC Facility based on our extensive knowledge of the Radford site and on our unique phasing approach . . . Our approach ***ensures on-time completion*** by using fast track design packages, schedule concurrency, multiple work crews, and construction.  This allows us to provide ***a solution for on-time completion of NC facility***."  (Emphasis added).

   c.  "Fluor is committed to delivering projects safely, ***on schedule, within budget***, and with the quality expected from our Customers.  With 103 years of experience and the collective expertise of our 40,000 employees worldwide, there is no job outside of Fluor's core capabilities.  We provide integrated solutions that span the entire project life cycle, including engineering, value engineering, procurement, construction, commissioning, and project management.  Throughout our history, Fluor has successfully completed construction projects relevant to the NC Facility project."  (Emphasis added).

51.  Fluor also reassured BAE OSI in the Proposal that its schedule "demonstrates our understanding of the NC Facility project and our ability to complete the effort in advance of the tentative duration of thirty-two months from October 15, 2015 through June 14, 2018."   Indeed, Fluor crowed that it was "confident in our ability to ***accelerate*** the construction on the NC Facility" (Emphasis added).

52.  Fluor's Proposal also touted its SmartPlant modeling expertise and experience:

   a.  "With SmartPlant®, we optimize the planning, sequencing, execution, and monitoring of design and construction activities from within a data rich virtual plant model.  The visual, collaborative environment reduces work, increases productivity, and reduces the need to reconcile design and construction conflicts by hand."

   b.  "During the Design Phase, we run a collision detection analysis in SmartPlant, which allows us to reconcile design conflicts prior to installation and order piping sooner."

c. "Because of the quantity and complexity of the piping required throughout this project, we mitigate design conflicts prior to installation using SmartPlant . . ."

53. Unfortunately, contrary to Fluor's unequivocal representations about its unparalleled expertise and experience as a contractor that specializes in the world's toughest and most challenging projects, Fluor's performance was inept and woefully under-resourced.  In short, Fluor proved itself wholly unable to complete the Project within the contractual deadline, as demonstrated below.

54. When Fluor submitted its initial Proposal in September 2015, it planned to subcontract out the process design – *i.e.*, the complex design that includes the web of piping and equipment systems necessary to manufacture the NC – to Burns & McDonnell, a large engineering firm with significant process design experience.

55. Soon after submitting its initial Proposal, Fluor decided to replace Burns & McDonnell and attempted to subcontract with another engineering firm – Wood Group Mustang ("WGM") – to perform the process design work.

56. Because BAE OSI and the Army wanted to accelerate the completion of the Project – which had been delayed by, among other things, the termination of Lauren – BAE OSI awarded Fluor an Undefinitized Contract Action ("UCA") on October 14, 2015 based on its review of Fluor's initial proposal submitted three weeks earlier on September 25, 2015.  A true and correct copy of the UCA is attached hereto as **Exhibit B**.

57. The UCA was an agreement between the parties to allow Fluor to commence certain early work activities on the Project with the expectation of accelerating the schedule and signified "the intention of the parties to execute a formal, definitive Firm Fixed Price type Agreement . . . in the

earliest practicable target date for definitization of the formal agreement." Ex. B, p. 1 (emphasis in original).

58. The original UCA amount was $9,331,676.00 and included contract line items ("CLINs") for steel purchases through one of Fluor's subcontractors and structural engineering work through Fluor's subcontractor Zapata.

59.   Prior to execution of the definitive firm fixed price contract between the parties, the UCA amount had increased to $31,886,646.00.  Included within that amount was 500 hours of time for WGM to analyze, assess, develop, and progress the process design.  *Id*. at UCA, Modification 3.

60.  Specifically, on November 17, 2015, BAE OSI agreed to pay Fluor to have WGM analyze, evaluate, and begin completing Lauren's incomplete process design, including the SmartPlant model, which Fluor had in its possession since at least early June 2015.

61. Accordingly, through the UCA, BAE OSI actually paid Fluor to, among other things, determine the level of completeness of Lauren's design and discover any perceived deficiencies *before* entering into the definitive Subcontract, which was not executed until December 17, 2015. Particularly in light of the UCA, in awarding Fluor the Subcontract, BAE OSI relied on Fluor to have performed adequate due diligence with respect to the design (the Lauren design) upon which Fluor claims to have elected to both base its firm-fixed price and the agreed baseline schedule which set the July 30, 2018 Subcontract completion date.

## TERMS OF THE DEFINITIVE FIRM FIXED PRICE DESIGN/BUILD SUBCONTRACT

62. On December 17, 2015, the parties entered into the definitive firm fixed price design/build Subcontract for Fluor to design, construct and partially commission (*i.e.*, a design-build turnkey type contract) the Project.  *See* Ex. A.

63. The Subcontract's firm fixed price was $245,690,422.00, which included the $31,886,646.00 funded through the UCA.

64. The Subcontract price included $14 million "for unforeseen contingencies, other than changes to the contract compensable under the Changes clause" and required that "[i]f a contingency arises for which Fluor will use the contingency funding, Fluor will document the circumstances and the estimated amount."  Ex. A, Subcontract ELP-100815-01, at Sec. 2.22. Upon completion of the Contract, Fluor and BAE OSI were to "share in any remaining contingency funding on a 50:50 basis." *Id*.

65. As of 2018, Fluor had exhausted all $14 million in contingency funds, at which point, Fluor could not recover any additional sums in excess of the firm fixed price unless a valid change order, pursuant to the terms of the Subcontract, was approved by BAE OSI.

66. The Subcontract further included a provision stating that "*time is of the essence* in the performance of the Work."  Ex. A, General Provisions, Sec. 28(e) (emphasis added).  Although the Subcontract indicated that Fluor's period of performance ran through September 30, 2017, BAE OSI subsequently approved Fluor's December 23, 2015 schedule as the contractually approved baseline schedule with a mutually agreed contractual completion date of July 30, 2018.

67. As discussed above, the Subcontract incorporated the SOW as part of the Technical Bid Package set forth in Exhibit E to the Subcontract (the Subcontract is Exhibit A to the Complaint).

68. In addition, under the Subcontract, Fluor:

    a.  Agreed to "provide a competent superintendent with necessary assistants, sufficient and competent management and supervisory personnel on site . . . .  Such superintendence and management shall efficiently supervise the Work and be responsible for all construction means, methods, techniques,

sequences and procedures and for coordinating all portions of the Work." *Id*. at General Provisions, Sec. 13(a);[9]

b.  "[R]epresented that it has the requisite expertise to undertake the performance of the work contemplated by this Contract and that BAE Systems, in reliance on such representation, has entered into this Contract." *Id*. at General Provisions, Sec. 21(e);

c.  Committed that all "work under this Contract shall be performed in a skillful and workmanlike manner consistent with the level of care and skill ordinarily exercised by industry-standard CONTRACTOR'S *(sic)* under similar circumstances." *Id*. at General Provisions, Sec. 23(f);

d.  Agreed that "[i]n the event [Fluor] fails to complete the Work within the Contract Schedule (as that date may be adjusted under the terms of the Contract Documents) [Fluor] agrees to reimburse BAE Systems ***all damages and expenses incurred by BAE Systems due to [Fluor's] failure to complete the Work by such time***." *Id*. at General Provisions, Sec. 28(e) (emphasis added);

e.  Agreed there "shall be no change in Contract Schedule without prior written BAE Systems approval." *Id*. at General Provisions, Sec. 28(a);

f.  Acknowledged that "[d]emands by BAE Systems that [Fluor] comply with the Contract Schedule (as adjusted under the terms of the Contract Documents) do not constitute acceleration." *Id*. at General Provisions, Sec. 28(d);

g.  Promised to "furnish sufficient forces, construction plant and equipment, and shall work such hours, including night shifts and overtime operations, as may be necessary to insure the performance of the work in accordance with the approved project schedule." *Id*. at Sec. 28(c),

h.  Committed that "[i]f, in the opinion of BAE Systems, [Fluor] falls behind the progress schedule, [Fluor] shall take such steps as may be necessary to improve its progress, and BAE Systems may require it to increase the number of shifts, overtime operations, days of work, and/or the amount of construction equipment at no additional cost to BAE Systems." *Id*.; and

---

[9] Contrary to Fluor's contractual commitment to adequately staff the Project with competent, experienced management, as stated previously, Fluor's parent company admitted in its most recent 10-K on September 25, 2020 that, during the period of the Project, Fluor (*i.e.*, the Defendant here) "did not maintain effective controls over project cost forecasting, primarily driven by a failure to maintain a sufficient complement of project level personnel with appropriate levels of accounting and controls knowledge for the Radford project."

    i.   Agreed that in "the event delays in the performance of work under this Contract are due to the fault or negligence of [Fluor], its SUBCONTRACTOR'S *(sic)* or it suppliers, or not otherwise an 'excusable delay', [Fluor] shall, at its cost, take all necessary measures to recover schedule." *Id*. at General Provisions, Sec. 28(g.)

69. Fluor also agreed that:  "In the event that [Fluor] anticipates a delay in performance under this Contract, it shall give written notice therefor to BAE Systems within five (5) working days, stating the reasons for the delay and identifying the actions, which CONTRACTOR is taking to minimize the impact of the delay."  *Id*.  at General Provisions, Sec. 28(f).

70. The Subcontract also limited each party's liability to the other for claims and damages, for any cause whatsoever, to $30 million.  *See* Ex. A, Subcontract ELP-100815-01 at Sec. 2.21.[10]

71. The Subcontract has been modified by mutual agreement of the parties through formal, written "Modifications."  Several of these Modifications reflect settlement of change orders

---

[10] The Subcontract's Limitation of Damages clause providing as follows:

Except as otherwise provided in this Subcontract, in the event of either Party's failure to perform in accordance with this Subcontract, whether such failure is occasioned by the acts or omissions of either Party, its respective suppliers, or the BAE Parties, either Party may pursue any and all damages and remedies available under this Agreement and/or applicable law. Except as otherwise provided in this Subcontract, damages and remedies that may be recovered by either Party shall be limited as follows: **For all claims, regardless of the basis on which the claim is made, the applicable party's liability for damages arising under or related to this Subcontract shall be limited to $30M, $30M being defined as the value including all changes and the maximum liability for damages.** Neither Party shall be liable for any indirect, special, incidental or consequential damages, including but not limited to lost profits or business interruption losses, whether arising under contract, warranty, express or implied tort, including negligence, or strict liability, arising at any time from any cause whatsoever in connection with this Subcontract or performance hereunder, even if caused by the sole or concurrent or active or passive negligence, strict liability or other legal fault of either of the Parties, their members, directors, officers, employees, agents, representatives, parent companies, subsidiaries, affiliates, joint venture partners, successors and assigns, and each of their respective owners, partners, members, shareholders, directors, managers, officers, employees, agents, representatives and subcontractors at any tier.

brought by Fluor.  The settled change orders in no way impacted the critical path or supported

extension of the July 30, 2018 completion date.

## FLUOR'S FAILURE TO PERFORM UNDER THE SUBCONTRACT

72. Although Fluor had been authorized to proceed with a number of work activities under the

UCA months prior to execution of the definitive Subcontract in December 2015, BAE OSI later

learned that it had failed to make any progress on many of those activities, including the process

design of the Nitration Building (NB) and the Stabilization Building (SB) piping.

73. The process design was critical because it described the detailed layout of the complex web

of piping required by the Project.  Without it, the construction of the NB and SB, as well as many

follow-on activities could not occur as-planned, and sometimes, not at all.

74. As discussed above, the "As Is" design documents and SmartPlant model were made

available to Fluor by June 2015 for any review and analysis Fluor deemed appropriate prior to it

deciding whether, and to what extent, to adopt the design and providing a firm-fixed price for its

bid.  Further, under the UCA, BAE OSI authorized Fluor, through WGM, to begin work on the

process design as early as mid-November 2015.

75. BAE OSI paid Fluor for this work under the UCA but it was either not done, or if done,

was not provided to BAE OSI, because Fluor and WGM had a falling-out.

76. Although Fluor indicated to BAE OSI that WGM would be its process design

subcontractor, Fluor actually did not have WGM under contract.  As of the execution of the

definitive Subcontract, Fluor assured BAE OSI that contracting with WGM was imminent.

77. Fluor's statement was false.  On January 21, 2016, more than two-months after WGM was

to have begun analyzing the in-progress design and working to complete a design, and one month

after the parties executed the Subcontract, Fluor notified BAE OSI that it was unable to come to a

contract with WGM, purportedly because WGM would not agree to the Federal Acquisition Regulations ("FAR") flow-down provisions that are standard on any project for the federal government.

78. Because Fluor had been unable to bring WGM on-board, it notified BAE OSI that it would self-perform the process design work.

79. As a result of Fluor's change to its design plan for the Project, Fluor should have been able to bring to bear its purported SmartPlant expertise, as represented in its Proposal.  Instead, based on information and belief, Flour was forced at a crucial time when design should have been progressing to initiate from scratch the recruitment and organization of a new team of process engineers, SmartPlant engineers, mechanical engineers, piping designers, electrical engineers, and instrumentation engineers.  In other words, Fluor misrepresented its expertise in its Proposal in process design and SmartPlant modeling (*see*, *e.g.*, "With SmartPlant®, we optimize the planning, sequencing, execution, and monitoring of design and construction activities from within a data rich virtual plant model.  The visual, collaborative environment reduces work, increases productivity, and reduces the need to reconcile design and construction conflicts by hand.").  Fluor's November 16, 2015 Technical Proposal, p. 1-12.  And, based on information and belief, Fluor apparently determined it was not necessary or appropriate to exam in any level of depth the "As Is" materials that were provided to it months before any contract award to help it formulate an appropriate bid and proposal for the Project.

80. BAE OSI reasonably relied on the fact that all bidders were on notice that: 1) Lauren had been terminated for concerns with respect to its performance; 2) the design documents and SmartPlant model from Lauren were available for their review, analysis and examination, if they determined such information was helpful or appropriate to prepare their firm-fixed price

design/build bids, including their proposed schedules to perform the Project; and 3) in any event, the materials provided bidders from Lauren were provided "As Is" and required verification and validation from the bidders prior to the bidders submitting their proposals.

81. Based on information and belief, Fluor only deemed it necessary to undertake a cursory review of the material supplied during the bidding process.[11]  Contrary to the representations in its proposal about its deep bench of design and SmartPlant experts, however, Fluor did not even get a skeletal process design team in place until February 2016.  As such, at the very inception of Fluor's involvement in the Project, it lost at least four months of valuable contract time that should have been devoted to analyzing and completing the in-progress process design.[12]

82. Fluor's decision to self-perform the process design work had an insidious and devastating impact on the Project, which ultimately set Fluor's work back years.  Although the loss of at least four months of process design work at the very beginning of the Project would alone have dramatically delayed the Project, that self-imposed delay was dramatically compounded by Fluor's ill-advised decision to self-perform this work through the mobilization of a brand-new, inexperienced team of engineers that had no prior involvement, experience, or history with the Project.  Fluor literally was starting "from scratch" in February 2016 in the design process and reviewing information that had been available to Fluor for nearly a year.

---

[11] In fact, it was not until after Subcontract execution that Fluor submitted a Request for Information ("RFI") requesting additional files to allegedly make the SmartPlant model fully accessible.  Fluor did not explain why the requested files, if they were actually necessary, were not requested sometime in the six months between when the SmartPlant files were provided in June 2015 and the Subcontract was executed in December 2015.

[12] The delay resulting from Fluor's Proposal misrepresentations was actually far worse than simply a four-month schedule slip at the beginning of the Project.  If Fluor had properly evaluated the files in the months prior to Subcontract execution, as it was paid to do, Fluor could have determined that additional resources needed to be brought to bear to ensure timely completion of its Work.

83. Fluor never recovered from the impact of its delay caused by its belated decision to self-perform the process design work.

84. In fact, Fluor did not complete the initial design until January 2019 – some six months *after* Fluor had agreed in the Subcontract to have completed the entire Project, including the design, construction and its partial commissioning work.

85. By the fall of 2016, it had become obvious that Fluor was significantly behind the contract schedule.  Accordingly, on November 2, 2016, BAE OSI issued a Cure Notice.  A true and correct copy of the November 2, 2016 Cure Notice is attached hereto as **Exhibit C**.

86. In Fluor's November 11, 2016 initial Response to the Cure Notice relating to the schedule, Fluor affirmed that it had resolved conflicts inherent in the original BAE provided Lauren design and errors in the Smart Plant model.[13]

87. In its December 2, 2016 follow-up Response to the Cure Notice, Fluor acknowledged responsibility for the delay and promised BAE OSI that it remained committed to meeting contract requirements and working closely with BAE to safely deliver the project on time.[14]

88.  In the December 2, 2016 Cure Notice Response, Fluor reassured BAE OSI that it would mitigate the delays as is required by the Subcontract, stating that it recognized that design and construction modifications and delays to date have caused the schedule to compress, and

---

[13] Fluor's November 11, 2016 letter is marked as "FLUOR PROPRIETARY INFORMATION," and for that reason is not being included as an Exhibit to this Complaint.  BAE OSI suggests that a protective order be established to address materials, such as this letter, that cannot be publically disclosed or are confidential.  After such protective order is put in place, a copy of the letter will be provided.

[14] Fluor's December 2, 2016 letter is marked as "FLUOR PROPRIETARY INFORMATION," and for that reason is not being included as an Exhibit to this Complaint.  BAE OSI suggests that a protective order be established to address materials, such as this letter, that cannot be publically disclosed or are confidential.  After such protective order is put in place, a copy of the letter will be provided.

committing to investigate, plan and initiate several measures to ensure the project is delivered on time despite these delays, and to work with BAE Systems to avoid further delays and potentially regain time in some schedule activities.  Fluor stated that it had already initiated several measures which would continue, and had taken action to identify others.

89.  The delay mitigation/recovery efforts that Fluor promised to perform in its Response to the November 2016 Cure Notice included:

   a.  Placing Process/Piping Engineers on 6x10 hour work days until design is complete with this mitigation strategy to begin on 12/5/16 and continue until the process engineering and piping design is complete.

   b.  Requiring the Designer of Record, Zapata Engineers, to develop a corrective action plan, by 12/12/16, to avoid further delays in its schedule, and add staff to its design team to increase the rate of design production.

   c.  Establishing and implementing schedule compression strategies with subcontractors including the all-critical piping activity of Thompson Mechanical and other subcontractors as they are selected to optimize their work sequencing to allow for a compressed construction timeline.

90.  These identified mitigation efforts unequivocally confirmed that, after more than a year of work, Fluor had utterly failed to prepare and finalize the required process and piping designs so that the Project could timely move to construction.  Although Fluor had promised to cure its delay at the end of 2016, BAE OSI and the Army had nonetheless lost confidence in Fluor's schedule updates and demanded a re-baselined recovery schedule.

91. In response, Fluor submitted a number of proposed recovery schedules which re-affirmed Fluor's commitment to, and the feasibility of, meeting the July 30, 2018 Subcontract completion date.

92. BAE OSI detrimentally relied upon Fluor's representation in its November 11 and December 2, 2016 letters, and the subsequently submitted proposed re-baselined schedules, as

Fluor's assurance that any asserted pretextual reason for Fluor's delay would not further delay performance beyond the July 30, 2018 Subcontract completion date.

93. In reliance on Fluor's commitment to complete its work by July 30, 2018, BAE OSI committed to its Army customer that the entire Project (which included certain commissioning and other activities beyond Fluor's scope of work) could be completed by December 31, 2018. The December 31, 2018 Prime Contract completion date, however, could only be achieved by BAE OSI if Fluor completed its Subcontract work by July 30, 2018.

94. BAE OSI's commitment to the Army to complete the Prime Contract work by December 31, 2018, in reliance on Fluor's completion promise, was memorialized in Modification 10 to the Prime Contract dated January 19, 2017. A true and correct copy of Prime Contract Modification 10 is attached hereto as **Exhibit D**. *See* Ex. D, Par. 4 ("The period of performance for this effort is 23 January 2012 through 31 December 2018.")

95. While reserving its rights, BAE OSI accepted Fluor's February 3, 2017 recovery schedule update as the new baseline schedule for Fluor's portion of the Project (the "Re-Baselined Schedule"). The Re-Baselined Schedule constituted Fluor's unequivocal commitment as of February 2017 to complete its work by the July 30, 2018 Subcontract completion date.

96. BAE OSI's and the Army's reliance on Fluor's commitment to complete its work by July 30, 2018 unfortunately proved to be misplaced.

97. While Fluor continued to submit schedule updates through most of the rest of 2017, which showed completion by July 30, 2018, the actual progress on the ground did not match Fluor's schedule updates. By the fall of 2017, Fluor's schedules bore little resemblance to reality (*i.e.*, they did not accurately depict actual progress on the ground) and became useless as a tool for planning the Project on a going forward basis.

98.   Despite showing timely completion for months and in breach of its contractual obligation to provide BAE OSI with prompt written notice of anticipated delays in performance, in its September 2017 schedule update – submitted less than a year before the Project was to have been completed - Fluor pushed its completion date out more than a year (from July 30, 2018 to September 2019).

99. Not only was Fluor's schedule submission improper because it dramatically extended completion without any adequate explanation or justification under the Subcontract, it was also replete with errors, including:  1,300 activities with 260 days of float (*i.e.*, time to complete without extending the completion date); numerous logic errors (*i.e.*, predecessor activities which must be completed before a follow-on activity can begin were being shown as not started even though the follow-on activity was shown as complete); and an incomplete pre-commissioning schedule.

100.    Not surprisingly, the Army was blindsided when BAE OSI reported the schedule slip forecasted in Fluor's September 2017 schedule (moving completion from July 30, 2018 to September 2019).  The Army could not understand how - after only recently agreeing to a contract extension based on Fluor's promise to complete its work by July 30, 2018 -the schedule could slip by over a year.  Neither could BAE OSI.

101.    The Army immediately admonished BAE OSI that "[t]he Government is increasingly concerned about a potential delay, particularly given the fact that a rebaseline effort resulting in a significant increase to the total price and updated performance completion dates was recently awarded."  *See* Gov't Letter RF17-065, dated September 11, 2017, a true of correct copy of which is attached as **Exhibit E**.

102.    The Army demanded an explanation of the schedule slip and on December 4, 2017, BAE OSI was forced to explain:

There are two main causes for the delay in the completion of the NC facility.  First, Fluor (our main subcontractor) failed to adequately staff, design, plan, and execute this program.   Second, BAE Systems failed to identify and remedy Fluor's performance in a timely manner.

*See* BAE Letter to PCO, dated December 4, 2017, a true and correct copy of which is attached as

**Exhibit F**.[15]

103.    In January 2018, Fluor submitted a schedule update further pushing out its projected completion date by another three months to January 2020.  In response, the Army issued BAE OSI a Show Cause Notice on February 8, 2018 demanding an explanation why BAE OSI should not be terminated for cause based on the failure to meet the Prime Contract's completion date due to Fluor's ever increasing forecasted delays and other schedule deficiencies.  A true and correct copy of the Government's February 8, 2018 Show Cause Notice is attached as **Exhibit G**.

104.    The seriousness of the Army's willingness to terminate because of Fluor's inexcusable delays —and the degree of reputational and contractual damage being done to BAE OSI as a result—was brought home by the simultaneous public issuance by the Army of a Request for Information on February 9, 2018, to "obtain information from industry regarding the ability to manage and execute large scale chemical/pharmaceutical plant construction to complete the design, construction and commissioning of a new nitrocellulose (NC) production facility at the Radford Army Ammunition Plant (RFAAP)."

105.    BAE OSI issued a Show Cause Notice to Fluor on February 12, 2018 to notify Fluor of the Army's action, to explain how the Army's action arose directly from Fluor's improper and untimely performance and to flow down the Army's specific directions to Fluor.  A true copy of BAE OSI February 12, 2018 Show Cause Notice is attached hereto as **Exhibit H**.

---

[15] Exhibit F contains a lengthy enclosure.  For that reason, only the cover letter is being provided.

106.     On February 21, and again of February 28, 2018, Fluor responded to the Show Cause notice with unfounded, pretextual grounds that disclaimed responsibility and cast blame on BAE OSI primarily due to the problems Fluor was allegedly having with the Lauren design – the "As Is" design it had received nearly three years before (and apparently elected not to analyze or validate previously) – and for the ultimate design for which Fluor was solely responsible under the Subcontract (independent of any "As Is" Lauren design).

107.     Fluor's pretextual attempts to blame BAE OSI for Fluor's undeniable breaches were not helpful in responding to the Army's Show Cause Notice. Nonetheless, on March 9, 2018, BAE OSI provided its response to the Army.

108.     In its response, BAE OSI detailed the significant new resources it was devoting to the Project in an effort to resolve the delays caused by Fluor's deficient performance, including, without limitation, assigning a Senior Executive as the new executive in charge of the Project, hiring new on-site Project resources to manage the Project, and retaining Burns & McDonnell and Analytical Management Solutions to oversee Fluor's schedule.

109.     In addition, BAE OSI, without any contractual obligation to do so and while reserving all rights against Fluor, removed work from Fluor's scope, which should have enabled Fluor to focus on critical activities, such as completion of the NB and SB, in order to finish the Project as soon as possible and help Fluor mitigate its long-running and pervasive breaches. The work deleted from Fluor's scope included: the design and construction of the Administration Building and Lab Facility and Dust Collection, Acid Sewer, and all remaining Cutter Warehouse work.

110.     BAE OSI was able to convince the Army not to terminate the Prime Contract and extend the completion date to account for Fluor's unexcused delay, but only by providing $9

million in concessions to the Army.  These concessions were in addition to the added resources and other curative actions promised by BAE OSI in its March 9, 2018 letter.

111.    The Army's agreement not to terminate BAE OSI and to extend the Prime Contract completion date was memorialized in Prime Contract Modification 17.  A true and correct copy of Prime Contract Modification 17 is attached hereto as **Exhibit I**.  In it, BAE OSI agreed, *inter alia*, to "perform a total of $9,000,000.00 in abnormal maintenance efforts on the legacy NC facility as needed" at no cost to the Army and the Army agreed that the Period of Performance ("PoP") "for the construction and commissioning of the new NC Facility is herein extended to 30 November 2020."  *Id*. at Pars. 2(a) and 3.

112.    For the remainder of 2018, Fluor continued to struggle with its process design and follow-on construction work, but nonetheless continued to forecast a January 2020 completion date.  This date, if it held, would have supported the revised overall Project completion date under the Prime Contract of November 30, 2020.

113.    While Fluor's schedule updates throughout 2018 nominally showed a completion date of January 2020, they continued to be replete with errors.  BAE OSI repeatedly raised these deficiencies with Fluor.  These deficiencies were particularly concerning to BAE OSI because the poor quality of Fluor's scheduling was one of the Army's grounds for the February 8, 2018 Show Cause Notice.  *See* Ex. G.

114.    On September 11, 2018, BAE OSI again notified Fluor of the many deficiencies in its 2018 schedule updates and put Fluor on notice that BAE OSI intended to hold Fluor responsible for these issues.  A true and correct copy of BAE OSI's September 11, 2018 letter is attached as **Exhibit J**.

115.     The primary and continuing deficiency in all of Fluor's 2018 schedule updates was that they depicted, without approval from BAE OSI as required by the Subcontract, a completion date beyond the contractually required completion date of July 30, 2018.  In the September 11, 2018 letter, BAE OSI reminded Fluor that the Subcontract completion date, as set forth in the original approved baseline schedule in December 2015, and reconfirmed by Fluor in the approved February 2017 Re-Baselined Schedule, remained July 30, 2018.

116.     BAE OSI then expressly notified Fluor that:

> In the fall of 2017, Fluor sought to unilaterally expand the completion schedule to reflect more than one year of additional Project duration, without any proven basis or demonstration of entitlement . . . Since then Fluor has been submitting IMS [integrated management schedule] updates that indicate progressively later completion dates and, based on Fluor's most recent June 2018 IMS submission, Fluor is currently forecasting a 16 January 2020 completion date.  Under Subcontract Section 28(a), however, the Contract Schedule can only be revised with 'prior written BAE Systems approval.'  BAE Systems has never approved, in writing or otherwise, extending the contractually mandated completion date beyond 30 July 2018 [footnote omitted].  Accordingly, the Subcontract completion date remains 30 July 2018 and BAE Systems has treated, and – pending negotiation of Fluor's claims for compensable delay – will continue to treat, all delay beyond that date as unexcused delay and reserves all rights and remedies under the Subcontract and applicable law in connection therewith.  Ex. J, p. 3-4.

117.      Although the unapproved extension of the completion date was the primary defect in Fluor's 2018 schedule updates, the other defects were also serious.  They included:  schedules that did not reflect accurate critical paths, which made planning and delay mitigation very difficult, if not impossible; excessive durations for numerous installation activities that improperly reflect the anticipated construction sequence; and incorrect schedule logic.  *See id*. p. 2.

118.     For these reasons, BAE OSI advised Fluor that its "IMS submissions have been and continue to be materially flawed as a tool for reasonably forecasting the pending work in the field, for reflecting accurate critical paths to completion, or as a basis for the credible and accurate evaluation of potential impacting events."  *Id*.

119.     Because of these defects in the schedules, BAE OSI notified Fluor that it had lost confidence in the schedules and intended "to utilize outside scheduling expertise in addition to devoting increased internal resources to the effort.  BAE Systems will track the costs of these external and internal resources and claim them against Fluor."  *Id.* p. 3.

120.     BAE OSI also notified Fluor that BAE OSI had escaped termination for default caused by Fluor's unexcused delays, by among other things, acceding to the Army's demand for $9 million in additional concessions for maintenance work on the legacy NC facility.  This maintenance work on the legacy facility to keep it operative until completion of the new facility was only necessary because of Fluor's delay in completing its work.  As such, BAE OSI notified Fluor, "[b]e advised that BAE Systems intends to recover these costs from Fluor as the delay is to the account of Fluor."  *Id*.

121.     The $9 million in concessions are due from BAE OSI to the Army regardless of whether the Army orders the maintenance work at the legacy NC facility.

122.     In the face of BAE OSI's repeated admonitions that Fluor could not unilaterally extend the Subcontract's completion date, Fluor nonetheless in March 2019 submitted a schedule update forecasting completion of its Subcontract work on December 23, 2020.  This schedule reflected an additional 318-day delay beyond the already unapproved January 2020 completion date for Fluor's Subcontract Work.

123.     Most distressing about this new and substantial schedule slip was that Fluor admitted that it knew about the schedule slip since the beginning of 2019, but deliberately failed to provide BAE OSI notice of it.  Specifically, BAE OSI wrote to Fluor on March 26, 2019 that "Fluor is more than a month late in providing the most recent [schedule] update and we were informed out of the blue on Friday that ***previous [schedule] submissions artificially held the end***

*date providing inaccurate schedule data and analysis*."  A true and correct copy of BAE OSI's March 26, 2019 letter is attached hereto as **Exhibit K** (emphasis added).  This meant that Fluor admitted to knowingly submitting inaccurate and false schedule projections to BAE OSI for several months.

124.     Just as concerning, Fluor had inexcusably and inexplicably failed to perform an assessment of required construction activities and resources to understand and plan for pre-commissioning activities that were within Fluor's scope of work.

125.     Fluor's March 2019 schedule update was also not properly resource loaded (*i.e.*, allocation of man hours to work activities), which Fluor claimed it had no contractual obligation to do.  This meant that Fluor had no plan for how many workers and manhours were needed to complete various tasks.  As a result, Fluor had no way of knowing if additional tasks required more workers, whether additional workers needed to be brought in to help or whether workers could be shifted from less critical tasks to more time sensitive ones.  Put simply, without properly resource loading its schedules, Fluor had no viable way of managing its work.

126.     Thus, as of March 2019, Fluor was demonstrating that it was incapable of even understanding the status of construction, let alone being able to properly manage its completion.

127.     BAE OSI was understandably concerned and rightfully and repeatedly demanded that Fluor provide an explanation, a corrected schedule and take contractually required schedule recovery efforts.

128.     For example, on May 3, 2019, BAE sent Fluor a letter concerning Fluor's ever increasing schedule slippage.  A true and correct copy of BAE OSI's May 3, 2019 letter is attached hereto as **Exhibit L**.  In it, BAE OSI reminded Fluor of its responsibility under Subcontract General Provisions, Section 28(c) to "furnish sufficient forces, construction plan and equipment,

and [to] work such hours, including night shifts and overtime operations, as may be necessary to insure the performance of the work in accordance with the approved progress schedule" and that Fluor was required to "take such steps as may be necessary to improve its progress, and BAE Systems may require it to increase the number of shifts, overtime operations, days of work, and/or the amount of construction equipment at no additional cost to BAE Systems." *Id*.

129.     Accordingly, BAE OSI directed Fluor to:

a.   "[A]dd a second shift no later than August 2019 and take such other measures as necessary to recover schedule . . . ."; and

b.   "[I]mmediately . . . prepare and submit a Corrective Action Plan (CAP) that includes the one additional Work Shift and corrects the logic and other errors in [Fluor's schedule submissions]." *Id*.

130.     Unfortunately, until August 2019, Fluor simply ignored BAE OSI's demands.

131.     Based on information and belief, Fluor's unresponsiveness over much of 2019 was the result of a strategic review by Fluor's parent company which ultimately led to an announcement that the parent company would be restructuring and divesting its governmental businesses, of which Fluor was a part. *See, e.g.,* Fluor Corp. Q3 2019 Earnings Call Tr. (Fluor Corporation CEO stating "last month we committed to a plan to sell substantially all of the government and equipment rental businesses. Starting today we will be reporting those business lines as discontinued operations.").

132.     Beginning in August 2019, however, Fluor apparently had a change of heart, due at least in part, to its parent company's strategic internal review of the Project which concluded that "[i]n periods prior to 2019, [Defendant] … did not maintain effective controls over project cost forecasting, primarily driven by a failure to maintain a sufficient complement of project level

personnel with appropriate levels of accounting and controls knowledge for the Radford project."
Fluor Corp. 2019 10-K at 52.

133.    Thereafter, Fluor finally began to institute significant corrective actions and develop plans that demonstrated a credible commitment to completion.  These actions included replacing its entire Project team and devoting resources and attention to creating more accurate, realistic schedule updates which, while still indicating an unapproved Subcontract completion date, resulted in schedules with significantly fewer errors and which could actually be used to plan the Project to completion.

134.    While Fluor was taking corrective actions to better perform under the Subcontract, BAE OSI's notice to the Army of additional Project delay caused the Army to send a number of letters of concern, culminating on October 16, 2019 when the Army issued BAE OSI another Show Cause Notice.  A true and correct copy of the Army's October 16, 2019 Show Cause Notice is attached hereto as **Exhibit M**.  In this notice, the Army characterized BAE OSI inability to complete the Prime Contract work by the November 30, 2020 deadline due to Fluor's recently announced schedule slip as an anticipatory repudiation of the contract.  *Id*. p. 2.

135.    BAE OSI sent Fluor notice of the Army's Show Cause Letter and a reservation of rights on October 28, 2019.  A true and correct copy of the BAE OSI's October 28, 2019 Letter is attached hereto as **Exhibit N**.

136.    In that letter, BAE OSI documented the commitments, cooperation and corrective actions that Fluor agreed to take in the intensive discussions between the parties in August 2019.  BAE OSI also noted it "will materially rely upon Fluor's above commitments and ability to meet its proposed December 1, 2020, date for completion of water trials in responding to the Show

Cause Notice from the Government and invites Fluor to provide any relevant information that it believes would be helpful to include in that response." Ex. N, p. 2.

137.    BAE OSI also included the following reservation language in its October 28, 2019 letter:

> In acknowledging and necessarily relying upon Fluor's current proposed completion date, however, BAE Systems: (i) does not waive any rights or remedies for Fluor's failure to meet the Subcontract's original completion date; (ii) is not extending the contract completion date; and (iii) is not waiving or releasing any of the damages incurred by BAE Systems to date. *Id.*

138.    Fluor responded on November 5, 2019 by confirming its commitments outlined in BAE OSI's October 28, 2019 letter.  A true and correct copy of Fluor's November 5, 2019 letter is attached here to as **Exhibit O**.

139.    On November 8, 2019, BAE OSI responded to the Army's October 16, 2019 Show Cause Notice.

140.    Based, in part, on Fluor's more cooperative attitude and corrective actions, BAE OSI was again able to avert termination for default caused by Fluor's unexcused delays.

141.    While termination was avoided, in March 2020, the Army notified BAE OSI that it was "willing to offer BAE an extension to July 31, 2021 [to account for Fluor's delay in completion of Subcontract work until December 2020], for the construction and commissioning of the new NC Facility . . . provided adequate consideration is obtained.  The Government considers consideration in the amount of $6,700,000 to be adequate and appropriate for the eight-month extension to BAE's contractual requirements."  A true and correct copy of the Army's March 24, 2020 letter is attached as **Exhibit P**.

142.	BAE OSI has not agreed to the Army's request for $6,700,000 in new consideration.  If an amount of new consideration is determined, BAE OSI will seek recovery from Fluor.  BAE OSI will notify Fluor accordingly.

143.	Currently, Fluor is scheduled to substantially complete its work under the Subcontract in December 2020—two and one half years beyond the contractually required completion date.

144.	Throughout the Project, BAE OSI put Fluor on notice that its failure to complete its Work by the July 30, 2018 Subcontract Completion date was a breach of contract, that BAE OSI was being and had been damaged by Fluor's delays, including incurring (i) costs for extended BAE OSI project personnel, (ii) costs for additional personnel and outside resources, and (iii) costs of the concessions it was required to provide the Army to avoid termination for default caused by Fluor's delay.  These issues have been discussed and negotiated by BAE OSI, in good faith, with Fluor in project correspondence, at project level meeting and at executive level meetings over the last several years.  To date, Fluor has failed to accept its responsibility for these issues, and has failed to fulfill its contractual obligations owed to BAE OSI.   The parties are, therefore, at an impasse on the issues.

145.	Any and all applicable and enforceable conditions precedent under the Subcontract and applicable law to bring the claims set forth herein have occurred, have been performed, or are excused.

## COUNT I
### (Breach of Contract)

146.	BAE OSI re-alleges and incorporates all allegations contained in the foregoing paragraphs as if they were fully set forth herein.

147.    The Subcontract is a binding and enforceable agreement between BAE OSI and Fluor.

148.    Under, and in furtherance of, the Subcontract, Fluor agreed to undertake certain obligations in connection with designing and building the Project, including, but not limited to:

    a.   Agreeing to accept full design responsibility.

    b.   Agreeing that time was of the essence and that it would complete its Subcontract work by July 30, 2018;

    c.   Committing to furnishing sufficient forces, including working overtime, to ensure completion of its work by July 30, 2018;

    d.   Agreeing that there shall be no changes in the schedule without BAE OSI's approval;

    e.   Agreeing to reimburse BAE OSI for all damages and expenses incurred by BAE OSI due to Fluor's failure to complete the Work within the Contract deadline;

    f.   Committing to accelerate work at no additional costs to BAE OSI to recover schedule slippages to ensure completion by the July 30, 2018 Subcontract deadline; and

    g.   Agreeing to perform the work in a skillful and workmanlike manner consistent with the level of care exercised by similarly situated contractors in the industry.

149.    Fluor materially breached those Subcontract obligations, by among other actions:

a. Failing to adequately assess, evaluate, and complete the design work in a timely manner.

b. Failing, without a contractually or legally valid excuse, to complete its work under the Subcontract by July 30, 2018;

c. Failing to devote sufficient resources, including overtime work, to ensure completion of work by July 30, 2018;

d. Attempting to change the Subcontract completion date without BAE OSI's approval through submission of monthly schedule updates with completion dates beyond the Subcontract's July 30, 2018 deadline;

e. Failing and/or refusing to accelerate work at no additional costs to BAE OSI to recover schedule slippages to ensure completion by the July 30, 2018 Subcontract deadline;

f. Refusing to reimburse BAE OSI for all damages and expenses incurred by BAE OSI due to Fluor's failure to complete its work by July 30, 2018;

g. Failing to manage its work and the work of its subcontractors and suppliers in a skillful and workmanlike manner consistent with the level of care exercised by similarly situated contractors in the industry, as required by the Subcontract; and

h. Failing to perform adequately and assign sufficient adequately qualified personnel to various aspects of the work, including most critically, the process design.

150.     Fluor failed to cure all of these material breaches.

40

151.     As a direct and proximate result of Fluor's breaches of the Subcontract, BAE OSI has suffered damages in excess of $75,000.00.  Under the Subcontract, each parties' liability to the other party is limited to $30 million.  *See* Ex. A, Sec 2.21.

152.      BAE OSI damages will be proven at trial in an amount not to exceed the parties' maximum agreed $30 million limitation on liability for all claims and damages.

153.     Such damages for the breaches of the Subcontract detailed above include, but are not limited to:

    a.  BAE OSI's costs for extended (beyond July 30, 2018) and additional management resources and additional third party resources necessitated solely by Fluor's failure to completion its work by the Subcontract completion deadline;

    b.  The costs of the $9 million worth of abnormal maintenance to the legacy NC facility that BAE OSI was forced to perform at no cost to the Army as a concession to avoid a termination for default arising out of the February 2018 Show Cause Notice caused by Fluor's unexcused delay;

    c.  Any and all additional costs for concessions to the Army to avoid a termination for default arising out of the October 2019 Show Cause Notice caused by Fluor's unexcused delay; and

    d.  Excess cost for BAE OSI to complete work removed from Fluor's scope of work, including the design and construction of the Administration Building and Lab Facility and Dust Collection, Acid Sewer, and all remaining Cutter Warehouse work.

WHEREFORE, BAE Systems Ordnance Systems, Inc., respectfully requests judgment against Fluor Federal Solutions, LLC, in a specific amount to be proven at trial, together with prejudgment and post-judgment interest, costs, and reasonable attorneys' fees.

**\<signature follows on next page\>**

Dated:  September 30, 2020

Respectfully submitted,

  /s/ Todd M. Conley
Todd M. Conley (VSB #89839)
Jeffrey J. Golimowski (VSB #93525)
WOMBLE BOND DICKINSON (US) LLP
8350 Broad Street, Suite 1500
Tysons, VA 22102
Telephone:  (703) 394-2245
Email:  todd.conley@wbd-us.com

D. Stan Barnhill (VSB #22978)
barnhill@woodsrogers.com
Joshua R. Treece (VSB #79149)
jtreece@woodsrogers.com
Justin E. Simmons (VSB # 77319)
jsimmons@woodsrogers.com
WOODS ROGERS PLC
10 South Jefferson Street, Suite 1400
Roanoke, Virginia 24011
Telephone:  (540) 983-7600
Facsimile: (540) 983-7711

Karen M. Stemland (VSB #47167)
kstemland@woodsrogers.com
WOODS ROGERS PLC
123 East Main Street, 5th Floor
Charlottesville, Virginia 22902
Telephone: (434) 220-6826
Facsimile: 434-566-0473

*COUNSEL FOR PLAINTIFF*, BAE SYSTEMS
ORDNANCE SYSTEMS, Inc.