**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Roanoke Division**

| | |
|---|---|
| **BAE SYSTEMS ORDNANCE SYSTEMS, INC.** ) ) ) | |
| **Plaintiff,** ) ) | **Civil Action No. 7:20-CV-00587-MFU-RSB** |
| **v.** ) ) | |
| **FLUOR FEDERAL SOLUTIONS, LLC** ) ) | |
| **Defendant.** ) ) ) | |

**FLUOR FEDERAL SOLUTIONS, LLC'S MEMORANDUM IN OPPOSITION TO
BAE'S MOTION TO STAY AND TO BIFURCATE**

Respectfully submitted,

s/Scott P. Fitzsimmons
Scott P. Fitzsimmons (VSB 68147)
Kathleen O. Barnes (VSB 30451)
Edward J. Parrott (VSB 29499)
Sarah K. Bloom (VSB 94406)
Gregory M. Wagner (VSB 96017)
WATT, TIEDER, HOFFAR
& FITZGERALD, LLP
1765 Greensboro Station Place, Suite 1000
McLean, Virginia 22102
Tel: (703) 749-1000
Fax: (703) 893-8029
sfitzsimmons@watttieder.com
kbarnes@watttieder.com
eparrott@watttieder.com
sbloom@watttieder.com
gwagner@watttieder.com

*Attorneys for Fluor Federal Solutions, LLC*

## INTRODUCTION

BAE's untimely Motion to Stay and to Bifurcate is legally and factually unsupported. Indeed, BAE seeks to do nothing but delay this litigation and prevent Fluor from prosecuting its affirmative claims. BAE knows that it is liable for substantial damages that Fluor suffered on the NC Facility Project as a result of BAE's changes, delays, and defective design. And BAE wishes to avoid such liability through all possible measures. BAE's attempt to improperly delay this litigation should be rejected, and Fluor respectfully requests that this Honorable Court deny BAE's Motion to Stay and to Bifurcate in its entirety.

Although BAE first mentioned the possibility of requesting a stay and/or bifurcation in July of 2021, BAE ostensibly abandoned that position and never filed such a motion. Instead, BAE deliberately engaged in significant discovery efforts to understand Fluor's litigation position. Those efforts included exchanging the names of important fact witnesses, identifying the location of Project records to be produced, and finalizing an ESI Protocol that would control how the Parties produced records. BAE even negotiated, approved, and submitted to this Court a scheduling order that included a March 2023 trial date. That schedule has been approved by this Court. Fluor has also commenced third-party discovery by serving a subpoena on Lauren Engineers & Constructors, Inc. ("Lauren"), BAE's original subcontractor. Then, at the eleventh hour, when BAE's responses to Fluor's Document Requests and Interrogatories were due, BAE revived its idea of a stay. BAE timed its current motion to ensure maximum disruption to this case.

BAE has had months to formulate its legal arguments for a stay and bifurcation, and no intervening events between July 2021 and its recent filing justify such a delay. Indeed, BAE fails to present any compelling reason to stay this matter or a workable plan for bifurcation. Instead, BAE oversimplifies the issues in this case, and attempts to minimize BAE's substantial design obligations, including BAE's role as process designer, which affected every aspect of Fluor's work on the NC

Facility Project. The truth is that Fluor will require discovery on all issues to both present its affirmative claims and to defend against BAE's claims. This truth, and the intertwined nature of the issues in this action explains BAE's failure to maintain a consistent or coherent legal position as to the scope of each Party's design responsibility - the very issue that forms the basis for BAE's Motion to Dismiss and its Motion to Stay and Bifurcate.

BAE's vacillating legal arguments demonstrate that the issue of design responsibility is <u>not</u> as straightforward as BAE represents to this Court. Rather, the Parties' respective design responsibilities are so intertwined with other claims and defenses in this action that they simply cannot be disentangled in the manner proposed by BAE. As such, neither a stay nor bifurcation will promote efficiency in this case.

For the reasons set forth below, this Court should deny BAE's attempt to disrupt the Parties' agreed-upon Scheduling Order, and reject BAE's disingenuous reductionism as to its most critical obligations under the Subcontract.

## **BACKGROUND**

In June 2021, BAE moved to dismiss <u>part</u> of Fluor's Counterclaim and to strike Fluor's allegations seeking damages in excess of an alleged contractual damages cap. ECF Nos. 36, 38. Previously, in May of 2021, Fluor moved to dismiss <u>part</u> of BAE's Complaint because a portion of BAE's requested damages were consequential damages, which were explicitly waived in the Parties' Contract. <u>See</u> ECF 31 (collectively "the Pending Motions").

This Court will hear arguments on the Pending Motions on January 14, 2022. Although these motions have been pending for months, it was not until December 3, 2021 that BAE moved for a stay of discovery, and to bifurcate for early resolution two issues: "(1) [t]he [Sub]contract's assignment of design responsibility for the overall NC facility and whether any percentage-completion warranty existed for [the Lauren Design]; and (2) [e]nforceability and application of the [Sub]contract's $30M

damages cap."

### A.   BAE's Motion Reveals Its Misunderstanding of the Legal Issues in this Case

BAE's request to stay or bifurcate suffers from two immediate failings. First, BAE's Motion to Dismiss is not likely to prevail, thereby undermining its request to stay discovery. Indeed, when courts consider a motion to stay pending dispositive motions, they review the likelihood that the motions will be granted. Bennett v. Fastenal Co., No. 15-cv-543, 2016 WL 10721816, at *1 (W.D. Va. Mar. 8, 2016). BAE's Motion to Dismiss is based on the allegation that Fluor had all design responsibility for the NC Facility Project. Yet, BAE now has admitted responsibility for the Process Design. Thus, no credible dispute can exist that BAE warranted the Process Design and was responsible for costs arising from BAE's changes to the Process Design. For this reason, BAE's Motion to Dismiss will not dispose of all claims in this case. BAE's recent admission and acknowledgement of its Process Design responsibilities also ensures that no basis exists to dismiss Fluor's claims seeking additional costs and delays due to BAE's ever-changing Process Design.

Secondly, BAE's incoherence on the issue of design responsibility demonstrates exactly why its Motion to Stay and to Bifurcate must be denied. The issue of the Parties' respective design responsibility is largely inseparable from the remainder of this case. The various aspects of the Project's design are factually and legally intertwined with each other, and almost all other claims and defenses the Parties have asserted. The issue of design responsibility is not a simple, separable issue requiring minimal discovery. Thus, under no circumstances would staying or bifurcating this matter reduce the Parties' discovery burden. For these reasons, neither of BAE's proposed issues is appropriate for a stay or for bifurcation, and the Court should reject BAE's misguided experiment in inventive civil procedure.[1]

---

[1] Notably, by filing its Motion to Bifurcate now, before the Court has rendered any opinion on its Motion to Dismiss, BAE acknowledges its own belief that its Motion to Dismiss will not be granted.

**B.      BAE Has Admitted Responsibility for the Process Design, Which Affected All Other Project Components**

The issue of "design responsibility" – as set forth by BAE – has become much clearer now that BAE has fully acknowledged and admitted its responsibility for the Process Design. In fact, in its Motion to Stay, BAE makes a full-throated admission of its Process Design responsibilities. See ECF 64, at 4 (acknowledging that BAE was responsible for "providing the requirements for a proprietary NC manufacturing process," that BAE was responsible for the "throughput model," and that BAE was responsible for "specifying the process equipment"). Indeed, BAE admitted not only its responsibility for the Process Design, but also the critical interface between BAE's Process Design obligations and Fluor's work under the Contract. Id. ("BAE was responsible for specifying the process equipment to be used in the design; **Fluor was responsible for implementing those requirements in its design** . . . .") (emphasis added).

By admitting responsibility for the Process Design, <u>BAE must also acknowledge that it is also liable to Fluor for any costs incurred as a result of changes that BAE made to the Process Design</u>. Notably, BAE recognizes the tremendous impact that the Process Design has on the Project. In its Complaint, BAE described the Process Design as "critical" and affecting <u>all other work</u>. See ECF 1, ¶ 73 ("**The process design was critical because it described the detailed layout of the complex web of piping required by the Project. Without it, the construction of the NB and SB, as well as many follow-on activities could not occur as-planned, and sometimes, not at all**."). In this case, Fluor's damages arise predominantly because BAE constantly changed its Process Design.

BAE's most recent admission of its Process Design responsibility is wholly <u>inconsistent</u> with the assertions that BAE made in its Complaint, in which BAE alleged that Fluor was <u>solely</u> responsible for all aspects of the Project design, including the Process Design. See BAE Compl. ECF 1, at ¶ 30 (alleging that Fluor failed to "complete the process design"); <u>Id.</u> at ¶ 72 (alleging that Fluor failed to make progress on the "process design for the Nitration Building"). In response to Fluor's

4

Counterclaim, BAE also denied having <u>any</u> Process Design responsibility. <u>See</u> ECF 40, ¶ 167. BAE has clearly and fully retracted its initial position and now (properly) acknowledges its responsibility for the most critical aspect of the NC Facility Project – creating the technologically complex recipe for how the nitrocellulose would be manufactured and processed. As BAE recognizes, all other aspects of the Project were impacted when BAE's process changed.

Unlike BAE's Complaint, in which BAE disclaims all design responsibility, Fluor's Counterclaim accurately describes how and why BAE was responsible for major aspects of the Project's design. <u>See</u> ECF 29 ¶¶ 36-41, 157-185 (assigning responsibility for the process design to BAE and explaining the fundamental role of the Process Design on the Project). Fluor's responsibility was to construct the structures supporting BAE's Process Design, using the BAE-provided Lauren Design, and to install the piping and equipment that connected each of the BAE-designed nitrocellulose process components. Hence, any change that BAE made to the Process Design impacted Fluor's work.[2] As set forth in Fluor's Counterclaim, BAE's delay and constant modifications to the Process Design affected Fluor's work and caused Fluor to incur additional costs. ECF 29 ¶¶ 183-84. BAE's incoherence on the issue of design responsibility demonstrates exactly why its Motion to Stay and to Bifurcate must be denied.

> **C.    BAE "Corrected" and "Redlined" the Lauren Design, Included the Lauren Design in the Contract, and Required Fluor to Adhere to the Lauren Design**

BAE's newest argument to avoid design responsibility is that Fluor "elected to use" the BAE-provided Lauren Design, and therefore, BAE bears no responsibility whatsoever for the immature and defect-ridden Lauren Design. <u>See</u> ECF 64, at 4 (alleging that Fluor was required to correct the Lauren Design "once it [Fluor] <u>chose</u> to use it.") (emphasis added). Here again, BAE's effort to avoid

---

[2] One example of a direct affect that BAE's Process Design had on Fluor work's is related to PCN D000Y9 in the amount of ~$11 Million. In that PCN, Fluor requested costs for having to increase the HVAC size as a result of BAE's modified, and increased Process Design.

liability for its breach of the Contract is a complete fabrication for which BAE can neither find support in the Contract nor in the contemporaneous Project record. BAE's assertion that Fluor "elected to use" the Lauren Design also contradicts its prior arguments that Fluor was hired to "validate and complete" the Lauren Design. BAE fails to explain how Fluor could have been hired to "validate and complete" a design whose use on the Project was optional.

The truth is that BAE provided Fluor with the Lauren Design and directed Fluor to use the Lauren Design to bid the Project. See ECF 29, ¶ 10. During the Solicitation Phase, BAE also confirmed that the Lauren Design applied to "all disciplines" and must be "referenced and applied to the program." See ECF 29, ¶ 70. The Parties' Contract also unequivocally reveals that BAE "corrected" and "redlined" the Lauren Design before providing it to Fluor for use on the Project. See SOW § 2.0 ("The drawings, specifications, and technical documents provided in APPENDIX G are amended in this Statement of Work (SOW) by BAE Systems to show additional **requirements** and/or **corrections**.") (emphasis added); Contract SOW § F ("PFDs and P&IDs have been **redlined with all known process changes** to date including required actions from the preliminary PHA.")[3] (emphasis added).

Indeed, Sections F and 2.0 of the SOW reveal not only that BAE "corrected" and "redlined" the Lauren Design before providing it to Fluor, but also that the Process Design would directly impact Fluor's other work on the Project. In the Contract, BAE made a point to explain that the drawings provided by BAE reflected "all known process changes." SOW, § F. Thus, BAE recognized that changes to the Process Design would affect Fluor's work. Unfortunately, Fluor incurred significant costs during the Project as a direct result of the defects in the Lauren Design and the continuous changes BAE made to the Process Design.

---

[3] The acronyms PFD and P&ID are short for Process Flow Diagram (PFD) and Process and Instrumentation Diagram (P&ID). PHA stands for Process Hazard Analyses (PHA).

In addition to providing an allegedly "corrected" Lauren Design to Fluor, BAE attached the Lauren Design as Appendix G to the Contract's Statement of Work. The Contract then <u>required</u> Fluor to use BAE's "corrected" and "redlined" Lauren Design on the Project. <u>See</u> Contract SOW § F ("Subcontractor [Fluor] will revise and approve PFDs and P&ID's **based on the redlined documents, (see APPENDIX G)**") (emphasis added). The Subcontract also confirms that the Lauren Design represented the Project's "minimum requirements," SOW § 2.4.

Finally, the contemporaneous records in this matter fail to support BAE's assertion that Fluor "elected to use" the Lauren Design. In fact, BAE required Fluor to adhere to the Lauren Design during the Project. <u>See</u> Exhibit A (directing Fluor to adhere to the Lauren Design and specifications regarding mechanical valves). BAE's attempt to evade liability by asserting that Fluor "elected to use" the Lauren Design is, therefore, entirely unsupported.[4]

Most importantly, by providing Fluor with "corrected" and "redlined" Lauren Design drawings and specifications and requiring Fluor to use them on the NC Facility Project, BAE, as a matter of law, warranted that those drawings and specifications were adequate to construct the Project. BAE also represented in the Parties' contractual Design Configuration Management Plan (DCMP), which was approved <u>after</u> contract execution, that the Lauren Design was 85% complete. Clearly, BAE's contractual representation was wrong. But BAE's focus on the 85% representations misses the point. BAE breached its warranty that the Lauren Design was adequate for Fluor to complete the

---

[4] BAE's intent to obscure the contemporaneous record by staying discovery in this Court is <u>not</u> limited to Fluor's design responsibilities. Indeed, in its Motion to Dismiss, BAE asserted that Fluor could have prevented its damages by simply stopping work. <u>See</u> ECF 50, at 13 ("Fluor . . . had no obligation to proceed to perform 'constructive changes' under the Change Clause . . . ."). Like its other arguments, BAE's position fails to reflect the contemporaneous record. Indeed, in a letter dated August 20, 2017, BAE asserted that Fluor <u>must continue working</u> regardless of whether Fluor believed the work was within the Contract's scope. BAE stated "Whether the work is within or outside the scope of the Subcontract, Fluor is required to proceed with performance of the Subcontract. . . If Fluor believes the work is outside the scope of the Subcontract, Fluor is still required to proceed with the work and may not stop work."

Project. The Lauren Design was defective and both the substandard Lauren Design and changes to the Process Design impacted Fluor's overall Project costs.

### D. Bifurcation Would Not Reduce Discovery in this Case

Bifurcation serves no useful purpose as to the second issue BAE proposes to separate: the enforceability and application of three (3) Subcontract provisions limiting recoverable damages for certain types of claims to $30M ("the LOD clauses"). Even if the Court were to find in BAE's favor on <u>all</u> questions related to the Subcontract's LOD clauses, Fluor would still be required to present all of its claims and damages at trial so that the Court could determine the extent of damages that had been proven. Only after making that determination could the Court apply a damages cap. And Fluor requires discovery on all of BAE's changes, delays, and defective specifications to defend against BAE's allegations of delay. Thus, no efficiency is achieved by bifurcating or staying discovery as to this issue.

### LEGAL STANDARDS

### I. Standard Applicable to Motions to Stay

Motions to stay discovery "'are generally disfavored because delaying discovery may cause case management problems.'" <u>Bennett</u>, 2016 WL 10721816, at *1 (quoting <u>Fed. Ins. Co. v. S. Lithoplate, Inc.</u>, 2013 WL 4045924, at *1 (E.D.N.C. 2013)). A pending dispositive motion alone is insufficient to warrant a stay. <u>See</u> <u>Lismont v. Alexander Binzel Corp.</u>, No. 12-cv-592, 2014 WL 12527482, at *1 (E.D. Va. Jan. 14, 2014) (observing other courts' recognition that "[a]bsent extraordinary circumstances, litigation should not be delayed simply because a non-frivolous motion has been filed"). Instead, to determine whether to grant a stay, courts will "balanc[e] the harm produced by a delay in discovery against the possibility that the [dispositive] motion will be granted." <u>Bennett</u>, 2016 WL 10721816, at *1. To perform this balancing, courts ask whether, "tak[ing] a preliminary peek at the merits of the allegedly dispositive motion . . . there appears to be <u>an immediate and clear possibility</u> that it will be

granted." Id. (denying motion to stay because it was not immediately and clearly possible that motion to dismiss would be granted).

In order to establish "good cause" to stay discovery, the moving party must present a particular and specific demonstration of fact as to why a stay of discovery should be issued. Cognate BioServices, Inc. v. Smith, No. CIV. WDQ-13-1797, 2015 WL 5673067, at *2 (D. Md. Sept. 23, 2015) (quoting Baron Fin. Corp. v. Natanzon, 240 F.R.D. 200, 202 (D. Md. 2006). Thus, BAE must make a specific factual showing that the interests of justice and considerations of prejudice and undue burden to the Parties require a stay and that the benefits of a stay outweigh the cost of delay.

Indeed, the requirement to show "good cause" is a "high hurdle" for the moving party. Id. (quoting Furlow v. United States, 55 F. Supp. 2d 360, 366 (D. Md. 1999). In certain instances, as in this case, discovery stays result in case management problems, a prolongation of the proceedings, and a duplication of attorneys' fees. For these reasons, the Court must carefully weigh the potential costs and benefits of a stay of discovery.

## II.   Standard Applicable to Motions to Bifurcate

Bifurcating trials is only appropriate if doing so will "(1) promote greater convenience to the parties, witnesses, jurors, and the court, (2) be conducive to expedition and economy, and (3) not result in undue prejudice to any party." Wheeler v. Virginia, No. 17-cv-337, 2018 WL 2978043, at *1 (W.D. Va. Apr. 26, 2018) (internal quotations omitted) (denying bifurcation); Saunders v. Metro. Prop. Mgmt., No. 17-cv-159, 2021 WL 4303776, at *2 (W.D. Va. Sept. 21, 2021) (observing Rule 42(b)'s Advisory Committee's guidance that "[s]eparating issues for trial . . . 'is not to be routinely ordered'" (quoting Toler v. Gov't Emps. Ins. Co., 309 F.R.D. 223, 225 (S.D. W. Va. 2015))). "The party requesting separate trials bears the burden" of showing that bifurcation would advance these interests. Wheeler, 2018 WL 2978043, at *1. Courts disfavor bifurcation where, as here, the issues sought to be separated are not dispositive. See Latson v. Clarke, No. 16-cv-39, 2017 WL 3098124, at *3 (W.D. Va.

July 21, 2017) (denying bifurcation because, *inter alia*, such separation "would not be efficient because the issue is not dispositive of the entire case"). Finally, bifurcation is not appropriate where the issues to be bifurcated substantially overlap with other issues in the case. See Wheeler, 2018 WL 2978043, at *2 (denying bifurcation in part because issues to be bifurcated substantially overlapped with other issues); Collier, 2015 WL 6126476 at *3 (same).

## ARGUMENT

### I.     A Stay of Discovery is Inappropriate Because BAE's Dispositive Motions Are Unlikely to Be Granted and a Stay of Discovery Would Only Delay This Case

A stay of discovery serves no useful purpose in this case. As an initial matter, Fluor's Counterclaim presents a valid cause of action for breach of contract, to include a breach of the implied warranty of design specifications. For this reason, and in light of BAE's recent admission to its Process Design responsibilities, BAE's Pending Motions are unlikely to be granted.

The issues raised in the Pending Motions are complex, factually dense, and intertwined; and they cannot be resolved by reference to the pleadings alone. Even if the Pending Motions prevail, they will not dispose of the entire case. For example, Fluor's claims related to BAE's changes to the Process Design would survive. And despite BAE's disingenuous attempt to minimize Fluor's claims related to the Process Design, those claims comprise a significant portion of Fluor's Counterclaim. Thus, efficiency is not promoted by staying discovery. A stay would also prejudice Fluor's opportunity, due solely to BAE's delay, to timely recover the substantial sum owed to it by BAE, by jeopardizing the March 2023 trial date **to which the Parties agreed**.

#### A.     BAE's Pending Motions are Unlikely to be Granted

A stay of discovery is inappropriate in this case because there is no "immediate and clear possibility" that BAE's Pending Motions will be granted. See Bennett, 2016 WL 10721816, at *1. A Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a Complaint. See Barber v. Sam's Club East, Inc., No. 6:17-cv-00035, 2017 WL 4479221 at *1 (W.D.

Va. Oct. 6, 2017). It does not resolve contests surrounding the facts, the merits of the claims, or the applicability of defenses. See Republican Party of N. Carolina v. Martin, 980 F.2d 943, 952 (4th Cir. 1992). In resolving BAE's Motion to Dismiss, this Court must assume the allegations set forth in the Counterclaim are true and construe them in the light most favorable to Fluor. See id. Fluor's Counterclaim must merely set forth sufficient facts, accepted as true, to "state a claim for relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678, (2009).

### 1.   The Arguments, Facts, and Issues at Stake are Intertwined and Overlapping

The issues raised in Fluor's Counterclaim, and in BAE's Pending Motions, are simply too intertwined and fact-specific to be resolved on a Motion to Dismiss. As set forth in more detail below, it is also for this reason that BAE's Motion to Bifurcate must fail.

BAE's constant vacillation in its legal positions further illustrates the interconnected nature of the issues, claims, and defenses at stake. As set forth above, BAE initially argued that Fluor bore "all" design responsibility on the Project, denying any responsibility whatsoever for the Process Design. ECF 39 at 5-9, 12-13; ECF 40 ¶ 177. BAE also argued that Fluor was hired to "validate and complete" the Lauren Design, that the Contract contained no express or implied warranty that the Lauren Design was fit for use on the Project or was 85% complete, and that any pre-contract representations to that effect were disclaimed or merged into the Subcontract's final terms. Id. at 7-15. Thus, BAE asserted that Fluor failed to state a claim related to any design warranty.

BAE's arguments fail on the facts and as a matter of law. As set forth in Fluor's Counterclaim, after Contract execution, BAE approved the Parties' contractual DCMP document, which stated unequivocally that the Lauren Design, which BAE attached to the Subcontract, was estimated by BAE to be 85% complete. See ECF 29, 123-24. Thus, BAE's representations are not limited to precontract discussions. Rather, BAE committed its representations to writing, after contract execution, and approved its own representations regarding the Lauren Design. Any attempt by BAE to assert that

11

the DCMP is not a contract document simply fails.

Even without the BAE-approved DCMP, BAE's Motion to Dismiss is unlikely to prevail. Fluor is not required to establish an "express" warranty as to the completeness of the Lauren Design. Instead, and as set forth in Fluor's Opposition to BAE's Motion to Dismiss, by furnishing the Lauren Design and requiring Fluor to use it, BAE impliedly warranted its fitness for use on the Project. ECF 46 at 2-7, 8.

After reviewing Fluor's opposition brief, BAE abruptly shifted its position, asserting - for the first time in six (6) years - that Fluor "elected to use" the Lauren Design. ECF 49 at 1, 2, 3, 19. Yet, BAE continues to maintain that Fluor was hired to "validate and complete" the Lauren Design. Id. at 4. Moreover, after vehemently denying any design responsibility, BAE now admits responsibility for the entire Process Design, **including the throughput model**, around which the rest of the NC Facility is based. Id. at 5. Implied warranties, and liability for associated changes and delays, attach to BAE's Process Design responsibility.

Even while arguing that the design responsibility issues are straightforward and ripe for review, BAE has failed to take a consistent position as to the nature of Fluor's design responsibilities, the scope of BAE's design responsibilities, and the role of the Lauren Design on the Project. Thus, the Court is unlikely to resolve these issues at this early stage of the litigation, and before a single document has been exchanged in discovery.

      **2.**      **Resolving the Parties' Motions Requires Reviewing the Parties' Actions During Contract Performance**

As set forth above, the Contract unambiguously requires Fluor to use BAE's "corrected" and "redlined" Lauren Design on the Project. See SOW § F ("Subcontractor [Fluor] will revise and approve PFDs and P&ID's **based on the redlined documents, (see APPENDIX G)**") (emphasis added). The Contract also establishes that the Lauren Design represents the Project's "minimum requirements." See SOW § 2.4 ("Specifications provided in APPENDIX G represent the minimum

requirements."). BAE, however, now asserts that Fluor "elected to use" the Lauren Design, while also asserting that Fluor must "validate and complete" that same design. Thus, it is BAE – not Fluor – who believes that an ambiguity exists in the Contract. As a result, this Court must review the Parties' contemporaneous actions, which reveal that BAE held Fluor to the Lauren Design and specifications. BAE hopes to stay discovery in this case to avoid presenting these internal communications to the Court. BAE knows that none of its internal records support its recently-contrived assertion that Fluor "elected to use" the Lauren Design.

Next, despite now admitting full responsibility for the Process Design, including the throughput model, BAE attempts to minimize the impact that changes to the Process Design had on other aspects of the Project. ECF 49 at 5. Specifically, BAE argues that while it was responsible only for the Process Design, Fluor was responsible for the structural design, civil engineering, mechanical engineering, etc. See id. at 4. But Fluor's cost overruns in those areas are related directly to BAE's ever-changing Process Design. For example, when BAE changed the process equipment orientation, sizing, or capacity, it directly affected the amount of piping Fluor would install that connected to the process equipment.

BAE wants this Court to believe that the Process Design was a minimum feature of the NC Facility. But the Process Design is the central feature of the NC Facility – it is the element around which all other aspects of the NC Facility are based. BAE's changes to the Process Design impact the remainder of ECF's work. And BAE admitted this fact in its Complaint. See ECF 1 ¶ 73 (acknowledging that the Process Design was "critical" and "Without it, the construction of the NB and SB, as well as many follow-on activities could not occur as-planned, and sometimes, not at all.").

For the above reasons, to define the scope of each Party's design responsibility, the Court must review the Parties' course of performance, consider how key Subcontract terms were treated during the Project, and review BAE's internal documents, which will be revealed during discovery.

3.     **BAE Misrepresents the Issues Related to the Contract's Limitation of Damages Clause**

In its Motion to Stay, BAE asserts that the Pending Motions will address the Contract's Limitation of Damages (LOD) Clause. But BAE wholly misrepresents the issues presented in the Pending Motions. The fundamental issue related to the LOD clause is whether it applies to the type of claims asserted by Fluor in this action, and if so, whether the clause is enforceable under Virginia law. Even before reviewing those issues, the Court must address an ambiguity in the Contract, which contains <u>three</u> (3) LOD clauses with different terms.

Fluor's arguments are set forth more fully in its prior pleadings, but the plain language of the Contract reveals that the LOD clauses do <u>not</u> apply to the types of damages Fluor asserts in this case. Fluor's damages in this case arise from changes to its scope of work that were caused by BAE, and all three of the Contract's LOD clauses refer such damages to the Subcontract's Changes Clause for resolution.

Even if this Court interprets the LOD clauses in BAE's favor, Virginia law prohibits prime contractors from imposing a cap on recovery of a subcontractor's demonstrated additional costs. <u>See</u> VA Code § 11-4.1:1. In its Motion to Stay, BAE <u>failed</u> to inform this Court of this substantial legal argument now pending before the Court. Under Section 11-4.1:1, any contract provision that attempts to diminish a subcontractor's right to assert claims for demonstrated additional costs is "null and void." Thus, the LOD clauses are unenforceable as to Fluor if interpreted in the manner proposed by BAE. This Virginia statute has <u>never</u> been interpreted by any court in Virginia or elsewhere. This legal issue is, therefore, a matter of first impression and is not likely to be resolved on a Motion to Dismiss.

B.     **The Pending Motions Will Not Resolve the Entire Case or Narrow the Issues**

1.     **BAE's Motion to Dismiss Will Not Dispose of the Entire Action**

A stay of discovery will not promote efficiency in this case because the Pending Motions will not dispose of this entire action. As an initial matter, Fluor sought only a <u>partial</u> dismissal of BAE's

Complaint.[5] Further, BAE did <u>not</u> move to dismiss Fluor's claims related to BAE's changes to the Project's Process Design. Instead, BAE attempts to minimize the magnitude of those claims. For example, during the Parties' most recent conference call with Judge Ballou, BAE inaccurately represented that Fluor's damages related to BAE's Process Design changes are "minimal." BAE selected the example of Fluor's claim for additional piping within the Stabilization Building (SB), PCN D00X2, for which Fluor asserts $15,834,334.00 in damages against BAE, to support its position that Fluor's Process Design claims are insignificant. But contrary to BAE's argument, nearly $11 million – the majority of PCN D00X2 - relates to BAE's deficient Process Design. Thus, BAE misrepresented Fluor's claims to this Court; a significant portion of Fluor's damages arise from BAE's changes to the Process Design.

In Footnote 2 of its Motion to Stay and to Bifurcate, BAE again egregiously misrepresents Fluor's claims and damages.[6] Specifically, BAE asserts that <u>none</u> of the damages set forth in Fluor's delay- and acceleration-related claims (PCNs D000S3, D000U7, and D000Y0) relate to BAE's changes to the Process Design. That is false. Fluor reserves its right to amend its damages and to present them through expert testimony. As BAE well knows, however, when submitted during the Project, more than half of PCN's D000S3, D000U7, and D000Y0 (which approximate $73 Million) is attributable to BAE's Process Design.

BAE complains in its Motion to Stay that Fluor has not provided an accounting of how much of its damages are attributable to the Process Design changes. ECF 64 at 17-18. But that is precisely the purpose of discovery, which BAE seeks to avoid through its Motion. If BAE wishes to understand

---

[5] Fluor moved to dismiss only those costs related to "abnormal maintenance" that BAE agreed to perform on other parts of the Radford Army Ammunition Plant. Such damages constitute consequential damages and Fluor was not involved in those other parts of the Radford Plant.

[6] It is unclear how BAE arrived at the conclusion that $150 million of Fluor's claims are unrelated to the Process Design, but that conclusion is false. BAE selected PCNs that do, indeed, relate to the Process Design and, in any event, the selected examples do not add up to $150 million.

Fluor's claims in further detail, BAE may request that information through proper discovery requests and proceed to expert disclosures, during which Fluor's complete damages will be presented. BAE, however, wishes to avoid discovery, and yet complains that it has not received information from Fluor.

> **2.     BAE's Motion to Strike Will Not Prevent Fluor From Taking Discovery on its Full Damages and Defenses**

Even if the Court agrees with BAE's flawed interpretation of the Subcontract's LOD clauses, such a ruling would <u>not</u> reduce the scope of discovery. BAE believes that if recovery is capped at $30M, Fluor would be barred from presenting claims exceeding that amount. BAE is incorrect. Fluor must still take discovery on all of its claims, and present evidence on all of its damages, regardless of any alleged damages cap.

Should this Court apply an alleged damages cap, Fluor must nevertheless <u>present</u> all of its damages to this Court. At that point, after finding that Fluor has proven its damages, the Court could apply any damages cap. See <u>J.S. by Sites v. Winchester Pediatric Clinic, P.C.</u>, No. 5:19-CV-0097, 2021 WL 833955, at *4 (W.D. Va. Mar. 4, 2021) (declining to address constitutionality or applicability of statutory medical malpractice damages cap until after liability and amount of damages had been proven at trial). Indeed, Fluor must present all its claims and damages to preserve them for appeal.

Discovery of all issues is also required for Fluor to <u>defend</u> against BAE's Complaint, including BAE's allegations that Fluor delayed the Project. BAE's many changes to the Project, and its refusal to extend the schedule, excuse any alleged delay by Fluor. Fluor will, therefore, require discovery on the same issues regardless of whether the disputed provision applies to its affirmative claims.

> **C.     A Stay of Discovery Will Prejudice Fluor**

A stay of discovery will prejudice Fluor's ability to prepare its claims and defenses for trial. Fluor has asserted approximately $183 Million in damages arising out of BAE's defective specifications, as well as changes, delays, and acceleration caused by BAE. The factual and legal issues within Fluor's claims are complex and intricate and will require a significant amount of time to develop through

discovery. By comparison, BAE's claims are valued at $9 million and relate to one issue: Fluor's alleged failure to timely complete the Project.

The Parties' deadline to complete fact discovery is November 16, 2022. <u>See</u> ECF 60, at 1. The Parties now have less than a year to complete all fact discovery on their claims and defenses. And BAE's Motion to Stay would <u>not</u> pause discovery only until the Parties' oral argument on January 14, 2022. Rather, BAE has requested a stay until the Pending Motions are <u>decided</u>. ECF 64 at 1. Thus, BAE's plea for a "short stay" assumes that Judge Urbanski will rule on the Pending Motions from the bench. But discovery could be delayed for months if this Court does not rule from the bench.

Put simply, BAE, the Plaintiff in this case, asks this Court to delay discovery <u>indefinitely</u>, thereby stalling the case and eroding the time in which the Parties have to complete discovery. Such a delay would prejudice Fluor's ability to prepare its case, but would likely not materially affect BAE. This Court should reject BAE's unfair efforts to compress the discovery timeline to which it agreed.

Finally, BAE's assertion that this case is "just about money" inappropriately minimizes the importance of a $183 Million case and evinces BAE's utter disregard for these proceedings. BAE's goal is to delay revealing its own incriminating documents, prevent Fluor from prosecuting its claims, and move the trial date – such actions are fundamentally prejudicial to Fluor.

### D.    BAE Participated in Discovery for Months Without Objection

Any assertion that discovery presents an undue burden is belied by the fact that from July 23, 2021, until November 15, 2021, BAE participated in discovery without objection. Months after filing its Rule 12(b) Motions, BAE served Initial Disclosures, negotiated an ESI Protocol, and exchanged the names of hub and party custodians and non-custodial document locations with Fluor.

On October 15, 2021, after the Parties agreed to an ESI protocol for document production, Fluor served its First Set of Interrogatories and First Set of Requests for Production of Documents on BAE. In accordance with FRCP 33(b)(2) and 34(b)(2), BAE's responses were due November 15,

2021. For a full 26 days after it was served with discovery, BAE remained silent. BAE did not mention its desire or intention to seek a stay of discovery. Indeed, had BAE moved for a stay in July, or even the day after Fluor's discovery was served, the Motion would already be resolved. Yet, BAE intentionally stayed silent, hoping to delay this litigation as long as possible.

BAE also failed to inform this Court that third-party discovery is ongoing. Fluor has served subpoenas on Lauren Engineers as well as on the United States Army. Fluor also intends to request a letter rogatory through this Court as authorized by 28 U.S.C. § 1781(b)(2) to acquire documents from BAE's process designer, with whom BAE directly subcontracted. Fluor sought BAE's assistance identifying where their subcontractor could be served with discovery, but BAE refused to respond. On November 17, 2021, the subcontractor confirmed that they did not have a United States presence. As a result, Fluor must request a letter rogatory to acquire their documents.

BAE had five months to stay discovery and chose not to do so. Instead, without a court order and before even filing a motion to stay, BAE unilaterally imposed a stay of discovery in this case by objecting "to all discovery in this action until the Motions to Dismiss, Motion to Strike, and Motions to Stay and to Bifurcate are ruled upon by the Court." In doing so, BAE purposefully manipulated the schedule in this case in the hope of achieving its desired effect – to prevent the production of any document and to avoid explaining its shifting arguments in responses to interrogatories.

## II.     Bifurcation is Inappropriate, Inefficient, and Will Unnecessarily Delay This Litigation

Bifurcation is appropriate only where the Party proposing bifurcation can show that it would "(1) promote greater convenience to the parties, witnesses, jurors, and the court, (2) be conducive to expedition and economy, and (3) not result in undue prejudice to any party." Wheeler, 2018 WL 2978043, at *1 (emphases added; quoting F & G Scrolling Mouse, L.L.C. v. IBM Corp., 190 F.R.D. 385, 387 (M.D.N.C. 1999)).

Here, all factors warn against bifurcation. Bifurcation will not promote efficiency or convenience. Instead, it will greatly confuse, delay, and prolong this litigation. Additionally, Fluor will suffer prejudice if the issues, as framed by BAE, are bifurcated.

### A.    The Issues Are Too Inextricably Intertwined to Justify Bifurcation

This Court has repeatedly recognized that bifurcation is not appropriate where the issues proposed for bifurcation "substantially overlap" with other issues. <u>Wheeler</u>, 2018 WL 2978043 at *2; <u>Latson</u>, 2017 WL 3098124 at *3  (denying bifurcation of statute of limitations because that issue would not dispose of entire case and because there were "overlapping factual questions that bear upon all of the counts").

All cases upon which BAE relies involve bifurcation of claims that were factually and legally distinct from the remainder of the case. For example, in <u>Shire LLC v. Mickle</u>, this court bifurcated a counterclaim for tortious interference of contract, unfair competition, and violations of the Sherman Act because those allegations were factually and legally distinct from the breach of contract allegations at issue in the Complaint, and because they would be rendered moot if the breach claims prevailed. No. 7:10-CV-00434, 2011 WL 2959461, at *2 (W.D. Va. July 15, 2011). The Court even recognized that bifurcation would <u>not</u> have been appropriate if the factual or legal issues were "inextricably intertwined." <u>Id</u>. at *3.

Here, the issue of "design responsibility" is factually and legally intertwined with myriad other issues in this case. BAE's Motion attempts to minimize its design responsibility on the Project, in hopes of persuading the Court that the issue of "design responsibility" is a binary one. The Subcontract, however, recognizes clearly that changes to the Process Design affect the balance of plant. <u>See</u> SOW § F ("PFDs and P&IDs have been redlines with all known process changes to date including required actions from the preliminary PHA.").

Moreover, the "percentage-completion warranty" is just one of several bases for BAE's significant design responsibility, and resolution of that issue alone would not finally determine each Party's design obligations on the Project. In order to truly adjudicate each Party's "design responsibility," the Court must consider and resolve the myriad other legal issues set forth in Fluor's Counterclaim. It is unclear which of these numerous issues BAE wishes to bifurcate, as BAE has never presented a workable plan for bifurcation.

**B.      Resolving the Issues Proposed for Bifurcation Will Not Narrow the Scope of this Litigation**

Every argument BAE asserts in favor of bifurcation relies on the premise that resolution of the two issues BAE identified for bifurcation will somehow narrow, reduce, or simplify issues for trial. Neither issue will accomplish that result, even if resolved in BAE's favor.

The first issue proposed for bifurcation is "the contract's assignment of design responsibility for the overall NC Facility." But BAE has <u>admitted</u> it is responsible for the Process Design. ECF 49 at 5; ECF 64 at 4. Thus, Fluor's claims resulting from BAE's changes to the Process Design will proceed. As set forth above, BAE's changes to the Process Design make up a significant portion of Fluor's claims, and significant discovery is required to develop and resolve those claims.

Next, BAE proposes to bifurcate the issue of "whether any percentage-completion warranty existed for [the Lauren Design]." Presumably, BAE believes that if the Court finds that BAE never expressly warranted that the Lauren Design was 85% complete, Fluor's claims related to the Lauren Design evaporate. That is incorrect. The fundamental basis of Fluor's warranty of design specification argument is that BAE furnished specifications for the Project in the form of the Lauren Design. BAE then required Fluor to use and rely on those specifications to develop its proposal and to design and construct the Project. Therefore, BAE warranted that those specifications were fit for use on the Project, and such warranty cannot be disclaimed. Fluor's implied warranty claims extend far beyond a percentage complete, and BAE's proposed bifurcation will not resolve that issue. Thus, under BAE's

proposal, design responsibility will be litigated twice.

The final issue proposed for bifurcation is the enforceability and application of the Subcontract's LOD clauses. Notably, one of the Interrogatories which BAE refuses to Answer related to the LOD clauses. Nevertheless, as set forth above, even if BAE prevails in its interpretation of the three  clauses, Fluor will still be entitled to present all of its claims, damages, and defenses. The cap would apply only <u>after</u> the Court determines how much of Fluor's damages have been proven at trial. Such an approach is required to preserve issues for appeal, and is the approach observed in other contexts involving damages caps. See <u>J.S. by Sites v. Winchester Pediatric Clinic, P.C.</u>, No. 5:19-CV-0097, 2021 WL 833955, at *4 (W.D. Va. Mar. 4, 2021). Thus, no efficiency is achieved through bifurcation.

BAE's Motion portrays the alleged damages cap as a straightforward contract interpretation issue, ignoring the ambiguities among the three LOD clauses which may trigger the introduction of parol evidence. Under Virginia law, parol evidence is admissible to determine the intent of the parties where a contract or a part thereof is ambiguous. See <u>Nextel Wip Lease Corp. v. Saunders</u>, 666 S.E.2d 317, 323 (Va. 2008) (collecting cases and restating the well-established rule that "where the writing on its face is ambiguous . . . parol evidence is always admissible . . . to establish the real contract between the parties" (alterations in original) (quoting <u>Prospect Dev. Co. v. Bershader</u>, 515 S.E.2d 291, 296 (Va. 1999))). Importantly, "contradictory provisions in an instrument are ambiguous, even if the words themselves are not." <u>RL & DR Enters. v. Good Shepherd Int'l Miracle Ctr.</u>, No. 151480, 2016 WL 3213564, at *4 (Va. June 2, 2016) (emphasis added); <u>accord</u> <u>Sprint Spectrum L.P. v. Shenandoah Pers. Commc'ns</u>, 2020 WL 5846482, at *4 (E.D. Va. Sept. 22, 2020). BAE's Motion to Bifurcate utterly ignores that the Subcontract contains three separate LOD clauses, two of which reference "changes," and one of which does not. On their faces, the LOD clauses are contradictory in terms of their scope. Parol evidence may therefore be necessary to interpret and reconcile the three LOD clauses. Thus,

discovery on the Parties' intent will still be required.

Thus, bifurcation would not be economical, and would not expedite the case. Instead, it will necessitate two separate discovery periods, and perhaps, multiple trials on overlapping issues related to the Parties' respective design obligations on the Project.

### C.    The Bifurcated Issues Ignore Fluor's Theories of the Case

For all the reasons noted above, delaying the discovery period in this case would prejudice Fluor's ability to prepare its claims and defenses for trial. But bifurcation would result in additional prejudice to Fluor because the bifurcated issues are framed only to promote BAE's theory of the case. Fluor's primary theories of the case are ignored in BAE's proposal, although they bear directly on the issue of BAE's design responsibility.

Specifically, the first issue proposed for bifurcation focuses on "whether any percentage-completion warranty existed for [the Lauren Design." As framed, this issue captures only one of several legal arguments Fluor has advanced to demonstrate that BAE bears significant design responsibility on the Project. BAE ignores Fluor's arguments– that BAE impliedly warranted the adequacy of the Lauren Design by correcting and redlining it, providing it, and requiring Fluor to rely on it, and that BAE was responsible for the entire Process Design. Fluor's arguments would remain unaddressed and discovery on those theories would be significantly delayed, despite the fact that they bear directly on the Parties' design responsibilities under the Contract.

### D.    Bifurcating Discovery Would Not Promote Greater Convenience to this Court, the Parties, or the Witnesses

Because the issues proposed for bifurcation overlap with the issues that would remain in the case, BAE's approach would likely involve duplicative discovery efforts involving the same witnesses. For example, the witnesses familiar with BAE's representations as to the maturity of the Lauren Design at the time it was provided to Fluor are also likely to be familiar with BAE's many changes to the Process Design. Addressing the Lauren Design issue in isolation (and even then, only part of it),

will require those witnesses to endure multiple rounds of preparation, depositions, and trial testimony. Such an approach is not economical or convenient.

## **<u>CONCLUSION</u>**

For the reasons set forth above, all relevant factors counsel against a stay of discovery and against bifurcation of the issues BAE has identified for early resolution. For this reason, this Court should deny BAE's Motion to Stay and to Bifurcate in its entirety.

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 10th day of December 2021, a copy of the foregoing was

delivered via the CM/ECF system to the following:

> Todd M. Conley (VSB 89839)
> Jeffrey J. Golimowski (VSB 93525)
> WOMBLE BOND DICKINSON (US) LLP
> 8350 Broad Street, Suite 1500
> Tysons, Virginia 22102
> Tel: (703) 394-2275
> Fax: (703) 790-2623
> todd.conley@wbd-us.com
> jeff.golimowski@wbd-us.com
>
> D. Stan Barnhill (VSB 22978)
> Joshua R. Treece (VSB 79149)
> Justin E. Simmons (VSB 77319)
> WOODS ROGERS PLC
> 10 South Jefferson Street, Suite 1400
> Roanoke, Virginia 24011
> Tel: (540) 983-7600
> Fax: (540) 983-7711
> barnhill@woodsrogers.com
> jtreece@woodsrogers.com
> jsimmons@woodsrogers.com
>
> Karen M. Stemland (VSB 47167)
> WOODS ROGERS PLC
> 123 East Main Street, 5th Floor
> Charlottesville, Virginia 22902
> Tel: (434) 220-6826
> Fax: (434) 566-0473
> kstemland@woodsrogers.com
>
> *Attorneys for BAE Systems Ordnance Systems, Inc.*

Respectfully submitted,


s/ Scott P. Fitzsimmons
Scott P. Fitzsimmons (VSB 68147)
WATT, TIEDER, HOFFAR
& FITZGERALD, LLP
1765 Greensboro Station Place, Suite 1000
McLean, Virginia 22102
Tel: (703) 749-1000
Fax: (703) 893-8029
sfitzsimmons@watttieder.com

*Attorneys for Fluor Federal Solutions, LLC*