```
                    UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF VIRGINIA
                      ROANOKE DIVISION


    ****************************************************************

BAE Systems Ordnance      CIVIL ACTION NUMBER 7:20-CV-00587
Systems, Inc.,            JANUARY 14, 2022  10:00 A.M.
                          MOTION HEARING VIA ZOOM
        Plaintiff,
vs.

FLUOR FEDERAL SOLUTIONS,  Before:
LLC,                      HONORABLE MICHAEL F. URBANSKI
                          UNITED STATES DISTRICT JUDGE
        Defendant.        WESTERN DISTRICT OF VIRGINIA


    ****************************************************************

APPEARANCES:

For the Plaintiff:     JOSHUA R. TREECE, ESQUIRE
                       JUSTIN E. SIMMONS, ESQUIRE
                       Woods Rogers PLC
                       10 S. Jefferson Street, Suite 1400
                       Roanoke, VA  24011
                       540-983-7730

                       KAREN M. STEMLAND, ESQUIRE
                       Woods Rogers PLC
                       123 E. Main Street, Fifth Floor
                       Charlottesville, VA  22902
                       434-220-6826

                       TODD M. CONLEY, ESQUIRE
                       Womble Bond Dickinson LLP
                       8350 Broad Street, Suite 1500
                       Tysons Corner, VA  22102
                       703-394-2245




Court Reporter:        Judy K. Webb, RPR
                       210 Franklin Road, S.W., Room 540
                       Roanoke, VA 24010
                       (540)857-5100 X 5333

PROCEEDINGS RECORDED BY ELECTRONIC RECORDING;
TRANSCRIPT PRODUCED BY COMPUTER.
```

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

```
 1  APPEARANCES CONTINUED:

 2  For the Defendant:     KATHLEEN O. BARNES, ESQUIRE
                           SARAH K. BLOOM, ESQUIRE
 3                         SCOTT P. FITZSIMMONS, ESQUIRE
                           GREGORY MAGNUS WAGNER, ESQUIRE
 4                         Watt, Tieder, Hoffar & Fitzgerald, LLP
                           1765 Greensboro Station Place, STE 1000
 5                         McLean, VA  22102
                           703-893-8029
 6

 7
     Also Present:         ALICE ELDRIDGE, ESQUIRE
 8                         Senior VP and general counsel For BAE

 9

10                         CATHERINE RONIS, ESQUIRE
                           VP & associate counsel for BAE
11

12                         JOSEPH PORT, ESQUIRE
                           Senior in-house counsel for BAE
13

14                         JON CONTE, ESQUIRE
                           Senior counsel for Fluor
15

16

17

18

19

20

21

22

23

24

25
```

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1          (Court convened at 10:00 a.m.)

2               THE COURT:  Let's ask the clerk to call the case.

3               THE CLERK:  Yes, Your Honor.

4          We have *BAE Systems Ordnance Systems, Inc. versus*

5     *Fluor Federal Solutions, LLC*, Civil Action 7:20-CV-587 for a

6     motions hearing.

7               THE COURT:  Okay.  Good morning, Counsel.  I've read

8     these hundreds of pages of briefs that you-all filed and

9     looked at this contract, this subcontract, which appears to be

10    a put-together conglomeration of several different kinds of

11    documents, or a main document with a bunch of attachments.

12    And my law clerk and I, Zach Turk, have tried to study the

13    contract language.

14          I want to hear first this morning from BAE and then

15    Fluor about the Rule 12(f) motion, and we'll go from there, as

16    needed, to the Rule 12(b)(6) motions.

17          So let's hear first from BAE on the Rule 12 motion

18    that you have filed.

19               MR. TREECE:  Thank you, Your Honor.  Joshua Treece on

20    behalf of BAE.  And with me today, I would like to introduce

21    BAE's in-house counsel that is joining us.  We have Alice

22    Eldridge, senior vice president and general counsel for BAE;

23    Catherine Ronis, vice president and associate general counsel

24    for BAE; and Joseph Port, senior in-house counsel for BAE.

25          I also have with me today, Your Honor, Karen

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1  Stemland -- she is in my office not appearing by video -- and

2  Justin Simmons.

3        And as an administrative matter, Your Honor, we

4  understand the order of the arguments that you would like and

5  will proceed in that manner.  I wanted to let the Court know

6  that Mr. Simmons is going to argue with respect to Fluor's

7  partial motion to dismiss, and I'm going to handle BAE's Rule

8  12(f) motion and motion to dismiss.

9        And then just as a housekeeping matter, I wanted to

10  let the Court know and make sure the Court has received it, we

11  sent a binder of the mostly contract documents that were

12  highlighted to the Court and also to opposing counsel.  Your

13  Honor, I don't know if you were able to get that.  I'm not

14  sure if your -- it sounds like you might be a little under the

15  weather, so I'm not sure if you've received that.

16        THE COURT:  No, I'm not under the weather.  I'm fine.

17        MR. TREECE:  Oh, okay.

18        THE COURT:  Chambers received the binders this

19  morning.  We were there waiting for them last night, but they

20  didn't show up last night.  But I understand they've been

21  delivered this morning and we'll be sure to take a look at

22  them.

23        MR. TREECE:  Certainly.  Thank you, Your Honor.  And

24  then we also have delivered hard copies of the slides.

25        So let me go ahead now and share the screen for our

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1   Rule 12(f).  It looks like the host has disabled screen

2   sharing.  I don't know if that's something that we can remedy.

3             THE CLERK:  Yes, sir.  Give me just one second.

4             MR. TREECE:  Sure.

5             And, Your Honor, while we are working to pull up the

6   slides, I want to begin with some short background.

7             As the Court is aware, this is a firm fixed-priced,

8   design-build contract to design and construct the NC Facility

9   at the Radford Arsenal.  That's the Nitrocellulose Facility.

10            With respect to the 12(f) motion, relevant background

11  on that issue, Your Honor, is the subcontract was entered into

12  on December 17th, 2015.  Before the subcontract was entered

13  into and before the parties agreed to the damages --

14  limitation on damages therein and the damages cap therein,

15  Fluor actually had started work on the project, and they did

16  so under something called an undefinitized contract action.

17            And Your Honor will see at the very outset of the

18  agreement, and I've got a slide in here to kind of cull that

19  out for the Court, but at the very outset of the agreement,

20  there's all this work that precipitated the definitization of

21  the final subcontract, which is to say Fluor was paid to start

22  work before the final subcontract was entered.

23            And this is just in, you know, the contracts of this

24  type, it's a matter of efficiency where you can go ahead and

25  start the work before you enter the agreement.  And that's

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1   what happened here.  So before any limitation of damages was

2   entered, Fluor had begun the work under the UCAs, is what we

3   refer to them as, so the undefinitized contract action.

4        Now, with that, let me see if I can go ahead and get

5   our slides before the Court.

6        Is everyone seeing the opening slide for the Rule

7   12(f) motion?

8        THE COURT:  I see it.

9        MR. TREECE:  All right.  Thank you.

10       And, Your Honor, so with respect to the motion to

11   strike the first thing to point out is the subcontract is a

12   fully integrated and merged agreement.  It constitutes the

13   entire agreement of the parties.  So for present purposes, the

14   Court need look no further than the four corners of the

15   agreement.  The same is true with the motion to dismiss, which

16   we'll discuss later.

17       THE COURT:  Well, how can I do that if two of the

18   three limitation of damages provisions include changes and the

19   third one does not?

20       MR. TREECE:  Your Honor, those are -- the reason you

21   can do that is because that remains entirely unambiguous.  And

22   the reason it remains unambiguous is there are three

23   provisions, all of which essentially say the same thing --

24       THE COURT:  Well, they don't, because the third one

25   says "including changes," and the other -- no, the third one

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1  does not include -- have the "including changes" language.

2  And is that significant?

3        MR. TREECE:  It's not significant, Your Honor,

4  because what it is, it's a definition, right?  So this says

5  the "subcontract shall be limited to 30 million.  30 million

6  being defined," so that's the definition of 30 million here,

7  "as the value including all changes and the maximum liability

8  for damages."

9        So you have two provisions that say, "30 million.

10 Here's the definition of 30 million, defined as the value

11 including changes."  And then you have another provision that

12 says "limited to 30 million."  It doesn't restate the

13 definition a third time, but as Your Honor is aware, that's

14 the point of a definition, so you don't have to continually

15 restate it throughout the document, right?

16        THE COURT:  Well, does the fact that two of the three

17 include changes and one does not, does that create ambiguity

18 requiring some -- the Court to allow discovery on this issue?

19        MR. TREECE:  Absolutely not, Your Honor, for the

20 reason I just mentioned, is all of them consistently say the

21 cap is 30 million.  There's a definition of that cap in two

22 different places that say, "30 million is the value of all

23 changes."  There's nothing, nothing that impliedly contradicts

24 that definition in any way, shape, or form.  It is crystal

25 clear that the definition of 30 million includes all --

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1   includes the value of all changes, the maximum liability for

2   damages.  It is a definition --

3          THE COURT:  Let me ask you this.  Let me ask you

4   this:  Do I even need to get to the changes language?  Because

5   you-all argue that Fluor didn't properly submit changes and

6   what they're really doing here is trying to recover their own

7   cost overruns.

8          MR. TREECE:  Correct.  Yeah, Your Honor doesn't need

9   to get to that.  Your Honor can interpret this and say under

10  any circumstance Fluor is limited to 30 million.  Whether they

11  call it changes, whether they're actually just cost overruns,

12  which is what they are, in both cases they're limited to

13  30 million.

14         We point out changes because Fluor tries to

15  incorrectly characterize them as changes, and we say, "Well,

16  even if you take your incorrect and factually unsupported

17  characterization as true, it's still barred, so under no

18  circumstance can you exceed 30 million."  So that's where we

19  are with respect to that issue, Your Honor.

20         And, you know, what's interesting here is Fluor

21  proposed this language, right?  They cite to a statute, which

22  I'll get to later in this presentation, but they cite to a

23  statute that's really designed to protect the small

24  subcontractors from big general contractors.  Here Fluor is a

25  large company, of course.  They are experts in design/build

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1  contracts; they allege the same in their counterclaim.  And

2  they are the ones that proposed this, right?  So they're

3  trying to remove from the contract their own damages cap,

4  which is stunning to say the least.

5        THE COURT:  Well, here's the problem I have with

6  this, with this claim for damages above 30 million:  You-all

7  attach an e-mail between the two people that are the point of

8  contact on this contract in which Fluor's representative says,

9  "If we sue each other, we're limited to 30 million."

10       Now, I know I can't consider that at 12(f) because

11  it's -- well, maybe I can; I don't know.  But whether I deal

12  with this at Rule 12 or Rule 56, how in the world can Fluor

13  bring a claim for more than $30 million at the end of the day?

14  I mean, where is the good-faith basis for it?  Their own

15  contracting person said, "We can't bring a claim for more than

16  $30 million."  That's what this contract says.

17       So unless it's barred by the statute, it seems to me

18  that whether it's Rule 12 or Rule 56, I don't see how in good

19  faith Fluor can make that claim.

20       What's your position, Mr. Treece?

21       MR. TREECE:  I agree with you wholeheartedly.  Now, I

22  mean, and more importantly that e-mail -- and I realize the

23  Court doesn't need to reach that issue because it is

24  unambiguous, but that e-mail says, "We've got a read from

25  legal."  That's their legal department's interpretation that

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1   was communicated to BAE.

2           Again, we're not saying the Court has to deal with

3   that; at Rule 56 the Court certainly would.  But now we

4   need --

5           THE COURT:  I'm just saying there's a lot of time and

6   effort teed up in this litigation where Fluor is seeking

7   $185 million in damages when their own documents, their own

8   e-mails establish that Fluor understands they can't sue for

9   any more than 30 million.  So I don't understand how counsel

10  can in good faith make these arguments, because at the end of

11  the day, when that person is deposed, they're going to say

12  what that e-mail says.

13          So let's turn to what I think is the important issue

14  here, is the applicability of this Virginia statute.  Because,

15  I mean, if the statute applies, then it doesn't matter what

16  Fluor says, this thing is out.  So the question is, does the

17  statute apply in this case?

18          MR. TREECE:  Absolutely not, Your Honor.  I'm going

19  to move this forward to those slides.  So the statute plainly,

20  plainly does not apply, and there are numerous reasons for

21  which it doesn't apply.  So, first, the statute applies only

22  to private projects not government projects.

23          THE COURT:  Well, how do we know that?  The statute

24  on its face doesn't say it only applies to private projects.

25  I mean, it doesn't say that.  And there's no limitation or

1   exclusion in there about public versus private.  So I want to

2   know what your basis is for arguing that it only applies to

3   private contracts.

4         MR. TREECE:  Certainly, Your Honor.  So with respect

5   to the statute and private projects, so we provided the Court

6   the secondary source, recognizing that it bars prospective

7   bond waiver claims on private projects.  And also, this was

8   passed under Senate Bill 891, and it is expressly defined as a

9   statute "relating to mechanics' liens; subcontractors' waiver

10  of lien rights."  It's expressly relating to mechanics' liens,

11  and it also deals with asserting a claim.  Nonetheless, the

12  statute is expressly related to that issue.

13        Pursuant to a long-standing Virginia law, statutes

14  relating to mechanics' liens do not, in the absence of an

15  express (statutory) provision, apply to government buildings

16  or projects.  This was established in 1899, Your Honor, and

17  again restated in *Jones*, recognizing mechanics' lien statutes

18  do not, in the absence of an express provision, apply to

19  public buildings erected by states, counties, and towns for

20  public use.  And so that is the reason.

21        And if Your Honor looks at the immediately preceding

22  section, this is one that voids indemnification for

23  negligence.  And even that section is an express provision

24  applying it to public projects.  So we know that for this

25  statute to apply to public buildings and projects would need

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1   to have an express provision applying it to public buildings

2   and projects.  It does not have that, so that is one basis

3   upon which it plainly doesn't apply here.

4          And just kind of more to that point, it's interesting

5   to note the Virginia Procurement Act has a statutory cap.  So

6   the Virginia Public Procurement Act says that, "A public

7   contract may include a provision for modification of the

8   contract during performance, but no fixed-price contract,"

9   which is what we have, "may be increased by more than

10  25 percent of the amount of the contract or 50,000."  So it's

11  a statutory cap.  And then it goes on to say, "whichever is

12  greater, without the advanced written approval of the

13  Governor."  So there's a cap that requires the governor to

14  approve anything that goes beyond it.  This statute remains in

15  effect, this Virginia Public Procurement Act.

16         What Fluor's position is, is Fluor's position is that

17  11-4.1:1 somehow makes this void and unenforceable.  That is

18  plainly not how this statute works, and that's the reason it

19  only applies to private projects not the one we're dealing

20  with.

21         Your Honor, the reasons that we provide for the

22  inapplicability of this statute to our circumstance are

23  entirely independent based, right?  So this is one, that it

24  doesn't apply to private projects.  The second is, from the

25  facts here, Fluor provided services and materials on this

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1  project before the subcontract was definitized --

2         THE COURT:  Is that a fact in dispute?  How can I

3  rule on that on a Rule 12(f) claim?

4         MR. TREECE:  Your Honor can rule on that because it's

5  not a fact in dispute, because it's acknowledged in the

6  contracts themselves.  And let me get just directly to that.

7         So this, Your Honor, Docket 1-2 -- it's in your

8  binder.  It's also Docket 1-2 at 4.  This is the second page

9  of the very start of this subcontract, right?  So you've got

10  the order, and then you have the UCAs, right?  So this is the

11  UCA work that was done before the subcontract was entered.

12  And you see here -- this will be relevant as well when we get

13  to our motion to dismiss -- they were paid -- I think this is

14  on the order of $36 million in total.  It's something in that

15  neighborhood.

16         So they were paid for design engineering, $10 million

17  for design engineering in advance.  Mustang -- Mustang is a

18  design engineering firm they originally hired to do their

19  design work.  Mustang was paid 500 hours before the

20  subcontract was entered, to evaluate the Lauren design and

21  everything else.  And then you've got engineering cost, steel

22  purchased.  They were doing all of this work.

23         All of this work is incorporated in the subcontract.

24  You see right below this, "Subcontract description on page 3."

25  Go to page 3.  This is page 3.  "This firm fixed-price

1  subcontract agreement is issued for efforts to support the NC

2  facility, and incorporates funding provided by the UCA," so

3  the funding previously, "and subsequent modifications prior to

4  definitizing the subcontract."  The potential ceiling is

5  245 million.  Yeah, so it's 31 million for these UCA tasks,

6  right?

7            And so Your Honor is aware, I know that you may not

8  have the binder in front of you, but when you do get the

9  binder in front of you, we have provided the Court -- it's

10 also, for the Court's reference to pull it up on the docket,

11 it's docket -- it's docket 1-4.

12           This is the undefinitized contract action.  It's a

13 letter dated October 14th, 2015, and it says:  Pending

14 execution of the definitive agreement by the parties, the

15 seller, Fluor, is hereby authorized and agrees to commence

16 work under this UCA starting October 14th, 2015.

17           This is not some independent work on a different

18 facility on something entirely unrelated to the subcontract.

19 This is them starting the subcontract work under the UCA

20 before the agreement is definitized.

21           It goes on to say in this, "Upon receipt of the draft

22 definitive agreement, the seller agrees to promptly begin

23 negotiating with BAE."  So as Your Honor is aware from the

24 statute, the statute only bars a party from prospectively

25 waiving the right to assert a claim before providing any work

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1  on the project.

2        And here's the statute, right?  So it says, "A

3  subcontractor may not waive or diminish the right to assert a

4  claim in advance -- in advance of furnishing any labor,

5  services, or materials."  And then it goes on to say that a

6  provision that does so, that limits their right to assert a

7  claim in a contract executed prior to providing any labor,

8  services, or materials, is null and void.

9        So the limitation on damages was entered into and

10  agreed upon in the definitized subcontract executed

11  December 17th, 2015.  The UCA work that they did prior to

12  that, which is any labor, service, or material that they

13  provided before, that is before they agreed to it.  So the

14  limitation on damages as a matter of record fact cannot apply.

15        The contract itself recognizes the work was done.

16  They plead in their counterclaim that the work was done.  They

17  plead -- in paragraph 89 of their counterclaim, Fluor admits

18  that they did work on the NC facility under the UCA.  And so

19  what they try to say is, they try to say, "We did it under the

20  UCA but not under the subcontract," and perhaps they're trying

21  to draw some distinction between the two.  Whatever

22  distinction they're trying to draw is entirely conclusory and

23  not supported by the contract documents and what is before the

24  Court as a matter of fact in the record.  And obviously to the

25  extent their pleading contradicts the exhibits to our

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1   complaint, which are incorporated -- the contract, that is to

2   say, to the extent their allegations contradict the exhibits,

3   the exhibits are going to control as Your Honor is aware.

4          So as a matter of fact, there is no way this statute

5   could apply in this circumstance.  Your Honor should recognize

6   this statute is in derogation of common law, so it has to be

7   strictly construed.  When it says, "any labor, services, or

8   materials," it means what it says, any labor, services, or

9   materials.  Did Fluor provide any labor, services, or

10  materials?  They absolutely did and admit they did in

11  paragraph 89.  So Your Honor doesn't have to deal with any

12  discovery on that issue.  It is before the Court as a matter

13  of pleaded fact.

14         And, you know, finally, the other reason the statute

15  doesn't apply, Your Honor, is the statute is about capping

16  damages not about limiting claims.  As Your Honor saw, the

17  statute says, "limit the ability to assert" --

18         THE COURT:  No, I think you've got that backwards.

19  You said the statute about capping damages not limiting

20  claims, but that's not true.  Your argument is that the

21  provisions in the contract are about capping -- or limitations

22  on damages not limitations on claims.

23         MR. TREECE:  Thank you, Your Honor.  That is an

24  essential correction, and you're exactly right.  So the

25  statute says you can't limit claims, but it says nothing

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1  about capping --

2            THE COURT:  Is there really any difference there?

3            MR. TREECE:  There's absolutely a difference there,

4  Your Honor.  It's the same thing with a medical malpractice

5  cap, right?  So you can assert the claim and all aspects of

6  the claim that you may have, but your damages from the claim

7  asserted are capped, right?  So you're not restricted in your

8  ability to assert a claim.  You're capped in your recovery on

9  the claim you assert.  It's the difference between a claim and

10 a remedy, and I know the Court is very familiar with that

11 distinction.

12           So here's a case that gets to that issue, right?  So

13 this is not a hold harmless or anything along those lines.

14 And this *Richmark* case that we've cited, "Limitation of

15 Liability clause, 'did not purport to indemnify or hold

16 architect harmless from damages, simply established a

17 bargained-for cap on liability.'"  I mean, it's a fine

18 distinction in the other context, but before the Court it's an

19 appropriate and reasonable distinction because the Court is

20 well aware of the stark difference between claims and

21 remedies.

22           So more importantly, this is not something that BAE

23 proposed to limit anything Fluor could do; this was a

24 provision that Fluor proposed.  So rather than this being the

25 context where a general contractor tries to limit a small

1  subcontractor from asserting claims before they even start

2  work, this was usually used in, you know, a lien waiver

3  context but -- you know, in practice in the past.  This is not

4  that circumstance.  Fluor established its contract rights in

5  the first place with this limitation of damages.  Again, it's

6  their proposal, and that's a matter of pleaded record.  And

7  we've got that in the documents we've provided to the Court in

8  the binder, Your Honor.

9          In paragraph 114 of their counterclaim they

10  incorporate by reference their cost proposal.  And we have

11  provided to the Court in this binder and also in the documents

12  that we've submitted, document 37-1, this is their cost

13  proposal, with excerpts, where it's saying, "Fluor is adding

14  this limitation on damages.  Here's the redline."  And it has

15  exactly what ended up in the final version of the contract,

16  Your Honor.  And they made that change in various locations.

17          So this is Fluor --

18          THE COURT:  Regardless of who proposed it, it says

19  what it says.

20          MR. TREECE:  Exactly.  Exactly.  I mean, it does say

21  what it says.

22          THE COURT:  And the statute says what it says.

23          MR. TREECE:  Correct.  And the statute plainly does

24  not apply given all of the reasons we've discussed.

25          THE COURT:  All right.  Mr. Treece, thank you.

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1           Let's hear from Fluor on the Rule 12(f) issue.

2           MR. FITZSIMMONS:  Your Honor, this is Scott

3   Fitzsimmons on behalf of Fluor Federal Solutions.  I just want

4   to introduce some of my team who is with me this morning.

5   Here in the room I have Kathy Barnes.  She will be defending

6   BAE's motion to dismiss.  I'll be arguing the 12(f) motion and

7   Fluor's motion to dismiss.  I also have in the room with me

8   our associate Sarah Bloom, and Greg Wagner is also on the

9   call.  He's with our office.  We also have from Fluor Jon

10  Conte is on the line here.  He is senior counsel with Fluor.

11          And if I may try to share my screen as well, Your

12  Honor.

13          THE COURT:  Nice so see all of y'all,

14  Mr. Fitzsimmons.

15          MR. FITZSIMMONS:  Thank you, Your Honor.  Can you see

16  that, Judge?

17          THE COURT:  I certainly can.

18          MR. FITZSIMMONS:  So Mr. Treece certainly gave BAE's

19  interpretation not only of the Limitation of Damages clause

20  but of the Virginia Code.  I know Your Honor has read the

21  briefings.  But, quite frankly, what BAE is presenting to this

22  Court is that the Limitation of Damages clause applies to

23  changes, and if in fact the Limitation of Damages clause

24  applies to all possible changes that BAE issued on this

25  project, then BAE could order any number of changes, require

1   Fluor to perform any amount of work up to whatever cost BAE

2   desired, and then simply stop paying Fluor at $30 million.

3        Now, under Virginia law, obviously, which the Court

4   has to apply to this contract, the terms have to be not only

5   in harmony but they have to, quite frankly, make sense.  And

6   it's simply irrational and absurd to believe that Fluor signed

7   up to perform any amount of work at the direction of BAE,

8   regardless of what change BAE may make on the project, and

9   agree to limit its damages or its recovery to $30 million.  It

10  simply is an irrational interpretation of the Limitation of

11  Damages clause that is being presented by BAE.

12       So I'd just like to start -- Your Honor, you asked at

13  the beginning about the motion to strike.  Quite frankly,

14  we'll go into it, but it's the wrong procedure that BAE is

15  seeking.  This Court does not grant motions to strike damages

16  in contract claims.  Every single case --

17       THE COURT:  Whether or not I do it at a Rule 12 or

18  whether I do it at a Rule 56, isn't your own evidence going to

19  be that it was Fluor's intention that if you-all sued each

20  other then you would be limited to $30 million?  That's what's

21  in that e-mail.

22       MR. FITZSIMMONS:  Well, we'll back up just one step,

23  Your Honor.  BAE presents without any -- without any support

24  the fact that Fluor presented this Limitation of Damages

25  clause.  BAE does not present whether the parties discussed

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1  this clause, BAE does not present whether the parties

2  negotiated this clause.  But clearly Fluor did not present the

3  clause that was incorporated into the contract.

4        THE COURT:  Well, I mean, you know, regardless of who

5  presented it, I mean how can you-all in good faith make a

6  claim for $185 million when your own evidence is going to be

7  that, from your own person who is the point of contact on this

8  signed contract, says you're limited to 30 million?

9        MR. FITZSIMMONS:  Your Honor, the e-mail from

10  Ms. Lewis that BAE attempts to rely on I think introduces --

11        THE COURT:  I mean, Ms. Lewis wrote that.  I mean,

12  she wrote it.  And you look at the contract, and the e-mail is

13  between Lura Lewis and Erin Phalen, they are the two people

14  that are, under Section 2.2 of the contract, are the

15  authorities under this contract.

16        MR. FITZSIMMONS:  So, Your Honor --

17        THE COURT:  I don't know.  I'm just wondering how

18  counsel, in good faith, can make a claim for 185 million when

19  your own evidence is going to be you're limited to 30.

20        MR. FITZSIMMONS:  Because that e-mail, Your Honor,

21  invites more questions than it answers.  That e-mail that

22  discusses $30 million does not discuss the specific type of

23  damages that are capped to $30 million.  They are presenting a

24  cherry-picked, single e-mail that was throughout this

25  multi-month negotiation, and what you will see at the

1  beginning of that e-mail is they're talking about insurance.

2  Then what is clearly not answered is what damages are capped.

3         Now, Fluor will not dispute that there may be some

4  damages that are capped, but certainly not related to any

5  changes that BAE may have caused or directed on the project.

6  So the e-mail does not answer whether or not the changes that

7  BAE caused on the project are capped.  It simply says that

8  there's a $30 million cap.  And, certainly, the cap, as we say

9  in our brief, there may be a cap applicable to personal

10 injury, there may be a cap applicable to environmental claims.

11 And on this project, which was a nitrocellulose project, which

12 is the chemical that is included in munitions, that actually

13 make munitions explode, there are risks on this project.

14 And --

15        THE COURT:  Mr. Fitzsimmons, let me ask you this

16 question:  Is there a question of fact, therefore -- from your

17 argument, there's a question of fact as to whether or not this

18 cap applies to changes or not?

19        MR. FITZSIMMONS:  Not only is there a question of

20 fact as to whether it applies to changes, but the fact that

21 Article 46 does not include the word "changes," and the fact

22 that Article 6 (sic) does not reflect what BAE presents --

23 what BAE is arguing is that Fluor somehow presented a clause

24 and it was incorporated directly into the contract.  But

25 Article 46, as Your Honor pointed out at the beginning of this

1   call, does not include the word "changes."

2          THE COURT:  Right.  That's the third one, right?

3          MR. FITZSIMMONS:  It is the third one, Your Honor.

4   So --

5          THE COURT:  So how can the Court -- and here's the

6   question I tried to ask Mr. Treece, and the question is this:

7   Two of the provisions include the words "including all

8   changes," and one provision doesn't, okay?

9          MR. FITZSIMMONS:  Correct.

10         THE COURT:  How is the Court supposed to as a matter

11  of law pick and choose between those?

12         MR. FITZSIMMONS:  Well, Your Honor, it would be our

13  argument that it's clear that the provision does not

14  incorporate changes.  However --

15         THE COURT:  Yeah, but --

16         MR. FITZSIMMONS:  -- if the Court finds an ambiguity,

17  if the Court finds an ambiguity, you're absolutely correct

18  that you cannot grant BAE's motion to strike.

19         THE COURT:  Well, how can you say it doesn't include

20  changes when 2.21, Limitation of Damages, says the,

21  "30 million being defined as the value including all changes

22  and the maximum liability for damages"?  How can you say it

23  doesn't include changes when it says it includes changes?

24         MR. FITZSIMMONS:  Your Honor, if you look at the

25  beginning of the -- all three of them, all three of the

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1  provisions --

2       THE COURT:  Right.  Right.  I get your point, "except

3  as otherwise provided in this subcontract."

4       MR. FITZSIMMONS:  That's absolutely correct, Your

5  Honor.  But the important aspect of the "except as otherwise

6  provided" language is that the Limitation of Damages clause

7  defers to the Changes clause.  And I have the Changes clause

8  up on the screen here, Your Honor.  And by deferring to the

9  Changes clause and saying "except as otherwise provided," the

10 Changes clause has a very specific limitation that BAE could

11 have imposed on any particular cost.  The Changes clause

12 states that on any particular change BAE could impose a

13 limitation of that specific change.  And the Changes clause

14 does not defer to any other -- in fact, the Changes clause

15 says:  Except with respect to such limitations that are set

16 forth in the Changes clause, nothing contained herein shall

17 affect the right of the parties to an equitable adjustment.

18       So whereas Limitation of Damages clause defers

19 clearly to other clauses in the contract by its terms "except

20 as otherwise provided," the Changes clause, which is Section I

21 1A(3)(j), limits any reference to other contract provisions,

22 and states very specifically.  So with that, Your Honor, the

23 two provisions can be read in harmony.  The Limitation of

24 Damages clause defers to the Changes clause.  The Changes

25 clause provides BAE with an avenue to limit damages and then

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1  states specifically, "Except with respect to such limitation,

2  no other clause can limit damages with regard to changes."

3        So when Your Honor asked how can the two -- how can

4  the two clauses be read in harmony, that's how the two clauses

5  can be read in harmony.  And it was clearly the parties'

6  intent, Your Honor, to remove the word "changes" because it

7  was removed from Article 46.  BAE's argument that somehow this

8  clause was simply adopted, slapped into the contract and

9  agreed upon -- in fact, BAE has no source whatsoever for the

10  fact that Fluor proposed this.

11        So with that, Your Honor, if you look -- and we cite

12  to several cases, *Shepherd versus Davis*, *Route Triple Seven*

13  and *Vir2us*.  All of those cases, including the Supreme Court

14  of Virginia, have reviewed limiting language, including

15  similar to "except as otherwise provided," and found that they

16  defer to other provisions.  And here we have that exact same

17  situation, Your Honor.  So --

18        THE COURT:  Okay.  So what your argument is, is that

19  the "except as otherwise provided in this subcontract"

20  requires the Court to defer to this limitation contained in

21  the Changes clause?

22        MR. FITZSIMMONS:  That's correct, Your Honor.

23        THE COURT:  Okay.  I understand that, but -- I

24  understand that argument, but if that's true, what does

25  "30 million being defined as the value including all changes

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1  mean"?  Isn't that inconsistent?

2       MR. FITZSIMMONS:  As we argued in the alternative,

3  because we believe -- we believe the statute clearly defers to

4  the Changes clause.  But as Fluor argued in the alternative,

5  there is an ambiguity.  An ambiguity exists.  Not only is

6  there an ambiguity between two of the provisions and one that

7  does not have the word "changes" -- and clearly, again, the

8  parties intended to remove the word "changes."  Why would they

9  remove it in one and not in the others --

10       THE COURT:  No, I hear you.

11       MR. FITZSIMMONS:  But then you just read --

12       THE COURT:  I hear you on that, Mr. Fitzsimmons.

13       MR. FITZSIMMONS:  Then another reading that could

14  potentially exist, Your Honor, is if you just read the

15  provision grammatically, does "changes" in fact refer to scope

16  of work or does it refer to any changes that the parties may

17  agree to to the $30 million?  And in that case, if it only

18  refers to changes to the $30 million, then we're left with a

19  provision that doesn't refer to changes in the scope of work

20  at all.  We're left with a provision that talks about

21  $30 million going back to "except as otherwise provided in

22  this subcontract" --

23       THE COURT:  Mr. Fitzsimmons, could you explain that

24  point again?  You lost me there.

25       MR. FITZSIMMONS:  Oh, certainly.  So the highlighted

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1  section we have down at the bottom where it says, "$30 million

2  being defined as the value including all changes," that

3  language actually -- as we put into our original counterclaim,

4  this isn't the first contract that Fluor and BAE has entered

5  into, and, in fact, they've entered into a number of

6  contracts.  They have a boiler project, they had a cutter

7  warehouse, and those projects contained also a limitation of

8  damages provision, except that limitation of damages provision

9  was read as "the value of the subcontract including all

10  changes."  So it was the value of the subcontract plus

11  changes.  That's how those -- that's how those provisions in

12  those contracts, both the boiler's contract, the federal

13  warehouse, the limitation of damages are read, that it's the

14  subcontract price including damages.  So subcontract price

15  plus, plus changes.

16          This could be read very similarly.  It's $30 million

17  including any changes, plus changes.  $30 million being

18  defined as the value plus any changes.

19          THE COURT:  What does that mean "being defined as the

20  value"?

21          MR. FITZSIMMONS:  The value would be the value of the

22  limitation of damage for personal injury, for torts, for

23  environmental claims, et cetera.  But what it certainly is not

24  is a value that's limiting your changes, because BAE knows

25  exactly where these limitation of damages provisions came

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1  from.  And it's $30 million being defined as the value, which

2  I assume BAE argues is the value of the limitation of damages

3  for, as we argue, torts and personal injury, including all

4  changes, because it's very common in the construction industry

5  to have a limitation of liability that is your contract value.

6  And then "including all changes" increases that limitation of

7  damages.

8       THE COURT:  All right.  $30 million including all

9  changes you're reading to say $30 million plus changes?

10       MR. FITZSIMMONS:  That's correct, Your Honor.

11       THE COURT:  As opposed to -- but they don't say

12  "30 million plus changes."  The contract says "30 million

13  including all changes."

14       MR. FITZSIMMONS:  But "$30 million including all

15  changes is $30 million," as we argue, going back to the very

16  common practice in the construction industry that you begin

17  with your limitation of damages as your contract value and

18  then it goes up with each change.  So as BAE directs changes

19  to the contract, the limitation of damages would certainly go

20  up.

21       So the idea that somehow, going back to the

22  beginning, that somehow BAE and Fluor, or Fluor would even

23  sign up to a contract whereby BAE could essentially order a

24  gold-plated nitrocellulose facility and Fluor would agree to

25  perform all of that work is an irrational interpretation of

1  this contract.  It would allow BAE to run rampant, as it did

2  on this project, and direct -- direct Fluor to perform any

3  amount of work.

4        THE COURT:  Okay.  All right.  Mr. Fitzsimmons, thank

5  you for that.  Tell me why you think none of this matters

6  because it's barred by the statute.

7        MR. FITZSIMMONS:  Thank you, Your Honor.  So the

8  limitation of damages provision, contrary to how -- or, I'm

9  sorry.  The Virginia Code, contrary to how BAE presents it to

10  Your Honor, is not a mechanics' liens statute.  It doesn't

11  apply to private contracts whatsoever.  As Your Honor

12  identified, the statute doesn't apply -- doesn't use the word

13  private or public project whatsoever.  Under no circumstances

14  does the plain language of the statute state that it applies

15  either to public or to private.

16        What the limitation of damages states -- I'm sorry,

17  the Waiver clause states is that a subcontractor cannot sign

18  up for and waive its claims for demonstrated additional costs.

19  If it does so, it's null and void.  There's no doubt that this

20  statute was effective.

21        If you look at the legislative history, what BAE

22  argues is that somehow Fluor performed some work before

23  entering into its contract under the UCA.  And they go to

24  paragraph 89 of Fluor's counterclaim.  Fluor doesn't say or

25  argue that it performed any work under the subcontract.  In

1  fact, what Fluor argues is that it performed work under the

2  UCA.

3         But this language that BAE lights upon that says

4  "before performing any work," doesn't mean the beginning of

5  the project.  Such an interpretation would be absolutely

6  draconian.  What BAE attempts to interpret in this statute is

7  that a subcontractor could drive its truck onto a project

8  site, dump off some 2x4s, put its shovel in the ground, then

9  walk over to the trailer, sign the contract, and by putting

10  those 2x4s on the ground and putting its shovel in the ground,

11  that contractor has waived all of its rights to demonstrate

12  additional costs.  That can't possibly be the interpretation

13  that the Virginia legislature intended, and, in fact, it's not

14  the interpretation that the Virginia legislators intended.  As

15  we argued in our briefing, when Senator Chapman presented this

16  legislation --

17         THE COURT:  No.  I think it was -- wasn't it Senator

18  Petersen?

19         MR. FITZSIMMONS:  Senator Chappy Petersen; you're

20  correct.

21         When Senator Petersen presented this statute, it was

22  originally presented in the mechanics' lien law; however, when

23  it got up to Governor McAuliffe, Governor McAuliffe said,

24  "Wait a minute here.  There's a couple of aspects of this

25  statute.  Part of it goes in the mechanics' lien law, but part

1  of it goes into Title 11, which is contracts."  So BAE's

2  argument somehow this is a mechanics' lien law and doesn't

3  apply is just absolutely undermined by the legislative

4  history.

5          And on top of that, if you look at the introduction

6  of this bill by Senator Petersen, he says very specifically

7  that it protects a subcontractor from waiving his lien rights,

8  bond claims, claims for -- or any other rights unless the

9  subcontractor has been compensated for the work or materials

10  related to the waiver.

11          That language is important, because, historically,

12  BAE refers to mechanics' lien and lien waivers happening on a

13  monthly basis.  And the Virginia courts for years have found

14  that in order to confirm a lien waiver, a lien waiver requires

15  consideration.  So along with this statute that says clearly

16  that -- as introduced by the author of this legislation, it

17  states that "unless the subcontractor has been compensated for

18  the work or materials related to the waiver."  Now, this goes

19  back to the idea of any work performed.  The idea, again, that

20  a contractor could put its shovel in the ground and then waive

21  all of its rights to all demonstrated additional costs would

22  be an irresponsible interpretation of this Virginia code.  The

23  better interpretation --

24          THE COURT:  But in this case, but in this case, this

25  isn't a case where the contractor came and cut the grass

1   before starting the work, or, as you say, delivered a load of

2   lumber and put the shovel in the ground.  In this case,

3   related to this project, Fluor did a bunch of work under the

4   UCA, which was later incorporated into the subcontract, and

5   got paid millions of dollars.  So this isn't a -- let's not

6   put the strawman up there by putting the shovel in the ground.

7   Let's talk about the facts of this case.

8          MR. FITZSIMMONS:  Certainly, Your Honor.  So BAE

9   argues that somehow the UCA was incorporated into the

10  subcontract that was executed in December.  That's absolutely

11  false.  And as Fluor argued in its --

12         THE COURT:  Well, okay, I get that.

13         MR. FITZSIMMONS:  Fluor performed --

14         THE COURT:  I understand.  But regardless, going back

15  to the words of the statute, whether the UCA is superseded or

16  whether the UCA is incorporated into it, y'all did work on

17  this project to the tune of millions of dollars before the

18  subcontract is signed.  Therefore, doesn't the statute simply

19  not apply here?

20         MR. FITZSIMMONS:  No, Your Honor, because the

21  interpretation of "any work" is not a temporal interpretation.

22  Again, it doesn't mean that a subcontractor may perform any

23  amount of work and then simply waive all of its rights.  It's

24  not a time based.  The idea of "any work" means any work

25  performed under the contract, whether you're doing work at the

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1   end of the project, you're doing work in the middle of the

2   project, you're building the roof, you're building the walls,

3   you're building changes that may arise on the project.

4   Because a subcontractor, when they first enter into a

5   contract, may not be aware of all the modifications --

6           THE COURT:  Okay.  So you're saying I've got to read

7   into this statute "work on this contract"?

8           MR. FITZSIMMONS:  That's what the -- that's what the

9   words of the statute state, that --

10          THE COURT:  Well --

11          MR. FITZSIMMONS:  -- it's work on the contract.

12          THE COURT:  Where does it say "work on the contract"?

13  Help me out there, Mr. Fitzsimmons.  Show me where it says

14  "work on the contract," or, in this case, "on the

15  subcontract."

16          MR. FITZSIMMONS:  It says:  (Reading)  A provision

17  that waives or diminishes a subcontractor's right --

18  lower-tier subcontractor's, or material... to assert payment

19  bond or his right to demonstrate in a contract executed prior

20  to providing any labor, services, or material is null and

21  void.

22          So it refers to the contract, Your Honor, in the

23  code.

24          THE COURT:  Sure.  Sure.  Absolutely, the provision

25  in the contract.  The provision in the contract is null and

1  void unless you provided labor, services, or materials before

2  the contract is signed.  That's what this says.

3          MR. FITZSIMMONS:  Your Honor, we would interpret it

4  differently.  We would interpret --

5          THE COURT:  Okay.  Help me out to understand exactly

6  what you mean.

7          MR. FITZSIMMONS:  We would interpret -- so as

8  Mr. Treece acknowledges, or argues, the history of this clause

9  comes down from the lien waivers.  The lien waivers, again,

10  require consideration.  Lien waivers come in on a monthly

11  basis after work is performed and when a contractor is

12  compensated.

13          The idea of any labor, services, or materials does

14  not refer to, again, the contractor who may even do some work.

15  And none of the work that Fluor is requesting costs for is

16  related to the UCA at all.  The cost that Fluor is requesting

17  is related to changes that occurred much later on in the

18  project.

19          The idea of any labor, services, or material defines

20  that this waiver applies to any possible work that the

21  contractor may perform under the contract.  It does not

22  establish a timeline.  In fact, that was the intent when

23  Senator Petersen introduced this.  He said, "Wait a minute.

24  Until you've been paid for this work, you don't waive it."

25          So that's the history of this.  So to the extent that

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1  there's any question about "any labor or material," then it

2  appears that there may be a question of ambiguity in the

3  reading, and then at that point Your Honor is well within your

4  rights to go to the legislative history and see where Senator

5  Petersen presented this.  Again, the idea of any labor,

6  services, or material is not a time-based discussion.  It's

7  not performing work at the beginning of a project, before you

8  execute a contract, and, therefore, somehow the

9  subcontractor is --

10       THE COURT:  Okay.  If you say it's not temporal based

11  or time based -- you said that a couple of different times --

12  how do you explain the use of the word "prior to"?

13       MR. FITZSIMMONS:  Because, as I mentioned, you can

14  issue lien waivers on a monthly basis.  You can potentially

15  issue claim waivers.  In fact, when we receive -- it's very

16  common in the construction industry when a contractor is paid

17  for work, that it provides a claim waiver; that once it's been

18  paid for that -- once it's been paid for that work, that it

19  issues a claim waiver and a waiver of additional -- it says to

20  the owner, whomever it may be, that, "You know what?  I don't

21  have any further costs related to the work that you have paid

22  me for, and, therefore, I am providing you on a monthly basis,

23  as I get paid, a waiver of my claims for that work for which

24  you have paid me for."  That way both parties know that

25  regardless of how the contract ends, that there's not going to

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1  be a dispute with regard to the work for which the contractor

2  has been paid.  So that's -- that's what it means, "prior to

3  providing any labor, services, or materials."

4          THE COURT:  Okay.  All right.  Thank you for that,

5  Mr. Fitzsimmons.

6          I want to go and ask Mr. Treece a question, and that

7  is this:  Mr. Treece --

8          MR. FITZSIMMONS:  I'll stop sharing.  If I may, Your

9  Honor, I'll stop sharing.

10          THE COURT:  Okay.  Thank you, Mr. Fitzsimmons.

11          Mr. Treece, Mr. Fitzsimmons started his argument and

12  made a good point about how your reading of this provision in

13  the contract is irrational and would allow BAE to run

14  rampant -- I think those are the words Mr. Fitzsimmons used --

15  over the rights of Fluor.  He says BAE could order all these

16  changes and make Fluor do all of this work and then say, "Too

17  bad, so sad.  You're stuck to 30 million."  Tell me why that

18  argument doesn't carry water.

19          MR. TREECE:  Certainly, Your Honor.  It doesn't carry

20  water because of the plain language of the agreement and the

21  plain language of the clause we're talking about.  If

22  30 million is defined as the value of all changes, and BAE

23  says, "Go make a gold-plated centrifuge," I think, or

24  something along those lines I think was his example, Fluor

25  could say, "We're going to do $30 million worth of work on a

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1  gold-plated centrifuge and no more.  Try to recover from us,

2  because $30 million includes the value of all changes.  You

3  just directed us to do $30 million in gold-plated changes.

4  That's our maximum exposure.  We're doing $30 million; try to

5  sue us for more.  You can't get anything."  That's what they

6  would say to us, right?

7        Their arguments are totally untethered from the

8  language of the agreement.  If you look at what they're

9  proposing, if they want to strike changes and they claim that

10 the Changes clause somehow overrides this language, that's

11 just not possible, because their construction would require

12 the Court to say, "30 million being defined as" and strike the

13 entirety of "value including all changes" and the maximum

14 value of liability for damages.  BAE is the only party that

15 has a consistent construction.  Again, the absence of a

16 definition a third time in Section 46 is in no way

17 contradictory, directly --

18        THE COURT:  Let me go back.

19        MR. TREECE:  Yeah.

20        THE COURT:  Let me go back to the question I asked,

21 because the question I asked, your argument seems to agree

22 with Mr. Fitzsimmons, and that is that this contract, as you

23 read it, would allow BAE to order $60 million in changes;

24 Fluor, under the contract, would have to make those changes;

25 and then BAE would only have to pay them 30 million.

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1        MR. TREECE:  Answer me this, Your Honor:  Why would

2   Fluor do that when Fluor's exposure is limited to 30 million

3   being defined as the value of all changes?  Why would they do

4   60 million in changes --

5        THE COURT:  No, that's not the question for the

6   Court.  The question for you is, isn't that -- isn't that

7   reading of it just irrational?

8        MR. TREECE:  It is absolutely not irrational.  And

9   more than that, it is what Fluor proposed.  Mr. Fitzsimmons

10  says that we have no evidence that Fluor proposed this.  To

11  the contrary, based on what they incorporated by reference in

12  their complaint -- and this, again, is docket 37-1; it's

13  before the Court, and this is Fluor's redline.  It says, "See

14  attached redline document below."  Fluor has included a

15  statement on the limitation on damages below.  They added

16  this.  They introduced this redline all throughout.

17        I'm actually a little stunned that Mr. Fitzsimmons is

18  referring to contracts other than this one, because he well

19  knows that those contracts do not have this language.  He's

20  referring to a package boiler contract that has language about

21  the value of the contract plus changes.  That's what the plain

22  language says, "value of the contract plus changes."  This --

23        THE COURT:  Is that the case that Judge Dillon has?

24        MR. TREECE:  That is the case with Judge Dillon.

25        And I'm a little stunned by the false equivalency

1  between the two, because he well knows that this language is

2  entirely different, and it's Fluor's own proposed language.  I

3  would invite the Court to look at that and then assess the

4  credibility of that argument, Your Honor.

5          THE COURT:  Well, I've got plenty to look at by

6  looking at this case alone.

7          MR. TREECE:  Understand.  Understand.  Now, Your

8  Honor --

9          THE COURT:  You-all have given me plenty to look at

10 here.

11         Okay.  I think I have a pretty good idea with regard

12 to this argument.  What I'd like to do now is turn briefly to

13 BAE's motion to dismiss Fluor's counterclaim, and there are

14 really three parts to that.

15         MR. FITZSIMMONS:  Your Honor, if I may make one

16 comment about our last -- I just want to refer Your Honor --

17         THE COURT:  Sure, Mr. Fitzsimmons.  Go ahead.

18         MR. FITZSIMMONS:  I just want to refer Your Honor to

19 the arguments that we made in our brief with regard to the

20 contract prohibiting Fluor from stopping performance.  The

21 contract is very clear that --

22         THE COURT:  That's why I asked the question of

23 Mr. Treece, because I noted that from your brief.

24         MR. FITZSIMMONS:  Thank you, Your Honor.

25         THE COURT:  Give me a big picture, Mr. Fitzsimmons.

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1   Tell me how you-all got stuck with this $185 million in

2   changes.  Tell me how that came about.  What's the nature of

3   how that happened?

4          MR. FITZSIMMONS:  It's actually a good segue into the

5   next briefing, Your Honor.

6          THE COURT:  All right.

7          MR. FITZSIMMONS:  So, fundamentally, BAE provided

8   Fluor with a design, and you'll hear about this in the

9   argument, and that design was known as the Lauren design.

10         THE COURT:  Right.  I got that.  I got that.

11         MR. FITZSIMMONS:  That design was prepared by a prior

12  subcontractor to BAE.  And then during the project -- or

13  during solicitation, as we put into our counterclaim and we

14  put an exhibit in, BAE directed Fluor to bid to the Lauren

15  design, and, in fact, derided Fluor on its price, proclaiming

16  that the design was 85 percent complete.

17         And so not only did Fluor bid to the Lauren design as

18  directed by BAE, the contract states clearly that Fluor was

19  obligated to adhere to the Lauren design.  The Lauren design

20  was initially native files, it was -- it was what's called a

21  Smart Plant model, an electronic model, and BAE represented in

22  the contract that they had redlined, they had corrected, they

23  had provided updates to the design.

24         And then we also have to remember that there's a

25  second aspect of this, and that is the process design.  And

1  you'll hear about this from Ms. Barnes.  There's no doubt that

2  under this contract BAE was responsible for the process

3  design.

4        You think of the process, Your Honor, as the black

5  box that really controls the entire NC facility, right?  It's

6  huge thousand-gallon tanks.  It is where the nitrocellulose

7  comes in like Saran wrap and it gets cut up, and then it gets

8  into these acid tanks, and it goes through this system and it

9  goes to stabilization tanks.  It's a huge chemical process.

10        BAE was responsible for that process and responsible

11  for providing the equipment for that process.  And during the

12  project, BAE fundamentally changed that process, the

13  underlying process.  And as BAE put in their complaint, the

14  underlying process controlled the web of piping that was to be

15  constructed in the entire NC facility.  And Fluor's costs

16  arise largely but not primarily from that piping as a result

17  of BAE's changes to the process design.

18        So included in Fluor's counterclaim are design

19  changes that were specifically directed by BAE.  One example

20  we put into our counterclaim, and only one example was we

21  included a letter whereby BAE directly required Fluor to use a

22  specific valve, thereby controlling the equipment that Fluor

23  was to use.  After Fluor had already spent money on an

24  equivalent valve, BAE came in and said change that valve.

25  That's a $5 million change.

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1          Another example, when BAE changed the process design,

2     it increased the heating in the facility.  So the heat in the

3     facility just changed.  That required a change to the HVAC

4     system in the NC facility.  That was a direct and proximate

5     result of BAE changing the process design.

6          So we had process design changes, we had directed

7     changes, such as the valves, and then we had tremendous delays

8     while BAE was negotiating and changing its process design with

9     its proprietary designer, a company named Bowas, who was

10    providing this underlying process.  There were tremendous

11    delays that occurred on this project as a result of Fluor

12    waiting for BAE to change and decide what it's doing with its

13    process.

14          Then we fundamentally have the Lauren design that was

15    represented by BAE during a solicitation period and in the

16    contract to be 85 percent complete.  And so there's an aspect

17    of Fluor's damages that are related to an implied warranty and

18    specifications.  Set aside whether it's 85 percent complete,

19    it just wasn't fit for its purpose.  There were clashes.

20          This is after BAE represented to Fluor in the

21    contract that the Lauren design was redlined, the Lauren

22    design was corrected, and Fluor was obligated, as you'll see

23    and Ms. Barnes will put up, obligated to adhere to that Lauren

24    design.  So all those culmination of changes and that sort of

25    a bowl of spaghetti between BAE's process design and the

1  piping, that's how all of these -- and Fluor was submitting

2  what's known as proposed change notices or changes to BAE

3  timely, as we set forth in our counterclaim.  We were timely

4  presenting to BAE each of these changes in a timely basis.

5          THE COURT:  Well, BAE says, "You're not entitled to

6  any these changes because we never agreed to them."

7          MR. FITZSIMMONS:  Certainly, Your Honor, that's a

8  self-serving -- that's a self-licking ice cream cone, Your

9  Honor.  The only one who controls whether or not BAE agrees

10 whether or not it's a change is BAE.  So under Virginia's

11 prevention document, if BAE is the only one who can agree

12 whether or not it's a change, and BAE is the only one who can

13 issue the written change order -- the reason we are here, Your

14 Honor, is because, fundamentally, the parties disagree as to

15 what's within or outside the scope of the project.  And it's

16 our argument --

17         THE COURT:  Right.  No, I get that.  And I carefully

18 looked at the scope of work yesterday; I focused on that.

19         But going back to what we were talking about earlier,

20 Mr. Treece says Fluor never would have done more than

21 $30 million in work on all these changes because they knew

22 their liability was limited to that.  Fluor never would have

23 done that.  But you're saying, "Now, wait a minute.  We did

24 185 million."

25         MR. FITZSIMMONS:  Your Honor, not only did we perform

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1  185 million, but going back to -- going back to the provision,

2  again, we couldn't walk off the project.  It's clear, and I

3  had it on our slides and I sent it to you and Your Honor has

4  seen it, the clause clearly states Fluor can't walk off the

5  project.  So -- and it also goes to how Fluor -- intent and

6  their understanding of the clause.

7        Now, so fundamentally, Your Honor, what BAE is trying

8  to say is, "Well, if you disagreed, you should have walked off

9  the project.  Oh, and by the way, BAE is the only one who can

10 control whether this is a written change, and you never should

11 have performed it without a written change," when BAE was the

12 only one in control of whether or not they could issue a

13 written change.

14       So if I'm BAE, of course I'm going to say nothing is

15 a written change -- nothing is a change.  And why would I

16 agree that anything is a change, right?  Because they're not

17 going to sign up and admit, as they should properly, that in

18 fact they were impacting Fluor's costs through changing its

19 process design, in providing Fluor with what was represented

20 to be a corrected and redline design, requiring Fluor to

21 adhere to and use that design on the project, and then, you

22 know, stepping aside and saying, "Well, nothing is a change.

23 And by the way, since I didn't issue you a change or approve

24 this, then I'm not liable for it."  I mean, that's just a

25 self-serving argument if I've ever seen it.  The only one who

1  was in control of determining that BAE believed it was a

2  change was in fact BAE.

3          I'll stop there, because Ms. Barnes, I didn't want to

4  steal her thunder, but you asked me a question, Your Honor.

5          THE COURT:  Well, no, you said you wanted to say

6  something else so I gave you that opportunity.

7          MR. FITZSIMMONS:  That's fair.

8          THE COURT:  I've lost track of where we are on the

9  motion to dismiss filed by -- it's a motion to dismiss filed

10 by BAE, and so I think, don't we have to hear from those folks

11 first?

12         MR. FITZSIMMONS:  Yes, Your Honor.  So that would be

13 Mr. Treece, I believe.

14         MR. TREECE:  Are you ready, Your Honor?

15         THE COURT:  Yes, I'm ready.

16         MR. TREECE:  All right.  Let me share my screen

17 again.

18         All right, Your Honor, while I appreciate

19 Mr. Fitzsimmons' narrative, it is grossly misleading and in no

20 way based on the contract, as I'll walk the Court through, and

21 so would correct all of those misstatements.

22         So but before I do that, I want to just kind of give

23 the Court a little background on the basic ordering agreement.

24 So BAE is, of course, the defense contractor that operates the

25 arsenal.  The Army has a basic ordering agreement with BAE

1   where they basically say, "Here's something that we want done

2   at the arsenal," and then the task order too was directed to

3   the NC facility.  Now, in connection with that task order, the

4   Army, not BAE, selected the proprietary nitrocellulose

5   manufacturing process system by Bowas, which is spelled with a

6   W as B-O-W-A-S and is based in Austria.  And the Army's

7   technical bid package required the use of the Bowas system.  I

8   know Mr. Fitzsimmons likes to claim that's, you know, BAE's

9   system, and I understand sort what he's trying to say, but,

10  ultimately, it was the Army that selected and dictated the use

11  of that system.

12          And one thing on the 12(f), just to jump back, we're

13  not dealing, Your Honor, with anything relating to lien

14  waivers.  The only reason we've raised a lien is in connection

15  with the interpretation of the statute itself.  But liens are

16  not at issue here.  Fluor, for example, can't put a lien on

17  the Army's property, right?  So that again goes to the

18  inapplicability of the statute to the issue at hand.

19          But back to the motion to dismiss.  In 2015, BAE

20  hired Fluor to do the actual design and construction of the NC

21  facility.  This is a design/build contract.  You'll see a lot

22  of cases by Fluor --

23          THE COURT:  Let's just go there, okay?  Is there a

24  question of fact that the Court need -- in applying the

25  *Spearin* doctrine, right, which is their implied warranty of

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1  design, right, is there a question of fact as to who is the

2  designer here?

3          MR. TREECE:  Absolutely not.

4          THE COURT:  They say you're the process designer and

5  you're the designer, and you say -- and they say, "We had to

6  follow Lauren Engineering, and it was 85 percent done, and

7  there was a misrepresentation."  And you say, "No.  No.  No.

8  They're the designer."  How can the Court resolve that on a

9  12(b)(6)?

10          MR. TREECE:  Your Honor, fortunately the contract

11  spells this out clearly, so that is how the Court can make

12  this determination, because the contract assigns all design

13  responsibility to Fluor, ultimate design responsibility.  All

14  design responsibility that is at issue in their counterclaim

15  is plainly assigned to Fluor under the contract.

16          Let me just walk the Court through the contract

17  provisions that are relevant to that issue.  So it begins with

18  a statement of work.  Of course, it says, "Statement of Work.

19  Subcontractor shall provide all necessary facilities,

20  equipment, materials, et cetera, to accomplish the Statement

21  of Work," right?  And then it says the price is not subject to

22  adjustment.  So you can't have a change order if you're doing

23  something under your Statement of Work, right?

24          So then we look to the Statement of Work.  The

25  Statement of Work says it's to design and construct NC

1   facility.  So they weren't hired to take plans that were

2   completed plans and go and implement those.  The Lauren

3   drawings are not a requirement under the contract.  That is

4   clear on the face of the contract, and I'll walk the Court

5   through how that is clear on the face of the contract.

6        The Lauren drawings are for reference only.  It says:

7   Subcontractor shall prepare their own drawings.  Subcontractor

8   shall prepare their own specifications, own construction

9   specifications.  It is incumbent on the subcontractor to

10  perform their own analysis.  And then, unequivocally,

11  subcontractor shall be solely responsible for the design, not

12  the process design, not the electrical design, not the piping

13  design.  "All design."  "Solely responsible for the design."

14  Subcontractor is responsible to validate, correct, and

15  complete all PFDs.

16        Essentially, what happened here, Your Honor, is

17  Lauren is gone from the project.  Everything Lauren did was

18  turned over to Fluor in the eight-month bidding process.  It

19  was turned other to them as is and for reference only.  And it

20  is essentially saying, "Look, somebody else was on this

21  project, they did some work.  You look at it; if you can use

22  anything there to save on cost and expense, by all means do

23  it.  But if you can't use it, you have to look, you have to

24  validate, you have to complete.  You're ultimately

25  responsible, but here's information that you may or may not be

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1  able to use.  Use who you want at your own risk."

2           *Spearin* does not apply because they are extremely

3  clear assignments of liability to Fluor, and disclaimers, and

4  there's express warranties that Fluor gave over the design

5  here.  *Spearin* cannot apply on the facts of this case.  And

6  any of the authorities they cite in Virginia are not

7  design/build contracts.  They're talking about contracts where

8  somebody is just hired to build not to design.  This is a

9  design/build contract and Fluor is solely responsible for

10 design.

11          Merger clause, we've talked about that.  But they

12 rely on their proposal, and they say, "Well, maybe the Lauren

13 drawings are not clearly required by the contract, but if you

14 look at our proposal, you'll see that we referenced it," or

15 "If you look at our post contract submissions, you'll see that

16 we referenced the Lauren design."

17          The problem for them is none of those are part of the

18 contract.  It supersedes your proposal, right?  So whatever

19 they're putting out, whatever their characterizations, that's

20 not the agreement.  They cannot vary or modify the terms.

21 With their post contract submissions, even there they're

22 responsible for any error or deficiency which may exist in the

23 submitted designs.  They have the responsibility for all

24 errors and deficiencies in the design.

25          And, I mean, clearly BAE shall not be liable for any

1  of Fluor's increased cost or performance that would result

2  from Fluor's implementation of changes that BAE did not first

3  approve in writing.  Fluor's response, if they don't get

4  approval from BAE, is to not do the work, and say, "No, we're

5  not spending money to do that until you approve it, because we

6  don't have an obligation to do anything that you don't first

7  approve."

8          So Fluor's assertion, which is misleading, based on

9  having to do all this work without a written approval, they

10 did not have to do the work, and they're instructed not to do

11 the work without approval.  So that's the issue there.

12         Now, it was expressly a conceptual design, right?  So

13 they're getting something they knew was not complete, and they

14 knew they had to validate, correct, and complete it.

15         So I want to break this apart, Your Honor, because

16 this really isn't a single count breach of contract.  And the

17 *Consilio* (phonetic) case that they cite, which is not a

18 design/build case, it's just a design case, so it's

19 inapplicable as to the *Spearin* issues, but what's relevant in

20 that case is in that case the parties correctly broke out an

21 implied warranty claim from an equitable adjustment claim.

22 Here Fluor tries to do an artful pleading and dump basically

23 three claims under one count.  But these are all independently

24 subject to dismissal.

25         But I want to conceptually break it down for the

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1  Court into, really, two things that we're talking about.

2  We're talking about the Lauren design, which is drawings,

3  right?  It's the 3D model of, as Mr. Fitzsimmons represents,

4  the spaghetti of piping and everything else.

5          The P&IDs are not that.  The P&IDs are base level

6  schematics that just show this component is connected to this

7  other component, right?  But the Bowas equipment was delivered

8  to a warehouse, right?  So Fluor retrieved it from the

9  warehouse, they were responsible for installing it in the

10  facility and doing all of the -- all of the web of piping that

11  goes with it.  That is fully and completely their

12  responsibility.

13          So you've got the two issues:  You've got the Lauren

14  design, which is drawings.  You've got directed or

15  constructive changes.  To be a directed or constructive change

16  it has to be outside the scope of work; otherwise, it's you

17  doing your scope of work.  And as we know from the contract

18  itself, they're not entitled to any increase in the cost of

19  work that is within their scope of work.  And then we've got

20  two extra contractual claims I'll kind of discuss at the back

21  end.

22          So anything relating to the Lauren design is entirely

23  not a viable claim and should be dismissed on with a motion to

24  dismiss, because the contract -- the four corners of the

25  contract assign all relevant design responsibility to Fluor.

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1   That's to say all design responsibility they take issue with

2   is all within Fluor's ambit.  It does not require adherence to

3   the Lauren design, and there is no percent complete

4   representation.  In fact, contrary representations are in the

5   contract, as we'll get through.  The direct and constructive

6   changes I'll talk about a little bit later.

7           So with respect to the contract and design

8   responsibility, there's a definition of work, and the

9   definition of Fluor's work is all of the design.  All of the

10  design, that's Fluor's work.  "Contractor shall be totally

11  responsible for all design drawings and specifications."

12          Here's something that the Court really has to

13  appreciate and Fluor tries to glaze over, right?  There's

14  drawings and then there's equipment, right?  So there's

15  equipment, the Bowas system, essentially, and then valves and

16  materials and things.  Those are not drawings, right?

17          So this says in the Statement of Work this is a

18  conceptual design -- this says, this is a conceptual design

19  developed by LEC.  So they knew it was conceptual.

20          Now, in the industry, and I believe Fluor represented

21  something along these lines, conceptual means something on the

22  order of 30 percent or 35 percent.  The Court doesn't need to

23  reach that.  The Court just needs to understand that the plain

24  meaning of conceptual is that it's not a design that you can

25  go and take and implement in a build contract.  They have to

1  design it, right?  They get something conceptual, they can use

2  it in a manner they see fit, right?

3          Then it goes on to say there are drawings,

4  specifications, and technical documents in Appendix G.  Three

5  different things: drawings, specifications, and technical

6  documents.  The drawings, which are the Lauren design,

7  provided for reference only, plainly stated.  Subcontractor

8  shall prepare their own drawings to be used for design review

9  submittals.

10          So the drawings, Lauren design, are for reference

11  only.  Specifications, which are equipment only and --

12  equipment and materials, are in native word files.  These

13  aren't design files; these are native word files, right?  So

14  they're different from the Lauren drawings in Appendix G and

15  represent minimum requirements.

16          So the equipment and materials are the minimum

17  requirements.  In other words, if you've got a valve that can

18  handle a certain psi, you might be able to go above that psi,

19  but this is the baseline requirement for that valve, right?

20          And it's interesting that what they try to use to say

21  that they were required by the Lauren -- to use the Lauren

22  drawings or Lauren design is this minimum requirements.  This

23  is a red herring and -- excuse me.  This is a red herring and

24  misleading because they well know that the only minimum

25  specifications are with respect to equipment and materials,

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1  not any drawing.

2         And, in fact, the example they give in the brief and

3  the example you just heard from him, he gives an example of

4  valves, right?  They try to say, "Well, we tried to change

5  this valve."  That plainly shows that the Lauren drawings and

6  specifications for equipment are fundamentally different,

7  right?  So subcontractor, even despite the fact that these are

8  sort of baseline requirements -- so it says, "You have to have

9  at least this level psi for a valve.  You can go above that,

10  but here's the base" -- they still have to prepare their own

11  construction specifications.

12         It's incumbent upon subcontractor to review the

13  documents, that it perform their own analysis.  And

14  subcontractor shall be solely responsible for the design we

15  talked about.  Subcontractor shall validate and complete all

16  PFDs and P&IDs.  So PFDs are process flow diagrams.  That's a

17  very high level of here's what machine is going to connect to

18  what machine.  The P&IDs are the piping and instrumentation

19  diagrams.  And, again, those are just schematics; that's not

20  the design per se.  The design is kind of like that 3D model,

21  which is totally independent of the specifications and are for

22  reference only.

23         In any event, they have the obligation to validate

24  and complete.  That means correct, which makes sense because

25  they are designing this facility.  So they're not required to

1   use the Lauren design.  They can decide to use some aspect of

2   it if it's a cost savings or beneficial.  At the end of the

3   day, that's their decision because they are the expert hired

4   to perform the design and build.

5          Appendix G-10, which they reply heavily on, totally

6   disposes of their argument that they have to somehow adhere to

7   the Lauren design, which they knew was incomplete.  Appendix

8   G-10 is titled "Equipment Specifications," and that's

9   referring to various equipment and materials.  Appendix G did

10  not require the use of the Lauren design, which is why they

11  contort themselves to try to cite to their own proposals

12  precontract or their own submissions post contract to try to

13  say, "Well, see here and here, we're talking about the Lauren

14  design, so it has to be in there as a requirement."  It is not

15  in there as a requirement.

16         And if there's any dispute, their technical proposal,

17  which is not part of the contract, recognizes their

18  responsibility to validate the existing design status, except

19  ownership of the existing design, correct and complete

20  existing design for all aspects of the project.  So that's

21  what they're intending to do.  This is not part of the

22  contract, but they know that they're getting information that

23  is incomplete, and they know that it's their duty if they want

24  to use any aspect of that -- of that, excuse me, to complete

25  it.

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1      Now, they refer to these "Design After Award"

2  documents.  They call it the Statement of Work.  It's not the

3  Statement of Work, and we flesh that out in the slide that you

4  can look at, Your Honor.  And then they selectively quote from

5  that in their counterclaim.

6      In paragraph 149, they omit the operative language,

7  right?  So this essentially says that, you know, BAE's review

8  doesn't relieve them from their design responsibility.  They

9  omit this bolded language "or limit the subcontractor's

10  responsibility for design."  They omit that.  They try to

11  say -- they use that to say a subcontractor -- excuse me.

12  Subcontractor's, excuse me, accepted proposal to try to fold

13  in their proposal with this contract.

14      Their proposal is not part of the contract, and Part

15  4 makes that clear.  (Phone ringing.)  Part 4 makes that

16  clear, Your Honor, because it outlines what is discussed with

17  respect to any proposal that's incorporated, and it is a

18  different proposal than any of the ones referenced in their

19  counterclaim.  In fact, it is just cost spreadsheets.  And if

20  you look at Part 4, "Attachments," Exhibit I is a proposal

21  dated November 25th, 2015.  What they allege are their

22  proposals in the counterclaim are none of those that are dated

23  November 25th, 2015; they're ones dated prior, and that's in

24  paragraphs 115 and 116.  So it's plain that their proposals

25  are not part of the contract.

1          Even if you look at this design specification
2   document that they do rely on, which is not the Statement of
3   Work, it goes on to say the same thing we've been saying and
4   the same thing the rest of the contract says:  "Subcontractor
5   is responsible for all specifications."  They're responsible
6   to provide 100 percent design.  They're responsible to update,
7   finalize, and present design analysis.

8          You know, I know that Mr. Fitzsimmons has spent much
9   of his time trying to separate process design and claim that
10  BAE had some responsibility for that, that somehow it impacts
11  the analysis here.  That's not the case at all, Your Honor.
12  This is the subcontract document, right?  This is the
13  milestone schedule, Subcontract Exhibit F.  This is Fluor's
14  milestones, and this is payment they get for the milestones.

15         So they're getting $10 million for process design,
16  and they're getting $10 million for process design over the
17  span of an entire year.  And it says there's an engineering
18  kickoff meeting at the beginning, December 2015, and then they
19  begin a 60 percent process design, right?  So they're trying
20  to say, "We thought it was 85 percent."  That's plainly not in
21  the contract.  It's a fully integrated agreement.

22         But what the contract does say, they're not even at
23  60 percent, because they're going to begin 60 percent at this
24  date and they're getting two-and-a-half-million dollars to do
25  that.  And then by June of the next year, they're going --

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1  they will have the 60 percent process design complete, and

2  then go through 90 percent, and then, you know, nearly a year

3  later they'll have an issue for construction process design.

4         So Fluor is trying to skirt its process design

5  obligations when they know they're solely responsible for the

6  design, and the subcontract itself -- this is Exhibit F to the

7  subcontract -- plainly recognizes Fluor's responsibility for

8  process design.

9         If we go back, the contract elsewhere recognizes that

10  process design is expressly within their scope.  Subcontractor

11  is responsible for the following process: engineering and

12  design.  Subcontractor will revise, which means correct, all

13  PFDs and P&IDs based on the redline documents.  Validate

14  existing redline PFDs.  Subcontractor shall develop

15  interfacing systems.  They're responsible for all of that web

16  of piping they're talking about.  They're expressly

17  responsible for that.

18         And so if we move further down this, Your Honor, when

19  I talked about the 60 percent process design moving forward to

20  100 percent, the Court may sit there and think, "Well, why is

21  it starting at 60 percent?  Is there a representation that

22  it's 60 percent complete?"  No, there's not, because this is

23  part of Fluor's document.  This is excerpted; it's a

24  screenshot.

25         This is just how Fluor posed doing the design work.

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1  They said, "We're going to do 60 percent and 90 percent peer

2  reviews."  So there's not a, you know, 30 percent review or

3  50 percent review.  It starts at 60.  And then the milestones

4  where they get paid are based on this 60, 90, and 100.

5          So they plainly had the design responsibility for the

6  process, and what they're trying to do now is shift that

7  responsibility in a way that is untenable based on the plain

8  language of the agreements.  And we kind of flesh out what we

9  flesh out in brief where they can't rely on any precontract

10  representation or their own cost and technical proposals that

11  are issued after the fact, or their post contract reviews.

12  And we've talked about this in terms of them being responsible

13  for any error and deficiency regardless of what they may

14  submit for review to BAE.

15          So, Your Honor, the reason we're here on the motion

16  to dismiss is because the four corners of the contract do

17  answer this question.  You know our position with respect to

18  them seeking cost overruns not really changes.  But, you know,

19  Fluor guarded themselves against this risk, right?  When a

20  contractor in this circumstance enters into a fixed-price

21  contract, they are assuming the risk of underbidding, right,

22  and so they have to be careful in that process.

23          They were paid, as Your Honor saw, for Mustang to do

24  500 hours worth of work in advance of signing this contract.

25  So whatever they may have needed to do, they were paid to do

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1  in advance of signing this contract.  But they also negotiated

2  a contingency, a $14 million contingency fund that says,

3  basically, if there's anything unforeseen here, you can use

4  $14 million, and Fluor ultimately gets to decide how to use

5  that $14 million.  So they guarded against the risk, and now

6  they are stuck with the terms of their contract despite their

7  arguments now.

8       *Spearin* doesn't apply here, Your Honor, for numerous

9  reasons, the first of which is the subcontract here goes far

10  beyond any general disclaimer.  It required Fluor to perform

11  its own analysis, submit its own design and drawings and

12  specifications.  And the two critical cases that we provide

13  for the Court *Modern Continental South v. Fairfax Water*

14  *Authority*.  And there the Court recognizes that *Spearin*

15  wouldn't apply where the contractor is required to review for

16  defects or ambiguities.  We've demonstrated that's their

17  obligation.  I've got another slide on that.

18       In *McClain* -- this is a Virginia Supreme Court case

19  and dispositive of the issues here.  That was a case -- that

20  wasn't even a design/build case; that was just a build case.

21  But even in the build case, the County gave bridge plans to a

22  contractor and it was a tension bridge.  It turned out they

23  didn't have enough space to erect the bridge, and the

24  contractor was ultimately held responsible because they agreed

25  to check the dimensions of the structure, so add the

1    obligation to validate.  Here we go far beyond that.  They

2    have obligations to validate, revise, correct, all of those

3    things, Your Honor.

4            And let me just get to the warranty, right?  This

5    entirely disposes of any purported *Spearin* claim under the

6    contract.  The warranty says, "In addition to any other

7    warranties in this contract, contractor, Fluor, warrants the

8    work is free from any defect in design furnished."  They

9    have -- they're granting that ultimate warranty, right, and

10   that distinguishes every single case that they cite.

11           And then it goes on to say, "Contractor shall remedy

12   at contractor's expense any defect."  And then it goes on to

13   say, "any defect in the design furnished," right?  And then it

14   says, "Omissions from drawings or specifications necessary to

15   complete -- or necessary to carry out drawings and spec shall

16   not relieve contractor from performing as if fully and

17   correctly set forth.  Contractor shall check all drawings

18   furnished to him immediately upon their receipt, compare all

19   drawings, verify the figures, be responsible for any errors.

20   Contractor shall be responsible for all measurements, and his

21   review in no way relieves contractor for any errors or

22   deficiencies."

23           In that sense, Your Honor, what they got is an "as

24   is" -- expressly as-is information from Fluor -- from, excuse

25   me, Lauren based on work in progress.  Everything was turned

1  over to them.  They're the experts.  They were paid 500 hours

2  for Mustang to look at this.  And it is essentially telling

3  them, "Look, you're the experts.  Here's what's been done.  If

4  you can realize any cost savings by utilizing this, you know

5  better than we do, you figure it out.  You have that

6  responsibility; we don't."  And that's, really, the

7  dispositive issue within the four corners of this agreement,

8  Your Honor.

9          Let me --

10          THE COURT:  Let's go ahead and hear what Fluor has to

11 say about your motion to dismiss.  And I don't need to hear

12 argument on the good faith and fair dealing or the *quantum*

13 *meruit* in the equitable argument.

14          Let's hear from -- let's hear from Fluor.  I

15 understand your point, and what I'm struggling with is, based

16 on what Fluor has submitted, is there a question of fact as to

17 the design responsibilities in this case and whether *Spearin*

18 controls?  Let's hear from Ms. Barnes.

19          MS. BARNES:  Your Honor, I think, and I'm not sure

20 whether this is a real misunderstanding or not, but what BAE

21 and Mr. Treece seem to have confused here is that Fluor is not

22 running from any of its responsibilities for the completion of

23 the Lauren design.  Fluor is not running from its

24 responsibilities to deal with this web of piping that is

25 specified by BAE's process design.  What Fluor is saying is

1  that in the handshake between BAE providing its process design

2  requirements and Fluor attempting to integrate those

3  requirements in its design, the defects and the changes in the

4  BAE process design caused increased costs and delays to Fluor.

5  And under *Spearin*, there is an implied warranty of

6  specifications that when BAE provides its process design to

7  Fluor, it is saying to Fluor that, "You can take this design

8  and do your work because this design is accurate, and this

9  design that we are giving you will allow you to do your work."

10      THE COURT:  But what about all those things that

11  Mr. Treece just went over which says Fluor is solely

12  responsible for the design?  Doesn't the contract itself undo

13  this implied warranty claim?

14      MS. BARNES:  No.  In every contract that you will

15  see, you will see that the contractor, if the contractor is

16  doing the construction or a design/build contractor, is going

17  to be solely responsible for the final design.  That does not

18  have anything to do with the implied warranty.

19      THE COURT:  Well, that's not true.  That wasn't in

20  that *McClain* case where they applied *Spearin*.  There wasn't

21  language in that contract that said the contractor was liable

22  for the design.

23      MS. BARNES:  In the *McClain* case, the contractor was

24  liable prior to the execution of the contract and during the

25  bidding to verify and go out to the site and look at the --

1   and look at the dimensions and the measurements.  We have

2   nothing like that here.

3         We have no responsibility to, prior to the

4   subcontract execution, do any verification, any validation,

5   anything, because, very frankly, BAE was continuing to do

6   their amending, correction, and completion of the -- or

7   correction and updating of the Lauren design as we were doing

8   our bidding.  The only time that Fluor had any requirement to

9   validate or complete the design was after the subcontract was

10  executed.

11        So *McClain* doesn't have anything to do with it and

12  neither does the case where they're talking about that the

13  parties discussed the errors that they expected to be in the

14  design.  Well, if you already know from discussions with the

15  party that is giving you the design that there are going to be

16  errors in it, then, yes, you're responsible for those errors.

17  But we don't have anything like that in this case.  In fact,

18  what we do have is an opposing party in BAE who put in the

19  Statement of Work that we were given at the solicitation that

20  the Lauren design has been updated, corrected, and amended.

21  So not only didn't we get that design as is or for reference

22  only, that design was represented in the contract to have been

23  updated, amended, and corrected.

24        I'm going to put my presentation on the screen

25  because I think that we -- there is some information that we

1  do need to talk about.

2        I think at this point we're going back to the fact

3  that BAE is now arguing that they are not responsible for the

4  process design.  So we've had a real journey in this case

5  talking about who is responsible for what.

6        THE COURT:  Yeah, is there -- and as regards this

7  issue, is there a question of fact that precludes the motion

8  to dismiss?

9        MS. BARNES:  Yes, because if BAE is now saying that

10  they're not responsible for the process design, then I think

11  that there is a question of fact as to where the

12  responsibility ends, where BAE's responsibility ends, that

13  they admit not only in their complaint and pleadings, but also

14  in their reply brief, finally, and in later briefs for the

15  motion to stay that were submitted to this Court.

16        THE COURT:  All right.  So, Ms. Barnes, help me out,

17  then, and point out to me where that disputed issue of fact

18  might be with regard to the responsibility for the design.

19  Because I read your presentation, the 70-page slideshow this

20  morning, and I appreciate y'all doing this -- oh, and let me

21  ask you, each side, to go ahead and docket your slideshows,

22  okay?  Just docket them as presentations, you know, just, you

23  know, slideshows or PowerPoint presentations for use of the

24  Court.  Because they really are another set of briefing,

25  right?  It's just briefing with bold and highlighting and

1  underlining; that's all it is.  And I appreciate it, because

2  it, you know, in getting ready for this argument and reading

3  the briefing helped you-all crystallize your thinking on this.

4  So I find these PowerPoints really helpful.  So if y'all don't

5  mind, go ahead and just docket them afterwards.

6          Ms. Barnes, what I was asking you:  Where is, in

7  these agreements, any question of fact as to responsibility

8  for the design?  Because Mr. Treece says it's all on y'all.

9          MS. BARNES:  Okay.  Well, let me just talk a little

10 bit about what the process design is.  And we have

11 descriptions of the process design not only from BAE but also

12 from Fluor.  Fluor talks about the fact that in its

13 counterclaim, at paragraphs 37 and 38, that BAE selected,

14 procured, and provided the proprietary equipment system which

15 they represent to be a state of the art system that controls

16 the overall NC facility process and includes the system for

17 nitrocellulose transfer and throughput.  And that means that

18 what BAE did was it determined the manufacturing process with

19 its subcontractor as how this nitrocellulose would be

20 prepared.

21         In BAE's complaint, it talks about the complex design

22 is the process design that includes the web of piping and

23 equipment system necessary to manufacture the NC, this

24 nitrocellulose.  This is what we are saying is BAE's

25 responsibility.  The process design is critical, because it

1  described the detailed layout of the complex web of piping

2  required by the project.

3          Now the reason why this issue and who is responsible

4  for this process design is very important is because there is

5  a handshake.  And what our claim is, because it comes right

6  out of the contract, is that what BAE does is it determines

7  what the manufacturing process is and then Fluor has to build

8  the systems that house this manufacturing process, and Fluor

9  has to build the web of piping and design the web of piping

10  that integrates these processes, that connects these processes

11  that BAE designs.

12          And so when Fluor says that the BAE design was

13  defective and it changed, it's because Fluor was unable to use

14  the design that it was given to design this web of piping and

15  to house the buildings that house this process.  In the time

16  when Mr. Fitzsimmons took all my thunder, he talked about the

17  fact that Fluor's responsibility is to build the facilities

18  around the equipment and the process that BAE designs, and

19  that where BAE changes the equipment, makes it bigger, makes

20  it stronger, makes it have more energy -- I'm thinking of

21  maybe a car, if you have an engine and you're going to go from

22  a V8 to a V12, there are a lot of things that have to change

23  in the interior, in the skin that -- the exterior of the car,

24  how the car has to run, because of that change in the engine.

25  And so what we are saying is that BAE continued to change the

1  engine of this process throughout the project, which meant

2  that Fluor had to redo its designs, had to redo that spaghetti

3  dish of piping in order to connect to the different equipment

4  that was changing that BAE provided.

5          And so BAE wants to claim that they have no

6  responsibility for that and that somehow Fluor has the

7  responsibility to specify the equipment, and that even if

8  there are changes, that BAE has no responsibility.

9          But the contract has the Changes clause and the

10  contract says that if there are changes, whether direct or

11  constructive, that Fluor -- and Fluor is impacted, and its

12  costs, and there are delays, that Fluor is entitled to an

13  equitable adjustment.  And so BAE can't run from that simply

14  by, you know, confusing words and, you know, misstating what

15  the subcontract says and shortening sentences with ellipsis to

16  try to act like Fluor is somehow responsible for the process

17  design.

18          Fluor has to house the system and has to connect the

19  system in the web of piping, and that is what it is there to

20  do.  When BAE makes changes to the process, makes changes to

21  the size of the equipment, makes changes to how the equipment

22  functions, those changes impact Fluor's obligations and

23  Fluor's design.  And in this case, what Fluor is trying to do

24  is to get the equitable adjustments that the Changes clause

25  mandates that they're entitled to because of the changes that

1  BAE made to the process design, the delays that were caused by

2  these changes.  And so that is the process design.

3          THE REPORTER:  I'm sorry, this is the court reporter.

4  Judge, can I have a minute?  I just need one minute.  Judge,

5  are you there?

6          THE COURT:  Yes, I'm here.

7          THE REPORTER:  Judge, can I have just one minute?

8          THE COURT:  Yes.

9          THE REPORTER:  Sorry.

10      (Discussion off the record between the Court and the

11  court reporter.)

12          THE COURT:  Okay.  I don't know who is doing it, but

13  somebody is recording this presentation, because I can see on

14  the bottom of the screen these words as I'm speaking them.

15  The court reporter just communicated with me to say that she

16  wasn't doing it, and it would be in violation of the court's

17  rules for anybody else to be recording this particular

18  hearing.  That's not what we're supposed to be doing, and --

19  because there's only one recording that is being made of these

20  proceedings, and that is the official court reporter.  And so

21  I don't know what's going on or who is -- I can still see it,

22  and it seems to me it's coming from your end, Ms. Barnes,

23  because it was only coming up while you were presenting.

24          MS. BARNES:  Okay.  Let me see if -- yeah, I don't

25  have record on.

1          THE COURT:  I don't know what's going on with regard

2    to that, but, look, I understand the issue with regard to this

3    Rule 12(b)(6).  I understand it very well, and it's set out in

4    the briefs and these presentations/slideshows.

5          BAE says Lauren doesn't apply because it's a

6    design/build contract and Fluor is responsible for the design.

7    Fluor says, "No.  No.  No.  BAE is responsible for the overall

8    design and we just have to do our implementation of the

9    overall process design."  I understand the arguments on the

10   12(b)(6) and I thank you for them.

11          Let me now hear from --

12          MS. BARNES:  Your Honor, could I just have one more

13   thing to say?

14          THE COURT:  Sure.  Sure, Ms. Barnes, absolutely.

15          MS. BARNES:  Okay.  I really want to -- I think I

16   really need to say in case there is some confusion that I have

17   caused, because Fluor is not trying to run from its

18   responsibility for the final design.

19          What Fluor is saying is that BAE provided a design,

20   and obviously there is a dispute as to whether or not that

21   design was a 60-percent design or an 85-percent design, but I

22   think there can be no dispute that the contract said that that

23   design was updated, amended, and corrected.

24          There also can't be any dispute, but I guess there is

25   a dispute, as to whether or not Fluor was allowed to not use

1   that design.  Fluor believes we were required to comply with

2   the Lauren design, so there is a dispute about whether or not

3   you could elect to use the Lauren design.

4           Fluor was required to take the information from BAE's

5   process design and then take the Lauren design and complete

6   that design, and complete the work on the project.  The final

7   design documents are Fluor's.  The final process documents are

8   stamped by BAE.

9           Fluor has a warranty for the final design documents.

10  If something is wrong in the design of the nitration building,

11  Fluor's warranty says that those design documents have to be

12  correct and have to conform to the specifications.  The Lauren

13  design is the specifications, and that design was provided to

14  Fluor in native form so that Fluor could reference those

15  designs when it prepared the final designs.

16          Fluor was required to validate and complete.  If

17  there is no design that we have to use, there's nothing to

18  validate, there's nothing to complete.  So the fact that the

19  words of the contract say you must validate and complete, it

20  means that there is something that BAE provided to Fluor to

21  use, to validate when the contract was signed, and then to

22  complete.

23          And I have to say that this whole time Mr. Treece has

24  said, "validate, correct, and complete" as if that is

25  something that is included in the contract.  Well, it is not,

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1  and Mr. Treece cannot in good faith say that it is.

2          The corrections to the Lauren design were done by

3  BAE.  If you look at the Statement of Work, any time it talks

4  about correcting the Lauren design, it is done by BAE, and

5  updating the Lauren design, it is done by BAE.  What Fluor was

6  told in the Statement of Work is that all of the changes to

7  the process design would be included in Appendix G, which is

8  the Lauren design and the process design that Fluor was

9  provided by BAE when it bid this work.

10          And so the implied warranty of specifications is a

11  claim that comes from *Spearin* and is adopted in Virginia that

12  if the owner or general contractor hands a design to the

13  design/builder and says, "Use this design to complete the

14  work," then the prime contractor also gives an implied

15  warranty that the -- or the design that they provide can be

16  used for that purpose.  And our claim is that the Lauren

17  design was defective, there were clashes, there were errors,

18  none of which we were told, and none of which Fluor was able

19  to find before executing the contract.

20          So there were all of these things in there that made

21  it such that Fluor could not complete the design within the

22  time or within the cost that it anticipated on the project,

23  and that is the implied warranty of specifications in a

24  nutshell.  It has nothing to do with who has the final design

25  responsibility.  It has to do with the fact that we were given

1  a design, told to use it, to validate and complete, and we

2  could not do that within the time or the cost that was

3  anticipated and agreed to by the parties under the contract.

4        THE COURT:  I appreciate that, Ms. Barnes, and I

5  thank you for that.  I do, I appreciate your argument.

6        MR. TREECE:  Your Honor, can I just very quickly?

7  Two minutes.  I promise no more than two minutes.  There's

8  just one issue I want to stress, and that is, Your Honor, I

9  just want the Court to think conceptually about two different

10 things:  One, the Lauren design and whether that's required

11 under the contract.  That's why we call out specifications and

12 equipment being different.  So Lauren design is one issue.

13        The other issue that they talk about is directed

14 changes, changes being made to the process equipment during

15 the course of the contract, right?  So that's a separate

16 theory for their claim.  They don't allege anything -- the

17 only thing they allege in their contract with respect to that

18 are the valves, right?  The only equipment they claim that

19 there was a change with respect to in their pleadings is the

20 valves.

21        So that's the only thing that we've got from them on

22 that issue.  And what they're trying to do is conflate the two

23 to make it seem like this big issue when, really, the Lauren

24 design is not a contract requirement, right?  It is a

25 for-reference only, to the extent you can use it, validate it

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1   and complete it.  That is your obligation.

2          The redlines that they're talking about are redlines

3   based on a process hazard analysis that Lauren did, that they

4   didn't get to add into before.  But they received that

5   precontract, they got paid.  We paid Mustang, their design

6   subcontractor, 500 hours of work to assess the state of

7   affairs.  And, again, they are the design/build contractor

8   with the represented expertise to assess it.

9          So those are the issues I wanted to point out, Your

10  Honor.  And we --

11         MS. BARNES:  If I might just say --

12         THE COURT:  No.

13         MS. BARNES:  -- that I think that all of what

14  Mr. Treece just said we dispute factually, and so on a motion

15  to dismiss -- he's not citing to the counterclaim, he's not

16  reading the counterclaim correctly, and so on a motion to

17  dismiss on 12(b)(6), outside of the counterclaim there's no

18  argument here.  And this motion to dismiss should not be

19  granted on the mere fact that in order to make his argument

20  Mr. Treece has come up with G-10 and equipment specifications

21  and all these things that have nothing to do with the implied

22  warranty and specifications.

23         THE COURT:  Okay.  Thank you all for that.  I was

24  fully aware of those arguments on each side.  I appreciate

25  you-all feeling like you wanted to add something else, but

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1   I've got this, okay?  I understand these arguments and I

2   appreciate it.

3          The last argument -- we've gone on for two hours,

4   which is about three times what the Fourth Circuit is going to

5   give you on any kind of motion at the end of the trial.  But

6   the last issue is the Rule 12(b)(6) motion filed by BAE with

7   regard to these -- the two issues, the excess -- no, I'm

8   sorry.  I'm sorry, it's not BAE's.  It's Fluor's 12(b)(6) on

9   the excess cost for descoped work and the abnormal maintenance

10  work, the $9 million deal cut with the Army, okay?  So it's

11  Fluor's motion to dismiss on that.

12         Let's hear -- and I have a pretty good handle on

13  this, but I'd be happy to hear whatever else you-all would

14  like to say that might be helpful to the Court.

15         Let's hear from Fluor first; it's your motion.

16         MR. FITZSIMMONS:  Thank you, Your Honor.  Scott

17  Fitzsimmons again.  And understanding your request to provide

18  some alacrity to these briefings here, let me -- if you don't

19  mind, I'm just --

20         THE COURT:  Let me just say that with regard to these

21  issues y'all have done a great job fleshing them out in the

22  briefing.  I obviously just got the slideshows this morning

23  and have not studied them, but I've looked through them as

24  we've gone.  Y'all have done tremendous work for your clients

25  of making your positions clear.  It is a lot for me to absorb

 1  all at one time.  I'm trying to do the best I can, and I just

 2  want you to know I appreciate the work that you-all have done.

 3          MR. FITZSIMMONS:  Thank you, Your Honor.  With regard

 4  to Fluor's partial motion to dismiss, Fluor's motion to

 5  dismiss is based on two fundamental arguments.  One, BAE is

 6  asking for what is known -- what they are calling excess costs

 7  for work that they descoped, that BAE administratively used a

 8  contract clause to descope from the contract, or has been

 9  calling it a descope.  Yet BAE now requests excess costs to --

10  and, fundamentally, that is the administrative building and

11  the laboratory.  BAE removed that work from the contract, BAE

12  hired another contractor to perform that work, and BAE did not

13  terminate for default, they did not partially terminate for

14  cause.  They simply removed, just like all the changes that

15  we're talking about right now, which are additive changes, BAE

16  has the right to issue deductive changes.  And when BAE issues

17  a deductive change, they do not then have the right to seek

18  excess costs for whatever costs BAE would incur, because they

19  then control those costs.  They removed it administratively,

20  they admit that they had no obligation to do it, and -- let me

21  just go through.  So the excess costs must be dismissed.

22          Finally, and second, Your Honor, BAE's request for

23  this abnormal maintenance cost, this sweetheart deal that BAE

24  executed at Mod 17 with the Army, are prohibited consequential

25  damages.  Not only did BAE calculate these alleged damages

1  based on the estimated amount of what they're calling abnormal

2  maintenance on the existing legacy facility, but BAE does not,

3  cannot, and has not since the complaints have been filed

4  alleged that they performed one element of abnormal

5  maintenance on the NC legacy facility.  So there's no actual

6  damages that were incurred.  Nevertheless, they negotiated

7  this $9 million deal with the Army, and in their agreement

8  with the Army BAE agreed that if they don't perform

9  maintenance on the legacy facility, well, then, BAE will

10  perform maintenance anywhere on the project completely

11  unrelated to -- now, abnormal maintenance, Your Honor, is

12  certainly not anything that the parties could have

13  contemplated.  It's simply called abnormal maintenance.

14        In addition, there were intervening events that make

15  these absolutely consequential damages.  The principal

16  intervening event being at under no circumstance did Fluor

17  anticipate that BAE would enter into an agreement with the

18  Army whereby they would agree to modify the barracks or change

19  the golf course, or whatever it may be.

20        And BAE's argument is that, "Well, they're just

21  paying back the damages through a bartering system."  But

22  that's a false narrative, Your Honor, because the damages, as

23  set forth in their -- in their complaint and in their briefing

24  were calculated based on the amount of estimated maintenance

25  that would be performed.  It wasn't direct damages such as

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1  additional rental costs or additional labor, something that

2  would be a direct and proximate result of any alleged breach

3  by Fluor.  So the abnormal maintenance cost must be dismissed

4  as well.

5           And then, third, in its complaint BAE alleges

6  6.7 million in what they call additional concessions to the

7  Army.  Yet, in its briefing, in their opposition brief, BAE

8  admits that they haven't paid that amount.  So they have no

9  damages.  So, fundamentally, they have no breach of contract

10 action with no damages, yet they claim -- they somehow reserve

11 their rights to bring that.  So I'll go through this fairly

12 quickly.

13          THE COURT:  Well, let me just -- aren't there

14 questions of fact as to each one of these?  I mean, you argue

15 it's really a matter of they didn't properly plead

16 entitlement, or they didn't properly plead causation on these.

17 Isn't there really fundamentally as to all of these questions

18 of fact?

19          MR. FITZSIMMONS:  Not necessarily, Your Honor,

20 because the document upon which BAE relies, and then they cite

21 that they administratively -- and we included this in our

22 briefing, because BAE relied on it in their complaint, states

23 clearly with regard to the excess costs -- these are BAE's

24 words: the descoped work, the deductive change order, the

25 deductive change order will be issued under the contract

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1  Changes clause.  These aren't words that Fluor made up.  This

2  was a letter that BAE sent to Fluor, and it was BAE who

3  elected rather than to use the termination for default

4  provision -- and, in fact, there are two termination clauses

5  in this contract.  Rather than partially terminate, which

6  would authorize BAE to, in fact, potentially recover if the

7  termination was proper these excess costs, these are BAE's

8  words:  BAE stated that they are removing this work, the admin

9  building and the laboratory, under the Changes clause.  They

10  used the word "deductive change."

11          THE COURT:  But they argue the reason why they had to

12  do this was because of Fluor's delay.  So wouldn't that be,

13  as, you know, a plausible claim that this -- they had to go

14  out and spend extra money on this descoped work because y'all

15  weren't doing it in time?  Isn't that a plausible claim under

16  *Iqbal* and *Twombly*?

17          MR. FITZSIMMONS:  It would be a plausible claim, Your

18  Honor, if it had any support whatsoever in the actual actions

19  that occurred on the project.  This letter is the letter that

20  BAE sent to Fluor.  They do not mention in this letter that

21  they are removing this work because Fluor is delayed, not at

22  all.

23          In their complaint, BAE argues that somehow -- BAE

24  argues that somehow, "Well, we're going to let Fluor focus on

25  other critical activities."  But I think it was Mr. Treece who

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1 said, "Well, you can't run away from the documents."  This is

2 the document, and it says right here that the reason the admin

3 building and the laboratory were removed is because the

4 parties could not agree with the co-location of it, so they

5 removed it.

6       THE COURT:  But isn't that a question of fact?

7       MR. FITZSIMMONS:  Your Honor, this plainly sets forth

8 BAE's contemporaneous interpretation of what they were

9 invoking.  And, in fact, in their -- in their complaint, they

10 do not invoke changes -- they do not invoke the Termination

11 clause whatsoever.  They don't plead the Termination clause,

12 they don't mention the Termination clause because they know

13 they cannot do that.

14       They know they cannot plead the Termination clause

15 because, fundamentally, what BAE did on the project is

16 entirely different than what BAE now seeks from this Court.

17 BAE sought an administrative deduction of the laboratory and

18 the admin building during the project.  Now they walk into

19 this Court and they're telling a completely different story.

20 They're saying somehow they terminated because of delay.  It

21 just doesn't match up, Your Honor.

22       THE COURT:  I appreciate that, Mr. Fitzsimmons.

23       MR. FITZSIMMONS:  And these are -- just for your

24 edification, these are the two Termination clauses.

25       THE COURT:  I saw that.

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1          MR. FITZSIMMONS:  It allows a partial termination,

2   and BAE did not take that action.

3          Now, moving on to the abnormal maintenance.  This

4   claim for abnormal maintenance must be dismissed because there

5   is unenforceable consequential damages.

6          THE COURT:  Is there a question of fact as to whether

7   this $9 million is a consequential or a direct damage?

8          MR. FITZSIMMONS:  The way that the -- the way that

9   BAE describes this -- these damages, these alleged $9 million

10  of damages in the counterclaim is that it was for maintenance

11  on the existing NC facility.  Maintenance on the existing NC

12  facility is a consequential damage.

13         For example, if the HVAC broke on the existing NC

14  facility, there was an intervening event that caused that HVAC

15  to break, and that would be either age or weather or something

16  else, if the roof on the existing NC facility leaked, there

17  was an intervening event that caused that roof to leak, a

18  lightning strike, it rusted, those types of damages are not a

19  direct and proximate result of Fluor's delay on the project.

20         THE COURT:  But you take it a step further.  What

21  they say, okay, just for the sake of argument,

22  Mr. Fitzsimmons, what they say is, "No.  No.  No.  No.  You

23  can't look to the maintenance we were doing on the golf

24  course," or you say the barracks or whatever this other stuff

25  is, or a piece of equipment that goes out.  What they say is,

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1  "The 9 million we agreed to was directly caused, we allege, by

2  Fluor's delay because the Army was going to cancel our

3  contract unless we agreed to it."  So that would be more in

4  the nature of a direct -- that 9 million -- the overall

5  agreement to pay the 9 million, wouldn't that be a direct

6  consequence of Fluor's delay -- as they allege, right? -- as

7  they allege, as opposed to a consequential damage?

8          MR. FITZSIMMONS:  Your Honor, the analysis that would

9  need to be performed in order to determine whether any

10  termination was threatened, proper, appropriate -- a

11  termination for default of a government contract, as the

12  federal circuit has identified, is a draconian step, and the

13  analysis that would necessarily be performed -- they haven't

14  alleged that the contracting officer performed an appropriate

15  analysis.  They haven't alleged that a termination would even

16  be proper under these situations in light of, especially, the

17  extension of time that Fluor would be entitled to as a result

18  of all of the delays caused by BAE's actions.

19          So this sort of red herring argument that, "We would

20  have been terminated" does not convert what is truly a

21  consequential damage into some kind of direct under the threat

22  of termination.  A threat of termination does not convert

23  these damages that are truly consequential to a direct damage

24  arising --

25          THE COURT:  That is in fact what they argue.

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1          MR. FITZSIMMONS:  It's a baseless claim, and it is

2   not a surviving -- and it is not a plausible claim, as Your

3   Honor identified under *Iqbal*.  That somehow there was this

4   threat of termination out there, and that's why -- and again,

5   the contemporaneous documents upon which you can review,

6   because they are identifying this specific action that they

7   took, do not state that the reason we are removing the admin

8   building or laboratory is because we have a threat of default.

9   That is not the reason that BAE (inaudible).

10          THE COURT:  And simply because it's not in the

11   documents, does that mean that I can rule that way or does it

12   present a question of fact?

13          MR. FITZSIMMONS:  Well, they did not plead any of

14   that, Your Honor.  They pled that they identified a removal of

15   this for -- to allow, I think, Fluor to focus on more critical

16   activities.  But when you look at the supporting records,

17   which you can because they rely on those supporting records,

18   it's -- again, they took one step during the project and they

19   took a completely other step during this litigation.

20          THE COURT:  Mr. Fitzsimmons, thank you for that.

21          I think Justin Simmons was going to argue this.  I

22   have a pretty good handle on this.  This was the first set of

23   briefs that I read, and I studied these carefully.  And I

24   thank you for that.

25          Let's hear from Mr. Simmons.

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1          MR. SIMMONS:  Yes, Your Honor.  As evidenced by your

2   questions to Mr. Fitzsimmons, I think Your Honor does have a

3   good handle on the parties' positions here, so I would just

4   like to make a few points quickly.

5          THE COURT:  You know, Mr. Fitzsimmons picks up on

6   Mr. Treece's argument on the other issues and says, "Look, you

7   can't stray from the documents here.  You can't stray from

8   what really happened.  And with regard to this descope, you

9   did it as a deduction from the contract, and so you can't come

10  now and claim that it was breach and it was caused by our

11  delay.  And you didn't terminate us for cause; you didn't use

12  that provision of the contract.  You used the deductive change

13  part, and so you don't get to get damages for that."  Why

14  doesn't that make sense?

15         MR. SIMMONS:  Your Honor, I think, and it's absent

16  from Fluor's presentation both on brief and in its slides, but

17  the provision we rely on in seeking those damages is

18  Section 28(e), which says, "In the event of an unexcused

19  delay, Fluor agrees to reimburse BAE systems all damages and

20  expenses incurred by BAE systems due to contractor's failure

21  to complete the work by such time."

22         We allege plausibly in our complaint that Fluor

23  failed to complete the project by July 30th, 2018, and as a

24  result the Army issued a show cause notice -- it's part of our

25  pleadings -- and threatened to terminate unless we took

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1  certain remedial actions.  And one of those actions we

2  determined that was appropriate was to descope certain work so

3  that we could complete that work and Fluor could complete

4  other work that was part of its original scope in order to

5  meet the Army's deadline.  That was only required because

6  Fluor failed to meet the July 30th, 2018, completion deadline.

7        Your Honor, so the focus should be on 28(e), and

8  that's what we're claiming here.  It says that Fluor agrees to

9  reimburse BAE, "for all damages and expenses incurred as a

10 result of its failure to complete the project on time."

11 That's what we're alleging here.  The same goes for --

12        THE COURT:  How is that consistent with what you-all

13 did when you descoped that?  What Mr. Fitzsimmons says is

14 that, no, that's not what you did.  You used a different

15 provision of the contract, so you can't come in now and try to

16 rewrite history.

17        MR. SIMMONS:  Well, Your Honor, (A) that document

18 that they have attached, we do not -- under the Fourth Circuit

19 precedent, that is not to be considered on a 12(b)(6).  That

20 is not integral to our complaint.

21        But, two, if you look at that document, it plainly

22 states "delay."  We are relying or seeking these damages

23 because of a delay.  If Fluor had completed the project on

24 time, there would be no need for us to descope that work and

25 no need for us to incur the cost that we did.  So we ought to

1  be able to recover the difference between what we would have

2  paid Fluor and what we had to pay another subcontractor to

3  complete the work.  And we plausibly allege that in the

4  complaint.

5       THE COURT:  Well, why didn't you terminate for cause

6  and go that way?  Why did you use the deductive change?  That

7  seems mutually exclusive to me.

8       MR. SIMMONS:  I don't believe so, Your Honor.  I

9  mean, Mr. Fitzsimmons right there talked about termination

10 being a draconian remedy.  Here the parties were trying to

11 work together, or at least BAE was, to meet the Army's

12 deadline.  And under those circumstances, we determined that

13 best course was to descope that work and have another

14 contractor perform it and recover whatever the difference was,

15 which we're plainly allowed to do under Section 28(e).

16      Now these go to matters of proof, Your Honor.

17 Whether that was, you know, necessary and reasonable, those

18 are matters of fact.  We're going to have to prove that, and

19 we admit that.  But they're not matters for a 12(b)(6), for

20 the Court to determine on a motion to dismiss, because we

21 plausibly alleged it in the complaint.

22      The same goes for the $9 million in consideration we

23 had to provide to the government.  We have attached the show

24 cause notice.  The government was threatening to terminate.

25 In fact, it issued a request for information about other

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1  interests from other contractors in completing the project.

2          So we had two options:  (A) we let the government

3  terminate the contract; or (B) we make some kind of

4  concession, we give some kind of consideration for the delay.

5  And they demanded consideration.  That's a direct result of

6  Fluor's failure to perform the contract on time, Your Honor.

7  So these are not consequential damages; these are direct

8  damages.

9          It's no different than in the case law that we cite.

10  For instance, the *Hemenway* case where they're trying to build

11  a furniture store, and because of the contractor's delay the

12  owner had to continue to pay rent on a legacy facility.  The

13  same thing is true here.  There was a delay --

14          THE COURT:  Yeah, but, I mean, this is -- I mean, the

15  kind of thing they talk about as direct damages in the case

16  law is like -- you know, in the *Roanoke Memorial* case it

17  involved increased financing costs and things like that.  I

18  think the language of the cases say it has to be predictable

19  and within the contemplation of the parties.  And how can you

20  say cutting this $9 million deal with the Army could be

21  predictable or within the contemplation of the parties?

22          MR. SIMMONS:  So how is it not predictable that if

23  Fluor failed to live up to its bargain -- because we relied --

24  we told the Army we're going to be able to complete this

25  project on such and such a date.  In order to meet that

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1  deadline, Fluor had to do its part and complete the project by

2  July 30th, 2018.  If it failed to meet its part, it was

3  perfectly predictable that BAE was not going to be able to

4  live up to its bargain.  And the government knew that, and so

5  the government threatened to either terminate or we give them

6  some kind of money for the delay, some kind of consideration.

7  And here we go, they agreed on the $9 million.

8       There's an interesting part in one of the cases that

9  we cite, the *Hiss v. Friedberg* case.  That involved the

10  recovery of attorney's fees.

11       THE COURT:  Attorney's fees, right.  Right.

12       MR. SIMMONS:  But in that case the defendant

13  complained, says, "Well, you know, they should have -- the

14  plaintiff should have bought out the leasehold interest.  They

15  could have paid much less than what they're seeking for that

16  leasehold interest."  And the court rightly points out, says,

17  "Hey, defendant, you could have come out and bought the

18  leasehold interest."  Same for Fluor.  We tried, we issued

19  them a show cause notice, saying that the Army is going to

20  terminate this contract.  We had to do something to get the

21  extension that we needed.  Fluor, as alleged and as shown in

22  the attachments, refused to participate in that process.  It

23  can't now be heard to complain that, "Why did you pay this

24  money to the government?"  Well, because the government was

25  going to terminate the contract.

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1          But, again, that gets back to matters of proof.

2    Whether the $9 million was reasonable, that's a matter of fact

3    for the Court to determine after discovery and the

4    presentation of evidence.  And the same goes for, you know,

5    whether it was -- the other expenditure couldn't be avoided.

6    That's, again, a matter of fact that we're going to have to

7    prove.

8          Your Honor, I find it -- I hope the Court appreciates

9    the irony here.  It's a classic example of

10   approbate/reprobate.  Here on one hand they're saying, "Don't

11   hold us to a limitation of damages provision."  On the other

12   hand, "Let's hold BAE to a limitations on damages provision."

13         And Your Honor asked Mr. Treece a question about why

14   would Fluor agree to this $30 million limitations.  Well, the

15   exact reason why they did is because the consequences would

16   have been dire.  If the Army had terminated the contract as a

17   result of Fluor's unexcused delay, BAE could then look to

18   Fluor for those damages.

19         Now, Fluor determined at the outset that better to

20   cap them at 30 million.  And so we're not saying we're not

21   held to that.  In fact, in our complaint we make it clear that

22   we are, that we sustained more damages but we're limited to

23   30.  And we submit, Your Honor, on these facts, as alleged,

24   that we've stated plausible claims for both the excess cost

25   from the descoped work and the $9 million in consideration

1   provided to the government to avoid default.  We ask that Your

2   Honor --

3          THE COURT:  I appreciate that, Mr. Simmons, and I

4   appreciate you tying those arguments together.  That's

5   thoughtful, because each side would like to benefit from a

6   provision limiting damages in this case.  But when it comes to

7   that particular provision, each side also argues that it ought

8   not to apply.  You-all argue that the consequential damages

9   provision shouldn't apply to the $9 million of abnormal

10  maintenance, and the other side argues that the 30 million cap

11  shouldn't apply for a variety of reasons, which we've been

12  over.

13         MR. SIMMONS:  I think there's one difference, though,

14  in what the parties' position is.  They argue as a matter of

15  law that that provision is null and void.  We don't submit

16  that.  It's fully enforceable.  We argue as a matter of fact

17  these are direct damages.  You know, if the Court upon

18  presentation of evidence concludes otherwise, then we're stuck

19  to that, because the contract does plainly exclude

20  consequential damages.

21         THE COURT:  Thank you for that, Mr. Simmons.

22         Mr. Fitzsimmons, this is your motion.  I'll let you

23  be heard.  I'll give you the last word on your 12(b)(6), sir,

24  if you will.

25         MR. FITZSIMMONS:  Certainly, Your Honor.  I just want

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1   to follow up with the last statement that Mr. Simmons made

2   about the limitation of damages provision being null and void.

3   Now, obviously Your Honor understands the two-step analysis

4   that you must undergo, which is first to analyze whether the

5   limitation of damages in fact applies to changes, but then

6   whether or not there is a Virginia code.  The reason we argue

7   that the limitation of damages is null and void is because we

8   have a very clear Virginia code that prohibits any waiver of

9   claims for demonstrated additional costs.

10          BAE doesn't have anything like that in this

11  situation.  BAE clearly waived consequential damages.  There's

12  no doubt that the type of damages that they are seeking with

13  regard to the $9 million is, quote, "abnormal maintenance."

14  They don't call it regular maintenance.  They don't call it,

15  you know, I'm greasing the doors.  They call it abnormal

16  maintenance.  We believe fundamentally it's because BAE was

17  actually being paid for all of its regular maintenance because

18  they have a cost reimbursement in the contract with the Army

19  and they were getting paid for all regular maintenance.  So

20  they're calling it now abnormal maintenance.  So,

21  fundamentally, that type of damage is a consequential damage,

22  Your Honor.  So with that, we'll rest on the motion.

23          THE COURT:  Thank you, Mr. Fitzsimmons.

24          Let me just say that I know there's lots of other

25  folks on the call other than Mr. Treece and Mr. Simmons and

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1  Mr. Fitzsimmons and Ms. Barnes that I know have had a great

2  deal to do with the work in this case.  I want to say that

3  this is -- you present some interesting issues that the Court

4  has tried to reckon with.

5          I was prepared to rule from the bench on several of

6  these motions, but I'm not going to today because -- I

7  appreciate your arguments.  We've had two and a half hours

8  together, yeah, almost two and a half hours together.  I want

9  to study these, again, these PowerPoint presentations and

10 focus on some of the points that you-all have made today

11 during your argument.

12         But one of the things that concerns me is the scope

13 of this litigation.  It looks like we have a trial date in

14 this case set I think maybe March or April of next year,

15 right?

16         MR. FITZSIMMONS:  Right.

17         THE COURT:  As I look at my docket, you-all have

18 scheduled this for a bench trial, right?

19         MR. FITZSIMMONS:  Correct.

20         THE COURT:  Wow.  I've had some bench trials in

21 Federal Tort Claims Act cases and every time I do one of

22 those, I say to myself, man, I wish I had a jury.  But I

23 appreciate you-all -- that this is for a bench trial.  So

24 that's not to say that the Court may not impose an advisory --

25 impanel an advisory jury.

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1          The guy I clerked for, Judge James C. Turk, used to

2   always impanel an advisory jury.  In 1989, I tried a -- "I

3   tried."  I was on the trial team; I shouldn't say I tried it.

4   With Bill Kopit of D.C., and Bill Poff and Heman Marshall of

5   Roanoke, we tried an injunction case brought by the government

6   under Section 7 of the Clayton Act involving the Roanoke

7   Memorial Hospital and Community Hospital, the merger of those

8   two hospitals.  We tried an injunction case, and Judge Turk

9   impaneled an advisory jury in that case.  And as it turned

10  out, as was the case with Judge Turk generally, he was very

11  wise.  And so I haven't gotten there yet; this is a long way

12  off.  There are a lot of things I have to think about on these

13  motions, and y'all have spent hundreds of pages and referred

14  to lots of different contract provisions.

15          I do have, as my new law clerk on this case, this is

16  his second week, this is Zach Turk, who is Judge Turk's

17  grandson, and he is working for me on this case, and he's

18  thrilled that he got this simple and easy case to start as his

19  first case that he's working on for me.  He is just -- we

20  spent some time yesterday afternoon together going over the

21  arguments after we all went through them and there's a lot

22  going on here.

23          But let me ask you a question:  Where do you-all

24  stand on discovery?  Have you started even?  I mean, you've

25  got a trial a year from now.  Where do you stand on discovery?

1          MR. TREECE:  Your Honor, so with respect to

2   discovery, we filed a motion to bifurcate.  To the extent that

3   anything survives our motion to dismiss, we think it makes a

4   lot of sense to determine what the contract requires first

5   before we delve into seven years of contract performance and

6   the minutiae of every single change order.  Because what the

7   contract requires in terms of who has design responsibility is

8   going to dictate whether the vast majority of these change

9   orders are even still at issue, right?  So I think determining

10  design responsibility will address that issue.  The

11  applicability of the damages cap will certainly affect the

12  analysis there.

13          So we had proposed a tiered analysis of doing, you

14  know, maybe a limited hearing with the Court -- limited

15  discovery and a limited hearing on what the contract requires,

16  right?  So if we needed to do limitation of damages discovery

17  with Lura Lewis and Erin Phalen and the like, we can do that

18  in a discrete manner, present that in a short hearing, and

19  that would excise a large portion of the case to the extent

20  that anything remains after the motions to dismiss.

21          That's what we had proposed.  We raised that with

22  Judge Ballou, and then Judge Ballou said, "Well, you know,

23  this is a bench trial so I'm going to defer that issue to

24  Judge Urbanski.  I'm not going to rule on that."

25          There was a motion to compel, because we were trying

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1  to stay all this until we could find out sort of what the

2  design -- what the Court concludes the design responsibilities

3  are and whether the Lauren design is even -- could support a

4  claim, because that will just take up the vast majority of the

5  case.  And so Judge Ballou ordered us to respond to written

6  discovery responses by the 19th, I think it is, and then we're

7  to agree on search terms.

8       One of my proposals to Judge Ballou was that, well,

9  perhaps we do search terms that are limited to the contract

10 interpretation issues, and do the first set of the case on

11 contract interpretation, do the second set of the case on

12 contract performance.  I think that is a very efficient way to

13 proceed.

14      I know that motion is not technically set for hearing

15 today and we've already, you know, used a lot of time.  I

16 think the Court can look at the briefs and certainly

17 understands the case and what's going on in the case, and

18 could appreciate the benefit that could arise from having

19 limited discovery on contract interpretation, what does the

20 contract require.  Okay, here's what the contract requires,

21 what's left, and then do performance discovery in the second

22 phase.

23      THE COURT:  But the problem with that, though,

24 Mr. Treece, is that what Ms. Barnes was talking about, and

25 that is, you know, she said that a lot of the damages -- I

1   mean a lot of the money that Fluor had to spend in this case

2   were because of delays that BAE caused and it wasn't Fluor.

3   So how is -- if a lot of their claim is due to -- is not due

4   to them and their delay, how can we -- how can we parse the

5   discovery?  I worry about that.

6          MR. TREECE:  Well, because what they're saying is

7   they're really saying the delays were caused by the Lauren

8   design and efforts we had to do to correct the Lauren design

9   that we didn't anticipate.  It's really the Lauren design is

10  what they're talking about.

11         So if the Court were to say the Lauren design is not

12  a requirement of this contract for you to abide by that,

13  there's no implied warranty over that, then they're going to

14  go to the second aspect of their claim, were there any

15  directed changes over the process equipment that really

16  affected this.  I'm not sure that there are any.  The valves

17  maybe.  Maybe there's more.

18         I'm not trying to represent that I know all of those

19  performance facts over the course of seven years.  What I'm

20  saying is it will fundamentally strike the vast majority of

21  their changes just to have a ruling on the Lauren design not

22  being in the contract and the limitation on damages being

23  enforceable.

24         And, you know, if we're limited to 30 million, I

25  realize that sounds like a large number in the run-of-the-mill

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1  case, in the context of this case with a 245 million contract,

2  a $14 million contingency, in the run of this particular case

3  that is something that could bring the parties closer together

4  for --

5         THE COURT:  Look, it's clear to me that the Rule

6  12(f) motion, that's why I started with it, it's clear to me

7  that the Rule 12(f) motion and the applicability of that

8  $30 million has huge impact for this litigation.  I get that.

9  I understand.

10        Let's hear from Mr. Fitzsimmons or Ms. Barnes about

11  where you stand on discovery and what your perspective is.

12        MR. FITZSIMMONS:  Your Honor, I appreciate the

13  opportunity.  So Mr. Treece is right, they moved to stay

14  discovery.  The reason they moved to stay discovery is because

15  BAE elected not to respond to Fluor's request for production

16  of documents or interrogatories, and BAE unilaterally and on

17  its own just elected not to respond and moved to stay

18  discovery.

19        And during the course of those arguments, I believe

20  it was Judge Ballou who said, "Well, wait a minute.  This is a

21  huge case and the discovery will be monstrous."  And one of

22  the issues that Your Honor brought up just today, and that was

23  the subject of the argument, is what Mr. Treece is asking to

24  sort of parse out, and that's design responsibility.

25        But you heard that BAE started today and Mr. Treece

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1  said for about 15 minutes that Fluor was solely responsible

2  for the design.  Yet in their own briefing, on page 5 of their

3  reply brief, BAE states, "To be clear, BAE does not and has

4  not argued that Fluor is responsible for all aspects of the

5  design."  So the arguments, Your Honor, that -- with regard to

6  design responsibility that Mr. Treece is trying to carve out

7  is the entirety of the case.

8          THE COURT:  No, Mr. Fitzsimmons, I get that.  And I

9  also worry -- I worry that there's questions of fact tied in

10 there as opposed to just questions of law.  That's what

11 troubles me about that.

12         And the other thing that the law clerk and I talked

13 about this week was, holy cow, we can't hold this case up any

14 longer.  These motions to dismiss were filed last summer,

15 right, and briefed last summer.  It's taken until now to get a

16 hearing.  I don't think that's my fault, but if it is I'm

17 sorry.

18         But we can't drag our feet on this case and expect to

19 hold that trial date, because there's a lot of discovery that

20 has to be done, and then -- and on any issues that remain,

21 Rule 56 motions, there's a lot of work that has to be done in

22 this case, I mean a lot of work that has to be done in this

23 case.  So that's why I raised the issue of the trial date and

24 I raised the issue of where you stand with discovery.

25         So, Mr. Fitzsimmons, your position would be we need

1  to get going on discovery; is that fair?

2          MR. FITZSIMMONS:  We need to move now, Your Honor.

3          THE COURT:  I hear you, because a year from now is

4  nothing.  When you're looking at litigation of this magnitude,

5  a year is nothing, especially when you've got to have Rule 56

6  motions filed so many weeks before trial.

7          Okay.  All right.  Well, I appreciate that

8  perspective.  I do not intend to let moss grow on my rulings,

9  okay?  I'm going to -- I have an idea as to what I want to do

10 with these 12(b)(6) motions, and I have an idea as to what I

11 want to do with this Rule 12 motion, and I had an idea going

12 in.  The arguments today have helped me think about it, but I

13 want to go back and study these -- study these -- look at the

14 briefs again and study these PowerPoints that you-all have

15 presented, which really crystallized your argument and brings

16 things together for me a very helpful way.

17         So I appreciate the work.  The clients should know

18 that the work and all the money that got spent on those

19 PowerPoint presentations are helpful to the Court in trying to

20 reach a resolution here.  So that's helpful.

21         Mr. Treece, did you want to say something else?

22         MR. TREECE:  I did, Your Honor, and that was just

23 that we're not trying to hold up discovery.  We're trying do

24 an orderly process of discovery, because there's no reason for

25 us to go do discovery on every single change order if there's

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1  going to be a ruling of here's what the contract requires,

2  that excises those change orders in their entirety.  There's

3  no reason to talk to witnesses on those change orders.

4          We've got change orders that are tens of millions of

5  dollars.  We don't need to go into the weeds on every duct

6  bank that was installed everywhere and do all this if the

7  contract says they're responsible for the duct bank, right?  I

8  mean, I'm just throwing that out as an example.  On the brief,

9  I just wanted to respond to that.

10          With respect to the design responsibility, the only

11  thing we ever said we were responsible for doing was procuring

12  the equipment and getting the materials, right?  So we're

13  responsible for equipment and materials; that's the

14  specifications that we've talked about.

15          And, again, if there's changes after the fact to a

16  particular piece of equipment they allege caused them harm, we

17  can do discovery on that if we need to.  I'm not aware of what

18  that would be.  I do think that if we structured this in what

19  are the contract requirements, discovery on what the contract

20  requires, and then discovery on performance will be a more

21  efficient way than having everyone run full steam at

22  $200 million of change orders for things that may end up being

23  irrelevant depending on what the parties' obligations under

24  the contract are.

25          So we would propose limited discovery on those

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1  issues, limited witnesses, a limited hearing on that, the

2  Court can rule on what the contract requires, and then we can

3  proceed to the performance discovery with respect to the

4  change orders that remain, if any.

5         THE COURT:  Okay.  I hear what you have to say,

6  Mr. Treece.

7         Mr. Fitzsimmons, any response?

8         MR. FITZSIMMONS:  Just very briefly.  You know, Your

9  Honor mentioned the limitation of damages.  It's our position

10  that even to the extent that the limitation of damages

11  applies, which we do not believe it does, we would still --

12  Fluor would still be obligated to present all of its damages.

13  BAE believes that if it's a $30 million case, then somehow

14  Fluor will pick and choose which PCNs it will be presenting.

15  But, fundamentally, not only to preserve the claims for

16  appeal, but also to present all of the damages to this Court,

17  to the extent that any limitation of damages does apply,

18  which, again, we do not believe it does, we would have to

19  present all of our damage, all $180 million of our damages,

20  and then Your Honor could decide whether or not there is a

21  limitation cap.  So that would prevent what Mr. Treece is

22  offering, which is somehow we would be minimizing discovery if

23  there's a limitation of damages or if they cut out design

24  issues, extra.

25         THE COURT:  Thank you for that, Mr. Fitzsimmons.  I

BAE Systems Ord. v. Fluor Fed. Solutions - 1/14/2022

1    appreciate it.

2          Okay, folks.  Thank you-all for today's arguments.

3    The law clerk and I will take a look at these PowerPoint

4    presentations.  I'm going to try to get you a sketch of a

5    ruling on these motions sooner rather than later so that we

6    can get you-all going on an appropriate discovery path.

7          Thank you all.  I hope everybody stays well.  I

8    appreciate our time together via Zoom, and if there's nothing

9    further, we will stand adjourned.  Thank you so much.

10         (Court recessed at 12:39 p.m.)

11

12                         CERTIFICATE

13   I, Judy K. Webb, certify that the foregoing is a

14   correct transcript from the record of proceedings in

15   the above-entitled matter.

16

17   /s/  Judy K. Webb            Date:  1/25/2022

18

19

20

21

22

23

24

25