IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| BAE SYSTEMS ORDNANCE SYSTEMS, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 7:20-cv-587 |
| v. | ) | |
| | ) | |
| FLUOR FEDERAL SOLUTIONS, LLC, | ) | |
| | ) | |
| | ) | By:   Michael F. Urbanski |
| Defendant. | ) | Chief United States District Judge |

## MEMORANDUM OPINION

This matter is before the court on defendant Fluor Federal Solutions LLC's ("Fluor") motion to dismiss plaintiff BAE Systems Ordnance Systems Inc.'s ("BAE") complaint, ECF No. 30, BAE's motion to strike defendant Fluor's answer to the complaint and counterclaim, ECF No. 36, and BAE's motion to dismiss Fluor's counterclaim, ECF No. 38. The issues have been fully briefed, and the court heard arguments on January 14, 2022. For the reasons stated below, the court (1) **DENIES** Fluor's motion to dismiss, ECF No. 30, (2) **GRANTS** BAE's motion to strike, ECF No. 36, and (3) **GRANTS in PART** and **DENIES in PART** BAE's motion to dismiss, ECF No. 38.

# I. Background Facts[1]

The following facts are taken from BAE's complaint, ECF No. 1, Fluor's counterclaim, ECF No. 29, and the contract documents referenced therein.

This case concerns a subcontract ("Subcontract") entered into by BAE and Fluor on December 17, 2015, for the construction of a nitrocellulose ("NC") facility at the Radford Army Ammunition Plant ("RFAAP") in Radford, Virginia. BAE Compl., ECF No. 1, at 1. The US Army Joint Munitions Command contracted with BAE to operate and maintain the RFAAP under a basic ordering agreement ("BOA") dated May 17, 2011. Pursuant to the BOA, the Army issued orders relating to the RFAAP called Task Orders. Under BOA Task Order 002 issued by the Army on January 23, 2012, BAE contracted to replace the legacy NC facility at the RFAAP with a newer one. This project, referenced herein as the "NC Project," required construction of four buildings, an acid tank farm, and a cutter warehouse. Id. at 12. BAE initially subcontracted the design of the NC Project to Lauren Engineers & Constructors ("Lauren") in 2012 but terminated the subcontract in 2015 because BAE found Lauren incapable of completing the work in a timely manner. Id. Despite terminating Lauren, BAE's contractually agreed upon timeline to construct the new NC facility remained unchanged and use of the Lauren design was required for the NC Project because the Army had already paid BAE for it. Fluor Countercl., ECF No. 29, at 29, 33.

After terminating Lauren, BAE sought another subcontractor for the NC Project. BAE Compl., ECF No. 1, at 13. During the solicitation process, BAE gave interested bidders access

---

[1] Facts taken from BAE's complaint and Fluor's counterclaim are presumed to be true for the purpose of this motion. Republican Party of North Carolina v. Martin, 980 F.2d 943, 952 (4th Cir. 1992); Walker Process Equip., Inc. v. Food Mach. & Chem. Corp., 382 U.S. 172, 175, (1965) (Allegations of counterclaim are taken as true on motion to dismiss).

to the Lauren design and other documents to expedite the procurement process. Fluor Countercl., ECF No. 29, at 31. These documents included Lauren's native design files, drawings, and product specifications. BAE Compl., ECF No. 1, at 14. Fluor alleges that BAE required the Subcontract to be performed in accordance with the Lauren design, that the Lauren design could be relied on for accuracy, and the selected subcontractor only had to complete the unfinished parts. Fluor Countercl., ECF No. 29, at 30. Additionally, BAE allegedly represented that the Lauren design was 85% complete. Id. at 30.

BAE solicited bids using a Request for Proposal ("RFP") which included a Statement of Work ("SOW") describing the requirements for the NC Project's design and construction. BAE Compl., ECF No. 1, at 14.  Fluor submitted a request for information ("RFI") asking BAE about the standards referenced in the SOW. Fluor Countercl., ECF No. 29, at 30. Fluor alleges that BAE responded by emphasizing the importance of compliance with the Lauren design. Id. During the bid and review process, Fluor was unable to determine the completeness of the Lauren design but relied on BAE's assertions that the design was 85% complete. Id. at 37. Fluor alleges that BAE responded that Fluor's initial bid was too high given what BAE had already paid Lauren for its design and that Fluor's price should be lower because the Lauren design was close to complete. Id. at 33. Fluor lowered its price and submitted a revised bid proposal on November 16, 2015.  BAE Compl., ECF No. 1, at 15. Fluor's bid outlined a firm-fixed price design/build. Fluor said it had the experience and resources to timely complete the NC Project and "Fluor [was] committed to delivering projects safely, on schedule, within budget, and with the quality expected from our Customers." Id. at 16.

Fluor initially forecast thirty-two months to complete the NC Project and listed June 14, 2018, as the completion date. Id. at 16. To allow Fluor to immediately commence work, BAE awarded Fluor an Undefinitized Contract Action ("UCA") in an amount approximating $9 million dollars. BAE selected the proprietary equipment systems to manage and control the NC facility. Fluor Countercl., ECF No. 29, at 28. BAE also allegedly retained responsibility for the process design, while Fluor had responsibility for the design and construction of systems to support BAE's plans. Id. Under the UCA, Fluor began procuring materials and physical construction work before the formal Subcontract was agreed upon. The UCA signified the parties' intention to enter into a formal agreement as soon as possible. BAE Compl., ECF No. 1 at 18.  The value of the UCA was later increased to approximately $32 million dollars. Id. at 18.

On December 17, 2015, BAE and Fluor agreed to a firm fixed price design and build Subcontract. Id. Section 2.13 of the Subcontract provides as follows: "**This is a Fixed Price Subcontract.** The Buyer shall pay the Subcontractor for the supplies, services and/or data delivered and accepted hereunder the firm fixed price stated in, Exhibit I. The price is not subject to any adjustment on the basis of the Subcontractor's cost experience in performing the Statement of Work." Subcontract, ECF No. 1-2, at 10 (emphasis in original). Fluor agreed to design, construct, and partially commission the Project for $245,690,422, which included the money spent already in the UCA. BAE Compl., ECF No. 1, at 19. The contract contained an unforeseen contingency provision which set aside an additional $14 million, "other than changes to the contract compensable under the Changes clause." Id. at 12.

Section 2.12 of the Subcontract provides as follows: "Subcontractor, as an independent company and not as an agent of BAE Systems, shall provide the necessary facilities, personnel, equipment and materials to accomplish the assigned tasks within the parameters of this Subcontract Agreement and in accordance with the Statement of Work (SOW). Exhibit E." Subcontract, ECF No. 1-2, at 10.

Section 1.0 of the SOW, headed **PROJECT**, contains the following description:

> The objective of this Statement of Work (SOW) is to design, procure, and construct (including construction checkout, and water runs) the new NC Area Acid Tank Farm, a Nitration area, Stabilization area, Dewater/Packout area, Administration building and the supporting areas/processes required to support the new Nitrocellulose Facility at the RFAAP. The Cutter/Warehouse is being built under a separate contract, but this SOW requires installation of process equipment and related mechanical, piping and E&I systems in this building.

Subcontract, ECF No. 1-2, at 75 (emphasis in original).

The SOW contains a section entitled "**2.0 SCOPE**." Relevant portions of the SOW's Scope section provide as follows:

> **2.0 SCOPE**
>
> 2.1 This project will design, procure, and construct the new NC facility. . . . The preliminary design of for[2] the new NC facility has been developed and is included in this SOW. This Conceptual Design was developed and is included in this SOW. This Conceptual Design was developed by Lauren Engineers & Constructor (LEC) based on the Technical Design Package (TDP) prepared by the U.S. Army. Drawings, specifications, and other technical documents provided in the appendices of this SOW were prepared by LEC and amended by BAE Systems.
>
> 2.2 The drawings, specifications, and technical documents provided in APPENDIX G are amended in this Statement of

---

[2] The myriad typographical errors in the provisions of the SOW are in the original.

Work (SOW) by BAE systems to show additional requirements and/or corrections. These drawings are provided for reference only. The Subcontractor shall prepare their own drawings to be used for design review submittals, construction and as Record Drawings. Native CADD files for these drawings are available to the Subcontractor.

2.4 Specifications provided in APPENDIX G represent the minimum requirements. The Subcontractor shall prepare their own construction specifications to be used for design review submittals and construction. Native Word files for these specifications will be made available to the Subcontractor.

2.5 It is incumbent upon the Subcontractor to review the documents submitted and to perform their own analysis, including Hazard and Operability Studies and Life Safety Code Analysis. The Subcontractor shall be solely responsible for the design and all safety reviews and safety submittals with all required state and federal agencies. . . .

2.6 BAE Systems has already purchased process equipment as indicated in Appendix F. It is the responsibility of the Subcontractor to ensure that the equipment they purchase meets all applicable US codes and standards. . . .

2.7 Subcontractor will be responsible to validate and complete all PFD's and P&ID's. PFSs and P&IDs are currently red lined to reflect all preliminary PHA action items and any other design changes that have occurred up to the time of this solicitation.

2.8 BAE Systems will write all operation manuals and train their staff accordingly. Subcontractor responsibilities include developing design basis documents to support BAE Systems operation manuals development and providing vendor supplied maintenance and operation manuals for subcontractor purchased equipment.

Subcontract, ECF No. 1-2, at 77-78 (emphasis in original).

Section 3.7 of the SOW is entitled "ORDER OF PRECEDENCE." It provides as follows:

3.7 ORDER OF PRECEDENCE

In the case of a difference between this SOW and the documents referenced within the Subcontractor shall contact BAE Systems for resolution.

In case of discrepancy either in the specifications or drawings, the matter shall be promptly submitted in writing to BAE Systems, who shall promptly make a determination in writing. Any adjustment by the Subcontractor without such a determination shall be at the Subcontractor's own risk and expense.

Subcontract, ECF No. 1-2, at 79.

The Subcontract specified that "time is of the essence in performance of the work." Id. at 32. The Subcontract included three clauses limiting each party's liability to $30 million for all claims and damages. Id. at 12, 42, 71. The Subcontract also required Fluor to provide competent staff, perform work in a skillful and workmanlike manner, and comply with the agreed upon schedule and other obligations. BAE Compl., ECF No. 1 at 19-20. In compliance with the Subcontract, Fluor was required to submit and adhere to a Quality Control Plan ("QCP"). Fluor Countercl., ECF No. 29, at 38. Within the QCP, Fluor submitted a Design Quality Control Plan ("DQCP"). The DQCP outlined how the parties would manage design of the project. Id. at 39. The DQCP stated that the NC project was to be based off the Lauren design. BAE accepted and approved the DQCP.

Fluor did not meet its forecasted timeline. BAE Compl., ECF No. 1, at 22-25. Fluor was first delayed because it decided to design the nitration and stabilization buildings' piping from scratch. Id. In fall 2016, BAE issued a cure notice because Fluor was significantly behind schedule. Id. at 25. Fluor stated that it was behind schedule because it had to fix issues in the Lauren design and smart plant model. Later, Fluor acknowledged responsibility for the delay

and promised BAE it was committed to delivering the NC Project on time. Id. at 25. In response to delays, BAE and the Army sought a re-baselined recovery schedule. Id. at 26-27. In January 2017, BAE recommitted to the Army to deliver the NC Project on time. Id. In September 2017, Fluor unilaterally notified BAE that its completion date would be a year delayed. Id. at 28.

The Army expressed concern to BAE about the altered timelines and increased costs which would occur. Id. at 28. BAE informed the Army as follows:

> There are two main causes for the delay in the completion of the NC facility. First, Fluor (our main subcontractor) failed to adequately staff, design, plan, and execute this program. Second, BAE Systems failed to identify and remedy Fluor's performance in a timely manner.

Id. at 29.

In January 2018, Fluor postponed the NC Project completion date to January 2020. Id. On February 8, 2018, the Army issued BAE a show cause order requiring it to explain why it should not be terminated for cause for failing to meet the prime contract's scheduled completion date. Id. On February 9, 2018, the Army issued a public statement asking the broader industry for information about who could complete design and construction of the facility at the RFAAP. Id.

On February 12, 2018, BAE issued Fluor a show cause notice. Id. BAE explained that Fluor's actions impacted BAE's obligations to the Army. Id. at 29. Fluor attributed its delays to problems with the Lauren design and alleged that BAE bore responsibility for the Lauren design's flaws. Id.

BAE provided the Army with information on steps it was taking to keep the NC Project on track. BAE added management resources, removed work from Fluor's original plan, and assumed work previously assigned to Fluor. Id. BAE reasoned that removing work from Fluor on certain buildings would allow Fluor to focus on its critical activities and adhere to the proposed timeline. Id. at 30.

BAE succeeded in convincing the Army not to terminate the prime contract and extending the completion date after agreeing to provide the Army $9 million in concessions. Specifically, BAE agreed to perform "'a total of $9,000,000.00 in abnormal maintenance efforts on the legacy NC facility as needed' at no cost to the Army and the Army agreed that the Period of Performance ("PoP") 'for the construction and commissioning of the new NC Facility [was] herein extended to 30 November 2020.'" Id. at 31.

Fluor's scheduling struggles continued throughout 2018. BAE reminded Fluor that the completion date could not be pushed further unless both parties agreed. Id. at 32. BAE informed Fluor that BAE intended "to treat, all delay beyond that date [the agreed completion date] as unexcused delay and reserves all rights and remedies under the Subcontract and applicable law in connection therewith." Id. at 32. BAE also informed Fluor that BAE was going to get help fixing issues created by Fluor and would claim these damages against Fluor. Id. at 33. BAE told Fluor that BAE had escaped default from the Army by issuing $9 million in concessions for maintenance work to keep to the legacy facility operative and that BAE intended to recover these concessions from Fluor. Id. at 33.

In March 2019, Fluor again postponed the NC Project completion date. Id. at 33. BAE determined that Fluor's schedule updates did not contain accurate forecasts on manpower and

hours needed for the project, so BAE ordered explanations and corrected schedules from Fluor. Id. at 34.

In May 2019, BAE reminded Fluor of its duty under the Subcontract to provide sufficient human and physical capital to finish the project on time. In August 2019, Fluor appeared to get the project back on schedule. Id. at 35-36.

Upon learning of continued delay in October 2019, the Army issued BAE a second show cause notice. Id. at 36. BAE sent Fluor a copy of the Army's show cause notice and a reservation of its rights reiterating BAE's reliance on Fluor to meet the NC Project's deadline. Id. BAE specified that it did not waive its rights to seek remedies and damages against Fluor for failing to meet the originally agreed upon completion date. Id. at 37.

In November 2019, BAE responded to the Army's show cause notice and avoided termination for reasons including Fluor's cooperative attitude and corrective actions. Id. The Army informed BAE that it was amenable to an extension of the timeline to July 31, 2021, if BAE provided additional consideration. Id. at 37. The Army believed $6.7 million was adequate consideration. BAE did not agree to the Army's demanded concessions. As of the complaint's filing, Fluor was scheduled to complete all its work by December 2020, two and a half years beyond the originally agreed upon completion date. Id. at 38.

Fluor alleges in its counterclaim that it was not at fault for failing to meet the agreed upon schedule. Fluor attributes its inability to perform to a variety of causes traceable to BAE. BAE allegedly did not provide Fluor with the NC facility's complete design information. Fluor Countercl., ECF No. 29, at 43. Fluor alleges its design responsibility was limited to supporting the process design which required validating and completing the Lauren design while BAE

retained responsibility for the overall process design according to Appendix F-2 of the SOW. Id. at 44.

Fluor alleges that it did not learn of the Lauren design's errors until after it entered into the Subcontract with BAE. In addition to design errors, Fluor determined the Lauren design failed to allocate necessary quantities of materials for the NC Project and miscalculated material costs. Id. at 48. Flour contends that the completion of the NC Project was delayed due to these problems with the Lauren design, and that this delay was unanticipated because BAE had represented that the Lauren design was 85% complete. Fluor also alleges it was required to follow the error-ridden Lauren design and that BAE rejected Fluor's work for noncompliance with the design. Id. at 41. For example, Fluor claims that BAE required Fluor to use specific valves from the design instead of functional substitutes.

Additionally, Fluor alleges that BAE issued countless oral and written changes to the work required under the Subcontract and these changes caused additional costs and delays to the NC Project. Id. at 48-49. Fluor contends that BAE's actions resulted in approximately 607 days of compensable NC Project delay. Id.

Fluor also alleges that it sent myriad change proposals to BAE seeking additional money for costs incurred addressing BAE's changes. Id. at 46. BAE did not approve any reimbursement for additional costs related to design changes and required adherence to the original Subcontract date. Id. at 46. Fluor attempted to open negotiations with BAE through good faith discussions but as of the counterclaim's filing date, Fluor had outstanding change proposals filed for more than $183 million. Id. at 53.

BAE filed suit in the Western District of Virginia Federal District Court on September 30, 2020, asserting a claim in Count I for breach of contract. BAE Compl., ECF No. 1, at 38-41.

Flour filed its counterclaim on May 24, 2021. ECF No. 29. Fluor's counterclaim sets forth claims in Count I for breach of contract, Count II for quantum meruit, and Count III for unjust enrichment. Fluor Countercl., ECF No. 29, at 55-59.

In its motion to dismiss, Fluor asks the court to dismiss BAE's (1) breach of contract claim related to Descope Work, and (2) breach of contract claim for recovery based on Fluor's alleged delay. Fluor Mot. to Dismiss, ECF No. 30, at 2-3.

BAE's motion to strike asks the court to strike allegations in Fluor's counterclaim, ECF No. 29, seeking damages in excess of the parties' agreed contractual damages cap. BAE Motion to Strike, ECF No. 36.

In its motion to dismiss, BAE asks the court to dismiss Fluor's (1) breach of contract claim related to (a) breach of the implied warranty of design, (b) breach of the duty of good faith and fair dealing, and (c) breach of the obligation to pay Fluor for change and delayed work, and (2) claims for quantum meruit and unjust enrichment. BAE Motion to Dismiss, ECF No. 38.

## II.     Legal Framework

### A.  Federal Rule of Civil Procedure 12(b)(6) Motion to Dismiss.

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a party to move for dismissal of a complaint for failure to state a claim upon which relief can be granted.  To survive a motion to dismiss under Rule 12(b)(6), the plaintiff must plead sufficient facts "to

raise a right to relief above the speculative level" and "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 570 (2007). A plaintiff establishes "facial plausibility" by pleading "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). In ruling on a 12(b)(6) motion, the court must accept all well-pleaded allegations in the complaint as true and draw all reasonable factual inferences in the light most favorable to the plaintiff. Ibarra v. United States, 120 F.3d 472, 474 (4th Cir. 1997). However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678; see Wag More Dogs, LLC v. Cozart, 680 F.3d 359, 365 (4th Cir. 2012) (holding the court "need not accept legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments") (internal quotation marks omitted).

### B. Federal Rule of Civil Procedure 12(f) Motion to Strike.

Rule 12(f) provides that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." In applying such rule, "a district court has broad discretion in deciding whether to strike matters from pleadings." F.D.I.C. v. Willetts, 882 F. Supp. 2d 859, 870 (E.D.N.C. 2012)(citing Renaissance Greeting Cards, Inc. v. Dollar Tree Stores, Inc., 227 F. App'x 239, 246 (4th Cir. 2007)). The function of a 12(f) motion to strike is "to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial." Gregory v. Belfor USA Grp., Inc., No. 2:12cv11, 2012 WL 2309054, at *1 (E.D. Va. June 15, 2012) (internal quotation omitted). However, "Rule 12(f) motions are generally viewed with disfavor 'because striking a

portion of a pleading is a drastic remedy and because it is often sought by the movant simply as a dilatory tactic.'" Waste Mgmt. Holdings, Inc. v. Gilmore, 252 F.3d 316, 347 (4th Cir. 2001) (quoting 5A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1380, 647 (2d ed. 1990)).

Rule 12(f) motions are proper where "the challenged allegations have no possible relation or logical connection to the subject matter of the controversy and may cause some form of significant prejudice to one or more of the parties to the action." Bailey v. Fairfax Cnty, No. 1:10-cv-1031, 2010 WL 5300874, *4 (E.D. Va. Dec. 21, 2010) (internal quotations omitted). When a damages cap exists, the court may decide to strike superfluous damages. See Boren v. Nw. Reg'l Jail Auth., No. 5:13CV013, 2013 WL 5429421, at *12 (W.D. Va. Sept. 30, 2013) abrogated on other grounds (outlining that when Virginia state law provided a damages cap, the court could strike damages in excess of the cap). "[T]he decision of whether to strike all or part of a pleading rests within the sound discretion of the [c]ourt." Barnes v. Dist. of Columbia, 289 F.R.D. 1, 6 (D.D.C. 2012) (citations omitted).

### III.   Fluor's Motion to Dismiss BAE's Complaint, ECF No 30.

Fluor requests that ¶109, ¶110, ¶111, ¶120, ¶121, ¶141, and ¶142 of Count I of BAE's complaint be dismissed according to Federal Rule of Civil Procedure 12(b)(6). Fluor Mot. to Dismiss, ECF No. 30 at 1-2. Fluor argues that BAE fails to adequately plead that Fluor violated or breached an obligation of the Subcontract that would entitle BAE to recover excess procurement costs related to descoped work. Fluor also argues BAE fails to sufficiently plead any injury or damage caused by Fluor's alleged breach of the Subcontract. Id. Alternatively, Fluor argues that BAE's damages were consequential damages barred from recovery under

the Subcontract. <u>Id.</u> There are three elements of a breach of contract claim under Virginia law: (1) a legal obligation of a defendant to the plaintiff, (2) a violation or breach of that right or duty, and (3) a consequential injury or damage to the plaintiff. <u>Adair v. EQT Prod. Co.</u>, 320 F.R.D. 379 (W.D. Va. 2017). At this stage of the proceedings, BAE has alleged plausible claims requiring denial of Flour's motion to dismiss.

### A. BAE adequately pleads the existence of a legally enforceable obligation.

To prove a legally enforceable obligation, the plaintiff must prove (1) offer, (2) acceptance, and (3) consideration. <u>Riley v. Barringer</u>, 337 F. Supp. 3d 647, 654 (W.D. Va. 2018). Fluor argues that BAE's decision to voluntarily remove certain work from Fluor released Fluor from its original obligation to perform the removed work. BAE counters that it was only required to do this work because of Flour's failure to do so.

The original duty to perform is found in the parties' firm fixed-price Subcontract, BAE Compl., ECF No. 1, at 5-6. This Subcontract was formed through a bid process which satisfied the requirements of offer, acceptance, and consideration. <u>Id.</u> at 18. The "descoped" work in question (the design and construction of the Administration Building and Lab Facility and Dust Collection, Acid Sewer, and all remaining Cutter Warehouse work) was included in the original Subcontract. <u>Id.</u> at 11-12.

### B. BAE's complaint sufficiently pleads a breach of contract occurred with regard to the descoped work.

#### a. BAE has sufficiently alleged that Flour was not released from its obligation to perform the descoped work.

BAE's complaint specifically alleges that Flur was not released from its obligation to perform descoped work. In response to pressure from the Army to meet BAE's scheduled

deadline, BAE alleges that it was required to assume the work from Fluor in an effort to mitigate Fluor's current and future Subcontract breaches. BAE Compl., ECF No. 1, at 30. Support for BAE's belief that it needed to assume work subcontracted to Fluor to meet the deadline is found throughout the complaint. See BAE Compl., ECF No. 1, at 15 (Fluor asserting it had the expertise to timely and successfully complete the project) contra 27 (detailing how Fluor's schedule did not match reality); 28, 29 (Fluor repeatedly pushed its completion date further without BAE approval); 28 (describing how the Army believed the causes for the project's delay were Fluor's lack of understanding as to the resources needed for the project and BAE's mismanagement of Fluor); 29 (the Army issued a request for information to gauge whether industry competitors could replace BAE and Fluor on the project due to their inability to meet the schedules). Despite Fluor's assertion that BAE assumed the descope work voluntarily, the language in ¶109 specifies that the decision was made to allow Fluor to focus elsewhere on additional subcontractual obligations. See id. at 30. In short, BAE plausibly alleges that Fluor was never released from its original subcontractual obligations related to the descoped work.

> ### b. BAE adequately pleads that Fluor's actions were a breach of the Subcontract.

Language throughout the Subcontract and Fluor's alleged actions articulated in the complaint support BAE's claim that Fluor breached the Subcontract. In Virginia, when the terms of the contract are clear and unambiguous, the contract is construed according to its plain meaning. Words used by the parties are given their usual, ordinary, and popular meaning. TravCo Ins. Co. v. Ward, 248 Va. 547, 552, 736 S.E.2d 321, 325 (2012) (internal citations and quotation omitted). Fluor argues that because the words "breach of contract" are not found

in the "Contract Direction/Changes" clause, actions involving that clause, like BAE's decision to assume descoped work, do not amount to a breach of the Subcontract. This argument ignores the fact that other clauses in the Subcontract, such as §28's "Construction Schedule/Time/Delays," establish expectations for the working relationship between BAE and Fluor. BAE plausibly alleges that Fluor's failure to adhere to these express contractual expectations, such as §28(e)'s requirement to timely perform, constitute a breach of the Subcontract and require action by the parties to respond to the breach. See Subcontract, ECF No. 1-2, at 31.

In short, BAE sufficiently pleads Fluor breached its obligations under the Subcontract regarding the descoped work because it alleges in its complaint that Fluor was unsuccessful in following the NC Project's schedule and Fluor did not fulfill all of its construction obligations under the Subcontract.

### c. BAE adequately pleads that the Subcontract entitles BAE to recover monetary damages incurred completing the descoped project.

Fluor believes that if liable for a breach of contract, it is only responsible for paying BAE the costs Fluor would have incurred to complete the project. Fluor cites Fox Construction Inc., ASBCA No. 55265, 08-1, for the proposition that normally costs for deductive changes are treated like additive changes and the purpose is to "keep the contractor whole when the government modifies a contract." Fluor Resp. to BAE Reply, ECF No. 43 at 19. Additionally, "pricing for the deductive change should be based on the contractor's current estimate or 'would have' cost for performing the deleted work as of the time of the deductive change." Id.

The present case is distinguishable from Fox because BAE is not seeking recovery under a deductive change. BAE is seeking recovery under a breach of contract claim for violation of §28(e)'s requirement to timely perform. §28(e)'s "Construction Schedule/Time/Delays" clause provides that "CONTRACTOR [Fluor] agrees to reimburse BAE SYSTEMS all damages and expenses incurred by BAE SYSTEMS due to CONTRACTOR's failure to complete the Work by such time." ECF No. 1-2 at 32. Since recovery under this clause does not require a deductive change, BAE plausibly pleads it can recover all its costs for descoped work.

### d. BAE's adequately pleads all the elements of a breach of contract claim with regard to the descoped work.

Viewed in the totality of the 43-page complaint and supporting exhibits, BAE's pleadings plausibly allege a claim for breach of the Subcontract with regard to the descoped work. BAE alleges that Fluor's delays required it to assume the work from Fluor and incur costs above and beyond Fluor's projections for the descoped work. Under BAE's legal theory, these costs are recoverable pursuant to §28(e) requiring Fluor to reimburse BAE for BAE's expenses caused by Fluor's failure to complete work on time. Subcontract, ECF 1-2 at 32. Because BAE's complaint states a plausible claim for relief, Fluor's motion to dismiss is **DENIED** as it pertains to the issue of descoped work.

### C. BAE's complaint plausibly pleads that the concessions to the Army were a foreseeable injury caused by Fluor's breach of the Subcontract.

### a. BAE sufficiently pleads that the $9 million concessions to the Army are damages stemming from Fluor's breach of the Subcontract.

In a claim for breach of contract, proof of damages is an essential element. Collelo v. Geographic Servs., 283 Va. 56, 72, 727 S.E.2d 55, 62 (2012); Sunrise Continuing Care, LLC v.

Wright, 277 Va. 148, 156, 671 S.E.2d 132, 136 (2009). Plaintiff bears "the burden of proving with reasonable certainty the amount of damages and the cause from which they resulted; speculation and conjecture cannot form the basis of the recovery. Damages based on uncertainties, contingencies, or speculation cannot be recovered." Shepherd v. Davis, 265 Va. 108, 125, 574 S.E.2d 514, 524 (2003) (internal citations and quotation marks omitted).

Fluor argues BAE's concessions to the Army are not an injury or cognizable damages related to its alleged breach of the Subcontract. BAE adequately pleads that it was required to make concessions to the Army as a result of Flour's failure to complete the NC Project by its specified date. Because of Fluor's untimely performance and subsequent breach of contract, the Army issued a show cause order to BAE. BAE Compl., ECF No. 1 at 29. BAE agreed to provide the Army $9 million in concessions to prevent termination of the prime contract. Id. at 30. BAE's complaint plausibly alleges that these concessions are losses BAE suffered because of Fluor's breach of the Subcontract.

### b. The court cannot determine at the motion to dismiss stage whether the $9 million concessions were direct damages as a matter of law.

There are two broad categories of contract damages, direct and consequential. The two categories are differentiable based upon foreseeability. Under Virginia law, direct damages are those that "flow 'naturally' from a breach of contract; i.e., those that, in the ordinary course of human experience, can be expected to result from the breach, and are compensable.'" Carnell Const. Corp. v. Danville Redevelopment & Hous. Auth., 745 F.3d 703, 725 (4th Cir. 2014) (quoting R.K. Chevrolet, Inc. v. Hayden, 253 Va. 50, 56, 480 S.E.2d 477, 481 (1997)). Consequential damages "arise from the intervention of 'special circumstances' not ordinarily predictable and are compensable only if it is determined that the special circumstances were

within the contemplation of the parties to the contract." Id. Whether damages are direct or consequential is a question of law while whether special circumstances were within the contemplation of the parties is a question of fact. Roanoke Hosp. Ass'n v. Doyle & Russell, Inc., 215 Va. 796, 801, 214 S.E.2d 796, 801(1975) (citing 5 A. Corbin, Contracts s 1012(89) (1964)). The distinction between direct and consequential damages is important because Fluor and BAE's Subcontract provides that "Neither Party shall be liable for any indirect, special, incidental or consequential damages…" Subcontract, ECF No. 1-2 at 12, §2.21.

Whether damages are direct or consequential is determined by looking at the strength of the connection between the breach of contract and the occurrence of damages. The stronger the plausibility that the alleged damages would result because of a contract breach, the more likely the damages are to be considered direct. Case law teaches that industry custom and practice is a factor in determining whether damages are direct and foreseeable. A number of cases address this issue in the construction context, typically requiring factual development prior to resolution. For example, the Virginia Supreme Court addressed this issue in Roanoke Hosp. Ass'n, 215 Va. at 802-03, 214 S.E.2d at 160-61, following a jury trial. The court concluded that extended financing interest costs incurred because of delays by a contractor's subcontractor were direct damages because it was common in the construction industry to use extended financing and it was understood that delays in construction would predictably result in greater interest expenses for the contractor. 215 Va. at 802, 214 S.E.2d at 160. However, costs incurred because interest rates rose were not direct damages because construction contractors and subcontractors do not ordinarily predict interest rates to change or factor those considerations into agreements. Id.  Likewise, in Banker Steel Co., LLC v. Hercules Bolt

Co., No. 6:10CV00005, 2011 WL 1752224, at *7 (W.D. Va. May 6, 2011), the court determined at the summary judgment stage that damages incurred by a contractor because of a roof collapse and repair were direct damages attributable to the beam supplier because the damages were a predictable result in supplying faulty beams. In contrast to Roanoke Hosp. Ass'n and Banker Steel, Flour's challenge comes at the pleading stage.

BAE adequately pleads that the $9 million in concessions incurred are direct damages related to Fluor's alleged breach of the Subcontract. The complaint alleges that BAE and Fluor were both sophisticated members of the construction and public contracts industry. BAE Compl., ECF No. 1, at 3-5. Fluor understood it was subcontracted to work on an Army project. BAE plausibly alleges that it was foreseeable to Fluor that its failure to timely complete construction for BAE would result in delays to the scheduled completion date and cause BAE to fail to meet its contractual obligations to the Army. Another plausibly foreseeable result was that delays in construction of the new facility would require continued use and maintenance of the older facility which would cost money. Additionally, BAE plausibly alleges that the show cause order provided to Fluor demonstrates that Fluor was knowledgeable and had notice of the repercussions its delays had on BAE.

It is important to acknowledge that BAE's concessions to the Army are different than the damages in Roanoke Hosp. Ass'n and Banker Steel because the injured party's damages had already been incurred in those cases. Here, however, the threat of the Army's termination of BAE's prime contract in the show cause order plausibly necessitated action by BAE to prevent further compounded damages. See Haywood v. Massie, 188 Va. 176, 182, 49 S.E.2d 281, 284 (1948) (specifying that an injured party in a breach of contract case is bound to

21

mitigate loss and damages are not recoverable as far as damages are compounded because of failure to act). Further, BAE plausibly alleges that the damages were foreseeable by the parties involved and contemplatable results of breaches of the Subcontract. Taken together, the alleged foreseeability of BAE's damages, notice provided by the show cause order, and the construction industry's characteristics render plausible BAE's pleadings as to the damages it incurred in making concessions to the Army to keep the prime contract. Whether these concessions turn out to be direct or consequential damages will depend on further factual development.

At this stage of the proceedings, the court is required to **DENY** Flour's motion to dismiss BAE's claim for recovery of the $9 million in concessions paid to the Army.

### IV.   BAE's Motion to Strike Fluor's Counterclaim, ECF No. 36.

Pursuant to Federal Rule of Civil Procedure Rule 12(f), BAE moves to strike Flour's counterclaim to the extent that it seeks damages exceeding $30 million as capped in the Subcontract. For the following reasons, the court **GRANTS** BAE's motion to strike.

### A.  The Limitation of Damages clauses limit Flour's counterclaim damages.

Virginia adheres to the "'plain meaning' rule: [w]here an agreement is plain on its face, is plain and unambiguous in its terms, the court is not at liberty to search for its meaning beyond the instrument itself. . . . This is so because the writing is the repository of the final agreement of the parties." Berry v. Klinger, 225 Va. 201, 208, 300 S.E.2d 792, 796 (1983). "Words that the parties used are normally given their usual, ordinary, and popular meaning. No word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words needlessly."

City of Chesapeake v. States Self-Insurers Risk Retention Group, Inc., 271 Va. 574, 578, 628 S.E.2d 539, 541 (2006) (quoting D.C. McClain, Inc. v. Arlington Cnty., 249 Va. 131, 135–36, 452 S.E.2d 659, 662 (1995)). The cardinal rule of contract interpretation is that the intent of the parties as expressed in the contract controls. Bender–Miller Co. v. Thomwood Farms, Inc., 211 Va. 585, 588, 179 S.E.2d 636, 639 (1971) (citations omitted). Under Virginia law, parties may limit their risk of loss through contract as long as it does not contravene public policy. All Bus. Sols., Inc. v. NationsLine, Inc., 629 F. Supp. 2d 553, 559 (W.D. Va. 2009) (citing Kocinec v. Pub. Storage, Inc., 489 F. Supp. 2d 555, 559 (E.D. Va. 2007)).

Three clauses in the contract limit BAE's and Flour's ability to claim damages in this lawsuit exceeding $30 million.

Section 2.21, entitled "Limitation of Damages," is contained in the Supplemental Terms and Conditions of the Firm Fixed Price Subcontract Agreement. Section 2.21 states as follows:

> Except as otherwise provided in this Subcontract, damages and remedies that may be recovered by either Party shall be limited as follows: For all claims, regardless of the basis on which the claim is made, the applicable party's liability for damages arising under or related to this Subcontract shall be limited to $30M, **$30M being defined as the value including all changes and the maximum liability for damages**.

Subcontract, ECF No. 1-2 at 12 (emphasis added). Critically, this limitation defines the $30 million damage limitation "as the value including all changes and the maximum liability for damages." Of note, this section of the Subcontract is not comprised of form terms and conditions. Rather, it specifically refers to both BAE and Flour.

Section 36, entitled "Limitation on Damages" and found in "Appendix 'J' — General Conditions for Subcontractors Performing Work at the Radford Army Ammunition Plant," contains language identical to that found in §2.21.[3] Again, the language of the clause expressly defines the $30 million limitation as "including all changes and the maximum liability for damages." ECF No. 1-2, at 71. As with § 2.21, this limitation does not appear in a form contract, but rather is contained in a section of the subcontract expressly referring to subcontractors working at the RFAAP.

The Subcontract also includes many pages of form terms and conditions, referencing neither Fluor nor the RFAAP. The section with these form terms and conditions, entitled "BAE CONSTRUCTION (modified) General Provisions for Construction Subcontracts/Purchase Orders," also contains a "Limitation on Damages" clause in §46. Section 46 of these general terms and conditions also contains language limiting recoverable damages to $30 million. For the most part, §46 of the general BAE terms and conditions mirrors the limitation of damage clauses found in §§2.21 and 36. However, §46 lacks the last fifteen words of §§2.21 and 36, which expressly define the $30 million cap to include all changes. Section 46 states as follows:

> Except as otherwise provided in this Subcontract, damages and remedies that may be recovered by either Party shall be limited as follows: For all claims, regardless of the basis on which the claim is made, the applicable party's liability for damages arising under or related to this Subcontract shall be limited to $30,000,000.

ECF No. 1-2, at 42.

---

[3] While §2.21 is entitled "Limitation of Damages," §§ 36 and 46 are entitled "Limitation on Damages." The court does not attribute any legal significance to this one-letter difference and collectively refers to the clauses herein as "Limitation of Damages" provisions or clauses.

BAE argues that the $30 million limitation applies across the board to limit Fluor's counterclaim to that amount. Fluor disagrees, focusing on the absence of the "including all changes" language in §46. Fluor's $183 million counterclaim largely consists of changes it says it was required to make to remedy the shortcomings in the Lauren design, which BAE required Fluor to use and which BAE represented was 85% complete. Because §46 makes no mention of changes, Fluor argues that the costs for changes contained in its $183 million counterclaim are not subject to the $30 million cap, but rather are governed by other provisions in the Subcontract. Therefore, Fluor contends that the costs it incurred for changes necessitated by the flawed Lauren design and otherwise demanded by BAE are not subject to the $30 million limitation.

Flour makes two arguments to avoid application of the $30 million Limitation of Damages provisions in the Subcontract. First, Fluor argues that the absence of the specific "including all changes" language in §46 renders the Subcontract ambiguous. Second, Fluor contends that the "[e]xcept as otherwise provided in this Subcontract" language prefacing the Limitation of Damages clauses opens the door to its recovery of costs for changes beyond $30 million. Each argument contravenes established canons of contract construction.

Both of the Limitation of Damages clauses containing the "including all changes" language are in Subcontract sections specifically referencing Fluor or work done by subcontractors at the RFAAP.  The Limitation of Damages clause lacking the "including all changes" is found in form BAE terms and conditions that make no reference to either Fluor or the RFAAP. "[A] specific provision of a contract governs over one that is more general in nature." <u>Condominium Servs., Inc. v. First Owners' Ass'n of Forty Six Hundred</u>

<u>Condominium, Inc.</u>, 281 Va. 561, 573, 709 S.E. 3d 163, 170 (2011); <u>see also</u> <u>Asphalt Roads &</u>

<u>Materials Co. v. Commonwealth</u>, 257 Va. 452, 460, 512 S.E. 2d 804, 809 (1999) (Lacy, J.,

concurring) ("specific section of the contract overrides the more general contract provisions").

> The ordinary rule in respect to the construction of contracts is
> this: that where there are two clauses in any respect conflicting,
> that which is specially directed to a particular matter controls in
> respect thereto over one which is general in its terms, although
> within its general terms the particular may be included. Because,
> when the parties express themselves in reference to a particular
> matter, the attention is directed to that, and it must be assumed
> that it expresses their intent whereas a reference to some general
> matter, within which the particular may be included, does not
> necessarily indicate that the parties had the particular matter in
> thought.

<u>Mutual Life Ins. Co. v. Hill</u>, 193 U.S. 551, 558 (1904). Consistent with the canon of contract

construction referenced in these cases, the fact that §§2.21 and 36 specifically define the

limitation of damages to "includ[e] all changes" controls §46, which contains the same general

limitation of damages but lacks the specific "including all changes" language. Moreover, the

fact that the "including all changes" language appears in the provisions specifically referring

to Fluor and the RFAAP supports the conclusion that the $30 million limitation on damages

applies to the increased costs for changes comprising Fluor's counterclaim. Further, the

placement of the §§2.21 and 36 damage limitation provisions in the body of the contract

specifically referring to Fluor or RFAAP, as opposed to §46, buried within generalized terms

and conditions, also supports giving effect to the "including all changes" language.

Next, Fluor relies upon the language opening each of the three damage limitation

provisions, which states "[e]xcept as otherwise provided in this Subcontract," as a means to

escape the application of the $30 million cap to its counterclaim. Fluor argues that the

Limitation of Damages provisions do not cap Fluor's recovery of the extra costs it expended on the project because the subcontract "otherwise provide[s]" two mechanisms for recovery for necessary costs associated with changes to the NC Project.  The first avenue is the Contract Direction/Changes provision in the form BAE terms and conditions generally applicable to BAE subcontractors, Subcontract, ECF No. 1-2, at 18-19, and the second avenue is the Changes provision of the Federal Acquisition Regulations ("FAR") 52.243-4.[4]

The problem with Fluor's argument is that "contract language will not be treated as meaningless where it can be given reasonable meaning." Ross v. Craw, 231 Va. 206, 343 S.E. 2d 312, 317 (1986). "When two provisions of a contract seemingly conflict . . . they [should] be harmonized so as to effectuate the intention of the parties as expressed in the contract as a whole." Plunkett v. Plunkett, 271 Va. 162, 168, 624 S.E.2d 39, 42 (2006) (quoting Ames v. American Nat'l Bank of Portsmouth, 163 Va. 1, 39, 176 S.E. 204, 217 (1934). By invoking the "[e]xcept as otherwise provided in this Subcontract" language, Fluor asks the court to excise the "excluding all changes" language of §§2.21 and 36.  To do so would render the "excluding all changes" language meaningless, which the court cannot do. Moreover, nothing in the "Contract Direction/Changes" and FAR 52.243-4 Changes provisions negate application of the $30 million Limitation of Damages provisions. In other words, there is nothing in the Changes provisions of the Subcontract or the FAR regulations "otherwise provid[ing]" that

---

[4] The subcontract includes a section entitled "Flow Down Provisions for Subcontract/Purchase Orders for Items Under a U.S. Government Prime Contract – Construction." Subcontract, ECF No. 1-2, at 45. The Flow Down Provisions state that "[T]he Federal Acquisition Regulations (FAR) and Defense Federal Acquisition Regulation Supplement (DFARS) clauses referenced below are incorporated herein by reference, with the same force and effect as if they were given in full text and are applicable, including any notes following a clause citation, during the performance of this Contract." Id.  One of the FAR clauses referenced in the Flow Down Provisions is FAR 52.243-4 CHANGES (Jun 2007).

the $30 million Limitation of Damages is inapplicable. The court is required to harmonize the provisions of the Subcontract to reflect the parties' intent. In doing so, the court cannot agree with Fluor that the "[e]xcept as otherwise provided in this Subcontract" exempts the Changes provisions from the $30 million damages cap, particularly where nothing in the Changes provisions provides any basis for such an exemption.

The Subcontract unambiguously provides that BAE and Fluor agreed to limit any claim for damages, including for changes, to $30 million.

**B. Va. Code Ann. § 11-4.1:1 is inapplicable as Fluor performed work on the project before executing the subcontract.**

Fluor argues that the Limitation of Damages provisions of the Subcontract are unenforceable under Virginia law. Virginia Code § 11-4.1:1 provides as follows:

> A subcontractor as defined in § 43-1, lower-tier subcontractor, or material supplier may not waive or diminish his right to assert payment bond claims or his right to assert claims for demonstrated additional costs in a contract in advance of furnishing any labor, services, or materials. A provision that waives or diminishes a subcontractor's, lower-tier subcontractor's, or material supplier's right to assert payment bond claims or his right to assert claims for demonstrated additional costs in a contract executed prior to providing any labor, services, or materials is null and void.

This statute has no application here as Fluor provided labor, services, and materials to BAE on the NC Project before executing the Subcontract.

On October 14, 2015, Fluor and BAE executed an Undefinitized Contract Action ("UCA") pursuant to which Fluor began work on the NC Project while the Subcontract was negotiated and finalized. Fluor Countercl., ECF No. 29, at 33. The UCA specified that both parties intended to execute a formal fixed price contact and the definitive contract would share the same start date. UCA, ECF No. 1-4, at 2. Under the UCA, Fluor began construction on

the project and completed approximately $32 million of work. BAE Compl., ECF No. 1, at 21. The official subcontract was executed on December 17, 2015, for $245,690,422.00, which included the $32 million spent on the UCA. Id. at 19.

Pursuant to the UCA, Fluor provided labor, services, and materials to BAE prior to negotiating and executing the Subcontract. Because Flour provided substantial services and materials before the Subcontract, containing Limitation of Damages clauses, was executed, Virginia Code §11-4.1:1 does not apply. Fluor's argument that this law provides opportunities for small subcontractors to be unfairly manipulated is acknowledged. But this case—involving sophisticated entities—is far removed from that concern.

## C. Fluor's invocation of equitable estoppel is unavailing.

Nor does equitable estoppel apply to prevent enforcement of the damages limitation agreed to by BAE and Fluor. "The elements necessary to establish equitable estoppel are (1) a representation, (2) reliance, (3) change in position, and (4) detriment, and the party who relies upon estoppel must prove each element by clear, precise, and unequivocal evidence." Princess Anne Hills Civic League, Inc. v. Susan Constant Real Estate Trust, 243 Va. 53, 59, 413 S.E.2d 599, 603 (1992) (citing Dominick v. Vassar, 235 Va. 295, 298, 367 S.E.2d 487, 489 (1988)). "Because the doctrine of equitable estoppel prevents the showing of the truth, it is applied rarely and only from necessity." Id. (citing Hyson v. Dodge, 198 Va. 792, 795, 96 S.E.2d 792, 795 (1957); Baker v. Preston, 21 Va. (Gilmer) 235, 300 (1821)). Fluor asks the court to set aside the parties' agreement to cap damages at $30 million, asserting that BAE repeatedly misrepresented that the Lauren design was 85% complete. But Fluor makes no claim that BAE made any representations as to the Limitation of Damages provisions of the Subcontract. The

fact that the alleged representation—relating to the Lauren design—bears no relation to the Limitation of Damages provisions of the Subcontract is significant because of what Fluor seeks to obtain by invoking equitable estoppel. Fluor does not seek rescission of the Subcontract, and, in fact, claims that BAE breached the Subcontract. Instead, by invoking equitable estoppel, Fluor seeks to excise one provision of the Subcontract while enforcing the remainder. Such a remedy is not legally available to Fluor. In <u>United States v. Idlewild Pharmacy, Inc.</u>, 308 F. Supp. 19, 23 (E.D. VA. 1969), the Eastern District of Virginia stated:

> One entitled to relief can affirm or avoid the contract, but he cannot do both; if he adopts a part, he adopts it all. He must reject it entirely if he desires to obtain relief. Defendant cannot accept the benefits of the contract and then assert he is entitled to be relieved of its obligations.

See also <u>Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH</u>, 206 F.3d 411, 418 (4th Cir. 2000) (Because plaintiff asserted a claim alleging failure to honor warranties of a contract, plaintiff was estopped from refusing to adhere to another section governing dispute resolution, specifically an arbitration clause, of the contract. Moreover, adherence to the dispute resolution clause was valid because it applied equally to all parties.); <u>Wachovia Bank, Nat. Ass'n v. Schmidt</u>, 445 F.3d 762, 769 (4th Cir. 2006) ("it is unfair for a party to 'rely on [a] contract when it works to its advantage, and repudiate it when it works to its disadvantage.'")(quoting <u>Hughes Masonry Co. v. Greater Clark County Sch. Bldg. Corp.</u>, 659 F.2d 836, 839 (7th Cir.1981)); <u>Vertex Telecom, Inc. v. XO Commc'ns, Inc.</u>, No. 1:06CV1209 JCC, 2006 WL 3746142, at *3 (E.D. Va. Dec. 14, 2006) ("… a plaintiff cannot at the same time seek to enforce a contact and render it void for fraud").

Where, as here, the claimed representation bears no relation to the Limitation of Damages clauses, equitable estoppel cannot provide the remedy Fluor seeks. This is not a case, for example, where BAE represented that the Limitation of Damages provisions did not apply to claims for unapproved change orders submitted by Fluor under the Subcontract. In such a case, an argument could be made that equitable estoppel ought to bar enforcement of the Limitation of Damages clauses. But Fluor makes no such claim here.

For these reasons, BAE's motion to strike Fluor's counterclaim for damages in excess of $30 million, ECF No. 36, is **GRANTED**. [5]

## V.    BAE's Motion to Dismiss Fluor's Counterclaim, ECF No. 38.

BAE requests that Fluor's counterclaim, ECF No. 29, be dismissed pursuant to Federal Rule of Civil Procedure Rule 12(b)(6). Fluor's counterclaim alleges three claims: (1) breach of contract, (2) quantum meruit, and (3) unjust enrichment. Fluor pleads breach of contract on three theories: (1) breach of the implied warranty of plans, designs, and specifications, (2) breach of the Subcontract's duty to grant Fluor equitable adjustments to the Subcontract's

---

[5] Although the court considers the issue of the application of the $30 million limitation of damages to Fluor's counterclaim from the plain meaning of the Subcontract itself, the court's legal conclusion is confirmed by evidence BAE offered in support of its motion to strike. BAE offered evidence in the form of email communications between Fluor's Subcontractor Contractual POC (presumably Point of Contact) listed in the Supplemental Terms & Conditions to the subcontract, Lura Lewis, and BAE's Contractual POC, Erin Phalen, sent on December 7, 2015, a week before BAE and Flour signed the subcontract. In that email communication, BAE's Phalen posed to Fluor's Lewis "a quick question for you regarding the inclusion of the Limitation of Liability (LOL) language that was inserted by Fluor. Can you tell me what Fluor believes is included within the LOL and what falls outside of it? It is my understanding that the LOL is in addition to the OCIP, but I wanted to verify that with you." BAE Reply to Mot. to Strike, ECF No. 50-1, at 3. After confirming that Phalen was asking about the Limitation on Damages clause in ¶36 of Appendix "J", which contains the "including all changes" language, Fluor's Lewis responded as follows: "I got a reading from Legal on how this works. . . . it has nothing to do with insurance. It's $30M total, regardless of whether we have no insurance or huge policy limits. All that we can win if we sue each other is $30M." BAE Reply to Mot. to Strike, ECF 50-1, at 2. To the extent that the absence of the "including all changes" language in ¶46 is read to provide ambiguity as to whether the $30 million applies to all of Fluor's counterclaim, including for the changes it claims it was required to make, the Lewis December 7, 2015 email pretty clearly answers the question that all Fluor can win if it sues BAE is $30 million.

price and schedule, and (3) breach of the implied covenant of good faith and fair dealing. BAE

argues that all counts should be dismissed for failure to adequately state a claim. ECF No. 38.

For the following reasons, the court **GRANTS in PART and DENIES in PART** BAE's

motion to dismiss.

### A. Fluor's counterclaim adequately pleads a breach of the implied warranty of design adequacy.

The implied warranty of specifications or design adequacy, often referred to as the

Spearin doctrine, provides that:

> [w]here one agrees to do, for a fixed sum, a thing possible to be
> performed, he will not be excused or become entitled to
> additional compensation, because unforeseen difficulties are
> encountered ... But if [a] contractor is bound to build according
> to plans and specifications prepared by the owner, the contractor
> will not be responsible for the consequences of defects in the
> plans and specifications.

United States v. Spearin, 248 U.S. 132, 136 (1918). This implied warranty is limited, however.

It does not protect a subcontractor who is negligent or one who makes "any express guarantee

or warranty . . . as to [the plans and specifications provided by the general contractor] being

sufficient and free from defects." Greater Richmond Civic Recreation, Inc. v. A. H. Ewing's

Sons, Inc., 200 Va. 593, 596, 106 S.E.2d 595, 597 (1959); see Modern Cont'l South v. Fairfax

Cnty. Water Auth., 72 Va. Cir. 268, at *2-3, 2006 WL 3775938 (Fairfax Cnty. Cir. Ct. 2006)

(finding Spearin inapplicable where express contract language requires the contractor to

"verify all . . . details shown on the drawings" . . . and to "notify [the engineer] of all errors,

omissions, conflicts and discrepancies").

Fluor argues BAE breached the implied warranty of design by misrepresenting the state

of the Lauren design and failing to compensate Fluor for additional costs incurred correcting

the design. BAE argues the implied warranty does not apply to its dealings with Fluor because Fluor expressly assumed all responsibility for the Lauren design in the Subcontract.

On the issue of responsibility for the Lauren design, the Subcontract is hardly a model of clarity. On this issue, the court is constrained to conclude that the Subcontract is ambiguous, breathing plausible life into the implied warranty of design counterclaim. BAE focuses its argument on the express terms of the Scope section of the SOW, but the court is not convinced that the SOW places all design responsibility on Fluor such that Flour's claim for breach of the implied warranty of design must be dismissed as a matter of law. For example, §2.1 states that "[t]he preliminary design of for (sic) the new NC facility has been developed and is included in the SOW." Subcontract, ECF No. 1-2, at 77. Section 2.1 explains that "[t]his Conceptual Design was developed by Lauren," based on the Army's specifications. Id. "Drawings, specifications, and other technical documents provided in the appendices of this SOW were prepared by [Lauren] and amended by BAE Systems."[6] Id. Further, §2.4 provides that "[s]pecifications provided in APPENDIX G represent the minimum requirements." Id. Given that the Lauren design files, as amended by BAE, are included as a portion of APPENDIX G, the court cannot agree with BAE that the Subcontract, as a matter of law, allows it to walk away from any responsibility for the Lauren design and its amendments thereto. Further factual development is required.

BAE places great reliance on other language in the SOW, but the court is not convinced that those terms are so clear that BAE's argument carries the day as a matter of law for BAE.

---

[6] Consistently, §2.2 confirms that BAE had its own hand in the design of the NC Project subject to the Subcontract. It states "[t]he drawings, specifications, and technical documents provided in APPENDIX G are amended in this Statement of Work (SOW) by BAE Systems to show additional requirements and/or corrections." Id.

For example, BAE argues that it has no responsibility for the Lauren design, or its amendments thereto, because §2.2 provides that the drawings, specifications, and technical documents provided in the Lauren design, as amended by BAE, "are provided for reference only," that Fluor should prepare its own drawings, and that native CADD files are provided for this purpose. Id. Again, however, this language must be read in conjunction with the other provisions of the SOW. At this stage of the proceedings, the court cannot conclude as a matter of law that the Subcontract unambiguously assigns all responsibility for the Lauren design to Fluor.

BAE disagrees, focusing on a clause in the second sentence of §2.5, which states "[t]he Subcontractor shall be solely responsible for the design . . ." Id. at 78. Considered alone, this partial sentence appears favorable to BAE. But the context in which it appears creates ambiguity. When read in its entirety, §2.5 appears to concern hazard and safety issues. The first two sentences of §2.5 state: "It is incumbent upon the Subcontractor to review the documents submitted and to perform their own analysis, including Hazard and Operability Studies and Life Safety Code Analysis. The Subcontractor shall be solely responsible for the design and all safety reviews and safety submittals with all required state and federal agencies." Read in context, there is ambiguity as to the scope of the design responsibility referenced in §2.5. Nor does §2.5 mention APPENDIX G, instead mentioning the Preliminary Hazard Analysis and Preliminary Code Analysis found in APPENDIXES H and D.  Thus, it is not clear from the text of §2.5 that it applies to designs unrelated to hazard and safety issues.

BAE also relies generally on the statement in §23(f) of the BAE form terms and conditions stating that "CONTRACTOR shall be totally responsible for the professional

quality, technical accuracy, feasibility, and coordination of all designs, drawings, specifications, and other services furnished by or for CONTRACTOR hereunder." Id. at 29. But this provision begs the question as to whether Fluor bore all responsibility for the Lauren design, or whether BAE may be liable under the Spearin doctrine based on the ambiguous language of the SOW.

Finally, BAE points to a §3.7 of the Technical Proposal[7] submitted by Fluor in which Fluor identifies Wood Group Mustang ("Mustang") as Fluor's engineering design subcontractor and indicating that Mustang's services included "[v]alidating the existing design status, acceptance and ownership of existing design, correcting and completing existing design for all aspects of the project identified in the BAE RFP." See BAE Reply in Supp. of Mot. to Dismiss Countercl., ECF No. 49, at 11. While this language supports BAE's argument, it fails to note that the Technical Proposal also provides in §3.1 that it was submitted "[i]n accordance with solicitation requirements," and that §3.7 also provides that Fluor will "deliver architectural design, engineering design, deliverables and construction support services as required for a completed project in accordance with the technical requirements stated throughout the documents provided." As such, the language of §3.7 of the Technical Proposal relied upon by BAE does not serve to fully clear the ambiguity present in the Subcontract as to whether BAE bears any responsibly under the Spearin doctrine for the Lauren design.

---

[7] In ¶119 of the counterclaim, Fluor alleges that its Technical Proposal is incorporated into the Subcontract. Fluor Countercl., ECF No. 29, at 37.

Because the language of the SOW in the Subcontract is ambiguous as to BAE's and Fluor's responsibilities for the Lauren design, the court cannot conclude as a matter of law that Fluor's counterclaim fails to state the first two elements of a <u>Spearin</u> doctrine claim.

Nor can the court conclude at this stage, from the pleadings and Subcontract documents referenced therein, that Fluor expressly guaranteed or warranted that the Lauren design "was sufficient and free from defects." <u>Greater Richmond Civic Recreation</u>, 200 Va. at 596, 106 S.E.2d 597. The court cannot resolve the applicability of this caveat to the <u>Spearin</u> doctrine without further factual development.

### B. Fluor's second breach of contact theory—claiming an equitable adjustment to the Subcontract price—states a plausible claim as to changes ordered by BAE.

Fluor's second breach of contract theory seeks an equitable adjustment to the Subcontract price and schedule "to compensate Fluor for all changes, including delays and acceleration, that are imposed and caused by BAE's actions on the Project." Fluor Countercl., ECF No. 29, at 56.

To be sure, neither the Subcontract nor the Changes provision of the FAR provide for equitable adjustment of change proposals made by Fluor which were not accepted by BAE. Paragraph 3(b) of the BAE CONSTRUCTION (modified) General Provisions for Construction Subcontracts/Purchase Orders in the Subcontract provides that Fluor "shall not implement any changes or modifications to this contract (including contract specifications and quality control provisions) without having first received written authorization to do so from BAE SYSTEMS' Procurement." Subcontract, ECF No. 1-2, at 18. Section 3(f) confirms that BAE is not liable for Fluor's "increased cost of performance that result from [Fluor's]

implementation of changes or modifications that BAE SYSTEMS' Procurement Representative did not first approve in writing." Id. Fluor alleges that BAE has withheld approval of its proposed changes and seeks $183 million in damages. Counterclaim, ECF No. 29, at 52-54. Thus, the Subcontract does not provide for equitable adjustment to the price concerning change proposals made by Fluor to which BAE did not agree.

On the other hand, FAR 52.243-4, entitled "Changes," incorporated by reference in the Subcontract, provides for equitable adjustment of changes required by the Contracting Officer. Assuming, without deciding, that BAE falls into this category for changes Fluor alleges BAE required it to make, Fluor's counterclaim plausibly alleges a claim for equitable adjustment of costs incurred by Fluor to make changes required by BAE.

### C. Fluor adequately pleads a breach of the good faith covenant.

Fluor alleges in its counterclaim that BAE breached the duty of good faith and fair dealing. In Virginia, the elements of breach of the implied covenant of good faith and fair dealing are (1) a contractual relationship between the parties, and (2) breach of the implied covenant. Enomoto v. Space Adventures, Ltd., 624 F. Supp. 2d 443, 450 (E.D. Va. 2009). The Fourth Circuit Court of Appeals has noted, "[i]n Virginia, every contract contains an implied covenant of good faith and fair dealing." Wolf v. Fed. Nat. Mortg. Ass'n, 512 Fed. Appx. 336, 345 (4th Cir.2013). However, where parties to a contract create valid and binding rights, an implied covenant of good faith and fair dealing is inapplicable to those rights. Ward's Equip. v. New Holland N. Am., 254 Va. 379, 385, 493 S.E.2d 516, 520 (1997). Actions occurring before contract execution are not considered in a claim for breach of the implied covenant

because no contractual relationship existed. Walker v. Hill, No. 3:20CV149, 2021 WL 1062238, at *9 (E.D. Va. Mar. 19, 2021).

Breach of the implied covenant of good faith and fair dealing is a contract, rather than a tort, claim. See Charles E. Brauer Co., Inc. v. NationsBank of Va., N.A., 251 Va. 28, 33, 466 S.E.2d 382, 385 (1996). "Although the duty of good faith does not prevent a party from exercising its explicit contractual rights, a party may not exercise contractual discretion in bad faith, even when such discretion is vested solely in that party." Virginia Vermiculite, Ltd. v. W.R. Grace & Co.-Conn., 156 F.3d 535, 542 (4th Cir.1998). The duty can also be breached if the purported exercise of a contractual right is dishonest, as opposed to merely arbitrary. See Enomoto, 624 F. Supp.2d at 450 (holding that the "claim [was] properly pled because ... Plaintiff alleges that Defendant's actions were not merely unfavorable, but dishonest"); Charles E. Brauer Co., 251 Va. at 35, 466 S.E.2d at 386 (holding that the implied duty of good faith was not breached when, "arguably, the bank's conduct was arbitrary, but it was not dishonest."). To satisfy breach of duty pleading requirements, the pleadings must adequately allege (1) another party acted dishonestly, and (2) a party hindered another's timely performance of a contract. Enomoto, 624 F. Supp. 2d at 443 (specifying that allegations of dishonesty supported by pleadings that defendant was not simply exercising expressed contract rights were sufficient to plead claim for bad and faith and unfair dealing); Goodrich Corp. v. BaySys Techs., LLC, 873 F. Supp. 2d 736, 742 (E.D. Va. 2012) (specifying that bad faith was sufficiently pleaded by details of contractor's inability to complete work within a timeframe, false assurances, and other refusals to commence work).

Fluor alleges that breach of the covenant occurred during performance of the Subcontract, while BAE argues that Fluor's claim is barred because its stems from BAE's extracontractual representations regarding the state of completion of the Lauren design. At this stage of the case, however, the court cannot grant BAE's motion to dismiss as Fluor alleges that breach of the covenant of good faith occurred after the Subcontract was formed and continued occurring while the Subcontract was being performed. Fluor Countercl., ECF No. 29, at 45-46, 49-50, 57. Because of its detailed pleadings, analogous to those found in Enomoto and Goodrich, Fluor adequately pleads BAE breached the duty of good faith and fair dealing by misrepresenting the status of the Lauren design, interfering with Fluor's performance of the Subcontract, and not compensating Fluor for work unilaterally implemented by BAE. Determining whether these allegations ultimately have merit requires further factual development.

### D. Fluor's quantum meruit and unjust enrichment claims are not actionable under Virginia law given the enforceable Subcontract.

In Counts Two and Three, Flour raises in the alternative equitable claims of unjust enrichment and quantum meruit. In T. Musgrove Const. Co., Inc. v. Young, 298 Va. 480, 485, 840 S.E. 2d 337, 340 (2020), the Virginia Supreme Court sought to "disentangle the two theories, which can easily be conflated." The court explained:

> A plaintiff can seek recovery in *quantum meruit* when the work was done at the instance and request of another. Mongold [v. Woods], 278 Va. [196], 203, 677 S.E.2d 288, [292]. See also Haynes Chemical Corp. v. Staples & Staples, 133 Va. 82, 87, 112 S.E. 802, [804](1922) ("Where one renders services for another at the latter's request the law, in the absence of an express agreement, implies a promise to pay what those services are reasonably worth, unless it can be inferred from the circumstances that those services were to be rendered without

compensation."). For example, *quantum meruit* is available when (1) the parties contract for work to be done, but the parties did not agree on a price, (2) the compensation mentioned is too indefinite, (3) there is a misunderstanding as to the price to be paid, or, (4) in some instances, the contract is void and of no effect. Marine Dev. Corp. v. Rodak, 225 Va. 137, 140-41, 300 S.E.2d 763[, 765] (1983). When the defendant has not requested the plaintiff's services, a plaintiff's claim is for unjust enrichment. See Candace Kovacic-Fleischer, Quantum Meruit and the Restatement (Third) of Restitution and Unjust Enrichment, 27 Review of Litigation 127, 132-33 (2007).

"*Quantum meruit* and unjust enrichment claims are only appropriate in the absence of an *enforceable* contract." Weiler v. Arrowpoint Corp., No. 1:10cv157, 2010 WL 1946317, at *9 (E.D. Va. May 11, 2010). As the Eastern District of Virginia later noted, "[i]f one area of Virginia law is certain, it is that a plaintiff cannot simultaneously recover in contract and in equity (i.e. quasi-contract)." McPike v. Zero-Gravity Holdings, Inc., 280 F. Supp. 3d 800, 809 (E.D. Va. 2017). A leading case enunciating this well-settled legal principal is Royer v. Bd. of Cnty. Sup'rs of Ablemarle Cnty., 176 Va. 268, 280, 10 S.E.2d 876, 881 (1940). There, the Virginia Supreme Court denied plaintiff's claim for quantum meruit, stating that "where there is an express and enforceable contract in existence which governs the rights of the parties, the law will not imply a contract in contravention thereof."

However, an exception to this rule exists "where work is done on an express contract which is void or unenforceable, the beneficiary of the work may be liable for the value of the services rendered under the implied contract between the parties." Id. But as in Royer, "this principle has no application to the instant case. Here the plaintiff claims the right to recover by virtue of an express contract. The defense is not that the contract is void or unenforceable, but that under the very terms of the agreement itself he is not entitled to compensation." Id.

Neither Fluor nor BAE contend that the Subcontract is void or unenforceable.  Absent such a contention, Fluor's counterclaims for quantum meruit and unjust enrichment fail to state a claim. As the Eastern District of Virginia stated in Vollmer v. CSX Transp., Inc., 705 F. Supp. 1154, 1176 (E.D. Va. 1989), "[p]laintiff's unjust enrichment theory must be rejected because a necessary condition precedent is absent: there must be no actual, express contract. Unjust enrichment claims can arise only where, unlike here, there is no express contract, whether written, oral or both."

Nonetheless, Fluor pleads in the alternative, seeking an equitable remedy in case its breach of contract claim is found wanting.  Fluor's argument fails. "Although it makes perfect sense for a plaintiff to plead quasi-contractual claims in the alternative when the applicability or enforceability of the contract is in dispute, the rationale for alternative pleading disappears when neither party contests the applicability or validity of the contract." McPike, 280 F. Supp. 3d at 810; Weiler, 2010 WL 1946317, at *9. "Because unjust enrichment claims are only appropriate in the absence of an enforceable contract, and neither party here challenges the validity or enforceability of the [Subcontract between BAE and Fluor, Fluor's] unjust enrichment claim must be dismissed." McPike, 280 F. Supp. 3d at 810.

Even though it does not contest the validity or enforceability of the Subcontract, Fluor argues that it is entitled to equitable recovery for work it performed beyond the scope of the Subcontract. This argument fails, however, as Fluor seeks compensation for work done on the NC Project, and the Subcontract covers all of this work. The Scope section of the Subcontract's SOW sets forth the expansive breadth of the Subcontract, as follows: "2.1 This project will design, procure, and construct the new NC facility." Subcontract, ECF No. 1-2,

at 77. The damages Fluor seeks in its counterclaim for recovery of costs incurred while designing and constructing the NC facility fall within the scope of the Subcontract. As such, Counts Two and Three of Fluor's counterclaim, seeking recovery for quantum meruit and unjust enrichment, are **DISMISSED**.

### VI.    Conclusion

For these reasons, the court **DENIES** Fluor's motion to dismiss, ECF No. 30, **GRANTS** BAE's motion to strike, ECF No. 36, and **GRANTS in PART** and **DENIES IN PART** BAE's motion to dismiss, ECF No. 38.[8] Fluor may proceed with Count One of its counterclaim, alleging breach of the Subcontract. Counts Two and Three of Fluor's counterclaim, alleging quantum meruit and unjust enrichment, are dismissed.

Entered: March 30, 2022

Michael F. Urbanski
Chief U.S. District Judge
2022.03.30 14:20:43
-04'00'

Michael F. Urbanski
Chief U.S. District Judge

---

[8] The court believes its decisions on the motions to dismiss and motion to strike narrow the remaining issues and obviate the concerns in BAE's Motion to Bifurcate, ECF No. 63, which is **DENIED**.