**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Roanoke Division**

| | |
|---|---|
| **BAE SYSTEMS ORDNANCE SYSTEMS, INC.** | ) |
| **Plaintiff,** | ) **Civil Action No. 7:20-CV-00587-MFU-RSB** |
| **v.** | ) |
| **FLUOR FEDERAL SOLUTIONS, LLC** | ) |
| **Defendant.** | ) |

**FLUOR FEDERAL SOLUTIONS, LLC'S REPLY IN SUPPORT OF ITS**
**MOTION FOR RECONSIDERATION AND FOR CLARIFICATION**

For purposes of a Motion to Strike, the Court was required to accept Fluor's allegations as true and construe the facts in the light most favorable to Fluor. Instead, the Court relied on allegations in *BAE's* Complaint—allegations that Fluor denied and thus should not have been treated as true. This alone requires reconsideration. In addition, BAE's Opposition offers no sound answers to the other grounds in Fluor's motion. As discussed below, each of these additional grounds warrants reconsideration.

With regard to the Court's interpretation of VA. Code Ann. § 11-4.1:1, a question of first impression and the first substantive decision interpreting a newly effective statute, BAE invokes inapplicable regulations cited nowhere in the UCA contract. BAE also tries to brush aside the Court's departure from the statutory language and its reliance on facts not in evidence. BAE then asserts that the entire UCA contract was "expressly incorporated" into the Parties' Subcontract. ECF 98 at 9. BAE even calls the UCA contract a "contract document." Yet, BAE fails to explain how the UCA contract is at all in harmony with the separate Subcontract agreement when the UCA contract contains its own "Terms and Conditions," including its own Limitation of Liability clause. For this reason, BAE's

attempt to assert that the Subcontract was somehow an extension of the UCA contract fails in its entirety.

Contrary to BAE's claim, the Court's findings regarding the Subcontract's Limitation on Damages provisions ("LOD") did not harmonize all of the Subcontract's provisions. As Fluor explained, the Court did not address how the Subcontract's Changes clause, Section 1A.3(j), which allows BAE to specifically limit its liability for changes in the scope of work, comports with the LOD provisions. Nor did the Court address Section 1.A.3(a), which requires Fluor to continue performing in light of a dispute. In fact, BAE presented this Court with an interpretation of Section 3(a) that **fully and completely** contradicted BAE's position during the Project. Section 3(a) requires Fluor to continue performing the Project during a dispute, and BAE invoked this provision, instructing Fluor that "If Fluor believes the work is outside the scope of the Subcontract, Fluor is still required to proceed with the work and may not stop." ECF 97-3, at 3. Yet during oral argument, BAE changed tack and espoused an entirely different interpretation wholly at odds with its position during the course of contract performance, asserting that Fluor should have performed out of scope work up to $30 million "and no more." Neither BAE nor this Court harmonized Section 3(a) with the other Subcontract terms.

Finally, BAE cannot deny that the Court relied on extrinsic evidence from BAE's briefing on the Motion to Strike. But for that reliance, which is inconsistent with the standard applicable to a Motion to Strike, key findings within the Court's March 30 decision related to the LOD provisions would be unsupported. Yet BAE disputes Fluor's right to adduce corrective evidence. Blocking that evidence would be manifestly inequitable.

For these reasons, and those set forth more fully below, the Court should grant Fluor's Motion and reconsider its factual and legal findings related to the Subcontract's LOD provisions and the application of VA. Code Ann. § 11-4.1:1 to this case.

# ARGUMENT

## I. BAE'S ARGUMENTS REGARDING THE LEGAL EFFECT OF THE UCA CONTRACT LACK MERIT

As set forth in Fluor's Motion, reconsideration of the Court's interpretation of Va. Code Ann. § 11-4.1:1 ("the Statute") is warranted. That Statute invalidates prospective waivers of claims for "demonstrated additional costs." In this case, the Court improperly relied on BAE's pleadings to support its conclusion that Fluor performed work under the Subcontract before the Subcontract was executed, thereby forfeiting the protections afforded by the Statute. The Court also erred in finding that an exception applied where work was performed on "the Project" rather than "the Contract."

BAE errantly asserts that the entire UCA contract was "expressly incorporated" into the Subcontract. In fact, BAE argues that the UCA contract was a "contract document." ECF 98 at 10. BAE offers no support for this argument, which ignores not only the fact that the UCA contract has its own terms and conditions and its own limitation of liability provision, but also that the "Subcontract" expressly supersedes the UCA contract. The truth is thus much simpler than BAE contends. The UCA contract and the Subcontract are separate legal documents, and the work performed by Fluor before Subcontract execution was performed under the UCA, not the Subcontract.

### A. BAE's Arguments as to the Legal Effect of the UCA Contract are Erroneous and Unsupported

BAE argues that the work Fluor performed under the UCA contract forfeited the protections afforded under the Virginia Statute because the UCA contract was "expressly incorporated" into the Subcontract. BAE cites no language that supports this argument—nor could it. There is none. The Subcontract incorporated only "**the funding** provided by the UCA and subsequent modifications." ECF 1-2 at 5 (Emphasis added). Nowhere does the Subcontract state that the UCA contract work was performed under the Subcontract. Again, the UCA contract states plainly that the Parties' Subcontract "will supersede this UCA contract **in its entirety**. . . ." ECF 1-4 at 1. BAE fails to explain

how the Parties' Subcontract could simultaneously incorporate the UCA contract and supersede it in its entirety.

BAE's assertion that the UCA contract constitutes a "Contract Document" under the Parties' separate Subcontract also injects further ambiguity into the Subcontract terms. The UCA contract contains distinct and independent terms and conditions, including a limitation of liability clause. ECF 1-4 at 7. BAE's argument that the UCA contract is somehow fully incorporated into the Subcontract necessarily implies that the Parties intended their dealings to be governed by two conflicting sets of terms and conditions and four limitations of liability provisions. That simply makes no sense—and as courts have recognized, "Common sense is as much a part of contract interpretation as is the dictionary or the arsenal of canons." Mount Aldie, LLC v. Land Trust of Va., Inc., 796 S.E.2d 549, 555 (Va. 2017) ("Our presumption is always that the parties 'were trying to accomplish something rational."). See also Aggarao v. MOL Ship Mgmt. Co., 675 F.3d 355, 368 (4th Cir. 2012) (the "prime interpretive dictate[] regarding judicial review" of contracts is for "all contractual provisions be read to make sense"); Dairy Energy, Inc. v. Hartford Steam Boiler Inspection & Ins. Co., No. 20cv68, 2021 WL 4620905, at *4 (W.D. Va. Oct. 7, 2021) ("court[s] should allow common sense as well as canons of construction to guide its interpretation of a provision"). Indeed, given that the UCA terminated on December 3, 2015, two weeks before the Subcontract was signed, wholesale incorporation of a terminated contract, including that contract's termination provisions, is a logical and legal impossibility.

Moreover, BAE's assertion that the Subcontract incorporated the entirety of the UCA contract by reference fails. In Virginia, incorporation by reference requires clear, unambiguous, and specific terms. World Fuel Servs. Trading, DMCC v. Hebei Prince Shipping Co., 783 F.3d 507, 519 (4th Cir. 2015). See also Power Paragon, Inc. v. Precision Tech. USA, Inc., No. CIV. A. 7:08CV00542, 2009 WL 700169, at *10 (W.D. Va. Mar. 17, 2009). Here, the Subcontract terms explicitly limit any

incorporation of the UCA contract solely to "funding." Hence, BAE's assertion that the entire UCA contract was incorporated into the Parties' separate Subcontract agreement fails.

Finally, BAE's reference to a U.S. Department of Veterans Affairs Regulation (VAAR), 48 C.F.R. § 817.7003, is misplaced, as is its reference to the Department of Defense Regulations Supplement (DFARS), 48 C.F.R. § 217.7403. The NC Facility is not a VA Project, and neither the specific VAAR nor the DFARS regulations cited by BAE are incorporated into the UCA contract or the Subcontract. Nor does the law impose these regulations on the UCA contract because they do not apply of their own accord to contracts between private parties. See 48 C.F.R. § 201.104 (DFARS applies to contracts made "by DoD contracting activities.").

In fact, the UCA contract between BAE and Fluor operated in a fundamentally different manner than UCA contracts issued under the VAAR and DFARS. A UCA contract under the VAAR/DFARS is subject to unilateral definitization by the Government. Such unilateral definitization could not occur under the Parties' UCA contract here. Instead, the UCA contract anticipated the Parties negotiating and executing a separate Subcontract agreement. Article IV of the UCA contract stated plainly that the UCA would automatically terminate in the event that the Parties did not execute a separate definitive agreement. Here, the UCA contract also had its own performance period, and it expired before the Parties executed the Subcontract. The UCA contract was also "superseded in its entirety" by the Subcontract. Injecting these irrelevant federal regulations into the Parties' contracts serves only to create confusion where no confusion exists – the UCA contract was a separate agreement from the Parties Subcontract, and all work performed by Fluor was performed before Subcontract execution was performed under the UCA.

**B. Erroneous Findings Related to the UCA Contract Caused the Court to Invoke an Inapplicable Statutory Exception**

BAE fares no better in seeking to address the Court's decision to make factual findings based on allegations raised only by BAE. In particular, BAE argues that the Court's reliance on the allegation

that Fluor "began construction on the Project and completed approximately $32 million of work" under the UCA contract ( ECF 94 at 29) is of no moment because Fluor admitted in its Counterclaim that it provided labor, services, or material before executing the Subcontract. But Fluor admitted no such thing. In fact, Fluor specifically alleged that any work preceding Subcontract execution was performed under the UCA contract, not the Subcontract. Fluor's allegation is consistent with the terms of the UCA, which state that Fluor would "***commence work under this UCA***." ECF 1-4 at 1 (emphasis added). BAE also asserts that Fluor's statement in Paragraph 89 of its Counterclaim presents "legal conclusions." But whether Fluor performed work under the UCA is a question of fact, and Fluor alleged that it performed work under the UCA. Thus, the Court's findings are based on allegations that are disputed by Fluor.

Finally, BAE defends the Court's reading of the Statute as including any work performed on the "Project," rather than "the Contract." But as Fluor explained, the Statute never mentions the word "Project"; it speaks only of work performed in advance of a waiver set forth in "a contract." BAE cites to the definition of "Project" in the Parties' Subcontract to back into its position that the UCA contract was somehow wholly incorporated into the Subcontract agreement. Such an interpretation, however, is unsupported by the Subcontract terms, which state clearly that only funding from the UCA contract was incorporated – not any work, terms, conditions, or other aspects of the UCA. Hence, BAE's attempt to evade the Statute's use of the term "contract" fails.

## II. THE COURT'S INTERPRETATION OF THE LOD PROVISIONS IS INCOMPLETE AND CONTRARY TO PRINCIPLES OF CONTRACT INTERPRETATION

BAE's defense of the Court's findings and conclusions interpreting the Subcontract's LOD provisions is flawed for several reasons.

First, the Court erroneously applied an inapposite canon of construction to override one version of the LOD provision, specifically Section 46, which does not contain the term "including all

changes." In doing so, the Court did not consider that the Parties fully negotiated Section 46 and changed the terms in that section specifically for the NC Facility Project. As set forth in Fluor's Motion, and admitted by BAE in its Opposition, the Parties negotiated Section 46 for the NC Facility Project and agreed to **delete** the term "including all changes."

Next, while the Court found that no ambiguity existed among the three versions of the LOD provisions (despite one version not containing the term "including all changes") the Court did not address or resolve ambiguities within the LOD provisions. Specifically, the Court did not address or consider whether the term "including all changes" refers to changes to Fluor's scope of work or simply to changes in the "value" limitation. The Court's interpretation of "including all changes," which relied upon extrinsic evidence submitted by BAE, also does not harmonize the Changes clause set forth in Subcontract Exh. A, § 1(A)(3)(j) ("the Changes Clause"), which "otherwise provides" a limitation on Subcontract changes that is unaffected by the LOD provision. Nothing in BAE's Opposition to Fluor's Motion for Reconsideration remedies these issues.

**A. The Court Did Not Address All Ambiguities Surrounding the LOD Provisions**

BAE's Opposition does nothing to justify the Court's reliance on BAE's Complaint to find facts relevant to its decision. See ECF 94 at 29 (citing to BAE's Complaint to assert that BAE spent $32 million under the UCA contract). In its opinion, the Court addressed only one ambiguity of the Subcontract's LOD provisions – i.e. the missing language of "including all changes" in § 46 – and it did so by applying the canon that specific provisions within a contract override general ones ("the Specificity Canon").

But that canon simply does not apply to the LOD provisions. That canon of construction exists to reconcile a general contractual provision that indirectly address a topic with a more specific provision which directly addresses that topic. See Davis v. Randolph Williams at Goose Creek, LLC, 106 Va. Cir. 477, 2020 WL 10316567 at*6 (2020) (construction of the Sales Contract rejected where

it improperly allowed two general provisions only indirectly related, if at all, to the disputed issue to control over the single specific provision in the Sales Contract that directly addresses that subject); Condo. Servs., Inc. v. First Owners' Ass'n of Forty Six Hundred Condo., Inc., 281 Va. 561, 573, 709 S.E.2d 163, 170 (2011) (Management Agreement's specific termination provision overrides reference to condominium's "Bylaws" which generally referred to employment terms and conditions to be established by a Board of Directors); Asphalt Roads & Materials Co. v. Commonwealth, Dep't of Transp., 257 Va. 452, 456 (1999) (differing site conditions clause addressed exact scenario presented by contractor, and governed over more general Measurement and Payment clauses stating that excavating and backfilling were included in the scope of work).

Here, all three LOD provisions address the same topic. Each seeks to impose a cap on recoverable damages for certain types of claims. The provisions contain the same discussion of cumulative remedies, consequential damages, and the amount of the limitation. In fact, the LOD provisions are identical but for a few words surrounding the value of the limitation. Thus, none of the LOD provisions is inherently more specific than any other so as to justify application of the Specificity Canon.[1]

### 1. The Parties Revised Section 46 Specifically for the NC Facility Project

The Court found that § 46 was a standard term "buried" in the Subcontract while Sections 2.21 and Appendix J were specific to the NC Facility Project. ECF 94 at 26. Yet, BAE's own detailed description of the Parties' negotiation of § 46 - during which the Parties explicitly agreed to **delete** the term "including all changes" - reveals that § 46 was anything but a standard term and condition. See

[1] BAE offers no reason for why the Specificity Canon would not prioritize Subsection (j) of the Subcontract's Changes Clause over the LOD provisions. Subsection (j) specifically addresses how BAE was empowered to limit its liability to Fluor for changes made to the Subcontract's scope of work. Contrarily, the LOD provisions announce a general damage cap to be applied "except as otherwise provided." Nevertheless, this Court found that nothing in the Changes provisions provides any basis for an exception to the $30 Million cap. ECF 94 at 28.

ECF 98 at 16-18. BAE's description of the Parties' negotiation acknowledges that § 46 initially limited liability to "the Subcontract price for the goods or services to be provided by Subcontractor, 'Subcontract Price' being defined as the cumulative value of Subcontract including all changes."[2] The final version, as set forth in the Subcontract, states only that the "liability for damages arising under or related to this Subcontract shall be limited to $30,000,000." ECF 1-2 at 42.

BAE also acknowledges that on December 11, 2015, during negotiations, Ms. Lewis sent a version of the LOD provision that contained the term "including all changes" (Section 2.21) while also providing a LOD provision that clearly **deleted** the term "including all changes" (Section 46). To clarify this obvious disparity, BAE argues that "the only conceivable interpretation" is that Fluor intended the terms of Section 46 to read the same as Section 2.21, i.e. to "include all changes." ECF 98 at 18. [3] Yet, the documents provide no such clarity. Rather, the only clear fact is that Fluor sent BAE a document deleting the term "including all change" from Section 46. Hence, Fluor revealed its intent to delete the term from the Subcontract, and the Parties agreed to delete the term. Notably, Ms. Lewis's December 11 revisions - which removed the term "including all changes" - was sent to BAE **after** her December 7, 2015 e-mail that was submitted by BAE and referenced by the Court in its decision.

BAE also asserts that Fluor agreed to a "hard cap of $30 million" in § 46. ECF 98 at 18. But whether a cap on some category of damages exists in the Subcontract is immaterial. The subject at issue in this case is whether the LOD provisions can be read in harmony, and whether Fluor intended

[2] The language initially set forth in Paragraph 46 stating "the cumulative value of the Subcontract including all changes" reflects the reasonable interpretation of Sections 2.21 and Appendix J Section 36 that the term "including all changes" is intended to increase the value of the $30 Million limitation by the value of any changes caused or directed by BAE.

[3]BAE accuses Fluor of withholding attachments to Ms. Lewis's e-mail and "comment bubbles" that state "$30 M." Fluor did not intentionally hide any comment or document. No dispute exists that § 2.21 contains the terms "including all changes", and the comment bubbles BAE references did not appear in the PDF version of the document that Fluor scanned for its attachment. Fluor also does not dispute that the Parties negotiated the term "$30,000,000" in § 46. In fact, $30 Million is set forth in the final version of § 46. What is clearly evident from the Parties' negotiations, however, is that **both parties** agreed to delete the term "including all changes" from § 46.

to limit BAE's liability for damages arising from "changes" to the Contract's scope of work. Contrary to the Court's finding, the parol evidence reveals that Section 46 is not a form term buried in the Subcontract. Instead, as BAE admits in its Opposition brief, Section 46 was negotiated specifically by the Parties for the NC Facility Project, and the Parties agreed to delete the term "including all changes." Nothing in BAE's Opposition disputes this fact, and nothing in the Subcontract renders the other LOD provisions superior to Section 46.

**2. The Court's Decision Does Not Harmonize the Subcontract's Change Clause**

Regarding the Subcontract's Changes clause, BAE seeks to read the clause out of the Subcontract almost entirely. Subcontract Exhibit A, § 1(A)(3)(j) states that BAE may "solicit from [Fluor] written agreement as to the maximum (in the case of an increase) or minimum (in the case of a decrease) adjustment to be made in the price and/or in the schedule (or time of performance), by reason of the change." The clause provides that Fluor must then submit "a 'not-to-exceed' (or 'no-less-than') amount or maximum (or minimum) schedule adjustment" which would bind the Parties as they proceeded to negotiate the change. The clause explicitly provided that "**except with respect to such limitations**, nothing contained herein shall affect the right of the Parties to an equitable adjustment by reason of the change, pursuant to this clause." Id. The Changes Clause unambiguously provides that no other clause contained within the Subcontract limits Fluor's ability to recover for changes to the Subcontract's scope of work. Notably, BAE never invoked this clause on the Project to limit its liability for scope changes, and now seeks to read it out of the Subcontract entirely.

BAE argues that the Changes Clause "cannot, under principles of contract construction, apply to the LOD." ECF 98, at 13. That assertion ignores the "except as otherwise provided" language within the LOD, which recognizes (and demands) interplay between the LOD provisions and other clauses that "otherwise provide[]" for an exception or a contrary limitation on damages, such as the one explicitly set forth in Subcontract Exh. A, § 1(A)(3)(j).

BAE claims that it would be illogical for the LOD provision to announce a cap that included "all changes" if the Changes Clause simultaneously allowed changes to exceed that cap. But it is BAE's interpretation that creates that paradox, not Fluor's. Fluor submits that "including all changes" does not refer to changes to the scope of the Subcontract that are compensable under the Changes clause. Instead, when the LOD provision states that damages are limited to "$30M, $30M being defined as the value including all changes," the word "changes" refers to subsequent changes that might be made to "the value" of the LOD. Under Fluor's interpretation, and only Fluor's interpretation, no conflict exists with the Changes clause.

Finally, BAE argues that the last words of Subsection (j) ("pursuant to this clause") reference only Subsection (j) and not the entire Changes clause. See ECF 98 at 15. Such an interpretation asks this Court to read Subsection (j) without reference to any other Subcontract terms, even though the "clause" referred to in the last sentence of Section (j) is the entire "Contract Direction/Changes" clause. The Changes clause, in its entirety, articulates the Parties' rights related to equitable adjustments to the Subcontract. Subsection (j) states clearly that, "except with the respect to such limitation" (i.e. a limitation to which BAE and Fluor mutually agree), nothing shall affect Fluor's right to an equitable adjustment pursuant to the Changes clause. BAE's attempt to treat Subsection (j) as a standalone provision unrelated to the complete Changes clause violates basic tenants of contract interpretation. Hence, the LOD provisions cannot and do not limit Fluor's right to an equitable adjustment.

### B. Documents Provided in Fluor's Motion Support the Propositions for Which They Were Proffered

Where a contract is unambiguous, extrinsic evidence may not be considered. Here, however, the Court has either: (1) considered BAE's extrinsic evidence after concluding that the Subcontract was unambiguous, or (2) acknowledged an ambiguity requiring reference to parol evidence, but considered evidence submitted only by BAE. Neither approach is proper and both justify reconsideration.

If the Court finds ambiguity within the LOD provisions, it must consider *both* Parties' extrinsic evidence of intent, including pre-contract negotiations and course of dealing. Such evidence should be presented to the Court after complete discovery, rather than the piecemeal fashion urged by BAE. Even without a finding of ambiguity, the Court may consider the documents Fluor attached to its Motion for Reconsideration. This is because those documents were offered for other, permissible purposes – specifically to reveal that the Court's findings were not supported by the facts that arose during the Project.[4]

First, Fluor introduced some of the Parties' pre-contract negotiations to address the Court's mistaken finding that § 46 was a "form term" unrelated to the NC Facility Project. ECF 94 at 26. The Court made that finding without reference to any document or fact in the record, and Fluor's Exhibits A and B establish that § 46 was negotiated extensively, and apparently more than the other versions of the LOD. See ECF Nos 97-2 and 97-3.

Next, Fluor introduced a letter BAE sent during the Project on August 20, 2017 in which BAE asserted that stopping work was not authorized under the Subcontract. ECF 97-3. In fact, BAE directed Fluor to continue performing even if work was out of scope. This letter addresses the precise issue now before this Court. In the letter, BAE describes how Fluor had stopped a particular aspect of the Project because "**BAE did not concur that the requirement was a changed condition**." ECF 97-3 at 3 (emphasis added). BAE instructed Fluor that it could not stop working, regardless of whether the work constituted a change to the Subcontract scope. BAE stated "Whether the work is within our outside the scope of the Subcontract, Fluor is required to proceed with the performance

[4] Fluor's interpretation of the LOD does not rely upon extrinsic evidence. In fact, BAE is the only party that resorted to extrinsic evidence to interpret the LOD. BAE, not Fluor, provided the Court an out-of-context email exchange for the purpose of interpreting the language of the Subcontract. The Court then relied upon that document and cited to it in rendering its decision on BAE's Motion to Strike.

of the Subcontract. **If Fluor believes the work is outside the scope of the Subcontract, Fluor is still required to proceed with the work, and may not stop work."** Id. (emphasis added).

BAE fails entirely to address the substance of this communication. The reason is clear – BAE argued before this Court an interpretation of the Subcontract that fully contradicts the position that BAE took during the Project. In fact, BAE argues that its own letter should be afforded "no weight" and that it cannot affect the Court's decision. See ECF 98 at 2 and 19. However, this document was introduced to rebut the newly created argument advanced by BAE: that Fluor's sole remedy for damages exceeding $30M for changes was to abandon the Project. Jan. 14, 2022 Tr. 36:19–25, 37:1–6.

In its decision granting BAE's Motion to Strike, this Court did not address Section 3(a) of the Changes clause, which requires Fluor to continue performing even in the face of a dispute. It was this Section that BAE specifically invoked in its August 20, 2017 letter. When Section 3(a) is read in context with the LOD clauses, as interpreted by the Court, the Subcontract terms cannot be harmonized. Fluor cannot on the one hand be required to continue performing changes to the scope of work at BAE's direction while at the same time be limited to recovering only $30 million for such work. The two provisions are simply irreconcilable, create ambiguity in the Subcontract, and precludes the Court from ruling as a matter of law that Fluor is barred from recovering anything above $30 million.

Contrary to BAE's assertion, the Supreme Court of Virginia has recognized that "**if a written instrument may have two interpretations, the courts, in endeavoring to determine the intention of the parties will follow the one which they put upon it by their own actions**." Bentley Funding Grp., L.L.C. v. SK & R Grp., L.L.C., 269 Va. 315, 332, 609 S.E.2d 49, 57 (2005). In this case, BAE made its interpretation of Section 3(a) clear during the Project – BAE believed that Fluor must continue performing work, even if that work is outside the scope of the Subcontract. When litigation arose, BAE changed its interpretation and asserted that Fluor could stop work once it reached $30

million in damages. The Court should not countenance BAE's after-the-fact disavowal of its own words and conduct – to do so would result in an outcome that is manifestly unfair to Fluor.

## III. THE PARTIES REQUIRE CLARIFICATION TO EFFICIENTLY PURSUE DISCOVERY

Fluor's Counterclaim comprises numerous distinct constructive and directed changes, the cumulative value of which adds up to more than $183 million. While the Court's March 30 decision struck "Fluor's counterclaim for damages in excess of $30 million" (ECF 94 at 31), it remains unclear which, if any, specific allegations are struck.

BAE maintains that issues arising from this lack of clarity can be addressed as part of any discovery dispute that may arise. Fluor's request for clarification, however, is not simply about discovery; it involves Fluor's substantive right to present Fluor's claims and damages at trial. Fluor asks that the Court confirm whether: (1) Fluor will be authorized to pursue discovery - and present at trial – all of Fluor's claims (including damages), or (2) the Court's March 30 decision striking certain damages purports to impose a cap on the claims or damages Fluor can present at trial.

Even if this were a discovery issue only, no good reason exists to delay the clarification requested by Fluor. BAE has already signaled to this Court its intention to evade Fluor's future discovery requests on the alleged basis that Fluor's damages are ultimately inadmissible at trial. Promptly clarifying the scope of the Court's ruling on the Motion to Strike benefits both parties, and the Court, by avoiding unnecessary discovery disputes (and the delay associated with them) and assisting the Parties in preparing for trial.

## CONCLUSION

For the reasons set forth above, and those set forth in Fluor's Motion, Fluor respectfully requests that the Court grant Fluor's Motion for Reconsideration and for Clarification, reconsider its findings, and deny BAE's Motion to Strike.

Respectfully submitted,

s/ Scott P. Fitzsimmons

Scott P. Fitzsimmons (VSB 68147)
Kathleen O. Barnes (VSB 30451)
Edward J. Parrott (VSB 29499)
Sarah K. Bloom (VSB 94406)
Gregory M. Wagner (VSB 96017)
WATT, TIEDER, HOFFAR
& FITZGERALD, LLP
1765 Greensboro Station Place, Suite 1000
McLean, Virginia 22102
Tel: (703) 749-1000
Fax: (703) 893-8029
sfitzsimmons@watttieder.com
kbarnes@watttieder.com
eparrott@watttieder.com
sbloom@watttieder.com
gwagner@watttieder.com

*Attorneys for Fluor Federal Solutions, LLC*

Dated: May 5, 2022

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 5th day of May, 2022, a copy of the foregoing was delivered via the CM/ECF system to the following:

Todd M. Conley (VSB 89839)
Jeffrey J. Golimowski (VSB 93525)
WOMBLE BOND DICKINSON (US) LLP
8350 Broad Street, Suite 1500
Tysons, Virginia 22102
Tel: (703) 394-2275
Fax: (703) 790-2623
todd.conley@wbd-us.com
jeff.golimowski@wbd-us.com

D. Stan Barnhill (VSB 22978)
Joshua R. Treece (VSB 79149)
Justin E. Simmons (VSB 77319)
WOODS ROGERS PLC
10 South Jefferson Street, Suite 1400
Roanoke, Virginia 24011
Tel: (540) 983-7600
Fax: (540) 983-7711
barnhill@woodsrogers.com
jtreece@woodsrogers.com
jsimmons@woodsrogers.com

Karen M. Stemland (VSB 47167)
WOODS ROGERS PLC
123 East Main Street, 5th Floor
Charlottesville, Virginia 22902
Tel: (434) 220-6826
Fax: (434) 566-0473
kstemland@woodsrogers.com

*Attorneys for BAE Systems Ordnance Systems, Inc.*

Respectfully submitted,

s/ Scott P. Fitzsimmons
Scott P. Fitzsimmons (VSB 68147)
WATT, TIEDER, HOFFAR
& FITZGERALD, LLP
1765 Greensboro Station Place, Suite 1000
McLean, Virginia 22102

Tel: (703) 749-1000
Fax: (703) 893-8029
sfitzsimmons@watttieder.com

*Attorneys for Fluor Federal Solutions, LLC*