IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| **BAE SYSTEMS ORDNANCE SYSTEMS, INC.,** | ) ) ) |
| Plaintiff, | ) ) Civil Action No.: 7:20-cv-587 |
| v. | ) ) ) |
| **FLUOR FEDERAL SOLUTIONS, LLC,** | ) By: Hon. Robert S. Ballou ) United States District Judge |
| Defendant. | ) ) ) |

## MEMORANDUM OPINION

BAE Systems Ordnance Systems, Inc. ("BAE") initiated this suit against Fluor Federal Solutions, LLC ("Fluor") alleging breach of contract relating to the design and construction of a nitrocellulose production facility for the United States Army. Fluor counterclaimed for breach of contract or, in the alternative, *quantum meruit* or unjust enrichment. The contract for the design and construction of the facility (the "Subcontract") contained three limitation of damages clauses which purport to limit the recovery of damages to $30 million. BAE moves the Court to hold that the limitation on damages clause in the contract limits Fluor's claims for all Proposed Change Notices ("PCNs") and other alleged damages to $30 million. Fluor seeks a ruling granting summary judgment that (1) the Subcontract's limitation on damages provisions in the contract do not limit Fluor's recovery for costs incurred performing BAE-caused changes on the project, and (2) the Subcontract's limitation on damages provisions are unenforceable to limit recovery through the Contract Direction/Changes clause ("Changes Clause") of the Subcontract as a matter of law under Virginia Code § 11-4.1:1.

I find that these clauses exclude from their scope any claim which may arise under the

changes clause of the Subcontract, and also that § 11-4.1:1 of the Virginia Code renders the limitation of damages clause null and void to the extent that it limits Fluor's ability to recover for costs arising under the Changes Clause of the Subcontract. Accordingly, I **DENY** BAE's Motion for Partial Summary Judgment and **GRANT** Fluor's Motions for Partial Summary Judgment.

I. **Factual Background**[1]

BAE manages an ammunition plant for the United States Army in Radford, Virginia commonly known as the Radford Arsenal. In January 2012, the Army awarded BAE a contract to design and build a new nitrocellulose production facility ("NC Facility") at the Radford Arsenal which includes (1) a cutter warehouse; (2) an acid tank farm; (3) a nitration building; (4) a stabilization building; (5) a dewater and packout building; and (6) an administrative and laboratory building.

On February 8, 2012, BAE entered into two subcontracts with Lauren Engineers and Constructor's, Inc. ("Lauren") for the design and construction of the NC Facility. That relationship, however, soured in the following years because of delays and cost overruns causing BAE to terminate both Lauren subcontracts for convenience on January 28, 2015. BAE and Lauren ultimately resolved their differences in an arbitration proceeding in which Lauren sought payment for work performed. BAE brought a counterclaim against Lauren contending that the design work was "wholly without value" and so defective that it amounted to fraud. The arbitration resolved by settlement.

BAE immediately began the process of replacing Lauren as a design/builder for the new NC Facility, and on April 16, 2015, hosted an Industry Day for potential bidders. The BAE

---

[1] The parties sharply dispute many of the facts central to the formation, interpretation, and performance of the contract between BAE and Flour at issue in this case. Both sides have submitted exhaustive statements of facts which each contends are undisputed. Yet, each side has filed detailed counterstatements disputing at length the other's claimed undisputed facts.

presentation at Industry Day provided attendees information about the project and the bidding process to allow them to analyze and assess the scope and nature of the project in advance of submitting proposals. Relevant to this case, BAE toldthose present that it had "obtained native design format design files from [Lauren] that provide an estimated 85% design solution with some areas requiring additional engineering. . ." and listing those areas requiring additional engineering. BAE also advised potential bidders that the required design work for the project included "[v]alidation of the existing design (estimated at 85%)" and "[c]ompletion of design and validation of mechanical performance."

BAE provided Fluor the Lauren Design documents to use in development of its bid. During the ensuing six months, from June 2015–December 2015, as Fluor put together its bid proposal, BAE regularly updated the Lauren documents with redlines and corrections.

In July 2015, Fluor entered into a Teaming Agreement with Burns & McDonnell for design, engineering support, and construction administration services in support of a potential subcontract between BAE and Fluor. Burns & McDonnell agreed to become the Designer of Record for the project and assume design responsibility under the prospective subcontract between BAE and Fluor. Burns & McDonnell reviewed the Lauren Design and SmartPlant 3D model for approximately four weeks and submitted a proposal to Fluor to validate and complete the Lauren Design for $31.3 million. That same day, Fluor submitted its first proposal to BAE for $306.5 million (inclusive of the Burns & McDonnell proposal) to validate and complete the Lauren Design and to construct the NC Facility.

BAE rejected Fluor's proposal stating, in part, that the Burns & McDonnell design price, was too high. On August 31, 2015, Kelly Bate, BAE's subcontracts manager emailed Fluor, "I'm concerned that the design portion of your proposal is really far out of whack with our

expectations. As a reference point, the entire original design was around $15M, and that should be about 80-90% complete . . . can we chat tomorrow about your approach to that portion of the proposal?"

Burns & McDonnell submitted a second proposal for design of the project on September 2, 2015, lowering its costs to $29.5 million. Two days later, Fluor submitted to BAE a revised price proposal for the whole project of $276.9 million, incorporating the reduced Burns & McDonnell design price and other cost reduction adjustments. Again, BAE rejected this proposal because of cost.

On September 24, 2015, Burns & McDonnell submitted its final proposal of $24.5 million for design services which Fluor incorporated into a revised bid of $216.2 million for the design and construction of the NC Facility. Alas, BAE again rejected this proposal because, in BAE's estimation, Burns & McDonnell did not give sufficient credit to the existing Lauren design, and "wanted to do more than what [BAE] thought was necessary to complete the design." Fluor then dropped Burns & McDonnell as the designer and turned to Woods Group Mustang ("WGM") to perform the design work for the NC Facility.

In October 2015, Fluor and BAE entered into a preliminary agreement referred to as an Undefintized Contract Action ("UCA") which funded and authorized Fluor to begin limited work while the parties negotiated the final subcontract to design and build the NC Facility. The UCA "constitutes an agreement between the parties on the terms and conditions set forth herein and signifi[ng] the intention of the parties to execute a formal, definitive <u>Firm Fixed Price</u> type Agreement . . . ." (emphasis in original). The UCA further provided that "[p]ending execution of the definitive Agreement by the parties, [Fluor] is hereby authorized, and agrees to, commence work under this UCA, including the purchase of necessary materials, if required, starting <u>October

4

14, 2015." (emphasis in original). Finally, the UCA provided that "[t]he definitive Agreement bearing the same start date, will supersede this UCA in its entirety . . . ."

Fluor conducted work under the UCA for the next six weeks. During that time, the parties agreed to four modifications of the UCA to account for additional work, the purchase of specific materials, and to increase the limitation of the contract amount. The UCA also provided funding for WGM to perform 500 hours of discrete design tasks which began in November 2015 with deliverables scheduled in January 2016.

On December 17, 2015, BAE and Fluor entered into the definitized agreement contemplated under the UCA for the design and construction of the NC Facility (the "Subcontract"). This agreement integrated, merged, and superseded all prior agreements between the parties—including the UCA. The Subcontract "incorporate[d] funding provided by the UCA and subsequent modifications prior to definitizing the subcontract agreement for a firm fixed price of $245,690,422.00.[2] Under the Subcontract, Fluor was solely responsible for the design of the NC Facility, including preparing their own drawings "for design review submittals, construction, and Record Drawings." The Subcontract set a completion date of July 30, 2018.

The Subcontract includes three limitation on damages ("LOD") clauses which provide that "except as otherwise provided in the subcontract . . . damages and remedies . . . for all claims . . . shall be limited to $30M." Two of the LOD clauses define $30M as "the values including all changes and the maximum liability for damages." The third does not define $30M.

The Subcontract allows changes to the contract scope of work or time for completion under the Contract Direction/Changes clause ("Changes Clause") which prescribes, among other

---

[2] It is not clear how the parties arrived at a final contract price, but it appears that it consists of $198.9 million to design and build the facility, approximately $32 million authorized under the UCA, and approximately $14 million in anticipated contingencies.

5

things, the process by which BAE could direct changes to the scope of work or by which Fluor could submit proposed changes to BAE through PCNs. The Changes Clause requires BAE and Fluor to make an equitable adjustment in the contract price and/or the delivery schedule to accommodate project changes which increase or decrease the costs or time required for performance. The Changes Clause also specifies that while Fluor must perform BAE directed changes BAE is not responsible for Fluor requested changes that BAE does not approve in writing.

Early in the performance of the Subcontract, Fluor dismissed WGM as the designer of record. Fluor, at that time, undertook all design work on its own. Fluor did not achieve substantial completion of the NC Facility by July 2018. BAE and Fluor disagree on the reasons why project delays occurred, but ultimately, Fluor reached substantial completion in February 2021. Because of the project delays, however, BAE paid the Army both for continued maintenance of the vintage NC Facility and as an incentive for the Army not terminating its contract with BAE to manage the Radford Arsenal.

BAE brought this action to recover its costs, including its payments to the Army, caused by Fluor's delays in completing the NC Facility. Flour filed a counterclaim for the changes which Fluor claims BAE directed or which Fluor contends were incorporated into the work under the Subcontract and which BAE has refused to pay.

## II.     Summary Judgment Standard

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Once the movant properly makes and supports a motion for summary judgment, the opposing party must show that

a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In determining whether a genuine dispute of material fact exists, the Court views the facts in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255. However, the nonmoving party cannot defeat a properly supported motion for summary judgment with mere conjecture and speculation. *See Glover v. Oppleman*, 178 F. Supp. 2d 622, 631 (W.D. Va. 2001). On the contrary, the court has an "affirmative obligation" to "prevent 'factually unsupported claims and defenses' from proceeding to trial." *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Celotex*, 477 U.S. at 317). The moving party is entitled to summary judgment as a matter of law where, viewing the evidence and the inferences arising therefrom in favor of the nonmovant, there are no genuine issues of material fact in dispute. Fed. R. Civ. P. 56(c). When reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Anderson*, 477 U.S. at 254–57; *See v. Durang*, 711 F.2d 141 (9th Cir.1983).

    **III.**     **Analysis**

        **A. Scope of Damages Limitation**

The parties have filed cross-motions for summary judgment regarding whether the LOD clauses limit Fluor's claims for the PCNs which BAE has refused to pay. BAE argues that the Subcontract is unambiguous, that no parole evidence is permitted, and that the plain language of the LOD clauses limit Fluor's claim to a maximum of $30 million for all rejected PCNs. Flour contends that the absence of the specific language "including all changes" language in § 46 renders the Subcontract ambiguous, and that inclusion of the phrase "[e]xcept as otherwise provided in this Subcontract" in the LOD allows recovery for increased costs under the changes clause in excess of $30 million. Fluor also contends that the LOD clauses violate Virginia Code

7

§ 11-4.1:1 because they improperly diminish its right to recover demonstrated additional costs on the project and are therefore null and void. The cross motions are narrowly focused on Fluor's ability to collect for PCNs under the Changes Clause.

This is not the first time the parties have raised their dispute surrounding the LOD provisions to the Court. BAE previously filed a Motion to Strike Fluor's Counterclaim, in which they argued Fluor's alleged damages were capped by the LOD provisions. The Court[3] granted BAE's Motion holding that the LOD provision applied to all changes under the Subcontract. Dkt. 94, 95. However, the Court subsequently granted Fluor's Motion to Reconsider upon finding that evidence that § 46 had been specifically negotiated raised a question as to the proper interpretation of the LOD clauses. Dkt. 111. Accordingly, I review the parties dispute surrounding the LOD provisions anew.

The Subcontract has three limitation of damages clauses which expressly cap damages for "all claims" by either party "arising under or related to this Subcontract" at $30 million. This provision is set forth in three different sections of the Subcontract: § 2.21 of the Project Purchase Order's Supplemental Terms and Conditions ("§ 2.21"); § 36 of Appendix J to the Subcontract that outlines BAE's General Conditions for Subcontractors Performing Work at the Radford Army Ammunition Plant ("§ 36"), and § 46 in the General Provisions for Construction terms of the Subcontract ("§ 46").

The LOD provisions located in § 2.21 and § 36 are identical and read as follows:

> Except as otherwise provided in this Subcontract, in the event of either Party's failure to perform in accordance with this Subcontract, whether such failure is occasioned by the acts or omissions of either Party, its respective suppliers, or the BAE Parties, either Party may pursue any and all damages and remedies available under this Agreement and/or applicable law. Except as otherwise provided in this Subcontract, damages and remedies that may be recovered by either Party shall be limited as follows: For all claims, regardless of the basis on which the claim is

---
[3] The district judge handling the case at that time transferred the case to me on March 13, 2023. Dkt. 166.

> made, the applicable party's liability for damages arising under or related to this Subcontract shall be limited to $30M, ***$30M being defined as the value including all changes and the maximum liability for damages.*** Neither Party shall be liable for any indirect, special, incidental or consequential damages, including but not limited to lost profits or business interruption losses, whether arising under the contract, warranty, express or implied tort, including negligence, or strict liability, arising at any time from any cause whatsoever in connection with this Subcontract or performance hereunder, even if caused by the sole or concurrent or active or passive negligence, strict liability or other legal fault of either Parties, their members, directors, officers, employees, agents, representatives, parent companies, subsidiaries, affiliates, joint venture partners, successors and assigns, and each of their respective owners, partners, members, shareholders, directors, managers, officers, employees, agents, representatives and subcontractors at any tier.

(emphasis added). The LOD provision in § 46 is identical to the LOD clauses located in § 2.21 and § 36 except it does not include the emphasized language defining the scope of $30M—"30M being defined as the value including all changes and the maximum liability for damages."

Virginia adheres to the "'plain meaning' rule: [w]here an agreement is plain on its face, is plain and unambiguous in its terms, the court is not at liberty to search for its meaning beyond the instrument itself. . . . This is so because the writing is the repository of the final agreement of the parties." *Berry v. Klinger*, 225 Va. 201, 208, 300 S.E.2d 792, 796 (1983). "Words that the parties used are normally given their usual, ordinary, and popular meaning. No word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words needlessly." *City of Chesapeake v. States Self-Insurers Risk Retention Group, Inc.*, 271 Va. 574, 578, 628 S.E.2d 539, 541 (2006) (quoting *D.C. McClain, Inc. v. Arlington Cnty.*, 249 Va. 131, 135–36, 452 S.E.2d 659, 662 (1995)). The cardinal rule of contract interpretation is that the intent of the parties as expressed in the contract controls. *Bender–Miller Co. v. Thomwood Farms, Inc.*, 211 Va. 585, 588, 179 S.E.2d 636, 639 (1971) (citations omitted).

I agree that the Subcontract is unambiguous, and thus I interpret the plain language of the

9

agreement. In doing so, I follow the fundamental canon of contract construction that "a specific provision of a contract governs over one that is more general in nature." *Condominium Servs., Inc. v. First Owners' Ass'n of Forty Six Hundred Condominium, Inc.*, 281 Va. 561, 573, 709 S.E. 3d 163, 170 (2011); *see also Asphalt Roads & Materials Co. v. Commonwealth*, 257 Va. 452, 460, 512 S.E. 2d 804, 809 (1999) (Lacy, J., concurring) ("specific section of the contract overrides the more general contract provisions").

> The ordinary rule in respect to the construction of contracts is this: that where there are two clauses in any respect conflicting, that which is specially directed to a particular matter controls in respect thereto over one which is general in its terms, although within its general terms the particular may be included. Because, when the parties express themselves in reference to a particular matter, the attention is directed to that, and it must be assumed that it expresses their intent whereas a reference to some general matter, within which the particular may be included, does not necessarily indicate that the parties had the particular matter in thought.

*Mutual Life Ins. Co. v. Hill*, 193 U.S. 551, 558 (1904).

Here, all LOD provisions are limited by the phrase "[e]xcept as otherwise provided in this Subcontract." This language necessarily implies that there are exceptions to this general provision provided elsewhere in the Subcontract. *See Route Triple Seven Ltd. v. Total Hockey, Inc.*, 127 F. Supp. 3d 607, 617 (E.D. Va. 2015) (the use of "except as set forth herein" referred the court to a remedy elsewhere in the contract and that this language was intentional and enforceable). To hold otherwise "would render [the limiting language] meaningless." In particular, the Changes Clause provides the process by which BAE could direct changes to Fluor's scope of work and by which Fluor could submit a PCN to BAE if such a change caused an increase or decrease in the cost of or the time for performance of the Subcontract. Subcontract § I.1A.3.

The Changes Clause provides that BAE "may, at any time, exclusively by a written order signed by its procurement Representative, and without notice to sureties, if any, make changes

within the general scope of this contract" in any matter affecting the contract. *Id.* It further provides that "if any such change causes an increase or decrease in the cost of or the time required for performance of the contract, an equitable adjustment shall be made in the contract price, the delivery schedule, or both." *Id.* This clause leaves no room for ambiguity—if there is a change made by BAE within the general scope of the contract there *shall be* an *equitable adjustment*.

"[C]ontract language will not be treated as meaningless where it can be given reasonable meaning." *Ross v. Craw*, 231 Va. 206, 343 S.E. 2d 312, 317 (1986). "When two provisions of a contract seemingly conflict . . . they [should] be harmonized so as to effectuate the intention of the parties as expressed in the contract as a whole." *Plunkett v. Plunkett*, 271 Va. 162, 168, 624 S.E.2d 39, 42 (2006) (quoting *Ames v. American Nat'l Bank of Portsmouth*, 163 Va. 1, 39, 176 S.E. 204, 217 (1934). To interpret the LOD provisions as applying to the changes clause at § I.1A3(j) would render the "except as otherwise provided" language meaningless and eviscerate the requirement that the parties "shall" reach an equitable adjustment wherever the scope of work or time of performance was changed. The Changes Clause makes clear that "nothing contained herein shall effect the right of the Parties to an equitable adjustment by reason of the change, pursuant to this clause." Subcontract § I.1A.3(j) Additionally, the changes themselves are not damages, rather, as the Subcontract makes clear, they are an equitable adjustment made by modifying the Subcontract. § I.1A.3(i) makes clear that agreed changes are made part of the Subcontract. Subcontract § I.1A.3(i) ("[i]f any such change causes an increase or decrease in the cost of or the time required for performance of this contract, an equitable adjustment shall be made, in the contract price, the delivery schedule or both, and **the contract shall be modified in writing accordingly**.") (emphasis added). Where the parties do not agree, the Changes Clause at

11

§ I.1A.3(m) requires Fluor to perform the work directed by BAE. Fluor's remedy where the parties do not reach an equitable adjustment under the Changes Clause is to resort to a lawsuit under the Disputes clause (§ I.1B.19). For these reasons, I find that the LOD clauses specifically exempts from their limitation the recovery sought by Fluor under the Changes Clause.

### B. Va. Code Ann. § 11-4.1:1

Even if I were to hold that the LOD provisions applied to Fluor's claims for unpaid PCNs, the LOD clauses are null and void under Virginia Code § 1-4.1:1 to the extent BAE seeks to limit Fluor's ability to recover under the Changes Clause.

§ 11-4.1:1 provides in relevant part:

> A subcontractor . . . may not waive or diminish his right to assert payment bond claims or his right to assert claims for demonstrated additional costs in a contract in advance of furnishing any labor, services, or materials. A provision that waives or diminishes a subcontractor's . . . right to assert payment bond claims or his right to assert claims for demonstrated additional costs in a contract executed prior to providing any labor, services, or materials is null and void.

Va. Code Ann. § 11-4.1:1 (2023). It is undisputed that Fluor is a subcontractor as defined by the statute. Va. Code Ann. § 43-1 (2023). BAE seeks to enforce the LOD provisions to prospectively limit Fluor's ability to seek damages for changes in excess of $30 million for its refusal to pay Fluor's claimed PCNs.

The principal issue regarding the applicability of § 11-4.1:1 is whether Fluor provided "labor, services, or material" under the Subcontract prior to executing the Subcontract. BAE contends that Fluor's work under the UCA constitutes providing "labor, services, or material" before entering the Subcontract. No doubt, on October 14, 2015, Fluor and BAE entered into the UCA allowing Fluor to begin work on the NC Facility while the parties negotiated and finalized the Subcontract. Certainly, under the UCA, Fluor began design and construction on the NC

Facility and provided labor, services, and material up to $32 million under that contract. But working on the NC Facility under the UCA does not remove the LOD clauses from the ambit of § 11-4.1:1 The Subcontract incorporated the funding from the UCA, but the Subcontract gave authorization to Fluor to "initiate performance of the work" described in agreement. Thus, I find that Fluor did not provide labor, services, or material under the Subcontract prior to its execution, and thus § 11.4.1:1 applies.

### IV. Conclusion

Therefore, Fluor's Motion for Partial Summary Judgment that the Subcontract's LOD provisions do not limit Fluor's recovery for costs incurred performing BAE-caused changes on the NC Facility Project is **GRANTED** and Fluor's Motion for Summary Judgment that the LOD provisions are unenforceable to limit recovery for changes as a matter of Virginia Law is **GRANTED** to the extent the LOD clause seeks to limit Fluor's right to assert claims for demonstrated additional costs.

Accordingly, BAE's Motion that the LOD provisions limit Fluor's claims for all PCNs and other alleged damages to $30 million is **DENIED.**

Entered: January 31, 2024

*Robert S. Ballou*

Robert S. Ballou
United States District Judge