CLERKS OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

September, 17, 2025
LAURA A. AUSTIN, CLERK
BY:s/ KELLY BROWN
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| **BAE SYSTEMS ORDNANCE SYSTEMS, INC.,** | ) | |
| | ) | |
| | ) | **Civil Action No. 7:20-cv-587** |
| **Plaintiff/ Counterclaim Defendant,** | ) | |
| | ) | **By: Hon. Robert S. Ballou** |
| **v.** | ) | **United States District Judge** |
| | ) | |
| **FLUOR FEDERAL SOLUTIONS, LLC,** | ) | |
| | ) | |
| | ) | |
| **Defendant/ Counterclaim Plaintiff.** | ) | |

## MEMORANDUM OPINION
## OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Army maintains a nitrocellulose facility operated by BAE in Radford, Virginia. BAE contracted with the Army to design and build a new production plant and subcontracted that work with Fluor Federal Solutions in a firm-fixed-priced contract with a total cost of $245,690,422.00. Design delays, construction delays and scope and cost changes plagued the project from the start. Eventually, the project reached its substantial completion many years behind the original completion date and millions of dollars over the original contract price.

This lawsuit explored the reasons for those delays and cost increases over the course of a three-week trial, and like so many things, the fault lies with both BAE and Fluor. BAE seeks damages in excess of $19,000,000 for delays to the completion of the project, the abnormal maintenance costs to previous facility beyond the completion date, and consequential damages paid to the Army because of delay to the completion and operation of the new facility. Fluor's five-count counterclaim seeks $179,181,683 in damages because of the deficiencies in the design

it inherited from BAE's previous contractor, changes to the scope of work, delays caused by BAE and cost increases it claims were the fault of BAE or beyond its control.

At the heart of the dispute lies a firm-fixed-priced contract which allocated the risks of construction delays and cost increases. Fluor cannot recover for increased costs caused by its oversights or mistakes in completing the work. Nor can it delay the completion of the project to account for design delays. But a firm-fixed-priced contract does not give BAE carte blanche to change the scope of the work without providing an equitable adjustment to the costs or schedule. Nor can it shirk responsibility for delays to the schedule it causes.

My findings of fact and conclusions of law from the trial follow in narrative form.

## I.    FACTUAL BACKGROUND[1]

BAE manages an ammunition plant for the United States Army in Radford, Virginia commonly known as the Radford Arsenal. In January 2012, the Army awarded BAE a contract to design and build a new nitrocellulose production facility at the Arsenal, which would include (1) a cutter warehouse; (2) an acid tank farm; (3) a nitration building; (4) a stabilization building; (5) a dewater and packout building; and (6) an administrative and laboratory building. The contract required BAE to construct the Facility around the BOWAS process, a proprietary method for manufacturing nitrocellulose.

### A.  Pre-Contracting Period

In February 2012, BAE entered into two subcontracts with Lauren Engineers and Constructors, Inc. The first contract was for the design of the Facility, and the second contract

---

[1] Some exhibits and a limited portion of the testimony at trial referred to "Highly Sensitive Documents" ("HSDs"). Resolution of the parties' claims has required the court to refer to HSDs, but the court has ensured that none of the information subject to such protection is included in this opinion. Thus, the entirety of this opinion will be placed on the public docket.

provided for the construction of the Facility. BAE and Lauren's relationship soured in the following years because of delays and cost overruns and by 2014, BAE concluded that its contract with the Army did not cover the expected cost or provide sufficient time to complete the facility. BAE sought to "rebaseline" its contract with the Army and solicited a proposal for a "firm fixed-price contract" from Lauren to complete the entire project. A firm-fixed-price contract provides for a definite price to complete the desired work and is not subject to adjustment based on the contractor's cost in performing the contract. The contractor accepts maximum risk and full responsibility for all costs and resulting profit or loss under a firm-fixed-price contract. Federal Acquisition Regulation 16.202-1. Rebaselining to a firm-fixed-priced contract with Lauren would allow BAE to give the Army an accurate estimate for the total cost of the Facility. In turn, the Army could obtain adequate funding for the project. BAE negotiated with Lauren throughout 2014 to arrive at a firm-fixed-price contract, but the parties were unable to reach agreement.

On January 23, 2015, BAE ordered Lauren to stop working on the design of the Facility. By March 10, 2015, BAE terminated both Lauren subcontracts for convenience. BAE requested that Lauren provide it with copies of all "drawings and specifications which have been released for construction" and all "'as is' drawings in an unprotected native, editable, electronic machine-readable file format." On April 6, 2015, BAE released Lauren for its work on the project. The release between Lauren and BAE terminating the Lauren contracts contained the following acknowledgement regarding the drawings:

> [T]he partially completed drawings and designs prepared by [Lauren] . . . are not final documents and are not intended to be relied on as 'Issued for Construction' documents. [BAE] uses these documents at [BAE]'s sole risk and without liability or legal exposure to [Lauren].

Shortly thereafter, BAE collected Lauren's design documents and retained two engineering

3

contractors, Power Engineers and Jacobs Solutions, to "validate" the Lauren design.

By terminating Lauren as the designer and builder of the new facility, BAE had no contractor to fulfill its contractual obligation to the Army to build a new nitrocellulose plant. So, it immediately began the process to find a new design/builder for the new Facility. On April 16, 2015, the company hosted interested potential bidders - AECOM, HiTT, Jacobs Engineering, Burns and McDonnell ("Burns") and Defendant Fluor Federal Solutions, LLC for an "Industry Day," where BAE provided the attendees information about the project and the bidding process to allow them to analyze and assess the scope and nature of the project before submitting bids. BAE told the Industry Day attendees that it had "obtained native design format design files from [Lauren] that provide an estimated 85% design solution with some areas requiring additional engineering. . ." The areas requiring additional engineering were listed: "Administration building (laboratory, layout)," "Packout Process," "Waste water recover process," "Tepid water system (safety showers/eyewash)," "Metal removal system," "Fume Abatement (use existing SCR or new system)," "HVAC," "Fire protection," and "Pre-PHA for the main operations is complete. Final HAZOPs for Fume Abatement, Cellulose Handling, and Packout remain." BAE also advised potential bidders that the required design work for the project included "[v]alidation of the existing design (estimated at 85%)" and "[c]ompletion of design and validation of mechanical performance."

Following Industry Day, BAE provided interested bidders with the Lauren design documents to use in the development of their bids. BAE uploaded the design documents to a SharePoint site in several batches between June and September 2015. Bidders were told that the documents were based on work in progress as of January 28, 2015 when Lauren put "pens down." BAE regularly updated the Lauren documents shared with Industry Day participants with

4

redlines and corrections. Among the redlined documents were Process Flow Diagrams (PFDs) and Piping and Instrumentation Diagrams (P&IDs), which depicted the BOWAS process that BAE (and ultimately its subcontractor) were required to use as the basis for the construction of the Facility.

Industry Day participants also received copies of Lauren's SmartPlant model, an interactive 3D model of the Facility, which allowed potential bidders to generate "Material Takeoffs" from the design. BAE provided the Lauren SmartPlant model "As Is."

On July 2, 2015, BAE released the Technical Bid Package ("TBP") for the project which included, among other things, a "Statement of Work," "Project Schedule," "Design After Award" procedures and specific construction and material specifications. The Statement of Work described the "scope" of the project as "design[ing], procur[ing] and construct[ing] the new NC facility." The Technical Bid Package also had a list of appendices and their contents which included an entry labeled "Appendix G" and a summary of the documents transferred to the SharePoint site through July 1, 2015. BAE also maintained a question-and-answer log to streamline the bidding process. In response to a July 15, 2015 question regarding "LEC [Lauren Engineering Company] Standards," BAE replied, "[t]he reference to existing Lauren standards is a general statement included in a all [sic] section to ensure that Lauren developed standards in all disciplines are referenced and applied to the program. The Lauren specs are located [sic] in appendix G."[2]

In July 2015, Fluor entered into a Teaming Agreement with Burns for design, engineering support, and construction administration services in support of a subcontract

---

[2] The Technical Bid Package explains that "Specification references include APPENDIX A: General Technical Requirements and the existing LEC standards in APPENDIX G: Existing Technical Documents."

between BAE and Fluor. Burns agreed to become the Designer of Record for the project and assume design responsibility under the prospective subcontract between BAE and Fluor. By July 29, 2015, BAE informed Fluor that all other Industry Day attendees had elected not to submit a bid on the project leaving it as the lone bidder to design and build the new facility.

On August 14, 2015, Burns submitted a proposal to Fluor to validate and complete the Lauren Design for $31.3 million. The same day, Fluor submitted its first proposal to BAE for $306.5 million (inclusive of Burns' proposal) to validate and complete the Lauren Design and construct the Facility. In addition to pricing, the proposal included a narrative list of assumptions underlying Fluor's costs. Many of the assumptions stemmed from "scope clarification" meetings between Fluor and BAE. For example, Fluor wrote in its August 14 proposal that "[l]ab testing equipment is not within the scope of this contract (per BAE answer to questions 7/15/15))." These meetings continued throughout the proposal period as Fluor refined its bid on the project.

BAE rejected Fluor's proposal, in part because it determined that Burns's design price was too high. On August 31, 2015, Kelly Bate, BAE's subcontracts manager emailed Fluor explaining BAE's position, "I'm concerned that the design portion of your proposal is really far out of whack with our expectations. As a reference point, the entire original design [under the Lauren contract] was around $15M, and that should be about 80-90% complete . . . ." The following day, in an internal email, Bate informed her colleagues that she had "planted the seed that BAE would consider somewhat drastic measures if we can't get the price down." D0033.

Burns submitted a second design proposal on September 2, 2015, lowering its design costs to $29.5 million. Wade Anderson, the project manager for Burns, wrote to Fluor explaining that its pricing was reasonable because "[o]verall existing design is approx. 50%, in our opinion." He also explained, "[g]iven the risk and nature of the project, an additional 5% built-in

contingency is reasonable." Two days later, Fluor submitted to BAE a revised price proposal for

the whole project of $276.9 million, incorporating the Burns reduced design price and other cost

reduction adjustments. Again, BAE rejected this proposal because of cost. BAE's Chief

Engineer, Mike Dargel, wrote, "[i]n summary, Burns & McDonald (B-M) is unwilling to give on

any design costs (they have almost 100-man years of engineering, much of it senior level) for the

NC Project. Because of that, the tentative plan is for Fluor to drop B-M."

On September 24, 2015, Burns submitted its final engineering proposal of $24.5 million

for design services which Fluor incorporated into a revised bid of $216.2 million for the design

and construction of the Facility. Like the previous proposals, this Fluor proposal included a

narrative list of bidding assumptions. And again, as like the previous proposals, BAE rejected

this proposal because, in BAE's estimation, Burns did not give sufficient credit to the existing

Lauren design, and "wanted to do more than what [BAE] thought was necessary to complete the

design." Fluor then dropped Burns as the designer.

On October 7, 2015, Fluor submitted a Revised Cost Proposal to BAE. The cover letter

limited the scope of the proposal to "procur[ing] BAE specified material and equipment" for the

Facility. On October 13, 2015, Fluor submitted another Revised Cost Proposal. This proposal

purported to cover the "design, procur[ment], and construct[ion] [of] the new NC Area Acid

Tank Farm, Nitration area, Stabilization area, Dewater/Packout area, Administration building,

and the supporting processes required for the new Nitrocellulose (NC) Facility at the Radford

Army Ammunition Plant." This proposal also included an extensive list of the assumptions and

exclusions underpinning Fluor's estimate. Notably, the proposal did not include a design

subcontractor.

On November 6, 2015, Fluor provided to BAE an "Updated Cost Proposal" which

consisted of spreadsheets detailing Fluor's proposed costs. Fluor provided an "Updated Technical Proposal" and an "Updated Cost Proposal" on November 16, 2015 and included for the first time Wood Group Mustang as an engineering subcontractor to perform the design work for the Facility after Fluor dropped Burns. Like prior proposals, the November 16 technical proposal included a set of bidding assumptions. It is unclear whether BAE responded to the November 16, 2025 cost proposal, but on November 25, 2015, Fluor submitted its final "Updated Cost Proposal," which was comprised solely of two pricing spreadsheets. This proposal lacks any narrative description of the project, Fluor's qualifications, or bidding assumptions.

### B. Undefinitized Contract Action

As Fluor developed its bid to design and build the Facility, it entered into a preliminary agreement on October 14, 2015 with BAE, referred to as the Undefinitized Contract Action, which funded and authorized Fluor to begin limited work. The Undefinitized Contract "constitutes an agreement between the parties on the terms and conditions set forth herein and signifi[ng] the intention of the parties to execute a formal, definitive <u>Firm Fixed Price</u> type Agreement . . . " (emphasis in original). The Undefinitized Contract further provided that "[p]ending execution of the definitive Agreement by the parties, [Fluor] is hereby authorized, and agrees to, commence work under this Undefinitized Contract, including the purchase of necessary materials, if required, starting <u>October 14, 2015</u>" (emphasis in original). Finally, the Undefinitized Contract provided that "[t]he definitive Agreement bearing the same start date, will supersede this UCA in its entirety . . . ."

Fluor worked under the UCA for six weeks before finalizing the definitized Subcontract. During that time, the parties agreed to four modifications to account for additional work, the purchase of specific materials, and increase the limitation of the contract amount. The UCA also

provided funding for Wood Group Mustang to perform 500 hours of discrete design tasks which began in November 2015 with deliverables scheduled in January 2016.

### C. The Subcontract

On December 17, 2015, BAE and Fluor entered into the definitized agreement for the design and construction of the Facility (the "Subcontract"). The Subcontract "incorporate[d] funding provided by the UCA and subsequent modifications prior to definitizing the subcontract agreement for a firm-fixed-price of $245,690,422.00.[3] The Subcontract set a completion date of July 30, 2018.

The Subcontract also incorporated the entire Technical Bid Package, including the Statement of Work and "Appendix G." Relevant to this action, the Statement of Work contained the following description of the work to be completed by Fluor:

> 2.1 This project will design, procure, and construct the new NC facility. The major areas include NC Area Acid Tank Farm (6043), Cutter/Warehouse area (6044) a Nitration area (6045), Stabilization area (6046), Dewater/Packout area (6047), Administration building (6048).
>
> 2.5 It is incumbent upon the Subcontractor to review the documents submitted and to perform their own analysis, including Hazard and Operability Studies and Life Safety Code Analysis. The Subcontractor shall be solely responsible for the design and all safety reviews and safety submittals with all required state and federal agencies…The documents provided indicate design and safety consideration many of which have been addressed within the preliminary design outlined in this RFP. Subcontractor is responsible for conducting and reporting on the final PHA and HAZOP reviews  . . . .
>
> 2.7 Subcontractor will be responsible to validate and complete all PFD's and P&ID's. PFDs and P&IDs are currently red lined to reflect all preliminary PHA action items and any other design changes that have occurred up to the time of this

---

[3] It is not clear how the parties arrived at a final contract price, but it appears to consist of $198.9 million to design and build the facility, approximately $32 million authorized under the UCA, and approximately $14 million in anticipated contingencies.

solicitation.

Section 2.2 details how Fluor should treat the documents included in Appendix G:

> The drawings, specifications, and technical documents provided in APPENDIX G are amended in the Statement of Work (SOW) by BAE systems to show additional requirements and/or corrections. These drawings are provided for reference only. The subcontractor shall prepare their own drawings to be used for design review submittals, construction and as Record Drawings. Native CADD files for these drawings are available to the Subcontractor.

Likewise, Section 2.4 states,

> Specifications provided in APPENDIX G represent the minimum requirements. The Subcontractor shall prepare their construction specifications to be used for design review submittals and construction. Native word files for these specifications will be made available to subcontractor.

The Statement of Work included numerous general and specific requirements for the project design and construction. Section 3 includes "General Requirements." For example, Section 3.2 requires, among other things, that the "process shall have a 25-year useful design life as an NC plant before a possible reuse/re-purpose or renovation to include normal sustainment, restoration, modernization activities and a 50-year building replacement life."

Section 4 notes that "Applicable design and construction criteria references are listed in APPENDIX A: GENERAL TECHNICAL REQUIREMENTS" and mandates that certain areas of the facility comply with the Americans with Disabilities Act (ADA) requirements. Section 5 contains "technical requirements with general applicability to Army facilities" as well as a description of the site and existing conditions.

Section 6 includes "PROJECT SPECIFIC Requirements," including, among other things, fire protection specifications, HVAC system requirements, plumbing system requirements and steel specifications. Importantly, Section 6 specifies that Fluor is responsible for "structural

design criteria and 3D Smart Plan modeling."[4] It also specifies that "Fluor is responsible for performing the process description and design basis documents, including developing and calculating the following: Design Basis Process Flow Diagrams, Process Instrumentation Diagrams, Utility and Energy Requirements, Heat and Material Balance, Throughput Model, etc. . . ."

The Statement of Work delineates BAE's Project responsibilities in Section 2.6 which states,

> BAE Systems has already purchased process equipment as indicated in Appendix F. It is the responsibility of [Fluor] to ensure that the equipment they purchase meets all applicable US codes and standards. BAE systems purchased process equipment will arrive on site in June 2016 and be stored in the Cutter/Warehouse until ready for installation.

Similarly, Appendix F-2 the "Division of Responsibility Matrix" notes, in relevant part, that BAE is responsible for "Process Description," "Design Basis," "Production Schedule," and "Throughput Model." This Appendix assigned to BAE and Fluor shared responsibility for the "Heat and Material Balance."

The Subcontract allows changes to the contract scope of work or time for completion under the Contract Direction/Changes clause ("Changes Clause") which prescribes, among other things, the process for BAE to direct changes to the scope of work or for Fluor to submit proposed changes to BAE through Proposed Change Notices ("PCNs").[5] The Changes Clause requires BAE and Fluor to make an equitable adjustment in the contract price and/or the delivery

---

[4] Several other provisions of the Statement of Work required Fluor to use a 3D Model. Statement of Work § D ("Add all duct runs and HVAC equipment to the 3D model"); Statement of Work § E ("Modeling fire protection systems in the 3D model"); Statement of Work § F ("Piping Orthographic Plans, Sections and Details (modeled in 3D format and hard-copy for review)").

[5] The Parties have also referred to PCNs as "proposed change notices" and "potential change notices" at different times in the litigation.

schedule to accommodate project changes which increase or decrease the costs or time required for performance. The Changes Clause requires Fluor to approve BAE directed changes, but BAE is not responsible for Fluor requested changes that BAE does not approve in writing.

The Subcontract also incorporates numerous sections of the Federal Acquisition Regulation (FAR). Most relevant here is the FAR Changes Clause § 52.243-4 which provides two methods by which the contract can be changed: "(a) The Contracting Officer may, at any time, . . . by written order designated to be a change order, make changes in the work within the general scope of the contract;" and "(b) Any other written or oral order . . . from the Contracting Officer that causes a change shall be treated as a change order under this clause . . . ." Sub-section (d) provides, "[e]xcept for an adjustment based on defective specifications, no adjustment for any change under paragraph (b) . . . shall be made for any costs incurred more than 20 days before the Contractor gives written notices . . . ." It continues, "in the case of defective specifications for which the Government is responsible, the equitable adjustment shall include any increased cost reasonably incurred by the Contractor in attempting to comply with the defective specifications."

The Subcontract contemplates a $14 million fund for "unforeseen contingencies" that are not compensable under the Changes Clause. The contract requires that Fluor seek BAE's agreement on the "amount and use of the [contingency] funding," but stipulates that "Fluor will make the final determination on use of the contingency funding." "[A]ny remaining contingency funding" must be split between the parties on a "50:50 basis." Andrea Sickler, a member of Fluor's proposal team, explained that the amount of contingency included in Fluor's contracts is tied to the company's assessment of risk.

In addition, the Subcontract incorporates some iteration of Fluor's proposal. Part 4.0

"Attachments" lists "Exhibit I Supplier Proposal (Nov. 25, 2015)." And there are references to the "Accepted Proposal" and the "accepted contract proposal" throughout the Statement of Work.

The Subcontract also contains a number of provisions pertaining to the schedule and delays. *See* Sections 28 (a)–(h). Generally, these provisions require Fluor to submit and maintain a "satisfactory" contract schedule. Section 28 (a) required Fluor to "furnish sufficient forces…and work such hours…as may be necessary to insure the performance of the work in accordance with the…schedule," and under Section 28(b), "take all necessary measures to recover schedule, Section 28(g)." Section 28(e) provides that "time is of the essence in the performance of the Work" and makes Fluor liable for "all damages and expense incurred by BAE…due to [Fluor's] failure to complete the work [within the contract schedule.]"

Finally, the Subcontract includes two integration clauses. The first, located on the signature page states,

> These terms and conditions constitute an offer by the [BAE] and said offer is expressly limited to acceptance on the exact terms set forth and no other terms and conditions shall be controlling: and these terms and conditions supersede the terms and conditions of your proposal or acknowledgement form, if any.

The second, located in Section 1A: "General/Administrative Provisions," provides:

a)  This Contract integrates, merges, and supersedes any prior offers, negotiations, and agreements concerning the subject matter hereof and constitutes the entire agreement between the Parties.
b)  [Fluor's] acknowledgement, acceptance of payment, or commencement of performance, shall constitute [Fluor's] unqualified acceptance of this Contract.
c)  Additional or differing terms or conditions proposed by [Fluor] or included in [Fluor's] acknowledgment hereof are hereby objected to by BAE SYSTEMS and have no effect unless expressly accepted in writing by BAE SYSTEMS.

**D. Subcontract Performance**

Fluor started work under the Subcontract in December 2015. From the beginning, the

13

project was plagued by delays, cost overruns and staffing issues. Within a few weeks of executing the contract, BAE sent Fluor additional updates to the PFD and P&IDs which had to be incorporated into Fluor's design. Then, in January 2016, Fluor was forced to restructure its design team. Fluor's final project proposal delegated the process design work to Mustang. But, Fluor did not have a final agreement with Mustang and never reached an agreement to complete the final design. Thus, Fluor undertook to perform the design work and designated itself as the designer of record.

In March 2016, almost a year after receiving Lauren's work product, including the SmartPlant model, Fluor's engineers began to analyze the model and discovered that it contained numerous errors that must be resolved before it could be used to complete the facility. BAE relied on Fluor's analysis of the SmartPlant Model (and its many shortcomings) in its contemporaneous legal dispute with Lauren. In its Lauren arbitration filings, BAE alleged, among other things, that the model was "wholly without value" and "required extensive corrective work."[6]

In June 2016, Fluor notified BAE that an interpretation from the Authority Having Jurisdiction ("AHJ") was required for the Life Safety Code Analysis ("LSCA"). The AHJ is the regulatory body responsible for administrating and enforcing certain codes and standards in a construction project. In this case, the AHJ was an official with the Army Corps of Engineers. Prior to 2016, BAE had not contacted the AHJ for any approvals on the project. BAE took the position that AHJ approval was not required for the project but agreed to reach out to the relevant official. BAE later reported that it took "over 6 months . . . to even begin discussions with the AHJ." In the meantime, Fluor put all design aspects that required AHJ review/approval

---

[6] BAE and Lauren ultimately settled their dispute.

on hold pending further action by BAE with the AHJ, but instructed Fluor to continue the design work and promised to assume the risk of the AHJ rejecting the design. In total, BAE concluded it took "nearly 2 years to resolve AHJ issues with the process building."

On November 2, 2016, BAE, frustrated with delays and Fluor's purported inability to submit an accurate schedule, issued a cure notice. The notice cited three-month delays in the structural steel and process design packages as well as delays in "Acid Tank Farm tank delivery and installation" and "Nitration Building Steel erection." Fluor responded in December 2016 with an updated schedule that accounted for existing delays and represented that the project could still be completed by July 30, 2018. Fluor's response included a list of schedule mitigation measures including, among other things, "Process/Piping Engineers work 6x10 hour days until design is complete" and requiring "Designer of Record, Zapata Engineers . . . [to] add staff to its design team to increase the rate of design production." Relying on Fluor's assurances that the project would be completed on schedule, BAE agreed to a "rebaselined" agreement with the Army that required the facility to be completed by December 31, 2018.

But, alas Fluor was unable to meet the schedule and project delays continued through the remainder of 2016. In February 2017, representatives of BAE and Fluor met at Fluor's offices in Charlotte to revise the baseline schedule again. The revised schedule maintained the July 2018 project completion date.

On March 31, 2017, BAE sent Fluor a second cure notice. This notice highlighted BAE's concerns with Fluor's structural steel engineer, Zapata. BAE also cited issues, as well as further schedule slippage. The letter noted that:

> If, in the opinion of BAE SYSTEMS, the CONTRACTOR falls behind the progress schedule, . . . BAE SYSTEMS may require it to increase the number of shifts, overtime operations, days of work, and/or the amount of construction equipment at no additional cost to BAE SYSTEMS.

In September 2017, Fluor informed BAE that it would not complete the project by July 30, 2018, and forecasted a completion date of September 2019. BAE informed the Army that the scheduled had slipped over a year. In response, the Army sent a letter requesting, among other things, "a plan on how BAE intends to sustain the legacy NC Facility, and the associated cost over and above normal maintenance to ensure the legacy facility is capable of continuous NC production . . ." and "[t]he consideration BAE considers adequate based upon the impacts of the [revised schedule]." In response, BAE offered the Army $6 million in maintenance projects, "over and above normal maintenance to enhance the maintainability and reliability of the existing facility."

The Army rejected BAE's proposal and, on February 8, 2018, sent BAE a Show Cause Notice demanding that BAE explain why it should not be terminated for cause. The Notice cites delays and takes issue with BAE's schedules as well as the number of PCNs BAE had received from Fluor. It says "[i]t is unclear how many of the PCN disputes have been settled and agreed to, and how many are ongoing that may further impact the schedule or add additional cost to BAE." The Army also issued a public Request for Information seeking "information from industry regarding the ability to manage and execute large scale chemical/pharmaceutical plant construction to complete the design, construction and commissioning of a new [NC] production facility at the [RFAAP]." On February 12, 2018, BAE issued a corresponding Show Cause Notice to Fluor. The Army ultimately agreed to extend BAE's contract to November 30, 2020, in exchange for $9 million in "abnormal maintenance" on the existing nitrocellulose facility. The November 30, 2020 date represented Fluor's most updated schedule plus six months buffer added by BAE.

On March 22, 2019, Fluor informed BAE of an additional 7-month delay, pushing the

estimated completion date to June 2021. BAE then extended the completion date of the prime contract from December 2020 to mid-2021 causing the Army to issue a second Show Cause Notice on October 16, 2019.

The Parties agree that by late 2019, the relationship between Fluor and BAE was broken. Fluor brought in a new team led by Kassandra Combs to resolve the situation. In Combs's words, her mandate was to "[c]omplete the project and get out." Toby Borge, BAE's project manager beginning in 2017, testified that when Combs joined the project "it was a complete sea change." Despite the parties revitalized relationship, the project continued to be delayed. On January 8, 2021, Fluor notified BAE that it "has experienced and continues to experience the impacts of project completion delays due to scope and/or activities that are the responsibility of BAE." The letter cites three reasons for the delay: 1) the removal of key BAE employees from the site due to COVID-19; 2) BAE's failure to timely "verify punch list items;" and 3) BAE vendor delays. As a result of these delays, Fluor was unable to complete its final work under the contract with BAE including performing the necessary "Loop Checks" to fulfill its pre-commissioning tasks.

In addition to delays, the project was plagued by disputes about the scope of Fluor's responsibilities. Throughout the performance period, Fluor submitted numerous PCNs seeking "equitable adjustments" for work it believed was outside of its scope.[7] Initially, Fluor sent requests to BAE, which were then analyzed by a technical reviewer, who issued a recommendation, and then approved or rejected by a member of BAE's subcontract team. Fluor tracked its PCNs, submitted and in progress, on a log that was shared with BAE at weekly meetings. Over time, the number of PCNs increased dramatically, and both parties changed their approach to resolving them. Fluor formed a "Tiger Team" to address the backlogged PCNs that

---

[7] The PCNs at issue in this case are described in detail at Part IV(D).

Fluor had not submitted to BAE. The Tiger Team was comprised of a project representative, a subcontracts representative, an engineer, an estimator and a full-time lawyer. Its mandate was to review the existing PCNs, determine whether Fluor was entitled to compensation, and draft a narrative justification for the PCN. Similarly, BAE formed a new board to process PCNs led by Toby Borge. In January 2019, BAE rejected and denied a large number of Fluor's PCNs totaling approximately $50 million. In sum, BAE paid approximately $23 million in PCNs.

Ultimately, Fluor reached substantial completion on February 12, 2021—over 925 days after the contractual completion date. As of the end of trial on February 23, 2024, BAE had yet to complete commissioning of the Facility.

## II.    PROCEDURAL HISTORY

On September 30, 2020, BAE filed the present suit alleging that Fluor breached the Subcontract by failing to timely complete the Facility. BAE seeks delay damages exceeding $19 million. Fluor filed five counterclaims: 1) breach of contract; 2) breach of the implied warranty of design adequacy; 3) breach of the duty of good faith and fair dealing; 4) quantum meruit; and 5) unjust enrichment.

The Parties filed cross motions to dismiss. The Court denied Fluor's motion to dismiss, concluding, among other things, that BAE adequately pled the elements of a breach of contract claim and that the company plausibly alleged that its damages were a direct result of Fluor's actions. The Court denied in part BAE's motion to dismiss finding that Fluor sufficiently pled that BAE breached the Subcontract, the implied warranty of design adequacy, and the duty of good faith and fair dealing. However, the Court granted BAE's motion to dismiss as to its quantum meruit and unjust enrichment claims, concluding that these claims were not viable because the relationship was governed by a valid express contract.

The Parties filed cross motions for partial summary judgment. The Court granted Fluor's motion to the extent Fluor sought a finding that the Subcontract's limitation on damages clauses do not limit Fluor's recovery for cost incurred performing BAE-caused changes on the Facility. The Parties' motions for partial summary judgment were otherwise denied.

The Court heard the Parties' surviving claims in a fifteen-day bench trial between February 5, 2024 and February 23, 2024. Following the trial, the Parties submitted proposed findings of fact and conclusions of law and post-trial briefs on the Subcontract and BAE's request for adverse inferences against Fluor based on its employees' invocation of the Fifth Amendment during their deposition. This opinion serves as the Court's Findings of Fact and Conclusions of Law from the evidence submitted at trial and included in the record through the Parties' post-trial briefing.

## III.    BAE'S BREACH OF CONTRACT CLAIM

BAE claims that Fluor breached the Subcontract by failing to complete the facility by July 30, 2018. As a result, BAE alleges that it incurred $10,247,115 in extended general conditions costs for which Fluor is liable. BAE also asserts that Fluor is responsible for the $9 million worth of "abnormal maintenance" BAE agreed to provide to the Army in order "to obtain a schedule extension." Dkt. 476 at 61. Fluor argues the BAE waived the contract completion date, and, in any case, BAE is responsible for the delay.

I find that the Parties did not waive the completion date, and I am persuaded by BAE's scheduling expert, Alex Staley, that Fluor is responsible for BAE's extended general conditions costs. However, I find that the $9 million BAE promised the Army is an unforeseeable consequential damage and is, therefore, not recoverable.

### A. Waiver of the Contract Completion Date

Fluor argues that BAE waived the contract completion date by agreeing to contract modifications after the original completion date and by failing to issue a notice of default. Dkt. 479 at 95–96. However, this argument is contrary to Virginia law. As Judge Dillon explained in resolving a similar dispute between Fluor and BAE, "in Virginia, a party waives a contract right only when the waiver is knowing and intentional." *Fluor Fed. Sol., LLC v. BAE Sys. Ordnance Sys., Inc.*, No. 7:19cv698, 2024 WL 4635304, at *33 (W.D. Va. Oct. 30, 2024) (citing *May v. Martin*, 137 S.E.2d 860, 865 (Va. 1964)). Here, Fluor cites no evidence that BAE intended to waive the contract completion date by modifying the contract. To the contrary, the record evidence shows that the contract modifications, rather than setting new completion dates, expressly left the original (then-passed) completion date in place, demonstrating that BAE intended to enforce the original completion date. *E.g.*, JX2-26 at 14 ("This modification does not recognize or result in an extension by BAE Systems of Fluor's time to complete the NC Facility."); *see also Fluor Fed. Sol.,* 2024 WL 4635304, at *33.

Similarly, the fact that BAE did not issue a notice of default does not establish waiver. Merely "allowing a party to complete his contract is no waiver of a right or claim to damages or loss incurred and actually paid caused by his failure to complete it at the time agreed on." *May*, 137 S.E.2d at 865; *see also Stanley's Cafeteria v. Abramson*, 306 S.E.2d 870, 873 (Va. 1983) ("[S]tanding alone, an obligee's acceptance of less than full performance by the obligor does not prove intent to relinquish the right to enforce full performance."). The record evidence shows only that BAE permitted Fluor to complete the project even though the completion date passed. That is not enough to demonstrate waiver, and I find that Fluor can be held to the original completion date.

### B.  Delay

The Parties agree that the project was delayed by 928 days from the original completion date. But both dispute the reason for the delays in the project and who bears responsibility for the delays. I am ultimately persuaded that BAE's expert most accurately allocates responsibility for the project delay and adopt his conclusion that Fluor is responsible for 740 days of delay. I am also persuaded that BAE's expert accurately calculated BAE's damages associated with the delay. Accordingly, I award BAE $10,247,115 in extended general conditions costs. However, I reject BAE's expert's conclusion that BAE and Fluor are *concurrently* responsible for the remaining 188 days of delay. Instead, I find that BAE *alone* was responsible for the additional delay.

#### 1.  The Critical Path

To analyze the overall project delay, both Parties' experts rely on a method of schedule analysis called "critical path." P0599 at 8. Critical path refers to "a group of activities on a project that must be completed on a certain timeline to keep the project on schedule." *See BAE Sys. Norfolk Ship Repair, Inc. v. United States*, 745 F.Supp.3d 336, 359 (E.D. Va. 2024) (quoting *Ultimate Concrete, LLC v. United States*, 141 Fed. Cl. 463, 480 (2019)). In other words, the critical path includes work that, if delayed, would delay the entire project. *See id.* Thus, a party seeking to recover for project delay must show that the other party caused delay in a particular activity or activities and that the activity or activities were on the critical path.

BAE's scheduling expert, Alex Staley, divided the project into nine "windows" of time. P0599 at 47. He compared the "as built" progress against the April 25, 2016 "baseline" schedule to determine the amount of delay to activities on the critical path in each window. *Id.* at 8. He then allocated each day of delay to the responsible party *Id.* Fluor's scheduling expert, Andrew

Rhodes, divided the project into five time windows and compared the "as-built" progress against contemporaneous schedule updates rather than one baseline schedule. D0385 at 34. The experts' distinct methodologies resulted in different interpretations of the critical path. I find that BAE's expert's methodology is more reliable given the circumstance. While both Parties agree that the April 2016 is a reliable baseline, numerous witnesses testified that Fluor's schedule updates were unreliable. In an internal email, one of Fluor's schedulers who analyzed the project noted that one version of the schedule "would not pass even the most lenient quality checks." Accordingly, I adopt BAE's conclusion that the critical path ran through the Nitration Building structural steel design, the Nitration Building piping design, fabrication and installation, roofing installation and then ultimately construction completion.

### 2.  Delay at the Start of the Project; October 14, 2015–March 29, 2017

BAE and Fluor agree that the critical path ran through the structural steel design packages, and the delays at the start of the project were a result of delays in these designs. *See* P0601 at 20; D0385 at 32. BAE's expert primarily attributes this delay to Fluor's subcontractor Zapata. *See* P599 at 20. This assessment is supported by the Parties' contemporaneous communications. For example, on August 30, 2016, Andrea Sickler, Fluor's subcontract administrator, wrote to Zapata making clear that Fluor attributed schedule delay to Zapata. *See* P0249. She wrote, "[w]e cannot afford to duplicate the schedule delay and Fluor level of effort to finalize the next IFC package." *Id.* She also cautioned, "[t]he Project Schedule for the forward-looking packages does not take into account the same level of effort that Fluor was required to expend to complete the Zapata design tasks for the ATF and the NB so far." *Id.* Sackler concluded, "Zapata [was] not taking the steps necessary to provide the design deliverables required to complete this Project in a timely manner, while also applying the appropriate

resources to make sure the packages completed are the quality required." *Id.* BAE echoed these concerns in a March 31, 2017 letter instructing Fluor to address the "schedule delays resulting from design deficiencies" in Zapata's work. P0131.

On the other hand, Fluor's expert attributes the delay in the structural steel design packages to: "AHJ issues;" "Voids issues;" "Process design changes in Period 1;" and "NB height reduction and reverse osmosis ('RO') water system." Authority Having Jurisdiction or AHJ issues refers to BAE's admitted failure to promptly contact and secure approval for certain aspects of the designs from an Army Corps of Engineers official. *See* D0825.224. I agree that the AHJ issues caused at least some of the delay to the critical path at the beginning of the project. However, I am persuaded that BAE's expert appropriately accounted for this delay by conceding that Fluor is not liable for 108 days of project delay during this period. P0599 at 23.

I am not persuaded that the "Voids issues," "NB height reduction and reverse osmosis ("RO") water system," or "Process design changes in Period 1" caused delay on the critical path. The evidence related to the voids demonstrates that resolving the issue caused some delay. However, there is no persuasive evidence that the "voids issue" impacted structural steel design and thus, no evidence that it delayed the critical path. To the contrary, Fluor's expert conceded that he did not know whether "any changes had ever been made to the structural steel to address the voids issue." Moreover, an earlier version of Fluor's delay analysis reveals that the structural steel was designed, fabricated and delivered in both the Nitration and Stabilization buildings months before the voids issue was resolved. *Compare* P0599, Ex.4 at 8 (noting that the voids issue was resolved on November 21, 2017) *with* P601 at 17 (noting that the initial steel was delivered in May 2017). That analysis ultimately concluded that the "voids issue" contributed to delays in the process piping design not the structural steel design. See P0599, Ex.4 at 7–8. As to

"NB height reduction and reverse osmosis ("RO") water system," Fluor's expert does not cite

any contemporaneous evidence that "NB height reduction and reverse osmosis ("RO") water

system caused any independent schedule delay. *See* D0385 at 52–53. Moreover, Fluor's prior

delay analysis does not reference it at all. *See* P0599, Ex. 4. Finally, as to "process design

changes in Period 1," Fluor's expert cites two specific process changes in Period 1 but does not

explain how the changes actually delayed the project.

### 3. Delay Through the Middle of the Project: March 30, 2017–July 15, 2019

Between March 30, 2017 and March 2, 2019, BAE's expert determined that the critical

path moved from the Nitration Building process piping design, through the fabrication of the

piping, and ultimately to the nitration building process piping installation. *See* P0599 at 26–27,

29–31, 34–36. BAE's expert argues that the delays in these activities stemmed from Fluor's

failure to timely deliver the piping design to its piping subcontractor, Thompson, which delayed

pipe fabrication, *see* P0599 at 29–30, and ultimately delayed pipe installation, *see id.* at 33. He

also attributes delay to the addition of extra "overhead feeder conduits for additional power

requirements" for which Fluor is not liable. *Id.* at 30–31. This is consistent with

contemporaneous emails between Fluor and Thompson and Fluor's relevant schedule updates.

P0599 at Exs. 26, 27.

Fluor argues that delay during this period was caused by continuing delays from the

unresolved "void issues," changes to pump specifications, process design changes and changes to

the NOx system. Fluor cites contemporaneous correspondence about these issues. *See* D0385 at

61–73. However, this correspondence fails to demonstrate that these issues actually caused

delay, much less delay to the critical path. *See id.* Moreover, these purported causes of delay are

inconsistent with Fluor's original delay analysis which does not identify changes to the pump

specification or the NOx system as sources of delay, and is more consistent with BAE's analysis. *See* P0599 at Ex. 14. Accordingly, I find BAE's expert more accurately describes delay during this period.

### 4.    Delay Through the Middle of the Project: July 16, 2019–January 9, 2020

Between July 16, 2019 and January 9, 2020, BAE's expert determined that the critical path ran through Nitration Building and Stabilization Building process piping installation. *See* P0599 at 37–39. He attributes delays in these activities to Fluor, who was contractually required to complete the piping installation. *Id.* I agree. The Subcontract required Fluor to "design, procure, and construct the new NC facility." SOW, Section 2.1. Absent some extenuating circumstances, Fluor is responsible for those delays. Fluor agrees that there were delays in the piping installation (though it argues that the critical path only ran through the stabilization building). D0385 at 74–79. Fluor attributes those changes to growth in the size of the project. *Id.* This argument is not persuasive. By entering a firm-fixed-price contract, Fluor assumed the risk and responsibility for increased costs associated with the project. *See* FAR 16.202-1. The Subcontract makes clear that BAE is only responsible for changes to the scope of the project. *See infra* Part IV(A)(1). Fluor's expert does not identify BAE-directed changes during this period that delayed the critical path of the project. D0385 at 74–79. Accordingly, I am persuaded that BAE's expert has appropriately attributed the delays during this period to Fluor.

### 5.    Delay Through the Middle of the Project: January 10, 2020–April 6, 2020

BAE's expert argues that the critical path moved into roofing installation at the Nitration, Stabilization and Dewater/Packout Buildings. P0599 at 41. The report also notes that the schedules reflected "near-critical paths through the energization of electrical systems in the Stabilization Building, and mechanical ductwork installations in the Stabilization and

Dewater/Packout buildings." *Id.* BAE attributes all the delay in these activities to Fluor. Fluor disputes that the critical path proceeded through the roofing but concedes that Fluor was responsible for the delay during this period. D0385 at 77–78.

### 6. Delay Through the End of the Project: April 7, 2020 – February 12, 2021

Finally, BAE attributes the delay between April 7, 2020 and February 12, 2021 to Fluor's failure to timely complete construction. However, BAE concedes that it cannot recover for the entire delay, because the company and one of its subcontractors were at least in part responsible for 34 days of the delay during this period. Fluor argues that BAE overestimates the construction delays and underestimates the delays associated with BAE's subcontractor. I am persuaded that BAE has accurately captured the delay during this period. The construction delays are consistent with BAE's assessment of the critical path, and his analysis of the delays caused by BAE's subcontractors is supported by trial testimony.

### 7. Concurrent Delay

BAE concedes that it cannot recover for 188 days of project delay because it is "concurrently" at fault for those days of delay. *See* P0599. However, BAE offers no explanation for what Fluor did or did not do that caused delay concurrent to BAE. Given the evidence that BAE caused the 188 days of delay identified in its report and the lack of evidence demonstrating that Fluor contributed to that delay, I am persuaded that BAE alone is responsible for the additional delay. That BAE cannot recover for these damages does not change the delay damages awarded to BAE. Yet, because BAE alone is responsible for this delay, these damages affect the "net" recovery as explained *infra* Part IV(D)(2).

### 8. Delay Damages

In its Proposed Finding of Facts and Conclusions of Law (Dkt. 479), Fluor does not

contest BAE's expert's calculation of its extended general conditions cost calculations, and I am persuaded that they are accurate. Accordingly, I adopt BAE's estimate and award the company $10,247,115.

### C.  BAE's Agreement with the Army to Provide "Abnormal Maintenance"

BAE also seeks damages arising from its ". . . acceding to the Army's demand for $9 million in additional concessions for maintenance work on the legacy NC facility. . . to keep it operative until [Fluor's delayed] completion of the new facility." Dkt. 1 at 33. Fluor contends it is not liable because BAE's "concessions" to the Army are consequential damages and were not contemplated by the Parties at the time of contracting. *See* Fluor Findings of Fact and Conclusions of Law at 98–99. I agree and find that BAE has not established its entitlement to the $9 million in maintenance projects it agreed to provide the Army.

There are two general types of contract damages: direct damages and consequential damages. *See Washington & O.R. Ry. Westinghouse Elec. & Mfg. Co.*, 89 S.E. 131, 133 (Va. 1916) (modified on rehearing). "Direct damages are those which arise 'naturally' or 'ordinarily' from a breach of contract . . . [and] can be expected to result from a breach." *Blue Stone Land Co. v. Neff*, 526 S.E.2d 517, 519 (Va. 2000). Consequential damages on the other hand arise from the intervention of "special circumstances" that are not typically predictable. *See Banker Steel Co., LLC v. Hercules Bolt Co.*, No. 6:10cv5, 2011 WL 1752224, at *6 (W.D. Va. May 6, 2011) (citing *Roanoke Hospital v. Doyle and Russell*, 214 S.E.2d 155, 160 (Va. 1975)). Whether damages are direct or consequential is a question of law. This determination is not based upon the actual understanding and foreseeability of the parties in a particular situation, but rather, is an objective question of whether the damages "flow ordinarily and expectedly" from a breach of contract, are ordinarily predictable under construction industry standards, or can be expected to

result from a breach of contract in the ordinary course of human experience. *Vienna Metro LLC v. Pulte Home Corp.*, 786 F.Supp.2d 1076, 1085 (E.D. Va. 2011). While this an objective inquiry, the facts of a particular case are often required to determine whether the alleged damages are of the kind that would ordinarily be expected to result from a breach. *E.g.*, *Roanoke Hospital*, 214 S.E. at 160 (addressing direct versus consequential damages analysis after jury trial).

Earl Lemon, who held a variety of senior roles at BAE, testified that the "abnormal maintenance" agreement with the Army included a variety of improvements to the legacy NC facility including, among other things, several completed projects i.e. restorations to the "chiller refrigeration system," "boiling tub repairs," and repairs to the "nitration agitators." Trial Tr. Day 3 (Lemon) 22:24–24:9. He confirmed that these projects were unrelated to the new facility, which Fluor was required to design and build. *See id.* 22:12–22:15; *see also* Trial Tr. Day 5 (Borge) at 100:21–101:4. BAE asserts that the Army demanded this maintenance because of Fluor's delays and flawed schedules. Thus, BAE argues that the $9 million in maintenance project are direct damages. *See* Dkt. 476 at 52–53. But paying for maintenance provided to a third-party on a *separate* facility is not the type of damages a party in Fluor's position would "naturally" expect to pay. Rather, the "abnormal maintenance" is a result of the "special circumstances" created by the Army's demand. Accordingly, I find that BAE's $9 million "abnormal maintenance" agreement is a consequential damage.

"Consequential damages 'are compensable only if it is determined that the special circumstances were within the 'contemplation' of both contracting parties'" at the time of contracting. *Va. Polytechnic Inst. & State Univ. v. Interactive Return Serv.*, 595 S.E.2d 1, 7 (Va. 2004) (quoting *NAJLA Assoc., Inc. v. William L. Griffith & Co. of Va., Inc.*, 480 S.E.2d 492, 494

28

(Va. 1997)). "The term 'contemplation' used in this context means both 'what was actually foreseen and what was reasonably foreseeable.'" *Id.* (quoting *Roanoke Hosp.*, 214 S.E.2d at 160 n.4.) "The question 'whether special circumstances were within the contemplation of the parties is a question of fact.'" *Id.*

Here, I am persuaded that the "abnormal maintenance" agreement was not reasonably foreseeable at the time of contracting. Toby Borge, senior program manager for the Facility, who helped negotiate the abnormal maintenance agreement with the Army, testified that the $9 million was based on pushing the project completion date out approximately 20 months. He confirmed that 20 months include Fluor's extended schedule plus six additional months he added for "margin." Trial Tr. Day 5 (Borge) at 88:9–89:9; 89:12–89:14. While it may have been foreseeable that Fluor's delay could result in financial penalties for BAE, there is no evidence that either party contemplated or could have contemplated that BAE would inflate Fluor's schedule and independently negotiate an amended agreement with the Army regarding the maintenance of a *separate* facility. Therefore, BAE is not entitled to recoup from Fluor the $9 million in "abnormal maintenance" that it committed to providing the Army.

## IV.    FLUOR'S COUNTERCLAIM

Fluor seeks compensation for forty-one unpaid PCNs and two unpaid "credits" for a total of $179,181,683. D0997. Fluor articulates three theories of recovery. First, Fluor argues that the PCNs stem from "out-of-scope" changes to the Subcontract, and therefore, under the Subcontract's two changes clauses, it is entitled to "equitable adjustments" to the Subcontract's price. *See* Dkt. 479 at 78. Second, Fluor contends that BAE breached the implied warranty of design adequacy by requiring Fluor to use the Lauren design which was defective and by misrepresenting the accuracy and completeness of the Lauren design. *Id.* at 79–88. Finally, Fluor

asserts that BAE breached the duty of good faith and fair dealing by refusing to acknowledge "that it has directed or caused changes or delayed work and then [failing] to evaluate and negotiation change orders for compensation of that changed work…." *Id.* at 89–90. I will address the Parties' overarching arguments and then reckon with the Parties' arguments specific to the various PCNs and credits.

### A. Fluor's Scope of Work and the Changes Clauses

Fluor argues that the cost increases detailed in the PCNs were caused by defects in the BAE-provided design; were directed, either explicitly or constructively, by BAE; or arose from costs that were excluded in Fluor's narrative cost and technical proposals and were therefore out-of-its scope of work. *Id.* at 30. Such expenses, Fluor argues, are BAE's responsibility under Subcontract Section 1A (3) "CONTRACT DIRECTION/CHANGES" and FAR § 52.243-4 Changes. (collectively "Changes Clauses"), which require BAE to make an equitable adjustment to the Subcontract's price when there is a change to Fluor's scope of work. *Id.* at 54. BAE generally argues that it is not responsible for the forty-one PCNs for three reasons: 1) the changes for which Fluor seeks compensation are within Fluor's scope of work, Dkt. 476 at 72; 2) Fluor failed to comply with the notice and authorization provisions of the two changes provisions, *id.* at 64; and 3) Fluor's narrative cost and technical proposals were not incorporated into the Subcontract.

### 1. Fluor's Scope of Work

The Parties dispute the scope of Fluor's work under the Subcontract. Fluor argues that it was required to comply with all the Lauren design documents and information it received from BAE during the bid process. *See* Dkt. 479 at 14–15. Thus, all costs incurred because of deviations from the Lauren design are out of scope and are compensable. On the other hand,

30

BAE argues that Fluor was only bound to use certain specifications from BAE and Lauren, and any changes to the Lauren design outside of those specifications are within Fluor's mandate to "design, procure and construct" the new facility. *See e.g.*, Dkt. 476 at 72–73.

I find that Fluor was not required to comply with all the materials provided by BAE. The Statement of Work unambiguously identifies which of the Lauren design documents Fluor was required to use and which were included for reference. The sections relevant to Fluor's PCNs are Sections 2.2, 2.6 and 2.7 of the Exhibit E to the Subcontract (the "TBP").

Section 2.2 of the TBP says:

> [t]he drawings, specifications, and technical documents provided in APPENDIX G are amended in the Statement of Work (SOW) by BAE systems to show additional requirements and/or corrections. These drawings are provided for *reference only*. The subcontractor [Fluor] shall *prepare their own drawings* to be used for design review submittals, construction and as Record Drawings.

JX2, Subcontract Ex. E. (emphasis added). Section 2.4 states:

> *Specifications* provided in APPENDIX G represent the *minimum requirements*. The Subcontractor [Fluor] shall prepare their construction specifications to be used for design review submittals and construction. Native word files for these specifications will be made available to subcontractor.

*Id.* (emphasis added). Section 2.6 states:

> BAE Systems has already purchased process equipment as indicated in Appendix F. It is the responsibility of the Subcontractor [Fluor] to ensure that the equipment they purchase meets all applicable US codes and standards. BAE Systems purchased process equipment will arrive on site in June 2016 and be stored in the Cutter/Warehouse until ready for installation.

*Id.* Finally, Section 2.7 provides:

> Subcontractor [Fluor] will be responsible to validate and complete all PFD's and P&IDs. PFDs and P&IDs are currently red lined to reflect all preliminary PHA action items and other design changes that have occurred up to the time of this solicitation.

*Id.* Read together, these sections make clear that Fluor was required to use the specifications provided in Appendix G, the process equipment listed in Appendix F, and the PFDs and P&IDs.

On the other hand, Fluor was not required to utilize the Lauren drawings, and, in fact, had a contractual duty to prepare the design drawings and specifications for construction.

Fluor cites several contract provisions it argues require Fluor to comply to all specifications and *drawings* from the Lauren Design. For example, Section 1C 22 "Specifications and Drawings," subsection (a) provides "CONTRACTOR shall comply with all specifications and drawings set forth in the SOW hereof." Dkt. 480 at 1; JX2 at FFS02036363. But this provision merely instructs Fluor to refer to the Statement of Work which plainly provides that the Lauren drawings were for reference only. Moreover, the third sentence of this provision reiterates Fluor's obligation to create its own drawings: "CONTACTOR is responsible for the preparation, by a licensed architect/engineer, of drawings setting forth in detail the requirements for the construction of the Work and Project based upon all applicable codes, laws, or regulations . . ." JX2 at FFS02036363.

Fluor also argues that "[t]he Division of Responsibility Matrix in Subcontract Statement of Work Appendix F-2 makes ~45 references to the Lauren Design and drawings." Dkt. 479 at 14. Specifically, in the "Notes" column the contract states "Lauren provided drawings" next to certain activities assigned to Fluor. JX2, Ex. E at BAE_RAD2509771. However, the note suggests only that a Lauren drawing associated with a particular activity exists, not that Fluor is required to use a particular drawing.[8]

Given the plain meaning of Section 2.2, 2.4, 2.6 and 2.7, I find, to the extent Fluor's PCN's stem from changes to the Lauren drawings, Fluor is not entitled to compensation.

---

[8] Fluor also cites to extrinsic evidence suggesting that it was required to comply with the entirety of the Lauren Design. But it is not appropriate for the Court to rely on such evidence where, as here, the contract language is unambiguous. *Virginia Elec. and Power Co. v. N. Va. Reg'l Park Auth.*, 618 S.E.2d 323, 326 (Va. 2005) ("Where language is unambiguous, it is inappropriate to resort to extrinsic evidence; an unambiguous document should be given its plain meaning.").

However, to the extent Fluor's PCNs rely on changes to the specifications in Appendix G, the process equipment listed in Appendix F or the PFDs and P&IDs, I find that the changes are outside of Fluor's scope of work and are compensable.

### 2. Exhibit I and Fluor's Narrative Proposals

Fluor argues that BAE is responsible for costs that were expressly omitted from its narrative cost proposals. However, the Parties dispute whether the Fluor's narrative proposals submitted to BAE were incorporated into the final Subcontract. BAE argues that the narrative cost proposals are excluded by the Subcontract's integration clause which reads in relevant part, "these terms and conditions supersede the terms and conditions of your proposal or acknowledgement form…." JX2 at FFS00376750; s*ee* Dkt. 478 at 24. Instead, BAE asserts that the Subcontract only includes the two spreadsheets expressly referenced in the list of attachments under "Exhibit I Supplier Proposal (Nov. 25, 2015)." *Id.* at 22. Fluor counters that the Subcontract incorporated Fluor's final narrative cost proposal, submitted in October 2015, through references to the "accepted proposal" in the Statement of Work. Dkt. 480 at 8. Alternatively, Fluor argues that the October 2015 narrative cost proposal was incorporated into the Subcontract through course of dealing. *Id.* at 24–25. I find that the Subcontract is ambiguous on this point, and the relevant extrinsic evidence suggest that the Subcontract includes Fluor's final narrative proposals, the October 13, 2015 Cost Proposal, JX4-5, and the November 16, 2015 Technical Proposal, JX4-7 were incorporated.

The language of a contract is ambiguous if "it may be understood in more than one way or when it refers to two or more things at the same time." *Video Zone, Inc. v. KF & F Props.*, *L.C.*, 594 S.E.2d 921, 923 (2004). "Such an ambiguity, if it exists, must appear on the face of the instrument." *Id.* at 924 (cleaned up). Here, the use of the phrase "accepted proposal" to define the

scope of the project in the Statement of Work directly contradicts the language of the integration clause. As a result, it is unclear whether Fluor's "accepted proposal" is or is not incorporated into the Subcontract. Similarly, the phrase "accepted proposal" could be understood to refer to either the spreadsheets labeled "Exhibit I: Supplier Proposal (Nov. 25, 2015)" or a different proposal accepted by BAE. "Exhibit I: Supplier Proposal (Nov. 25, 2015)" refers to two specific spreadsheets submitted on a particular day. However, "accepted proposal" may refer to a collection of documents comprising a broader accepted proposal. Thus, the Subcontract may be interpreted in different ways and is, therefore, ambiguous.

"When the terms of an agreement are ambiguous, a court will consider parole evidence to ascertain the intent of the parties." *See Video Zone*, 594 S.E.2d at 924. "Generally, the parties' interpretation and dealings with regard to contract terms are entitled to great weight and will be followed unless doing so would violate other legal principles." *Id.* (cleaned up). Thus, "uncertain rights of parties may be determined and fixed by their practical dealings with each other." *Id.* (citing *John H. Maclin Peanut Co. v. Pretlow & Co.,* 11 S.E.2d 607, 611 (Va. 1940)).

Here, there is evidence of "the parties' interpretation and dealings" that support both interpretations. However, I find the weight of the evidence suggests that both Parties believed that Fluor's October 13, 2015 Cost Proposal and November 16, 2015 Technical Proposal were incorporated into the Subcontract. Throughout the course of performance, both Parties referenced the two proposals in seeking entitlement to or in rejecting/accepting PCNs. For example, in support of PCN D00M1 Fluor wrote,

> Fluor proposal dated October 15, 2015 cites, 'The Structural Steel Fireproofing price is based on a 2 hour rating for the Dewater/Packout Building and the Nitration Building' (Tab 3, Attachment 2). No Stabilization Building fireproofing work is required by the contract." . . . Since these intumescent coatings were specifically excluded from the proposal, adding the requirement after contract award is a change to the contract.

D0569A. BAE ultimately agreed to pay PCN D00M1. JX2-22.

Similarly, Fluor submitted PCN F1, NB, SB & DWP seeking an adjustment for the addition of a concrete roof based on an assumption in the November 16, 2015 proposal— "Deleted the requirement for a concrete roof per design review meeting, 8.18-8.21.15." D1279. In reviewing the PCN, Michael Dargel, BAE's Chief Engineer, relied on this assumption in recommending that BAE approve Fluor's request:

> During the cost reduction meetings in Aug. 2015, BAE had no specific requirement for a concrete roof and agreed with Fluor's assumption in the bid that no concrete roof was required. Fluor determined later as part of the Life Safety Code Analysis that 1 hr rated roofs were required in some area. Because of this discussion at the cost reduction meetings, BAE agrees to fund this PCN.

D0989.03.

Finally, Lemon testified that BAE relied on a document titled the Supplemental Item Register to reject Fluor's claim for an equitable adjustment resulting from the need to install a larger chiller system (PCN D00E6) than originally specified. Tr. Day 3 (Lemon) at 74:2–76:7. Lemon explained that Fluor was not entitled to compensation because Fluor indicated in the Supplemental Items Register that it was aware, pre-bid, that a larger chiller would be required. *Id.* BAE's expert, Robert McCue, reiterated this argument in his testimony. Tr. Day 12 (McCue) at 260:18–261:6. As Fluor notes in its post-trial brief, the Supplemental Items Register is only referenced in the October 13, 2015 narrative proposal. JX4-5 ("Fluor's pricing is also based on the Supplemental Items Register resulting from discussion meetings with BAE during the week of August 17, 2015 – August 21, 2015"). Thus, BAE's denial of Fluor's chiller system PCN based on the Supplemental Items Register supports a finding that the October 13, 2015 narrative proposal is included in the Subcontract.

BAE cites two pieces of evidence in support of its view that the Subcontract only

includes the two spreadsheets transmitted on November 25, 2015. Neither are persuasive. First, BAE points to an email from Lura Lewis, Director, Fluor Government Group, circulating the "Definitized Contract." P0663. She writes,

> We have signed the BAE subcontract and are awaiting BAE's countersignature, which should occur NLT Monday. Attached are the documents which make up the contract and are part of the Baseline against which we must manage change.

*Id.* BAE reads this to mean that any document not attached to the email is excluded from the Subcontract. BAE reasons that since the attachment does not include Fluor's narrative proposals, they are not part of the Subcontract. Dkt. 476 at 27. This interpretation is obviously flawed. There are numerous documents which the Parties agree are incorporated into the Subcontract but are not included in the attachment, including, but not limited to, the November 25, 2015 spreadsheets, Appendix F, and the PFDs and P&IDs. *See generally* P0663.

Second, BAE cites an email from Greg Hagerman, Fluor's "Director Operations North America," stating, regarding a proposed PCN, "I am not sure how our proposal plays into this if we had a caveat in our proposal, but it was not incorporated in the 'Signed' contract." Dkt. 478 , Ex. xiv. Although Hagerman's comment appears to support the contention that the proposal was not included in the final contract, he explained in his deposition that he "wasn't sure if [the PCN] fell into' an exclusion in the contract." Hagerman Dep. at 207:14–21. With this context, it is clear Hagerman was simply not familiar with the exclusions in the contract. The email supports Fluor's position that there were assumptions and exemptions built into the Subcontract. Accordingly, to the extent Fluor's PCNs are based on work that was exempted from the Subcontract in the 2015 narrative cost proposal, I find that the changes are compensable.

### 3. Notice and Authorization Requirements

BAE argues that Fluor is not entitled to an equitable adjustment for several PCNs because

Fluor failed to comply with the notice and authorization provisions described in the Changes Clauses. Fluor argues in response: 1) BAE had actual notice of the changes detailed in the PCNs; 2) claims involving defective specifications do not require notice; 3) Virginia's "Prevention Doctrine" excuses any condition precedent requiring approval for changes; and 4) BAE waived the ability to enforce the Subcontract's notice and authorization provisions by failing to enforce them prior to this litigation. *See* Dkt. 479 at 90–93. I find that generally Fluor is not entitled to an equitable adjustment unless it followed the notice requirements detailed in Subcontract Section 1A(3) or the changes stemmed from defects in the specifications in Appendix G, the process equipment listed in Appendix F or the PFDs and P&IDs.

The Subcontract contains two clauses ostensibly governing changes to the contract— Section 1A (3) and FAR § 52.243-4. Both provisions require BAE to make an equitable adjustment to the Subcontract price to compensate Fluor for work outside of its original scope. However, the provisions describe different procedures by which the parties provide notice of changes and approve proposed work.

Section 1A (3)(e) permits BAE to "at any time, exclusively by written order signed by its Procurement Representative….make changes within the general scope of the contract." FFS0203635. If the prescribed change "causes an increase or decrease in the cost of or the time required for performance of this contact," Section 1A(3)(a) requires BAE to make an "equitable adjustment…in the contract price, delivery schedule, or both…" *Id.* To receive an equitable adjustment, Fluor must submit "a complete change proposal fully supported by factual information" within 30 calendar days[9] of receiving "the written change authorization." *Id.* The

---

[9] The thirty calendar days requirement appears to be contradicted by a subsequent paragraph in Section 1A(3), which requires Fluor to "submit any 'proposal for adjustment'…within seven (7) days from the date of receipt of the written order." *See* FFS02036354. However, to the extent the

provision reserves to BAE "sole discretion" to consider claims for equitable adjustment asserted after 30 days. *Id.*

Section 1A(3)(c) acknowledges that BAE personnel may "from time to time render assistance, give technical advice, discuss, or exchange information with [Fluor's] personnel concerning the work." However, these sections require that Fluor, to the extent it perceives this information as an "actual or constructive change," must "notify the BAE . . . Procurement Representative and shall not accept such direction or perform said action unless authorized by" the procurement representative. Section 1A(3)(c)–(d). Section 1A(3)(b) also makes clear that Fluor "shall not implement any changes or modifications to this contract…without first having received written authorization to do so from BAE . . . Procurement" and that BAE is not liable for costs that result from "[Fluor's] implementation of changes or modifications that BAE SYSTEMS' Procurement Representative did not first approve in writing." *Id.*

Like Section 1A(3)(e), FAR 52.243-4(a) permits BAE SYSTEMS to make changes in Fluor's work by written order. Likewise, it also requires Fluor to "assert its right to an adjustment" within 30 days of receiving a written order. FAR 52.243-4(e). However, in contrast to Section 1A(3), the FAR does not require "a complete change proposal fully supported by factual information" for an adjustment. Rather, it simply requires Fluor to submit "a written statement describing the general nature and amount of the proposal…" *Id.* Nor does the FAR require written authorization from the BAE SYSTEMS's Procurement Representative to proceed with an oral order. Instead, it simply requires Fluor to submit a written notice stating "(1) The date, circumstance, and source of the order; and (2) that the [Fluor] regards the order as a change

---

Parties believe there was deadline on the submission of a proposal/claim for adjustment, both appear to accept that 30 days is the applicable deadline. *See* Dkt. 476 at 66; Dkt. 479 at 73–74, 93.

order." FAR 52.243-4(b). Finally, unlike Section 1A(3), the FAR addresses "adjustments based on defective specifications…." For these adjustments, the FAR does not impose a deadline for submitting a claim for an equitable adjustment, so long as the claim is asserted before "final payment under this contract."

### a. BAE Had Actual Notice of Changes

Fluor first argues that it timely disclosed all PCNs on "PCN Logs" which were "shared weekly between the parties, including BAE's authorized procurement representative." Dkt. 479 at 72. The logs included, among other things, the "Notification Date," the "Date Submitted to BAE" and a short description of the proposed change. *E.g.* Ex. D745. Citing case law interpreting FAR notice requirements, Fluor argues that the Subcontract's notice and authorization provisions are satisfied by the PCN logs because BAE had actual notice of the PCNs. Dkt. 479 at 90–91. *See Nova Group/Tutor-Saliba v. United States*, 159 Fed. Cl. 1, 56–57 (2022) ("Although FAR 52.243-4(d) requires 20 day-written notice of changes, there is an exception to the 20-day notice requirement where, as here, the Government had "actual or imputed notice of the circumstances giving rise to the claim."). I agree.

However, to the extent Fluor argues that the PCN Logs satisfy Sections 1A(3)(b)–(f) requirement that a BAE procurement representative approves changes in writing, I find that "actual notice" of changes is insufficient. While some courts have found that actual notice satisfies written authorization provisions in contracts which incorporate FAR 52.243-4 through the "constructive-change doctrine," others have held that contract specific provisions regarding modifications like those contained in Sections 1A(3)(b)–(f) should be given effect. *Compare L3Harris Mar. Servs., Inc. v. BAE Sys. Norfolk Ship Repair Inc.*, No. 2:23cv259, 2024 WL 4642961, at *18 (E.D. Va. Oct. 30, 2024) *with Len Co. & Assoc, v. United States,* 385 F.2d 438,

443 (Ct. Cl. 1967). *See also Info. Sys. & Networks, Corp. v. United States,* 81 Fed. Cl. 740, 748 (2008), *aff'd,* 356 F.App'x 410 (Fed. Cir. 2009) (recognizing that the constructive change doctrine may not apply "in the face of contract provisions that not only indicate that all changes are to be approved in writing by the contracting officer, but also repeatedly warn that the contractor should not perform additional work without such a written order…."). The latter interpretation is consistent with the principal that conflicting contractual provisions should be harmonized as to effectuate the intention of the parties as expressed in the contract as a whole. *Plunkett v. Plunkett*, 624 S.E.2d 39, 42 (Va. 2006) (quoting *Ames v. American Nat 'l Bank of Portsmouth*, 176 S.E. 204, 217 (Va. 1934)). Here, both parties are sophisticated and would not have included Sections 1A(3)(b)–(f) unless they intended for all changes, actual or constructive, to be approved, in writing, by a BAE procurement representative. A reading of the contract that incorporates the notice requirements of FAR 52.243-4 and the authorization requirements of Sections 1A(3)(b)–(f) gives meaning to both provisions and effectuates the parties' intent.

**b.  Defective Specifications**

Fluor next argues that the Changes Clauses do not require notice of a change where the change arises from defective specifications. Dkt. 479 at 91. I agree. FAR 52.243-4 expressly exempts "adjustment[s] based on defective specifications" from its requirement that the Contractor give written notice of change.[10] *See* FAR 52.243-4 ("[E]xcept for an adjustment based on defective specifications, no adjustment for any change . . . shall be made for any costs incurred more than 20 days before the Contractor gives written notice as required."). However, I reject Fluor's contention that any defect in the Lauren design is a "defective specification." *See* Dkt. 479 at 91. Courts interpreting FAR 52.243-4 have found that the phrase "defective

---

[10] By contrast, Section 1A(3) does not address changes arising from defective specifications.

specification" refers only to specifications with which the contractor was obligated to comply.
*See Fireman's Funds Ins. Co. v. U.S.*, 92 Fed. Cl. 598, 652 (2010) (distinguishing between
specifications that "explicitly state how the contract is to be performed and permit no deviations"
and specifications that "specify the results to be obtained and leave it to the contractor to
determine how to achieve those results"). As noted above, Fluor was only required to comply
with the specifications in Appendix G, the process equipment listed in Appendix F, or the PFDs
and P&IDs. Accordingly, FAR 52.243-4's exception to the notice requirement for defective
specifications applies only to changes stemming from defects in the specifications in Appendix
G, the process equipment listed in Appendix F, or the PFDs and P&IDs.

### c. Virginia's Prevention Doctrine

Fluor also argues that the "prevention doctrine" precludes BAE from asserting that Fluor
is not entitled to certain equitable adjustments because it failed to get written approval for certain
changes. Dkt. 479 at 92. The prevention doctrine is the "principle . . . that if one party to a
contract hinders, prevents or makes impossible performance by the other party, the latter's
failure to perform will be excused." *Rastek Constr. & Dev. Corp. v. Gen. Land Com. Real Est.
Co., LLC*, 806 S.E.2d 740, 745 (Va. 2017) (citation omitted). "[T]he doctrine precludes the
preventing party from recovering damages for the resulting nonperformance by the party
prevented or from otherwise benefit[ing] from its own wrongful acts." *Id.* at 745–46 (citation
omitted). However, the Virginia Supreme Court has construed the prevention doctrine narrowly,
holding that it "has no application when the hindrance is due to some action of the promisor
which he was permitted to take under either the express or implied terms of the contract." *Id.* at
746. Quoting the First Restatement of Contracts the Court wrote, "the prevention doctrine does
not apply when 'the terms of the contract are such that the risk of such prevention or hindrance

as occurs is assumed by the other party.' " *Id.* (quoting Restatement First of Contracts § 295(b) (Am. L. Inst. 1932)).

Here, Fluor asserts that BAE prevented it from receiving approval to "perform changed Work" by failing to "acknowledg[e] that Fluor was performing extra work (i.e. reconciliation PCNs)." Dkt. 479 at 92. The contract permits BAE's procurement to deny its approval of change work. It also provides that in the event of a dispute about the existence of a change or the extent of a change, Fluor is required to continue work. JX2 at FFS02036354, Section 1(A)(3)(m). Thus, the Subcontract assigns "the risk of…prevention or hindrance" of the condition precedent— written approval of change work— to Fluor. Accordingly, I find that BAE is not liable for equitable adjustments resulting from changes it did not approve.[11]

### d. Waiver and Contract Modification

Finally, Fluor contends that the Parties modified and/or waived the Subcontract's notice, approval and PCN submission provisions through their course of dealing. In support, Fluor argues that BAE never rejected Fluor's PCNs "because [BAE] alleged the PCNs were either untimely or lack notice," and, conversely, BAE "approved PCNs were notice…was submitted past 30 days after the change was identified, and where no written authorization was provided." Dkt. 479 at 93. I find that this evidence is insufficient to establish that the Subcontract was modified through course of dealing or that BAE waived its right to deny PCNs, because Fluor failed to follow the Subcontract's notice, approval and PCN submission provisions.

"[A] course of dealing by contracting parties, considered in light of all the circumstances,

---

[11] There are circumstances under which Virginia's prevention doctrine might excuse the notice and authorization provisions. For example, if Fluor had evidence that BAE avoided giving approval in writing, consistently issued approval from individuals other than the Procurement Representative, etc. that would demonstrate that BAE prevented Fluor from satisfying these conditions precedent.

may evince mutual intent to modify the terms of a contract." *Cardinal Dev. Co. v. Stanley Constr. Co.*, 497 S.E.2d 847, 851 (Va. 1998) (citing *Kent v. Kent*, 34 S.E. 32, 33 (Va. 1899)). But the circumstances surrounding the parties' conduct "must be sufficient to support a finding of mutual intention that the modification be effective and such intention must be shown by clear, unequivocal, and convincing evidence, direct or implied." *Reid v. Boyle*, 527 S.E.2d 137, 145 (Va. 2000). Similarly, a party asserting that another party has waived a contractual right must prove "knowledge of the facts basic to the exercise of the right and the intent to relinquish the right are essential elements." *Reston Surgery Ctr. v. City of Alexandria*, 750 S.E.2d 214, 221 (Va. Ct. App. 2013) (cleaned up).

Here, Fluor's only evidence of BAE's intent to modify the Subcontract or relinquish its rights is the company's failure to enforce the notice and approval procedure consistently throughout contract performance. This, without more, is insufficient to establish a contract modification. *Id.* at 222–23. Nor is it sufficient to show waiver. As the Virginia Supreme Court explained in *Stanley's Cafeteria*, "an obligee's acceptance of less than full performance by the obligor does not prove intent to relinquish the right to enforce full performance." *See* 306 S.E.2d at 873 (finding no waiver even where a "lessor accepted smaller monthly payments than those the lessee was obligated by the lease to make" over a span of eighteen years.).

Additionally, the limited evidence presented at trial regarding the issues of waiver and implied modification suggests that neither party believed that the notice and approval provisions were no longer applicable. For example, in May 2018, Brian Hansel, emailed a BAE procurement represent seeking approval to proceed with change work. He wrote:

> With respect to D00T4, Fluor is seeking written authorization to proceed with this contract change…As for schedule impact for D00T4, the purchase of the additional materials to install is not within the current scope of contract and that is the portion that needs BAE written authorization to proceed. Failure to provide direction may

impact the schedule as Fluor is unable to proceed with the installation activities without the materials.

D0825.332. This plainly shows that Fluor believed it was obligated to comply with Section 1A(3)(b)'s prohibition against "implement[ing] any changes or modifications to this contract…without first having received written authorization to do so from BAE SYSTEMS Procurement." *See also* Trial Tr. Day 9 (Combs) 50:15–51:8 (showing that Fluor required formal direction before proceeding with work outside of its scope). Similarly, in October 2018, Kathy Kozak Roberts, a BAE contract manager, sent Fluor a letter denying several of Fluor's PCNs in which BAE calls out Fluor's failure to comply with Section 1A(3)(c)'s notice and Section 1A(3)(a)'s PCN submission requirements. BAE wrote:

> Fluor, again, issued no Notice of Change or other complaint contemporaneous with the change in arrangements, on June 29, 2018, well over a year after the fact, Fluor submitted PCN D0064 – Subcontractor Parking, claiming $2,312,098.03 for the alleged impact of the change in BAE Systems-provided parking areas for Fluor subcontractors.

P0019. Earl Lemon, who was involved in drafting the letter, explained at trial that the purpose of this sentence was to notify Fluor that it had not performed its contractual obligations. Trial Tr. Day 3, 85:19–86:7. BAE ultimately rejected PCN D0064 on its merits—not for failure to comply with the notice and PCN submission requirements. *See* P0019. Thus, BAE waived its right to enforce these requirements as to PCN D00064. However, by acknowledging that Fluor violated the Subcontract's Notice and PCN submission requirements, it negated any intent to amend the provision and reserved the right to enforce them on future change work. Accordingly, I find that BAE has not waived its general right to enforce the Subcontract's notice, approval and PCN submission provisions. Likewise, I find that these provisions have not been modified through the Parties' course of dealing.

44

### B. Breach of the Implied Warranty of Design Adequacy and *Spearin Doctrine*

Fluor asserts that it is entitled to recovery for breach of the implied warranty of design adequacy under *United States v. Spearin*, 248 U.S. 132 (1918), because the Lauren design contained latent defects and was not 85 percent complete, as represented by BAE. I disagree.

Under *United States v. Spearin*, a contractor who "is bound to build according to plans and specifications prepared by the owner . . . will not be responsible for the consequences of defects in the plans and specifications," even where the contractor agreed to "examine the site, to check up the plans, and to assume responsibility for the work until completion and acceptance." 248 U.S. 132, 136–37 (1918). The Supreme Court of Virginia adopted the *Spearin* doctrine in *Southgate v. Sanford & Brooks, Co.*, 137 S.E. 485, 487–88 (Va. 1927), but later modified it in *Greater Richmond Civic Recreation, Inc. v. A.H. Ewing's Sons, Inc.*, 106 S.E.2d 595, 597 (Va. 1959). In *Greater Richmond*, the court stated that a contractor who is bound to follow "plans and specifications" provided by the owner of the project will not be held liable for defects in those plans so long as the contractor did not expressly warrant that the plans are free from error. *Id.* However, subsequent Virginia courts have clarified that *Spearin* is not applicable where the contractor assumes responsibility for the design. *See Modern Continental South v. Fairfax County Water Auth.*, No. CL7004-2225019, 2006 WL 3775938, at *3 (Va. Cir. Nov. 21, 2006) (finding *Spearin* did not apply where the contractor was required to "verify all . . . details shown on the drawings…received from the Engineer" and to "notify him of all errors, omissions, conflicts and discrepancies."). *See also D.C. McClain Inc. v. Arlington Cnty.* 452 S.E.2d 659, 664 (Va. 1995) (finding that an owner was not responsible for errors in the drawings because the contract required that the "measurements and dimensions…be verified at the site by the Contractor.").

45

While the Subcontract unambiguously describes which Lauren design documents Fluor was required to use, *see supra* Part IV(A)(1), it is ambiguous as to whether Fluor assumed responsibility for the Facility design. *See BAE Sys. Ordnance Sys., Inc. v. Fluor Fed. Sol., LLC*, No. 7:20cv587, 2022 WL 969773, at *15 (W.D. Va. March 30, 2022). However, the money included in the Subcontract for design services and the testimony at trial makes clear that Fluor accepted responsibility for the accuracy of the design. Accordingly,  I find that BAE did not impliedly warrant that the existing Lauren design "was sufficient and free from defects."

Fluor essentially argues that it was only responsible for completing the Lauren design. But that argument is undermined by the fact that the Subcontract included almost $15 million for design services, *see* JX2, Ex. I-1, the same amount BAE purportedly paid Lauren for the entire Facility design. *See* D0825.097. Fluor's contention that BAE agreed to pay the same amount it had previously paid to Lauren for a full design of the new plant for Fluor to merely complete an already existing design is not credible.

Additionally, Michael Connors, Fluor's lead engineer on the project, testified at length at trial about Fluor's responsibility for the facility design. Connor confirmed that Fluor was the "designer of record" and "had an obligation to update the [Lauren] drawings and complete them after [Fluor] validated." Trial Tr. Day 7 (Connors) 262:18–24. He emphasized that drawings were "a starting point" because Fluor could not "stamp" the drawings as they were. *Id.* 259: 25; 260:1; 262:7–17. *See also id.* 255:14–17 ("Q:…So as the designer of record, Fluor…they couldn't just take the Lauren drawing that they determined they wanted to use and just stamp it, right? A: No."). He also confirmed that Fluor had the discretion to modify the Lauren drawings to meet the Subcontract requirements and relevant code:

> Q:  [I]t was Fluor's discretion as designer of record to determine how they were going to meet the requirements and the codes?

> A: We were responsible to meet them, yes.
> …Q: So the solutions, engineering solutions you were coming to in completing the drawings once you decided to use them, those were your decisions, your discretion as the designer of record as long as the codes were met?
> A: As long as you meet the contract requirements, yes but that didn't happen.

*Id.* 263:23–25; 264:1–11. It is clear from this testimony that Fluor was ultimately responsible for ensuring the adequacy of the facility design. It was responsible for guaranteeing that the design met the contractual requirements and satisfied the relevant codes and was given the discretion to modify the designs to achieve those aims.[12] As such, BAE is not liable for latent defects in the Lauren design and Fluor may not recover under *Spearin. See Modern Continental South,* 2006 WL 3775938, at *3).

To the extent Fluor's *Spearin* claim relies on a warranty that the Lauren design was 85 percent complete, I find that no such warranty existed. Fluor argues in numerous PCNs that because it relied on BAE's representation about the completeness of the design in formulating its bid, BAE impliedly warranted that the design was as complete as represented. This argument is flawed for two reasons. First, under Virginia law, an implied warranty of design is not created where, as here, a contractor assumes responsibility for the design, *see supra*. Second, the Subcontract disclaims any express precontracting representations:

> BAE SYSTEMS assumes no responsibility…for any understandings reached or representations made by any of its officers, employees or agents prior to the execution of the Contract, unless (1) such understanding or representations are

---

[12] Notably, the Parties agree that Fluor was, at a minimum, required to use certain documents provided by BAE. *E.g.*, Dkt. 479 at 17; Dkt. 476 at 14 (acknowledging that Fluor was required to use the PFDs and P&IDs). To the extent costs arise from defects in these documents, BAE is liable, *see supra* Part IV(A)(1).

expressly stated in this Contract and (2) this Contract expressly provides that the responsibility therefore is assumed by BAE SYSTEMS.

JX2, Section 1C.21.c. (FFS02036362).[13]

Likewise, to the extent Fluor's 85% relies on a theory that BAE materially misrepresented the state of the Lauren design. I find Fluor's claim is not viable, because it was not reasonable for Fluor to rely on BAE's representation about the completeness of the design.[14] Fluor spent months reviewing the design and was aware it was not 85% complete during the bidding period. *See Beck v. Smith*, 538 S.E.2d 312 (Va. 2000) ("Reliance may not be justified . . . when a potential buyer undertakes an investigation regarding the matter at issue.") For example, Fluor's initial design partner, Burns & McDonnell, repeatedly conveyed to Fluor that the design was less than 85% complete. *E.g.* P0165 ("Overall existing design [was] approx. 50%"). Similarly, Fluor's engineering firm, Zapata, identified numerous "examples of where the design documents are missing information or where the information is incomplete." Michael Connors, Fluor's engineering manager, conceded during his deposition that this "got [him] to start to be concerned that the design may not be 85% complete." Trial Tr. Day 8 (Connors) at 60:11–22. And, Thompson, Fluor's piping contractor, recognized that the design was incomplete and refused to "take the risk of the quantity growth to go from wherever the design was in 2015 to

---

[13] Fluor also suggests in passing that the 85% representation was incorporated into the contract through the Design Configuration Management Plan, which was referenced in Subcontract Mod. 33. Fluor Proposed Findings of Fact and Conclusions of Law at 86. However, Subcontract Mod. 33, which was approved in October 2020—5 years after the Subcontract—only references to the Design Configuration Management Plan is in a list of deliverables for which Fluor is responsible. JX2-33 at 6. There is no evidence that the Parties intended to incorporate the Design Configuration Management Plan or any other of the dozens of deliverables listed in Mod. 33.

[14] Fluor filed only a breach of contract claim and has not asserted any claims for fraud or fraud in the inducement.

wherever it ended up at IFC level." Bryant Dep. 33:11–34:6. Accordingly, BAE's representation that the Lauren design was 85% complete is not a valid basis for recovery.

### C. Breach of the Duty of Good Faith and Fair Dealing

Finally, Fluor alleges that BAE breached the express and implied duty of good faith and fair dealing by denying and/or reducing its PCNs. *See* Fluor Findings of Fact and Conclusions of Law at 88. BAE responds that it acted within its discretion not to pay Fluor for non-compensable work. BAE's Post Trial Brief at 104. I agree and find that Fluor failed to prove a breach of the express or implied duty of good faith and fair dealing.

The Subcontract expressly requires the Parties to "negotiate in good faith to resolve any . . . claim, dispute or cause of action." JX2 at §19(b). Additionally, like all contracts governed by the laws of Virginia, the Subcontract contains an implied covenant of good faith and fair dealing. *See Va. Vermiculite, Ltd. v. W.R. Grace & Co.*, 156 F.3d 535, 541–42 (4th Cir. 1998). The implied duty prevents a party from acting arbitrarily or unfairly in exercising its contractual discretion. *See Stoney Glen, LLC v. Southern Bank and Trust Co.*, 944 F.Supp.2d 460, 465–66 (E.D. Va. 2013).

Fluor alleges that BAE abused its discretion to deny PCN's under the Subcontract's Changes clause by:

> failing and refusing to pay Fluor despite acknowledging changes; delaying and accelerating work without the intent to compensate Fluor; failing to pay all due and owing; failing to compensate Fluor for increased costs arising from BAE's actions and changes related to the Process Design; issuing changes to Fluor's scope of work under the NC Facility Subcontract without the intent to compensate Fluor for such changes; and failing to cooperate with Fluor in correcting the defective design BAE furnished to Fluor

Fluor Findings of Fact and Conclusions of Law at 89–90. While BAE denied some PCNs to which Fluor was entitled compensation, *see infra* Part IV(D)(3), Fluor has not demonstrated that these denials were a product of bad faith. Rather, the evidence shows that BAE, engaged in an

in-depth technical review of Fluor's PCNs, negotiated the PCNs pricing, and, ultimately, paid numerous PCNs. As the project progressed, and it became increasingly clear that the facility would far exceed the Subcontract price, *both* parties sought to avoid bearing the cost of the overruns—Fluor by submitting PCNs and BAE by denying PCNs. Thus, I find that BAE did not breach the duty of good faith and fair dealing.

### D. Individual PCNs & Credits

Fluor's PCNs can be divided into three categories—"Reconciliation" PCNs, discreet PCNs, and delay PCNs. Fluor's "Site Work Credit" and "Blend Tank Credit" are addressed separately.

#### 1. Reconciliation PCNs

The bulk of damages claimed by Fluor flow through what it calls Reconciliation PCNs. D0821 at 22. Fluor argues that these PCNs "result from addressing a wide variety of process design changes that occurred" and are assessed by "comparing the as-bid and as-built facilities." D0818 at 3. *See* Fluor Proposed Findings of Facts and Conclusions of Law at 24–29. BAE challenges Fluor entitlement to the Reconciliation PCNs because, among other things, Fluor failed to prove a causal connection between alleged process design changes and the costs included in the PCNs. These PCN's are Fluor's retrospective view of the project and its attempt to recover damages for costs its bid failed to anticipate or for risks it accepted under the contract. I find that Fluor is not entitled to recover for the Reconciliation PCNs.

##### a. PCNs D00Y9, D00T4, D001Z, D002E[15]

Fluor calculated PCNs D00Y9, D00T4, D001Z and D002E by comparing Fluor's cost

---

[15] These PCN's are as follows: D00Y9-HVAC and Fire Sprinkler Reconciliation ($13,177,057), D00T4- Electrical Reconciliation (Including S5 and Z7)($4,851,702), D001Z-Scaffolding Impacts ($2,880,127), and D002E-Commissioning Cost- MMR Group, Etc. ($2,896,025).

estimates or subcontractor bids based on the Lauren Design documents with the actual costs incurred plus "markups for indirect costs and profit." *E.g.,* D821 at 27–28 (explaining PCN D00Y9). For example, Fluor's accounting expert explained in his supplemental rebuttal report that PCN D00T4 Electrical Reconciliation "is based on estimated unit costs (prepared by Fluor) for control valves, instrumentation requirements and pressure safety valves multiplied by the quantity increase (IFB v. IFC)[16] for each." D821 at 17–18. Fluor makes no attempt to tie specific cost/quantity increases to specific changes directed by BAE. Nor does it tie the increases to defects in the BAE/Lauren specifications and documents that Fluor was required to use, *see supra* Part IV(A)(1), or even defects in the broader collection of Lauren documents. Rather, the PCNs assert that <u>all</u> cost increases are associated with "constant changes in BAE's process design" and "tremendous growth in the scale of the project" resulting from BAE's misrepresentation that the Lauren design was 85% complete and defects in the design. D760.[17]

These general assertions do not support Fluor's entitlement to an equitable adjustment for these PCNs. Under the Subcontract, BAE is only responsible for out-of-scope changes directed by the company. *See supra* IV(A)(1). On the other hand, Fluor bears the risk of unexpected in-scope expenses or cost overruns. That is the nature of a firm-fixed-price contract. *See Fluor Fed. Sol., LLC v. BAE Sys. Ordnance Sys., Inc.*, No. 7:19cv698, 2004 WL 4635304, at *35 n.12 (W.D. Va. Oct. 30, 2024) ("In a firm-fixed-price contract, unexpected changes like increasing costs or the contractor needing to spend more on raw materials have no bearing because the price is set and not subject to change."). Because Fluor lumped all the cost increases together it did not provide sufficient evidence for the Court to evaluate which cost increases are the responsibility

---

[16] IFB refers to "Issued for Bid" and IFC refers to "Issued for Construction." *See* D0818 at 53, 106.
[17] Fluor uses the same language to justify PCNs D001Z, D002E, D00T4, D00Y9.

of BAE and which are the responsibility of Fluor.

To be sure, Fluor does identify specific BAE-caused changes in some of its PCNs as the source of "unforeseen costs to Fluor." D0825.451 at BAE_RAD3945948. For example, in PCN D00Y9, Fluor cites BAE's decision to "change[] the means of providing heat to coils in the roof-top AHUs from hot water, which was specified in the Lauren design, to steam" and necessity of switching from a ductless HVAC system to "a roof mounted direct expansion HVAC system." *Id.* However, because Fluor does not assign any monetary value to the individual changes, the evidence is insufficient for the Court to determine how much of the cost increases are due to the changes and how much are merely cost overruns. Accordingly, I find that Fluor is not entitled to PCNs D00Y9, D00T4, D001Z, D002E.[18]

### b. PCNs D002D, D00F5, D001J, D00W5, D00X2[19]

Fluor also seeks compensation for changes related to the amount and type of piping in the NB (D00W5), D0818 at 92 – 94, SB (D00X2), DWP Building (D001J), *id.* at 103–04, the ATF and site (D00F5), *id.* at 99–101, and the expansion of structural steel requirements through the project (D002D), *id.* at 106. To calculate the value of the piping reconciliation PCNs, Fluor compared the "quantities and costs" between the Lauren Design and final design for the pipeline in each of the various buildings. Fluor then categorized each change in quantity and cost based on the reason for the change. It assigned three categories for which BAE is purportedly

---

[18] I find that PCNs D00Y9, D002E, D001Z should also be denied because Fluor failed to comply with the Subcontract's notice and authorization requirements. Since the reconciliation PCN's are a retrospective effort to recover unexpected cost increases on the project, Fluor did not provide to BAE sufficient notice throughout the project of nature and scope of these substantial cost increases prior to completion of the work.

[19] D002D – Steel Reconciliation (Including I9 & Y4)($8,768,454), D00F5 – ATF & Site Piping Changes Reconciliation ($3,384,133), D00IJ – DWP Piping Reconciliation ($3,157,462), D00W5 – NB Piping Reconciliation ($13,989,077), and D00X2 – SB Piping Reconciliation ($11,536,120).

responsible—"MTO Errors," "Equipment Design Changes," and "Process Changes for Completed Systems" D825.447; D825.441; D825.444; D0672.

    None of these categories demonstrate entitlement to compensation. First, "MTO Errors" refers to errors in the "material takeoffs" derived from the Lauren SmartPlant model. D825.447 at 29; D0825.441 at 29; D0825.444 at 31; D0672 at 31. As discussed at length below, errors in Lauren's SmartPlant model are not compensable because Fluor was not required to use the SmartPlant model in making its bid. *See infra* Part IV(D)(3)(q). In fact, Fluor discovered there were errors in the Lauren SmartPlant MTOs related to the quantity of piping during the bidding period and its accepted proposal included an increased piping estimate provided by its then-design partner, Burns. D0821 at 25. "BAE's Equipment Design Changes" and "Process Changes for Completed Systems" categories are based on Fluor's assertion that the process design was not eighty-five percent complete as represented. [20] *See* D0825.447 at 27–29; D0825.441 at 27–29; D0825.444 at 27–31. However, as noted, BAE's eighty-five percent representation was not incorporated into the Subcontract and is therefore not grounds for recovery. *See supra* Part IV(B). Therefore, Fluor fails to demonstrate entitlement to PCNs D00F5, D001J, D00W5, D00X2.[21]

    To calculate the value of the steel reconciliation PCN (D002D), Fluor compared the

---

[20] The Subcontract allocates primary responsibility for the process design to BAE. Accordingly, changes to the P&IDs, which depict the process design, are compensable. However, the Subcontract also requires Fluor to "validate and complete" the P&IDs. Because Fluor attributes all increases in piping/piping material quantities together to its assertion that the process design was not 85% complete, it is impossible for the Court to determine which changes were caused by BAE and which arose from Fluor's obligation to "validate and complete."

[21] I find that PCNs D001J, D00W5, and D00X2 should also be denied because Fluor failed to comply with the Subcontract's notice and authorization requirements for the same reasons previously explained.

quantities, materials and labor associated with the structural steel in the Lauren Design against the final designs. In PCN D002D, Fluor details a number of alleged changes that caused the cost increases in the final design. D0825.452 at 15–17. For example, in November 2016, Fluor alleges that BAE made a number of comments on the structural steel design drawings for the Nitration Building submitted by Fluor which imposed numerous requirements like, "structural beam and column must have a 1 foot minimum clearance from walls," "Steel decking and all accessories must be T304 stainless steel west of column line 3." *Id.* at 15. But the evidence Fluor submitted at trial is insufficient to establish by a preponderance that the changes listed in the PCN were outside the scope of work in the contract and thus compensable as opposed to being part of the contractual scope, and therefore not compensable. Accordingly, I find that Fluor has not met its burden and fails to demonstrate entitlement to PCN D002D.[22]

### 2. Delay Related PCNs

#### a. Fluor Extended General Conditions-D00S3

Fluor claims $45,444,485 in "extended general conditions costs because of BAE-induced delay (D00S3). Dkt. 479 at 43–44; D0821 at 76. To calculate this PCN Fluor's cost expert calculated Fluor's average general conditions costs, including "field support and engineering, labor, materials, other direct costs" as well as general conditions costs recovered in approved PCNs, for each of the five delay measurement periods developed by Fluor's scheduling expert.[23] D0821 at 16–19. He then multiplied that average cost by the number of days of delay attributed to BAE in each period. For example, in Period 1 (April 25, 2016 – February 3, 2017), Fluor's

---

[22] I find that PCN D002D should also be denied because Fluor failed to comply with the Subcontract's notice and authorization requirements for the reasons previously explained.
[23] The expert recognizes that the extended general condition costs change during different periods of the project as the number of tradesmen working simultaneously on the project varies over time.

scheduling expert concluded that BAE was responsible for 135 days of delay. Fluor's cost expert multiplied 135 by Fluor's average daily costs during Period 1—$25,915—to arrive at Fluor's total average cost for Period 1—$3,498,525. *Id.* Fluor's expert than marked up the total average cost for each delay period to account for "profit and indirect costs" *Id.* BAE did not challenge Fluor's calculation of its extended general condition costs – only that BAE was not solely responsible for any delay caused or had any liability for Fluor's increased extended general condition costs.

The damages Fluor claims rely on its scheduling expert's determination that BAE was responsible for 743 days of delay throughout the project. *See* D0821 at 76; D0822 at 5. For the reasons previously stated, I reject this determination and conclude that BAE was responsible for 188 days of delay throughout the project. The delay periods for which BAE is responsible do not match the delay periods as calculated by Fluor. At trial, Fluor has the burden of proving its damages to a reasonable certainty, but the specific amount of the loss need not be proved to an absolute certainty. *MCR Federal, LLC v. JB&A, Inc.*, 808 S.E.2d 186, 195 (Va. 2017). Here, the allocation of specific dates of the 188 day delay attributable to BAE are identified only the periods identified by BAE's expert. *See* P0599 at 47. Fluor's calculation of the extended general condition daily costs are calculated in five separate periods. The time periods used by Fluor's expert overlap, but do not match those used to determined BAE-caused delay. To calculate Fluor's delay damages, the Court has used the lower extended general condition cost applicable to any particular period of delay multiplied by the number of days of delay in a period identified

by BAE's expert.[24, 25] *See Fairfax Cnty Redev. and Hous. Auth. v. Worcester Bros. Co., Inc.,* 514 S.E.2d 147, 152 (Va. 1999) (approving use of the *Eichleay* formula where evidence established a contractor suffered actual damages, and this method of calculation provided "an intelligent and probable estimate" of the damages incurred). The Court determines that an intelligent and probable estimate of the extended general conditions costs of $7,166,595 related to BAE's delay, which when marked up by profit and indirect costs results in an award of $8,055,792.[26]

### b.  Subcontractor Extended General Conditions-D00U7

Fluor also seeks $17,580,938 in "costs in paid to subcontractors for extended general conditions and additional craft labor due to BAE-caused delay" (D00U7). P0214; *see* D0822 at 4. Like PCN D00S3, this PCN is based on Fluor's scheduling expert's rejected allocation of responsibility for the project delay to BAE. *See* D0821 at 76; D0822 at 4. However, unlike the prior PCN, Fluor did not introduce evidence of its subcontractors' daily costs. As a result, Fluor fails to carry its burden of providing a reasonable basis to calculate the damages for the contractor-extended general conditions owed for the 188 days of delay, for which BAE is liable. *See TechDyn Systems Corp. v. Whittaker Corp.*, 427 S.E.2d 334, 337 (Va. 1993) ("[A] plaintiff must present evidence that will show within a reasonable degree of certainty the share of damages for which that defendant is responsible.").

---

[24] BAE's expert found that BAE was *concurrently* responsible with Fluor for certain periods of delay. *See supra* Part III(B). I am persuaded that BAE is solely responsible for those periods of delay, and therefore, Fluor is entitled to be compensated for them. *Id.*

[25] Fluor and BAE's delay measurement periods do not align perfectly. Therefore, the Court uses the lower of Fluor's daily rates applicable to each period of delay.

[26] The markup numbers are pulled from D0822, Attach. 5, Sch. 1. The Court has used the same percentages applied to the profit and overhead used by Fluor's expert as BAE did not offer any evidence that Fluor incorrectly calculated these percentages. I found Fluor's expert persuasive on this issue. Notably, the Court did not include Fluor's added "Consulting and Legal Cost," because Fluor did not provide sufficient information to allow the Court to allocate those costs by delay measurement periods.

### c.  Acceleration PCNs

#### i.   D00Y0

Fluor claims $7,558,305 for "overtime premium and amounts paid by Fluor to subcontractors for acceleration." D0997; D0821 at 20. Under the Subcontract, BAE may direct Fluor to accelerate its work. Costs associated with directed acceleration are compensable. However, Fluor is responsible for acceleration costs required to maintain the Subcontract schedule unless the delay necessitating acceleration is caused by BAE or is otherwise excusable. *See* JX2 at § 28(g) ("In the event delays in the performance of work under this Contract are due to the fault or negligence of [Fluor], its Subcontractor's or its suppliers, or not otherwise an 'excusable delay,' CONTRACTOR shall, at its cost, take all necessary measures to recover schedule."). *See also* JX2 at § 28(d) ("Demands by BAE systems that [Fluor] comply with the Contract Schedule (as adjusted under the terms of the Contract Documents) do not constitute an acceleration.).

To support its claim, Fluor's engineering expert argues that Fluor's acceleration costs were a result of "BAE's directions to Fluor to meet the project's final completion date while at the same [time] making changes to Fluor's scope of work." D0818 at 114. His report cites numerous instances of BAE directing Fluor to complete a particular "effort with no degradation from the...schedule." But neither Fluor's engineering expert nor its cost expert attempt to tie BAE's direction to specific acceleration costs or changes in project scope. Consequently, Fluor has failed to present evidence to establish by a preponderance how much Fluor spent to comply with BAE's orders to accelerate.

Instead, Fluor's final acceleration PCNs are based on its scheduling expert's conclusion that BAE was responsible for 76 percent of the project delay between February 2017 and

February 2019, affecting a majority of Fluor's subcontractors, and 81 percent of the delay between February 2017 and March 2020. D0821 at 21–23. However, for the reasons stated above, Rhodes's report does not accurately allocate responsibility for the delay in the project and therefore cannot serve as a basis for Fluor's recovery. While I agree with Fluor that BAE is responsible for acceleration costs necessitated by BAE-caused delay, Fluor has not provided the Court with sufficient information to calculate with any reasonable certainty the "acceleration" damages Fluor incurred because of the 188 days of BAE-caused delay. Therefore, Fluor fails to prove that it is entitled to its acceleration claims. *See TechDyn Systems*, 427 S.E.2d at 337 ("[A] plaintiff must present evidence that will show within a reasonable degree of certainty the share of damages for which that defendant is responsible.").

### ii.    D002F

Fluor also seeks the increased "costs of coating structural steel due to the change in application from field to shop coating," which Fluor argues was done to accelerate the schedule. Fluor's expert argues that BAE constructively directed Fluor to shop coat the structural steel for two reasons: 1) BAE inquired whether coating, i.e. fireproofing the steel, would impact the schedule; and 2) BAE's general insistence that the project complete date be maintained. D0818 at 126–127. Neither is persuasive. First, BAE did not direct a change by simply asking a question about the schedule. Second, as previously stated, BAE's general directions to Fluor to meet the project's final completion date cannot support recovery for acceleration because they are not tied to any change in project scope or BAE-caused delay. Accordingly, Fluor has failed to show entitlement to PCN D002F.[27]

---

[27] I find that PCN D002F should also be denied because Fluor failed to comply with the Subcontract's notice and authorization requirements.

### 3. Discreet PCNs

#### a. D0068-Water Recovery Tanks

Fluor seeks $7,372,403 for the costs and profit associated with installing water recovery tanks that were a different shape and larger than those included in Fluor's bid. *See* D0509; Dkt. 479 at 68–69. I am persuaded by Fluor's expert that the changes to the water recovery tanks were a result of specific changes BAE made to the P&IDs. *See* D0818 at 118-125. Therefore, the changes were constructively directed by BAE and are compensable. Likewise, I am persuaded by Fluor's expert that $7,372,403 is a fair and reasonable cost for installing the new tanks. Accordingly, Fluor is awarded $7,372,403 for PCN D0068.

#### b. D00B6-Safety Showers

Fluor seeks $6,333,686 for the costs and profit associated with installing an emergency shower heating system. D635. I am persuaded by the contemporaneous communications and trial testimony that the emergency shower heating system was within Fluor's original scope of work, *see* P0280, and is therefore not compensable.

#### c. D00Y3-Replacement of Trimtek Valves with Valtek Valves

Fluor argues that it is entitled to $5,228,279 to compensate it for costs incurred because of BAE's directive to change all "segmented ball valves from Trimteck to Valtek valves." Fluor Proposed Findings of Fact and Conclusion of Law at 71. *See* D0097. The Subcontract required Fluor to use certain brands of valves, including Valtek. P0650. When Fluor installed an alternative brand of valve without BAE's approval, BAE acted within its contractual discretion by insisting Fluor use Valtek valves. *See id.* (requiring certain brands or an "*approved* equal") (emphasis added). Therefore, I find that Fluor is not entitled to PCN D00Y3.

### d. D00E6-Chiller System Changes

Fluor seeks $2,357,012 to compensate it for the difference in the cost of the chillers specified by BAE in the Subcontract and the chillers it was ultimately required to install. *See* D0818 at 152–55. Although the Parties dispute whether Fluor knew or should have known that BAE's specifications were inadequate at the time of the bid, the Parties do not appear to dispute that the specifications ultimately included in the Subcontract were too small to accommodate the needs of the Facility. *See* Dkt. 476 at 96–97. As discussed, BAE provided specifications, like those for the chillers, were defined in Fluor's scope of work as minimum requirements and, thus, changes to these requirements are compensable. Accordingly, I find that Fluor is entitled to PCN D00E6. Further, I am persuaded by Fluor's expert that $2,357,012 is fair and reasonable compensation.

### e. D001N, D00P8, D001B-NOx Stack Relocation

Fluor submitted three PCNs related to relocating, designing and constructing the contractually required NOx Stack. *See* D530, D0719, D511. BAE does not contest that it directed Fluor to relocate the NOx Stack, Dkt. 478 at 103, and it conceded at trial that Fluor is entitled to some compensation for the changes, Trial Tr. Day 5 (Borge) 212:10–14. However, BAE argues that Fluor's NOx Stack PCNs should be denied because they do not reflect a purported "credit" for the NOx Stack included in Fluor's proposals or accurately demonstrate the actual cost of constructing the stack. I disagree. I am persuaded by Fluor's experts that the NOx stack PCNs are fair and reasonable and find that Fluor is entitled to all three. Fluor has established entitlement to $1,827,878 on this claim, *see* D0997, for PCNs D001N, D00P8, and D001B.

### f. D0064-Subcontractor Parking

Fluor claims $627,799 for costs purportedly associated with BAE's decision to move the

parking area designated for Fluor and its subcontractors. *See* D0997; D0821 at 41–42. However, I find that Fluor did not demonstrate that $627,799 is tied to costs it actually incurred because of changes to the parking location. To develop PCN D0064, Fluor "prepared a time study based on a sample of three trips, averaged." D0821 at 42. Fluor concluded that the extra time Fluor's subcontractors spent traveling from the new parking resulted in a "loss of productive time of 2.48% for craft labor for the period from March 2017 to December 2020." *Id.* It estimated that this loss of "productive labor" cost $831,264. *Id.* Fluor "additionally claimed the following costs: Bus Purchase costs; Bus maintenance costs; Bus fuel costs; and Labor costs in preparing the PCN proposal and labor to operate the buses" for a total of $1,202,377. *Id.* at 41–42.

Fluor's expert concluded that this study overestimated Fluor's costs and, without providing a basis for doing so, reduced the PCN by 50 percent. *Id.* 42–43. He testified at trial that the 50 percent reduction was not based on Fluor's costs, but, rather, his own "judgement." Trial Tr. Day 9 (Krafft) 246: 6–18 ("…[W]e don't know that Fluor actually paid more on account of the subcontracts that were already issued. And so, based on that, I just thought, well, judgmentally, let's cut it in half….") I find that this is too speculative to establish a reasonable basis for Fluor to recover on this PCN. Accordingly, Fluor's claim for PCN D0064 is denied.

### g. D00G9-Riggins Material Increase

Fluor argues that it is entitled to $901,349 for "tank and heat exchanger raw material price increases to a Fluor subcontractor due to nearly 11 months of delay as a result of numerous process design delays." D0818 at 164; D0997. BAE does not dispute that it was responsible for changes to the process design that delayed finalizing the tank design. *See* Dkt. 476 at 98–99. Instead, BAE argues that Fluor had sufficient information to order the raw materials for the tank and should have done so, even though the design was not finalized, to avoid increases in the cost

of the materials.[28] *Id.* However, I am persuaded by Fluor's expert and witnesses that it would have been unreasonable for Fluor to order the raw materials for the tanks before the relevant aspects of the process design were completed. Accordingly, I find that Fluor is entitled to PCN D00G9. I am also persuaded by Fluor's damages expert that $901,349 is fair compensation.

### h.  D00B7-NB, SB, DWP Dry Fire Suppression Systems

Fluor seeks $526,115 for the cost and profit associated with installing dry fire suppression systems in the "electrical, communication, and control rooms" (PCN D00B7). Dkt. 479 at 64. Fluor argues that a *dry* fire suppression system was outside its scope of work because its October 13, 2015 Cost Proposal specified that all "[p]ricing based on *wet* system throughout the buildings." JX4-5 at 3; *Id.* BAE counters that the October 13, 2015 Cost Proposal was not incorporated into the Subcontract, and, even if it was, the Statement of Work expressly requires a "compliant clean agent (dry) fire suppression systems….for any area with 'critical process controls.'" Dkt. 476 at 99.

I find that Fluor is entitled to PCN D00B7. First, for the reasons described above, the October 13, 2015 Cost Proposal which provides for a wet system was incorporated into the Subcontract. *See supra* Part IV(A)(2). Second, BAE misrepresents the language in the Statement of Work which requires BAE to use "either fire rated construction *or* a dry fire suppression system."[29] JX2, Ex. E, § E.1.a. at BAE_RAD2509793. There is no conflict between the wet

---

[28] BAE argues that PCN D00G9 should also be denied because Fluor failed to obtain BAE's written authorization for the work. Dkt. 476 at 69. I find that BAE has waived this argument as to D00G9 by failing to raise it in BAE's prior rejection of the PCN. *See* P0680.

[29] BAE also points to Appendix D, Fire Protection and Life Safety Code Analysis as a source of the requirement for a dry agent fire suppression system. Dkt. 476 at 99. However, the plain language of the Statement of Work makes it clear that Fluor was not required to comply with the preliminary life safety code analysis in Appendix D. *See* JX2, Ex. E, § 2.5 at BAE_RAD2508758 ("It is incumbent upon the Subcontractor to review the documents submitted and to perform their own analysis, including Hazard and Operability Studies and Life Safety Code Analysis.").

system described in the October 13, 2015 Cost Proposal and fire rated construction. Therefore, I find that the Subcontract did not require a dry agent fire suppression system. Accordingly, BAE's direction to install such a system constituted a change to Fluor's scope of work and is compensable. Further, I am persuaded by Fluor's damages expert that $526,115 is fair compensation for PCN D00B7.

### i.    D002A-DWP Packout Equipment

Fluor argues that it is entitled to $619,930 for its work assisting another BAE subcontractor install certain equipment. D0818 at 166; D0997; D1084. BAE agrees that Fluor is entitled to some compensation for the work but argues that the $619,930 Fluor seeks does not accurately reflect a credit BAE asserts it is owed. *See* Trial Tr. Day 4 (Dargel) at 77:1–13 ("Q: So BAE does believe there is some Fluor entitlement for a change to this PCN? A: Yes….Q: So…Fluor should have provided some credit for its base scope of work that would have been done to install [the] equipment? A: Yes. Q: And Fluor never provided any of that credit…? A: No."). However, BAE offers no evidence supporting its claim for a credit or establishing the amount of the credit. On the other hand, Fluor's damages expert reviewed the PCN and confirmed that it reflected costs actually incurred to complete the work. I am persuaded by Fluor's expert and find that it is entitled to $619,930 for PCN D002A.

### j.    D00X3-Construction of Centrifuges Isolation Blocks

Fluor claims $433,462 for the construction of centrifuge isolation blocks. D0818 at 168–69; D0997; D0782. Fluor argues that constructing the isolation block was outside the scope of the Subcontract, which only required Fluor to install the centrifuges, and should have been supplied by the vendor BAE contracted to supply the centrifuge equipment. *Id.* BAE agrees that Fluor was only required to install the centrifuges but argues that constructing the isolation blocks

is part of installation and was thus Fluor's responsibility. P602 at 82. In support of their positions, the Parties' experts cite two provisions in BAE's centrifuge specifications. Fluor notes that BAE's centrifuge vendor, not Fluor, was required to supply "vibration isolation for all Centrifuges." *See* D0818 at 169. BAE argues that the specification required Fluor to build the concrete isolation blocks because it called for Fluor to provide "Engineering, design and construction of all foundations, concrete pads and supports, including concrete weight required for vibration dampening." *See* 602 at 85. After reviewing the specification, I find that it is ambiguous as to whether Fluor or BAE's vendor was required to construct the isolation block. However, since BAE drafted the specification and was in the best position to allocate work between Fluor and its vendor, I construe the specification in favor of Fluor. *Martin & Martin, Inc. v. Bradley Enters., Inc.*, 504 S.E.2d 849, 851 (Va. 1998). In the event of an ambiguity in the written contract, such ambiguity must be construed against the drafter of the agreement.

Accordingly, I find that the centrifuge isolation blocks were outside of Fluor's scope of work and Fluor is therefore entitled to PCN D00X3. I also find that $433,462 is fair compensation for Fluor's work.

### k.  D00Y2-BAE Modified Appendix J

Fluor seeks $170,807 for the costs purportedly associated with applying "stricter background and drug testing requirements for the workers" than was originally required by the Subcontract. D0818 at 173; D0997. However, Fluor did not introduce any evidence demonstrating that it incurred any actual costs because of the enhanced requirements. Indeed, Fluor's damages expert conceded as much in his expert report. He wrote, "FTI was unable to identify actual modifications. Pending verification that actual costs were incurred, I have deemed the *estimated* amount as adequately supported." D821 at 52 (emphasis added). Accordingly, I

64

find that Fluor is not entitled to PCN D00Y2.

### l. D001H-DWP Fragmentation Walls

Fluor claims $192,944 for the cost of constructing fragmentation walls in the DWP. Dkt. 479 at 67; *see* D0517. Fluor argues that it expressly exempted fragmentation walls from its November 2015 Technical Proposal and thus the fragmentation walls were outside of its scope of work and are compensable. I agree. The November 2015 Technical Proposal states "Blast Protection/Mitigation Walls—Design not complete and requirements are not defined." JX4-7 at 73. Matt Sofley, Fluor's assistant project manager on the Facility project, testified that this language referred to fragmentation walls. Trial Tr. Day 6 (Sofley) 217:8–22. As noted, the November 2015 Technical Proposal and its exclusions, including its provision on fragmentation walls, was incorporated into the final Subcontract. *See supra* Part (IV)(A)(2). Accordingly, constructing the fragmentation walls was outside Fluor's scope of work and is compensable. Fluor is entitled to $192,944 for PCN D001H.

### m. D002I-Sieve Screen Welding

Fluor argues that it is entitled to $181,642 for additional welding work on tanks throughout the facility. *See* D0605. Fluor alleges that BAE insisted on the additional work despite having approved the original tank designs. *Id.* BAE responds that the additional welding work was only necessary because Fluor's tank subcontractor misinterpreted the approved design. Dkt. 476 at 101–02. I am persuaded by Fluor's expert and testimony at trial that the tanks were initially welded in accordance with the design approved by BAE and, therefore, BAE should bear the cost of the additional welding work. *See* D0818 at 177–79; Trial Tr. Day 9 (Combs) 52: 3–15. Accordingly, I find that Fluor is entitled to $181,642 for PCN D002I. *See* D821 at 53.

65

### n. D00O4-Zapata NB & SB Pipe Penetration Work After IFC

Fluor claims $98,141 for the costs associated with its "efforts to re-design pipe penetrations through floors and walls." Fluor Proposed Findings of Facts and Conclusions of Law at 40. Fluor offers two explanations for the re-design including, "the defective SmartPlant model [provided by BAE]," *id.,* and "specifications…that BAE generated…after the design" related to fire prevention, *see* Trial Tr. Day 13 (Williams) 120:3–121:2. However, Fluor does not identify an error in a required specification, s*ee supra* Part IV(A)(1), or a new specification that necessitated the additional work, *see* D0818 at 180. Accordingly, Fluor has not proved by a preponderance its entitlement to D00O4.

### o. D00Q2-Piping & Cable Tray Load Assessment

Fluor argues that is owed $125,509 for the costs of its subcontractor, Zapata, "redoing structural load assessments." Dkt. 479 at 38. Fluor argues both Zapata was forced to redo these assessments "due to improper calculations in the Lauren Design," *id.*, and "BAE's changes in the process design, D0818 at 181. However, Fluor does not identify an error in a required specification, s*ee supra* Part IV(A)(1), or a specific process change(s) that necessitated the additional work, *see* D0818 at 181. Accordingly, Fluor has not proved by a preponderance its entitlement to D00Q2.

### p. D002K-Category D Items

Fluor seeks $128,967 for completing certain "punchlist" items directed by BAE at the end of the project. *See* D610; D0997. Fluor argues that these items are out of its scope and are therefore compensable. Dkt. 479 at 62–64. However, I am persuaded by BAE's expert and the testimony at trial that these "punchlist" items were necessary to resolve reasonable safety concerns and therefore fell within Fluor's base scope— "design, procure and construct" the new

facility. P0602 at 85–87; Trial Tr. Day 5 (Borge) 27:6–29:25; JX2 Ex. E § 01 10 00, 1.0. As the Category D Items were in scope, I find that Fluor is not entitled to compensation for PCN D002K.

### q.  D0029, D00A7, D0036, D00S4-SmartPlant PCNs

Fluor submitted four PCNs for costs it alleges are associated with correcting "latent defects" in the SmartPlant model created by Lauren and later transmitted to Fluor by BAE. Fluor Proposed Findings of Facts and Conclusions of Law at 19. Fluor argues that correcting the SmartPlant model was outside of its scope of work. D0181 at 188. I disagree.

Fluor's scope of work included the creation of a SmartPlant 3D model. *See* JX2, Exhibit E at Section 0133.66 (3.7.1.6)("All CAD files shall be fully compatible with SmartPlant 3D"); *see also* Trial Tr. Day 7 (Connors) 125:4–125:13. However, it is unclear whether Fluor was required to use Lauren's SmartPlant model. If it did, corrections to Lauren's model are out of scope. *See supra* Part IV(A)(1). If it did not, the corrections are in scope and fall under Fluor's obligation to create a SmartPlant model. *Id.* The Statement of Work makes clear that Fluor was required to use the specifications (but not the drawings) provided in Appendix G, the process equipment listed in Appendix F and the PFDs and P&IDs. *Id.* It is not clear whether Lauren's SmartPlant model falls into one of these categories. *See* Dkt. 480 at 15–17; Dkt. 476 at 23–24. Therefore, it is necessary to consider extrinsic evidence to resolve this ambiguity.

I am persuaded that Fluor was not required to use the SmartPlant model developed by Lauren. In an internal memorandum, Jim Worcester, a Fluor employee, wrote:

> Fluor made the decision to utilize the Lauren's Smart Plant model because Fluor anticipated the model was accurate and was further along. As Fluor began the design utilizing the model, it was discovered that the model had a significant amount of errors and problems. Unfortunately, the design had progressed to a point where it was not feasible to scrap the use of the Lauren's model because it would have had a significant impact to the design schedule and construction

schedule. In retrospect, Fluor should have scrapped the entire Lauren's model (sic) and started from scratch.

J. Worcester Dep. Ex. 21;[30] *see also* C. Krueger Dep. Ex. 14. The clear implication of Worcester's memorandum is that Fluor had the discretion to use or discard Lauren's SmartPlant model. Likewise, Connors conceded at trial that Fluor utilized Lauren's SmartPlant model to meet "schedule commitments." Not because they were contractually obligated to do so. Trial Tr. Day 7 (Connors) at 125:17–126:3. Accordingly, I find that Fluor's efforts to correct mistakes in Lauren's SmartPlant model were in Fluor's scope of work and are therefore not compensable.

### r.   D002B–SB Fireproofing

Fluor argues that it is owed $452,022 for the costs and profit associated with touching up the "intumescent coating" applied to fireproof the steel in the Stabilization Building. Fluor Proposed Findings of Facts and Conclusions of Law at 66. D0997. Fluor's PCN argues that fireproofing the Stabilization Building was excluded from the Subcontract by Fluor's November 2015 technical proposal, and thus, applying (and touching up) the intumescent coating in the stabilization building was out of Fluor's Scope of Work and is compensable. *See* D0570. I agree and find that Fluor is entitled to PCN D002B. *See* JX4-7 at 73 ("Two hour protection on structural steel required only on de-water and nitration areas per design review meeting."). I am persuaded by Fluor's expert that $452,022 is an appropriate award for PCN D002B.[31]

---

[30] Fluor waived its objection to admitting Exhibit 21 to Worcester's deposition, because it agreed to have the same document admitted as Exhibit 14 to Krueger's deposition.

[31] BAE argues that PCN D002B should also be denied because Fluor failed to obtain BAE's written authorization for the work. Dkt. 476 at 69. I find that BAE has waived this argument as to D002B by failing to raise it in BAE's prior rejection of the PCN. *See* P0579.

### s. Additional PCNs for Which BAE Does Not Contest Liability – D001S, D001Q, D002H, D001W, D001R

BAE concedes that it is liable for the work described in PCNs D001S Sieve Fasteners, D001Q Fire Alarm Signals, D002H DWP North Scrubber, and D001W Sieve Screen Welding. Dkt. 476 at 104–05. Instead, BAE argues that the amount Fluor seeks in compensation for these PCNs is "unsupported and clearly excessive" and thus, it is not obligated to pay. *Id.* However, BAE offers no evidence supporting this claim. On the other hand, Fluor's PCNs each contain detailed cost estimates. *See* D0543, D534, D0599, D0556. Fluor also submitted expert testimony that the estimates were reviewed against Fluor's cost ledger and adjusted to reflect the actual costs incurred by the company. D821 at 49, 80; Trial Tr. Day 9 (Krafft) 204:3–205:3. I am persuaded by Fluor's expert analysis and find that it is entitled to $399,583 for PCN D001S, $68,011 for PCN D001Q, $42,888 for PCN D002H, and $15,939 for PCN D001W.

Similarly, BAE does not address PCN D001R, which Fluor argues "captures costs associated with BAE's direction to install additional Drive Isolation transformers." Dkt. 479 at 60. I find that Fluor has demonstrated entitlement to this PCN. *See* D0538. Accordingly, I award Fluor $43,894 for PCN D001R.

### 4. Fluor's Site Work Credit and Blend Tank Credit

In addition to its PCNs, Fluor seeks to be paid for two credits it alleges BAE wrongfully withheld. Dkt. 479 at 75. BAE does not address the credits in its post-trial briefing. The first credit, $973,813, relates to work that was "descoped" from the Subcontract. *Id.* In 2021, Fluor asserts that the Parties agreed to descope certain site grading/paving from the Subcontract. Fluor offered to "sell back" the work for $686,055. Trial Tr. Day 9 (Combs) 62:12–63:23. BAE rejected the offer but still performed the work itself. BAE later short-paid an invoice by $1,591,881 to cover its cost but declined to provide Fluor or the Court with any evidence

supporting those costs. *Id.* Fluor on the other hand submitted a detailed independent cost demonstrating that the value of the descoped work was $686,055. D1223. Fluor's expert acknowledges that Fluor estimated the value of the credit as "approximately $680,000." D0821 at 56. Fluor's expert reviewed the contract correspondence and the PCN documentation and argued persuasively that the value of the descoped work should be reduced to $618,068. *Id.* I find that this estimate is reasonably based on the evidence and is persuasive. Accordingly, I award Fluor the difference between the amount it short paid ($1,591,881) and the value of the work ($618,068) i.e. $973,813.

The second credit, $327,965, stems from a dispute that arose after a BAE procured an agitator that did not fit into a Fluor-fabricated tank. Trial Tr. Day 9 (Combs) 57:20–61:24. BAE believed the error was Fluor's fault and short paid an invoice in the amount of $327,965. *Id.* However, the Fluor's tanks were built to BAE provided specifications and the error was due to BAE's failure to communicate with its subcontractor. *See* D1218. Accordingly, Fluor is entitled to compensation for the cost associated with resolving the error.

## V.    CONCLUSION[32]

For all these reasons, the Court concludes that BAE is entitled to $10,247,115 for its breach-of-contract claim and Fluor is entitled to $24,792,642 for its counterclaim. Consistent

---

[32] The Subcontract does not reference prejudgment interest. Therefore, the decision to award prejudgment interest under the Virginia Code is within the discretion of the trial court. *See Wells Fargo Equipment Finance, Inc. v. State Farm Fire and Cas. Co.*, 823 F. Supp. 2d 364, 366 (E.D. Va. 2011). I do not find it appropriate to award pre-judgment interest in favor of either party. Both awards arose from a "bona fide legal" dispute; both Parties were found to have breached the Subcontract, and I find that equity counsels against awarding prejudgment interest. *See Hewitt v. Hutter*, 432 F. Supp. 341, 349 (W.D. Va. 1977) ("[I]t would [not] be fair to penalize defendants for exercising their right to litigate any bona fide legal questions that rose in connection with…this contract by imposing on them an obligation to pay a large sum of prejudgment interest.").

with these findings, the court will enter a judgment in favor of Fluor in the amount of $14,545,527.

Entered:  September 17, 2025

*Robert S. Ballou*

Robert S. Ballou
United States District Judge